1  STEPHEN R. HARRIS, ESQ.
2  Nevada Bar No. 001463
   HARRIS LAW PRACTICE LLC
3  6151 Lakeside Drive, Suite 2100
   Reno, NV 89511
4  Telephone: (775) 786-7600
   Facsimile: (775) 786-7764
5  E-Mail: steve@harrislawreno.com
6  Attorney for Debtor/ Plaintiff

7                   UNITED STATES BANKRUPTCY COURT

8                   FOR THE DISTRICT OF NEVADA

9                            * * * * *

10
11 IN RE:                              Case No. 19-51486-btb
                                       (Chapter 11)
12 ESSEX REAL ESTATE PARTNERS,
   LLC,                                Adv. No. 20-05001-btb
13
                    Debtor.
14 _____/

15 ESSEX REAL ESTATE PARTNERS,         DECLARATION OF STEPHEN R.
   LLC,                                HARRIS IN SUPPORT OF PLAINTIFF'S
16                                     STATEMENT OF UNDISPUTED FACTS
                    Plaintiff,         IN SUPPORT OF MOTION FOR
17 v.                                  SUMMARY JUDGMENT

18 INTEGRATED FINANCIAL
19 ASSOCIATES, INC., a Nevada
   corporation; and NEXBANK, SSB, a Texas
20 chartered state savings bank,
                                       Hrg. Date: May 14, 2020
21                                     Hrg. Time: 10:00 a.m.
                    Defendants.        Est. Time: ½ day to 1 day
22 _____/    Set By:    Calendar Clerk

23
24      STEPHEN R. HARRIS, an individual, under penalty of perjury states as follows:

25      1.      I am an attorney duly licensed in the State of Nevada. I am the proposed general

26 bankruptcy counsel for Debtor ESSEX REAL ESTATE PARTNERS, LLC ("Debtor" or

27 "Essex"), in Chapter 11 Case No. 19-51486-btb. The Debtor is also the Plaintiff in the above-

28 captioned adversary proceeding. I am over the age of 18 years, am mentally competent and have

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

1

1    personal knowledge of the matters set forth in this declaration.  If called upon as a witness, I could

2    and would competently testify to these matters.

3          1.    Attached hereto as **Exhibit A** is a true and correct copy of Fidelity National Title

4    Group Preliminary Report dated October 10, 2019.

5          2.    Attached hereto as **Exhibit B** are true and correct copies of a Deed of Trust Note

6    in the amount of $42,900,000 payable to The Foothill Group, Inc. (the "Foothill Note") and a

7    Deed of Trust Note in the principal amount of $23,100,000 payable to IFA (the "IFA Note")(the

8    Foothill Note and IFA Note collectively the "Notes").

9          3.    Attached hereto as **Exhibit C** is a true and correct copy of a Term Loan Agreement

10   dated November 29, 2007, by and among Essex Real Estate Partners, LLC, as Borrower, and The

11   Lenders That Are Signatories Hereto, as Lenders, Highland Financial Corp., as co-lead arranger,

12   Integrated Financial Associates, Inc., as co-lead arranger and NexBank, SSB as administrative

13   agent and collateral agent (the "Term Loan Agreement").

14         4.    Attached hereto as **Exhibit D** is a true and correct copy of a Deed of Trust,

15   Assignment of Rents and Leases, Security Agreement and Fixture Filing ("Deed of Trust"), for

16   the purpose of securing the obligations under the Notes and Term Loan Agreement.  The Deed of

17   Trust was recorded on December 4, 2007, in the Official Records of the Clark County Recorder

18   as Inst.# 20071204-0001853.

19         5.    Attached hereto as **Exhibit E** is a true and correct copy of a Joint Litigation

20   Agreement that was attached as Exhibit F to NexBank, SSB's Claim 1 filed in the Debtor's

21   Chapter 11 Case No. 19-51486-btb.

22         6.    Attached hereto as **Exhibit F** is a true and correct copy of certain email

23   correspondence I transmitted on behalf of the Debtor to Defendant's counsel on January 22, 2020.

24         DATED this 28th day of February, 2020.

25                                          /s/ Stephen R. Harris

26                                          _____

27                                          STEPHEN R. HARRIS

28

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Jennifer Hubbard
Sr. Escrow Officer
Fidelity National Title
500 N. Rainbow, Suite 100
Las Vegas, NV 89107
Direct: (702) 822-8180
Efax:  (702) 942-8173
email:  jennifer.hubbard@fnf.com

Tania M. Box
Vice President / Commercial Title Officer
**Fidelity National Title Group**
**NCS Las Vegas**
6765 West Russell Road, Suite 100
Las Vegas, Nevada 89118
P. 702-952-8295/F. 702-942-8141
tania.box@fnf.com
Group Email: BoxTeam@fnf.com

Property Address:    **APNs 191-14-311-002; 191-15-711-002; 191-15-811-001; 191-23-211-003 and 004 Las Vegas, NEVADA**

# PRELIMINARY REPORT

Effective Date:  October 10, 2019 at 7:30 a.m.

In response to the application for a policy of title insurance referenced herein, **Fidelity National Title Group** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitation on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One. Copies of the policy forms should be read.  They are available from the office which issued this report.

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

The policy(s) of title insurance to be issued hereunder will be policy(s) of **Fidelity National Title Insurance Company.**

Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered. It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.

Countersigned by:

By:

Randy Quirk, President

Attest

Michael Gravelle, Secretary

Authorized Signature

## SCHEDULE A

The form of policy of title insurance contemplated by this report is:

**TBD**

The estate or interest in the land hereinafter described or referred to covered by this report is:

**Fee Simple**

Title to said estate or interest at the date hereof is vested in:

**Laura B. Fitzpatrick, the Treasurer of Clark County, as Trustee for the State and County.**

**Upon redemption of delinquent property taxes and payment of all current taxes that are due and payable, a certificate of redemption will be recorded by the Clark County Treasurer, reconveying title to:**

**Essex Real Estate Partners, LLC, a Nevada limited liability company**

The land referred to herein is situated in the County of **Clark**, State of **Nevada**, and is described as follows:

**SEE EXHIBIT A ATTACHED HERETO AND MADE A PART HEREOF.**

Order No: 00957017-421-421

## SCHEDULE A
### (Continued)
## EXHIBIT A

Lots One (1), Eight (8), Twenty-One (21), Twenty-Two (22) and Twenty-Eight (28) of THE AMENDED PARENT FINAL MAP OF SOUTH EDGE, as shown by map thereof on file in Book 137 of Plats, Page 100, in the Office of the County Recorder of Clark County, Nevada.

Assessor's Parcel Number:  191-14-311-002, 191-15-711-002, 191-15-811-001, 191-23-211-003 and 004

Order No. 00957111T-421-421

## EXHIBIT A
(Continued)
## SCHEDULE B – Section A

The following exceptions will appear in policies when providing standard coverage as outlined below:

1.     (a) Taxes or assessments are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.     Any facts, rights, interests, or claims which are not shown by the Public Records but which could be ascertained by an inspection of the Land or which may be asserted by persons in possession of the Land.

3.     Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4.     Discrepancies, conflicts in boundary lines, shortage in area, encroachments or any other facts which a correct survey would disclose, and which are not shown by the Public Records.

5.     (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.     Any lien or right to a lien for services, labor or material not shown by the Public Records.

## SCHEDULE B – Section A
### (Continued)
## SCHEDULE B – Section B

At the date hereof Exceptions to coverage in addition to the printed exceptions to said policy form would be as follows:

1.   General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, payable in four (4) quarterly installments (due on or before 3rd Monday in August and 1st Monday in October, January and March, respectively) are as follows:

| | |
|---|---|
| Assessor's Parcel No.: | 191-15-711-002 |
| District Number: | 516 |
| Fiscal Year: | 2019-2020 |
| Total Taxes: | $18,763.60 |
| 1st Installment: | $4,692.22, delinquent |
| 2nd Installment: | $4,690.46, delinquent |
| 3rd Installment: | $4,690.46, not yet due |
| 4th Installment: | $4,690.46, not yet due |

(The 1st Installment above includes a fee for the Las Vegas Artesian Basin.)

| | |
|---|---|
| Affects: | Lot 8 |

Delinquent General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, are delinquent as follows:

| | |
|---|---|
| Assessor's Parcel No.: | 191-15-711-002 |
| Fiscal Year: | 2008-2019 |
| Total Tax: | $977,550.42, plus penalties and costs, if any |
| Affects: | Lot 8 |

2.   General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, payable in four (4) quarterly installments (due on or before 3rd Monday in August and 1st Monday in October, January and March, respectively) are as follows:

| | |
|---|---|
| Assessor's Parcel No.: | 191-14-311-002 |
| District Number: | 516 |
| Fiscal Year: | 2019-2020 |
| Total Taxes: | $8,884.53 |
| 1st Installment: | $2,222.46, delinquent |
| 2nd Installment: | $2,220.09, delinquent |
| 3rd Installment: | $2,220.69, not yet due |
| 4th Installment: | $2,220.69, not yet due |

(The 1st Installment above includes a fee for the Las Vegas Artesian Basin.)

| | |
|---|---|
| Affects: | Lot 28 |

Delinquent General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, are delinquent as follows:

| | |
|---|---|
| Assessor's Parcel No.: | 191-14-311-002 |
| Fiscal Year: | 2008-2019 |
| Total Tax: | $250,607.05, plus penalties and costs, if any |
| Affects: | Lot 28 |

## SCHEDULE B – Section B
### (Continued)

3A.   General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, payable in four (4) quarterly installments (due on or before 3rd Monday in August and 1st Monday in October, January and March, respectively) are as follows:

Assessor's Parcel No.:       191-23-211-<u>003</u>
District Number:             516
Fiscal Year:                 2019-2020
Total Taxes:                 $4,025.28
1st Installment:             $1,007.64, delinquent
2nd Installment:             $1,005.88, delinquent
3rd Installment:             $1,005.88, not yet due
4th Installment:             $1,005.88, not yet due
(The 1st Installment above includes a fee for the Las Vegas Artesian Basin.)
Affects:                     Lot 21

Delinquent General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, are delinquent as follows:

Assessor's Parcel No.:       191-23-211-003
Fiscal Year:                 2008-2019
Total Tax:                   $234,785.68, plus penalties and costs, if any
Affects:                     Lot 21

4.    General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, payable in four (4) quarterly installments (due on or before 3rd Monday in August and 1st Monday in October, January and March, respectively) are as follows:

Assessor's Parcel No.:       191-23-211-<u>004</u>
District Number:             516
Fiscal Year:                 2019-2020
Total Taxes:                 $4,422.72
1st Installment:             $1,107.00, delinquent
2nd Installment:             $1,105.24, delinquent
3rd Installment:             $1,105.24, not yet due
4th Installment:             $1,105.24, not yet due
(The 1st Installment above includes a fee for the Las Vegas Artesian Basin.)
Affects:                     Lot 22

## SCHEDULE B – Section B
### (Continued)

Delinquent General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, are delinquent as follows:

Assessor's Parcel No.:    191-23-211-004
Fiscal Year:    2008-2019
Total Tax:    $233,290.60, plus penalties and costs, if any
Affects:    Lot 22

5.    General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, payable in four (4) quarterly installments (due on or before 3rd Monday in August and 1st Monday in October, January and March, respectively) are as follows:

Assessor's Parcel No.:    191-15-811-001
District Number:    516
Fiscal Year:    2019-2020
Total Taxes:    $14,947.01
1st Installment:    $3,765.08, delinquent
2nd Installment:    $3,736.31, delinquent
3rd Installment:    $3,763.31, not yet due
4th Installment:    $3,763.31, not yet due
(The 1st Installment above includes a fee for the Las Vegas Artesian Basin.)
Affects:    Lot 1

Delinquent General and special State, County and/or City property taxes, including any personal property taxes and any assessments collected with taxes, are delinquent as follows:

Assessor's Parcel No.:    191-15-811-001
Fiscal Year:    2008-2019
Total Tax:    $765,658.70, plus penalties and costs, if any
Affects:    Lot 1

6.    Any taxes that may be due, but not assessed, for new construction which can be assessed on the unsecured property rolls in the Office of the Clark County Assessor, per Nevada Statute 361.260.

7.    Water rights, claims or title to water, whether or not disclosed by the public records.

8.    Mineral rights, reservations and easements in patent from the United States of America.
Recorded:    November 18, 2004 in Book 20041118
Document No.:    01280, Official Records.

9.    The terms, covenants, conditions and provisions as contained in an instrument, entitled "Ordinance No. 2010; An Ordinance of the City Council of the City of Henderson, Nevada, Extending the City Limits"
Recorded:    August 03, 2000 in Book 20000803
Document No.:    00742, Official Records.

10.    Dedications and Easements as indicated or delineated on the Plat of said Subdivision on file in Book 127 of Plats, Page 95, Official Records.

Amended by a Certificate of Amendment recorded February 24, 2006, in Book 20060224 as Document No. 2317, of Official Records.

Order of Vacation, vacating some of the dedicated roadways as set forth on the above mentioned map
Recorded:    August 30, 2007 in Book 20070830
Document No.:    01310, Official Records.

## SCHEDULE B – Section B
### (Continued)

11.    The terms, covenants, conditions and provisions as contained in an instrument, entitled "Residential Charter for Inspirada"
Recorded:    December 1, 2006 in Book 20061201
Document No.:    02785, Official Records.

**NOTE: COVENANTS, CONDITIONS AND RESTRICTIONS HAVE NOT YET BEEN ANNEXED FOR THE PROPERTY IN QUESTION.**

12.    The terms, covenants, conditions and provisions as contained in an instrument, entitled "Memorandum of Mass Grading Agreement"
Recorded:                   April 16, 2007 in Book 20070416
Document No.:            01927, Official Records.

13.    Dedications and Easements as indicated or delineated on the Plat of said Subdivision on file in Book 137 of Plats, Page 100, Official Records.

14.    Any Easements that were not affected by a vacation or abandonment
Recorded:                   August 30, 2007 in Book 20070830
Document No.:            01310, Official Records.

15.    The terms, covenants, conditions and provisions as contained in an instrument, entitled "Commercial Charter for Inspirada"
Recorded:                   October 18, 2007 in Book 20071018
Document No.:            02310, Official Records.

   Assignment of Founder's Rights (Town Center)
Recorded:                   October 19, 2007 in Book 20071019
Document No.:            01408, Official Records.

16.    The terms, covenants, conditions and provisions as contained in an instrument, entitled "Declaration of Easements and Covenant to Share Costs for Inspirada"
Recorded:                   October 18, 2007 in Book 20071018
Document No.:            02311, Official Records.

17.    The terms, covenants, conditions and provisions as contained in an instrument, entitled "Declaration of Special Land Use Restrictions (Town Center)"
Recorded:                   October 18, 2007 in Book 20071018
Document No.:            02312, Official Records.

## SCHEDULE B – Section B
### (Continued)

18.  The terms, covenants, conditions and provisions as contained in an instrument, entitled "Declaration of Development Covenants and Restrictions (Town Center)"

| | |
|---|---|
| Recorded: | October 19, 2007 in Book 20071019 |
| Document No.: | 01407, Official Records. |

19.  A deed of trust to secure an indebtedness in the amount shown below,

| | |
|---|---|
| Amount: | $66,000,000.00 |
| Dated: | November 29, 2007 |
| Trustor/Grantor: | Essex Real Estate Partners, LLC, a Nevada limited liability company |
| Trustee: | Chicago Title Agency of Nevada, Inc., a Nevada corporation |
| Beneficiary: | NexBank, SSB, in its capacity as collateral agent and administrative agent |
| Recording Date: | December 04, 2007 |
| Recording No: | 20071204-0001853, of Official Records |

By various partial assignments, the beneficial interest thereunder is now held by multiple beneficiaries of record in:

| | |
|---|---|
| Recording No: | 20071211-0000046, of Official Records |
| Recording No: | 20080402-0001287, of Official Records |
| Recording No: | 20080418-0003047, of Official Records |
| Re-Recording No: | 20081003-0004558, of Official Records |
| Recording No: | 20080418-0003048, of Official Records |
| Recording No: | 20080915-0004660, of Official Records |
| Recording No: | 20080915-0004661, of Official Records |
| Recording No: | 20080917-0001572, of Official Records |
| Recording No: | 20080917-0001573, of Official Records |
| Recording No: | 20080917-0001636, of Official Records |
| Recording No: | 20081106-0004592, of Official Records |
| Recording No: | 20101221-0003618, of Official Records |
| Recording No: | 20110124-0001990, of Official Records |
| Recording No: | 20120619-0001750, of Official Records |
| Recording No: | 20130424-0001212, of Official Records |
| Recording No: | 20130507-0000673, of Official Records |
| Recording No: | 20130905-0003156, of Official Records |
| Recording No: | 20140226-0000918, of Official Records |
| Recording No: | 20141217-0002730, of Official Records |
| Recording No: | 20150526-0001706, of Official Records |
| Recording No: | 20151014-0001452, of Official Records |
| Recording No: | 20170817-0000254, of Official Records |
| Recording No: | 20170929-0001295, of Official Records |
| Recording No: | 20171227-0001635, of Official Records |
| Recording No: | 20171227-0001636, of Official Records |
| Recording No: | 20171227-0001637, of Official Records |
| Recording No: | 20171227-0001638, of Official Records |
| Recording No: | 20171227-0001639, of Official Records |
| Recording No: | 20171227-0001640, of Official Records |
| Recording No: | 20171227-0001641, of Official Records |
| Recording No: | 20171227-0001642, of Official Records |
| Recording No: | 20171227-0001643, of Official Records |
| Recording No: | 20171227-0001644, of Official Records |
| Recording No: | 20171227-0001645, of Official Records |
| Recording No: | 20171227-0001646, of Official Records |
| Recording No: | 20171227-0001647, of Official Records |
| Recording No: | 20171227-0001648, of Official Records |
| Recording No: | 20171227-0001649, of Official Records |
| Recording No: | 20171227-00001650, of Official Records |

## SCHEDULE B – Section B
### (Continued)

| | |
|---|---|
| Recording No: | 20171227-00001651, of Official Records |
| Recording No: | 20171227-00001652, of Official Records |
| Recording No: | 20171227-00001653, of Official Records |
| Recording No: | 20171227-00001654, of Official Records |
| Recording No: | 20171227-00001655, of Official Records |
| Recording No: | 20171227-00001656, of Official Records |
| Recording No: | 20171227-00001657, of Official Records |
| Recording No: | 20171227-00001658, of Official Records |
| Recording No: | 20171227-00001659, of Official Records |
| Recording No: | 20171227-00001660, of Official Records |
| Recording No: | 20171227-00001661, of Official Records |
| Recording No: | 20171227-00001662, of Official Records |
| Recording No: | 20171227-00001663, of Official Records |
| Recording No: | 20171227-00001664, of Official Records |
| Recording No: | 20171227-00001665, of Official Records |
| Recording No: | 20171227-00001666, of Official Records |
| Recording No: | 20171227-00001667, of Official Records |
| Recording No: | 20171227-00001668, of Official Records |
| Recording No: | 20171227-00001669, of Official Records |
| Recording No: | 20171227-00001670, of Official Records |
| Recording No: | 20171227-00001671, of Official Records |
| Recording No: | 20171227-00001672, of Official Records |
| Recording No: | 20171227-00001673, of Official Records |
| Recording No: | 20171227-00001674, of Official Records |
| Recording No: | 20171227-00001675, of Official Records |
| Recording No: | 20181214-00000815, of Official Records |

A request that a copy of any Notice of Default and any Notice of Sale under the above deed of trust be mailed to:

| | |
|---|---|
| Party: | Vestin Realty Mortgage II, Inc. |
| Address: | 8880 W. Sunset Road, Suite 200, Las Vegas, NV. 89148 |
| Recording Date: | May 21, 2012 |
| Recording No.: | 201205210001170, of Official Records |

A substitution of trustee under said deed of trust which names, as the substituted trustee, the following

| | |
|---|---|
| Trustee: | First American Title Insurance Company |
| Recording Date: | September 29, 2017 |
| Recording No: | 20170929-0001295, of Official Records |

A request that a copy of any Notice of Default and of any Notice of Sale under the above deed of trust be mailed to:

| | |
|---|---|
| Party: | Integrated Financial Associates, c/o Candace C. Carlyon, Esq. |
| Address: | 3800 Howard Hughes Parkway, Suite 500, Las Vegas, NV. 89169 |
| Recording Date: | December 21, 2017 |
| Recording No.: | 20171221-0002788, of Official Records |

20.    Terms, provisions and conditions as contained in an instrument

| | |
|---|---|
| Entitled: | Amended and Restated Development Agreement |
| Recording Date: | October 3, 2013 |
| Recording No.: | Book 20131003, Instrument No. 01878, of Official Records |
| and Re-Recording Date: | January 21, 2014 |
| and Re-Recording No: | Book 20140121, Instrument No. 01471, of Official Records |

Modification(s) of said document
Recording Date:          December 14, 2015

## SCHEDULE B – Section B
### (Continued)

Recording No:                Book 20151214, Instrument No. <u>00915</u>, of Official Records

Modification(s) of said document
Recording Date:       December 14, 2015
Recording No:             Book 20151214, Instrument No. <u>00921</u>, of Official Records

Modification(s) of said document
Recording Date:       January 12, 2016
Recording No:             Book 20160112, Instrument No. <u>01371</u>, of Official Records

Modification(s) of said document
Recording Date:       February 22, 2017
Recording No:             Book 20170222, Instrument No. <u>02004</u>, of Official Records

Modification(s) of said document
Recording Date:       May 15, 2017
Recording No:             Book 20170515, Instrument No. <u>02131</u>, of Official Records

Modification(s) of said document
Recording Date:       October 17, 2017
Recording No:             Book 20171017, Instrument No. <u>00755</u>, of Official Records

Modification(s) of said document
Recording Date:       December 5, 2017
Recording No:             Book 20171205, Instrument No. <u>01676</u>, of Official Records

Modification(s) of said document
Recording Date:       March 28, 2018
Recording No:             Book 20180328, Instrument No. <u>00357</u>, of Official Records

Modification(s) of said document
Recording Date:       October 25, 2018
Recording No:             Book 20181025, Instrument No. <u>02689</u>, of Official Records

Modification(s) of said document
Recording Date:       November 14, 2018
Recording No:             Book 20181114, Instrument No. <u>01824</u>, of Official Records

Modification(s) of said document
Recording Date:       January 29, 2019
Recording No:             Book 20190129, Instrument No. <u>01984</u>, of Official Records

Modification(s) of said document
Recording Date:       January 29, 2019
Recording No:             Book 20190129, Instrument No. <u>01985</u>, of Official Records

21.     Terms, provisions, covenants and conditions as contained in an instrument
       Entitled:            Notice of Cooperation
       Recording Date:       April 07, 2017
       Recording No.:        20170407-<u>0002209</u>, of Official Records

22.     Matters and conditions as contained in an instrument
       Entitled:            Tax Trustee Deed
       Executed by:        Clark County Treasurer
       Recording Date:       July 02, 2018

Order No. 00957110-421-421

## SCHEDULE B – Section B
### (Continued)

| | |
|---|---|
| Recording No: | 20180702-<u>0000741</u>, of Official Records |
| Affects: | Lot 28 |
| And | |
| Recording Date: | July 02, 2018 |
| Recording No: | 20180702-<u>0000742</u>, of Official Records |
| Affects: | Lot 8 |
| And | |
| Recording Date: | July 02, 2018 |
| Recording No: | 20180702-<u>0000743</u>, of Official Records |
| Affects: | Lot 1 |
| And | |
| Recording Date: | July 02, 2018 |
| Recording No: | 20180702-<u>0000744</u>, of Official Records |
| Affects: | Lot 21 |
| And | |
| Recording Date: | July 02, 2018 |
| Recording No: | 20180702-<u>0000745</u>, of Official Records |
| Affects: | Lot 22 |

## SCHEDULE B – Section B
### (Continued)

23.      Rights and claims of parties in possession by reason of unrecorded leases, if any, that would be disclosed by an inquiry of the parties or by an inspection of said Land.

24.      If Extended Coverage is requested, this Company will require an ALTA/NSPS LAND TITLE SURVEY. If the owner of the Land the subject of this transaction is in possession of a current ALTA/NSPS LAND TITLE SURVEY, the Company will require that said survey be submitted for review and approval; otherwise, a new survey, satisfactory to the Company, must be prepared by a licensed land surveyor and supplied to the Company prior to the close of escrow.

   The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

25.      An inspection of said Land has been ordered; upon its completion the Company reserves the right to except additional items and/or make additional requirements.

26.      The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

   Limited Liability Company:        **Essex Real Estate Partners, LLC**

   a)      A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member

   b)      If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps

   c)      If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member

   d)      A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

   e)      If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

   The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

27.      As of the date of this report, the Company has communicated with the Secretary of State of Nevada. The entity known as Essex Real Estate Partners, LLC is currently in good standing..

### END OF SCHEDULE B EXCEPTIONS

### PLEASE REFER TO THE "NOTES" WHICH FOLLOWS FOR
### INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION

# NOTES

1.  EFFECTIVE JULY 1, 2003, ALL DOCUMENTS, EXCEPT MAPS, SUBMITTED FOR RECORDING WITH THE OFFICE OF THE CLARK/NYE COUNTY RECORDER, MUST COMPLY WITH NRS 247.110, AS FOLLOWS:

    (a)   Be on 20# paper that is 8 ½ inches by 11 inches in size;
    (b)   Have a margin of 1 inch on the left and right sides and at the top and bottom of each page;
    (c)   Have a space of 3 inches by 3 inches at the upper right corner of the first page and have a margin of 1 inch at the top of each succeeding page;
    (d)   Not contain printed material on more than one side of each page;
    (e)   Print that is NO smaller than 10 point Times New Roman font and contains no more than 9 lines of text per vertical inch; and
    (f)   MUST NOT be printed in any ink other than black.

    ANY DOCUMENT NOT COMPLYING WITH THESE GUIDELINES WILL BE SUBJECT TO AN ADDITIONAL, MINIMUM COUNTY NON-CONFORMING RECORDING CHARGE OF $25.00 PER DOCUMENT.

2.  The information on the attached plat is provided for your convenience as a guide to the general location of the subject property. The accuracy of this plat is not guaranteed, nor is it a part of any policy, report or guarantee to which it may be attached.

3.  PLEASE CONTACT THE ESCROW OFFICE FOR WIRING INSTRUCTIONS.

    Escrow No.:                   0095711T-421-421-TB
    Escrow Branch Address:   8363 W Sunset Road, Suite 100, Las Vegas, NV 89113
    Escrow Branch Phone:     (702) 932-0779

4.  Any documents being executed in conjunction with this transaction must be signed in the presence of an authorized Company employee, an authorized employee of an agent, an authorized employee of the insured lender, or by using Bancserv or other approved third-party service. If the above requirement cannot be met, please call the Company at the number provided in this report.

5.  Your application for title insurance was placed by reference to only a street address or tax identification number. Based on our records, we believe that the legal description in this report covers the parcel(s) of Land that you requested.  If the legal description is incorrect, the seller/borrower must notify the Company and/or the settlement company in order to prevent errors and to be certain that the correct parcel(s) of Land will appear on any documents to be recorded in connection with this transaction and on the policy of title insurance.

6.  Due to the Nevada Supreme Court's interpretation of N.R.S. §116.3116 (2)(c) in SFR Investments Pool 1, LLC v. U.S. Bank, N.A. 334 P. 3d 408 (2014), the Company is unwilling to issue the ALTA 9-06 Endorsement, but instead will issue the ALTA 9.10-06 Endorsement. This does not apply to common interest communities that are not subject to N.R.S. §116.3116 (i.e. apartment complexes, commercial condominiums that are exempt or other commercial properties).

7.  Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

8.  The Company and its policy issuing agents are required by Federal law to collect additional information about certain transactions in specified geographic areas in accordance with the Bank Secrecy Act. If this transaction is required to be reported under a Geographic Targeting Order issued by FinCEN, the Company or its policy issuing agent must be supplied with a completed ALTA Information Collection Form ("ICF") prior to closing the transaction contemplated herein.

9.    Last Deed of record purporting to convey title:
       Recording Date:        December 04, 2007
       Recording No:          20071204-0001851, of Official Records
       Affects:               All Parcels

       And
       Recording Date:        July 02, 2018
       Recording No:          20180702-0000741, of Official Records
       Affects:               Lot 28

       And
       Recording Date:        July 02, 2018
       Recording No:          20180702-0000742, of Official Records
       Affects:               Lot 8

       And
       Recording Date:        July 02, 2018
       Recording No:          20180702-0000743, of Official Records
       Affects:               Lot 1

       And
       Recording Date:        July 02, 2018
       Recording No:          20180702-0000744, of Official Records
       Affects:               Lot 21

       And
       Recording Date:        July 02, 2018
       Recording No:          20180702-0000745, of Official Records
       Affects:               Lot 22


Typist: **tj1**
Date Typed: **October 10, 2019**

**End of Notes**

## Note: Notice of Available Title Insurance and Escrow Discounts

Your transaction may qualify for one of the discounts shown below. In order to receive these discounts, you will need to contact your escrow/title officer or a company representative to determine if you qualify and to request the discount. Your escrow/title officer or company representative will provide a full description of the terms, conditions and requirements associated with each discount.

**Available Title Insurance Discounts (These discounts will apply to all transactions where the company is issuing a policy of title insurance, including such transactions where the company is not providing escrow closing services.**

### CREDIT FOR PRELIMINARY TITLE REPORTS AND/OR COMMITMENT CANCELLATION CHARGES ON SUBSEQUENT POLICIES

Where an order was cancelled and no major change in the title has occurred since the issuance of the original report or commitment, and the order is reopened within 24 - 36 months, all or a portion of the charge previously paid upon the cancellation of the report or commitment may be credited on a subsequent policy charge.

### PRIOR POLICY DISCOUNT (APPLICABLE TO ZONE 2, DIRECT OPERATIONS ONLY)

The Prior Policy Discount will apply when a seller or borrower provides a copy of their owner's policy upon opening escrow. The prior policy rate is 70% of the applicable owner's title premium. This discount may not be used in combination with any other discount and can only be used in transactions involving property located in Zone 2 (Zone 2 includes all Nevada counties except Clark, Lincoln and Nye) that are handled by a direct operation of the FNF Family of Companies.

### CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS

On properties used as a church or for charitable purposes within the scope of the normal activities of such entities the charge for a policy shall be 50% to 70% of the appropriate title insurance rate, depending on the type of coverage selected. This discount shall not apply to charges for loan policies issued concurrently with an owner's policy.

### INVESTOR RATE

This rate is available for individuals, groups of individuals or entities customarily engaged in real estate investments. The parties must provide reasonable proof that they currently hold title to or have transferred title to three (3) or more investment properties in the State of Nevada within the past twelve (12) months to qualify for this rate. On a sale transaction, the investor rate is 70% of the basic rate. This reduction does not apply to any surcharge calculated on the basic rate. On a refinance transaction or where the investor is obtaining a loan subsequent to a purchase, the rate shall be 85% of the applicable rate with a minimum charge of $385.00. The loan discount shall only apply to transactions priced under Section 5.1 B (1b) of the title insurance rate manual. This rate is available upon request only.

**Available Escrow Discounts** These discounts will apply only to the escrow fee portion of your settlement charges, and the discounts will apply only if the company is issuing a policy of title insurance in conjunction with providing escrow services.

### INVESTOR RATE

This rate is available for individuals, groups of individuals or entities customarily engaged in real estate transactions. The parties must provide reasonable proof that they currently hold title to or have transferred title to three (3) or more investment properties within the State of Nevada within the past twelve (12) months to qualify for this rate. The charge is 70% of their portion of the escrow fee. This discount may not be used in combination with any other discount. This rate is for sale transactions and it is available upon request, only.

Order No.: 00953167-421-421-TB

# Wire Fraud Alert

This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non exclusive self protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.
- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened.** DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.
- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.
- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*

*http://www.fbi.gov*

*Internet Crime Complaint Center:*

*http://www.ic3.gov*

## FIDELITY NATIONAL FINANCIAL, INC.
### PRIVACY NOTICE

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

**Types of Information Collected**

We may collect two types of information from you: Personal Information and Browsing Information.

Personal Information. FNF may collect the following categories of Personal Information:
- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.*, Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.*, loan or bank account information); and
- other personal information necessary to provide products or services to you.

Browsing Information. FNF may automatically collect the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or mobile device:
- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website

**How Personal Information is Collected**

We may collect Personal Information about you from:
- information we receive from you on applications or other forms;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**How Browsing Information is Collected**

If you visit or use an FNF Website, Browsing Information may be collected during your visit. Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**

Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to other websites. FNF is not responsible for the privacy practices or the content of any of those other websites. We advise you to read the privacy policy of every website you visit.

**Use of Personal Information**

FNF uses Personal Information for three main purposes:
- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and third parties' products and services, jointly or independently.

**When Information Is Disclosed**

We may make disclosures of your Personal Information and Browsing Information in the following circumstances:
- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

- to nonaffiliated third party service providers with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

Please see **"Choices With Your Information"** to learn the disclosures you can restrict.

## Security of Your Information

We maintain physical, electronic, and procedural safeguards to guard your Personal Information. We limit access to nonpublic personal information about you to employees who need to know that information to do their job. When we provide Personal Information to others as discussed in this Privacy Notice, we expect that they process such information in compliance with our Privacy Notice and in compliance with applicable privacy laws.

## Choices With Your Information

If you do not want FNF to share your information with our affiliates to directly market to you, you may send an "opt out" request by email, phone, or physical mail as directed at the end of this Privacy Notice. We do not share your Personal Information with nonaffiliates for their use to direct market to you.

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information and Browsing Information with nonaffiliated third parties, except as permitted by California law.

For Nevada Residents: You may be placed on our internal Do Not Call List by calling (888) 934-3354 or by contacting us via the information set forth at the end of this Privacy Notice. Nevada law requires that we also provide you with the following contact information: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: BCPINFO@ag.state.nv.us.

For Oregon Residents: We will not share your Personal Information and Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not share information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Information From Children

The FNF Websites are meant for adults and are not intended or designed to attract persons under the age of eighteen (18).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users

FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence for any of the purposes described in this Privacy Notice. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

**FNF Website Services for Mortgage Loans**

Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except (1) as required or authorized by contract with the mortgage loan servicer or lender, or (2) as required by law or in the good-faith belief that such disclosure is necessary to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes**

By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The revised Privacy Notice, showing the new revision date, will be posted on the FNF Website. Each time you provide information to us following any amendment of this Privacy Notice, your provision of information to us will signify your assent to and acceptance of the terms of the revised Privacy Notice for all previously collected information and information collected from you in the future. We may use comments, information or feedback that you submit to us in any manner that we may choose without notice or compensation to you.

**Accessing and Correcting Information; Contact Us**

If you have questions, would like to access or correct your Personal Information, or want to opt-out of information sharing for affiliate marketing, send your requests via email to privacy@fnf.com, by phone to (888) 934-3354, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

ATTACHMENT ONE (Revised 05-06-16)

**CALIFORNIA LAND TITLE ASSOCIATION**
**STANDARD COVERAGE POLICY – 1990**

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.   (a)  Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2.   Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3.   Defects, liens, encumbrances, adverse claims or other matters:
    (a)  whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
    (b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
    (c)  resulting in no loss or damage to the insured claimant;
    (d)  attaching or created subsequent to Date of Policy; or
    (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4.   Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5.   Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6.   Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

**EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.   Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2.   Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3.   Easements, liens or encumbrances, or claims thereof, not shown by the public records.
4.   Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5.   (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.
6.   Any lien or right to a lien for services, labor or material not shown by the public records.

**CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)**
**ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE**

**EXCLUSIONS**

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division; and
   f. environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it. This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5. Failure to pay value for Your Title.
6. Lack of a right:
   a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
- For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 5,000.00 |

### 2006 ALTA LOAN POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or

      (iv) environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13 or 14); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
    (a) a fraudulent conveyance or fraudulent transfer, or
    (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records. This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

{Except as provided in Schedule B - Part II,{ t{or T}his policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

### {PART I

{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records.}

### PART II

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:}

## 2006 ALTA OWNER'S POLICY (06-17-06)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:
{The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and that are not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor or material not shown by the Public Records. }
7. {Variable exceptions such as taxes, easements, CC&R's, etc. shown here.}

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY – ASSESSMENTS PRIORITY (04-02-15)

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i) the occupancy, use, or enjoyment of the Land;
   (ii) the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;

or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 5, 6, 13(c), 13(d), 14 or 16.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 16, 17, 18, 19, 20, 21, 22, 23, 24, 27 or 28); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.

5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, or any consumer credit protection or truth-in-lending law. This Exclusion does not modify or limit the coverage provided in Covered Risk 26.

6. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to Advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11.

7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching subsequent to Date of Policy. This Exclusion does not modify or limit the coverage provided in Covered Risk 11(b) or 25.

8. The failure of the residential structure, or any portion of it, to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This Exclusion does not modify or limit the coverage provided in Covered Risk 5 or 6.

9. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 27(b) of this policy.

10. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

11. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786-7600

## DEED OF TRUST NOTE

$42,900,000                                                          November 29, 2007

      FOR VALUE RECEIVED, ESSEX REAL ESTATE PARTNERS, LLC, a Nevada limited-liability company ("Borrower," whether one or more) hereby promises to pay to the order of THE FOOTHILL GROUP, INC., a California corporation ("Lender") under that certain Loan Agreement (defined below) among Borrower, NEXBANK, SSB, as the collateral agent and administrative agent (together with any and all of its successors and assigns, "Agent") as agent for the benefit of the lenders (collectively, "Lenders") from time to time a party to that certain Term Loan Agreement (the "Loan Agreement") dated November 29, 2007, without offset, in immediately available funds in lawful money of the United States of America, at Agent's Office as defined in the Loan Agreement, the principal sum of FORTY TWO MILLION NINE HUNDRED THOUSAND AND 00/100 DOLLARS ($42,900,000) (or the unpaid balance of all principal advanced against this Note, if that amount is less), together with interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

      1.   Note; Interest; Payment Schedule and Maturity Date.  This Note is the Note referred to in the Loan Agreement and is entitled to the benefits thereof and subject to prepayment in whole or in part as provided therein.  The entire principal balance of this Note then unpaid shall be due and payable at the times set forth in the Loan Agreement.  Accrued unpaid interest shall be due and payable at the times and at the interest rate(s) set forth in the Loan Agreement until all principal and accrued interest owing on this Note shall have been fully paid and satisfied.  Any amount not paid when due and payable hereunder shall, to the extent permitted by applicable Law, bear interest and, if applicable, a late charge as set forth in the Loan Agreement.

      2.   Security; Loan Documents.  The security for this Note includes a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (which, as it may have been or may be amended, restated, modified or supplemented from time to time, is herein called the "Deed of Trust") dated November 29, 2007 herewith from Borrower to Chicago Title Company, Trustee, covering certain property in the City of Henderson County of Clark, State of Nevada, described therein (the "Property").  This Note, the Deed of Trust, the Loan Agreement and all other documents now or hereafter securing, guaranteeing or executed in connection with the loan evidenced by this Note (the "Loan"), as the same have been or may be amended, restated, modified or supplemented from time to time, are herein sometimes called individually a "Loan Document" and together the "Loan Documents."  Notwithstanding the foregoing, the Environmental Indemnity Agreement dated November 29, 2007 ("Environmental Indemnity Agreement") is not a Loan Document.

      3.   Defaults.

         (a)   It shall be a default ("Default") under this Note and each of the other Loan Documents if (i) any principal, interest or other amount of money due under this Note is not paid in full within ten (10) days of the date when due, regardless of how such amount may have become due, (ii) any covenant, agreement, condition, representation or warranty herein or in any other Loan Document is not fully and timely performed, observed or kept, subject to any applicable grace or cure periods, or (iii) there shall occur any default or event of default under

the Deed of Trust or any other Loan Document, subject to any applicable grace or cure periods. Upon the occurrence of a Default, Agent on behalf of Lenders shall have the rights to declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts due hereunder and under the other Loan Documents, at once due and payable (and upon such declaration, the same shall be at once due and payable), to foreclose any liens and security interests securing payment hereof and to exercise any of its other rights, powers and remedies under this Note, under any other Loan Document, or at Law or in equity.

(b)      All of the rights, remedies, powers and privileges (together, "Rights") of Agent on behalf of Lenders provided for in this Note and in any other Loan Document are cumulative of each other and of any and all other Rights at Law or in equity. The resort to any Right shall not prevent the concurrent or subsequent employment of any other appropriate Right. No single or partial exercise of any Right shall exhaust it or preclude any other or further exercise thereof, and every Right may be exercised at any time and from time to time. No failure by Agent or Lenders to exercise, and no delay in exercising any Right, including the right to accelerate the maturity of this Note, shall be construed as a waiver of any Default or as a waiver of any Right. Without limiting the generality of the foregoing provisions, the acceptance by Lender from time to time of any payment under this Note which is past due or which is less than the payment in full of all amounts due and payable at the time of such payment, shall not (i) constitute a waiver of or impair or extinguish the right of Agent or Lenders to accelerate the maturity of this Note or to exercise any other Right at the time or at any subsequent time, or nullify any prior exercise of any such Right, (ii) constitute a waiver of the requirement of punctual payment and performance or a novation in any respect, or (iii) in any way excuse the existence of a Default.

(c)      If there is a prevailing party in any lawsuit, reference or arbitration arising out of or relating to this Note, the Loan Documents or the Loan, such prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in the action, reference or arbitration, including the market value of services of in-house counsel, in addition to costs and expenses otherwise allowed by law. In all other situations, Borrower agrees to pay all costs and expenses of the holder of this Note which may be incurred in enforcing or protecting the rights or interests of such holder, including attorneys' fees and expenses (including the market value of services of in-house counsel), investigation costs and all court costs, whether or not suit is filed hereon, whether before or after the Maturity Date defined in the Loan Agreement, or whether in connection with bankruptcy, insolvency or appeal, or whether collection is made against Borrower or any guarantor or endorser or any other person primarily or secondarily liable hereunder. From the time(s) incurred until paid in full to the holder of this Note, all such sums shall bear interest at the Past Due Rate defined in the Loan Agreement.

4.      Heirs, Successors and Assigns.  The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents. As further provided in the Loan Agreement, a Lender may, at any time, sell, transfer, or assign all or a portion of its interest in this Note, the Deed of Trust and the other Loan Documents, as set forth in the Loan Agreement.

5.    <u>General Provisions</u>.  Time is of the essence with respect to Borrower's obligations under this Note.  If more than one person or entity executes this Note as Borrower, all of said parties shall be jointly and severally liable for payment of the indebtedness evidenced hereby. Borrower and all sureties, endorsers, guarantors and any other party now or hereafter liable for the payment of this Note in whole or in part, hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that neither Agent nor any Lender shall be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non-exclusive personal jurisdiction of any state or federal court sitting in the city and county, and venue in the city or county, in which payment is to be made as specified in <u>Section 1</u> of this Note, for the enforcement of any and all obligations under this Note and the Loan Documents; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate any and all rights against Borrower and any of the security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full.  A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought.  Captions and headings in this Note are for convenience only and shall be disregarded in construing it.  The words "<u>include</u>" and "<u>including</u>" shall be interpreted as if followed by the words "<u>without limitation</u>." THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY NEVADA LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW.

6.    <u>Notices</u>.  Any notice, request, or demand to or upon Borrower or Lender shall be deemed to have been properly given or made when delivered in accordance with the Loan Agreement.

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN AND AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.

*(Reminder of page left intentionally blank – Signatures follow on next page)*

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

BORROWER:

**ESSEX REAL ESTATE PARTNERS, LLC,**
a Nevada limited liability company

By:  Las Vegas Development Associates, LLC,
    a Nevada limited liability company
Its:  Manager

By: _____
    Name: George F. Holman
    Its: Managing Member

<u>DEED OF TRUST NOTE</u>

$23,100,000                                                                November 29, 2007

     FOR VALUE RECEIVED, ESSEX REAL ESTATE PARTNERS, LLC, a Nevada limited-liability company ("<u>Borrower</u>," whether one or more) hereby promises to pay to the order of INTEGRATED FINANCIAL ASSOCIATES, INC., a Nevada corporation ("<u>Lender</u>") under that certain Loan Agreement (defined below) among Borrower, NEXBANK, SSB, as the collateral agent and administrative agent (together with any and all of its successors and assigns, "<u>Agent</u>") as agent for the benefit of the lenders (collectively, "<u>Lenders</u>") from time to time a party to that certain Term Loan Agreement (the "<u>Loan Agreement</u>") dated November 29, 2007, without offset, in immediately available funds in lawful money of the United States of America, at Agent's Office as defined in the Loan Agreement, the principal sum of TWENTY THREE MILLION ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($23,100,000) (or the unpaid balance of all principal advanced against this Note, if that amount is less), together with interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

     1.    <u>Note; Interest; Payment Schedule and Maturity Date</u>.  This Note is the Note referred to in the Loan Agreement and is entitled to the benefits thereof and subject to prepayment in whole or in part as provided therein.  The entire principal balance of this Note then unpaid shall be due and payable at the times set forth in the Loan Agreement.  Accrued unpaid interest shall be due and payable at the times and at the interest rate(s) set forth in the Loan Agreement until all principal and accrued interest owing on this Note shall have been fully paid and satisfied.  Any amount not paid when due and payable hereunder shall, to the extent permitted by applicable Law, bear interest and, if applicable, a late charge as set forth in the Loan Agreement.

     2.    <u>Security; Loan Documents</u>.  The security for this Note includes a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (which, as it may have been or may be amended, restated, modified or supplemented from time to time, is herein called the "<u>Deed of Trust</u>") dated November 29, 2007 herewith from Borrower to Chicago Title Company, Trustee, covering certain property in the City of Henderson County of Clark, State of Nevada, described therein (the "<u>Property</u>").  This Note, the Deed of Trust, the Loan Agreement and all other documents now or hereafter securing, guaranteeing or executed in connection with the loan evidenced by this Note (the "<u>Loan</u>"), as the same have been or may be amended, restated, modified or supplemented from time to time, are herein sometimes called individually a "<u>Loan Document</u>" and together the "<u>Loan Documents</u>."  Notwithstanding the foregoing, the Environmental Indemnity Agreement dated November 29, 2007 ("<u>Environmental Indemnity Agreement</u>") is not a Loan Document.

     3.    <u>Defaults</u>.

     (a)    It shall be a default ("<u>Default</u>") under this Note and each of the other Loan Documents if (i) any principal, interest or other amount of money due under this Note is not paid in full within ten (10) days of the date when due, regardless of how such amount may have become due, (ii) any covenant, agreement, condition, representation or warranty herein or in any other Loan Document is not fully and timely performed, observed or kept, subject to any

applicable grace or cure periods, or (iii) there shall occur any default or event of default under the Deed of Trust or any other Loan Document, subject to any applicable grace or cure periods. Upon the occurrence of a Default, Agent on behalf of Lenders shall have the rights to declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts due hereunder and under the other Loan Documents, at once due and payable (and upon such declaration, the same shall be at once due and payable), to foreclose any liens and security interests securing payment hereof and to exercise any of its other rights, powers and remedies under this Note, under any other Loan Document, or at Law or in equity.

(b)    All of the rights, remedies, powers and privileges (together, "Rights") of Agent on behalf of Lenders provided for in this Note and in any other Loan Document are cumulative of each other and of any and all other Rights at Law or in equity. The resort to any Right shall not prevent the concurrent or subsequent employment of any other appropriate Right. No single or partial exercise of any Right shall exhaust it or preclude any other or further exercise thereof, and every Right may be exercised at any time and from time to time. No failure by Agent or Lenders to exercise, and no delay in exercising any Right, including the right to accelerate the maturity of this Note, shall be construed as a waiver of any Default or as a waiver of any Right. Without limiting the generality of the foregoing provisions, the acceptance by Lender from time to time of any payment under this Note which is past due or which is less than the payment in full of all amounts due and payable at the time of such payment, shall not (i) constitute a waiver of or impair or extinguish the right of Agent or Lenders to accelerate the maturity of this Note or to exercise any other Right at the time or at any subsequent time, or nullify any prior exercise of any such Right, (ii) constitute a waiver of the requirement of punctual payment and performance or a novation in any respect, or (iii) in any way excuse the existence of a Default.

(c)    If there is a prevailing party in any lawsuit, reference or arbitration arising out of or relating to this Note, the Loan Documents or the Loan, such prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in the action, reference or arbitration, including the market value of services of in-house counsel, in addition to costs and expenses otherwise allowed by law. In all other situations, Borrower agrees to pay all costs and expenses of the holder of this Note which may be incurred in enforcing or protecting the rights or interests of such holder, including attorneys' fees and expenses (including the market value of services of in-house counsel), investigation costs and all court costs, whether or not suit is filed hereon, whether before or after the Maturity Date defined in the Loan Agreement, or whether in connection with bankruptcy, insolvency or appeal, or whether collection is made against Borrower or any guarantor or endorser or any other person primarily or secondarily liable hereunder. From the time(s) incurred until paid in full to the holder of this Note, all such sums shall bear interest at the Past Due Rate defined in the Loan Agreement.

4.    Heirs, Successors and Assigns. The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents. As further provided in the Loan Agreement, a Lender may, at any time, sell, transfer, or assign all or a portion of its interest in this Note, the Deed of Trust and the other Loan Documents, as set forth in the Loan Agreement.

H3131.0021 BN 1545339v3                    2

5.      <u>General Provisions</u>.  Time is of the essence with respect to Borrower's obligations under this Note.  If more than one person or entity executes this Note as Borrower, all of said parties shall be jointly and severally liable for payment of the indebtedness evidenced hereby. Borrower and all sureties, endorsers, guarantors and any other party now or hereafter liable for the payment of this Note in whole or in part, hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that neither Agent nor any Lender shall be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non-exclusive personal jurisdiction of any state or federal court sitting in the city and county, and venue in the city or county, in which payment is to be made as specified in <u>Section 1</u> of this Note, for the enforcement of any and all obligations under this Note and the Loan Documents; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate any and all rights against Borrower and any of the security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full.  A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought.  Captions and headings in this Note are for convenience only and shall be disregarded in construing it.  The words "<u>include</u>" and "<u>including</u>" shall be interpreted as if followed by the words "<u>without limitation</u>." THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY NEVADA LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW.

6.      <u>Notices</u>.  Any notice, request, or demand to or upon Borrower or Lender shall be deemed to have been properly given or made when delivered in accordance with the Loan Agreement.

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN AND AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.

*(Reminder of page left intentionally blank – Signatures follow on next page)*

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

BORROWER:

**ESSEX REAL ESTATE PARTNERS, LLC,**
a Nevada limited liability company

By:  Las Vegas Development Associates, LLC,
      a Nevada limited liability company
      Its:  Manager

      By: _____
         Name: George F. Holman
         Its: Managing Member

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

# EXHIBIT C

# TERM LOAN AGREEMENT

by and among

## ESSEX REAL ESTATE PARTNERS, LLC,
as Borrower

and

## THE LENDERS THAT ARE SIGNATORIES HERETO,
as Lenders

## HIGHLAND FINANCIAL CORP.,
as co-lead arranger

## INTEGRATED FINANCIAL ASSOCIATES, INC.,
as co-lead arranger

and

## NEXBANK, SSB,
as administrative agent and collateral agent

Dated as of November 29, 2007

H5131 0621 BN 1540603\~

TABLE OF CONTENTS

Page

ARTICLE 1      - THE LOAN .................................................................................... 1

    1.1    General Information and Exhibits .................................................. 1
    1.2    Purpose ............................................................................................ 1
    1.3    The Loan ......................................................................................... 1
    1.4    Evidence of Debt ............................................................................ 2
    1.5    Increase in Commitments ............................................................... 2

ARTICLE 2      - INTEREST RATES. ADVANCES AND PAYMENTS ................... 3

    2.1    Interest Rate .................................................................................... 3
    2.2    Computations and Determinations ................................................. 3
    2.3    [Intentionally Omitted.] .................................................................. 3
    2.4    Increased Cost and Reduced Return ............................................. 3
    2.5    Past Due Rate .................................................................................. 4
    2.6    Prepayment – Yield Maintenance ................................................. 4
    2.7    Late Charges ................................................................................... 4
    2.8    Payment Schedule and Maturity Date: Extensions of Maturity Date ................ 5
    2.9    Taxes ............................................................................................... 8
    2.10   Payments ......................................................................................... 9
    2.11   Agent Advances ............................................................................ 10
    2.12   Defaulting Lender ......................................................................... 11
    2.13   Several Obligations: No Liability: No Release ........................... 13
    2.14   Interest Reserve ............................................................................ 13
    2.15   Exit Fee ......................................................................................... 14

ARTICLE 3      - ADDITIONAL COVENANTS AND AGREEMENTS ................ 14

    3.1    Inspection ...................................................................................... 14
    3.2    Notice to Lenders ......................................................................... 14
    3.3    Financial Statements. Records and Reports ............................... 15
    3.4    Other Information .......................................................................... 16
    3.5    Reports and Testing ...................................................................... 16
    3.6    Advertising by Lenders ................................................................ 16
    3.7    Appraisal ....................................................................................... 16
    3.8    Loan-to-Value Ratio ..................................................................... 16
    3.9    Reporting Compliance .................................................................. 17
    3.10   Payment of Withholding Taxes ................................................... 17
    3.11   ERISA and Prohibited Transaction Taxes .................................. 17
    3.12   Single Purpose Entity ................................................................... 17
    3.13   Operational Matters ...................................................................... 19
    3.14   Other Limitations ......................................................................... 20
    3.15   Sale of Lots ................................................................................... 21
    3.16   Earnest Money Deposits .............................................................. 22
    3.17   Reserve Account (Additional Deposit) ....................................... 22

TABLE OF CONTENTS
(continued)

Page

3.18    Exceptions to Covenants, Representations and Warranties ...................................22

ARTICLE 4        - REPRESENTATIONS AND WARRANTIES............................................22

4.1    Organization.................................................................................................23
4.2    Authorization: No Conflict...........................................................................23
4.3    Enforceability...............................................................................................23
4.4    No Violation: No Litigation .........................................................................23
4.5    Taxes ............................................................................................................23
4.6    Requirements: Zoning ..................................................................................23
4.7    Separate Tax Lot ..........................................................................................24
4.8    Limited Assets and Liabilities......................................................................24
4.9    [Intentionally Omitted].................................................................................24
4.10    Financial Matters..........................................................................................24
4.11    Borrower Not a Foreign Person ...................................................................24
4.12    Business Loan...............................................................................................24
4.13    No Work Prior to Recordation .....................................................................24
4.14    No Sale/Encumbrance ..................................................................................25

ARTICLE 5        - DEFAULT AND REMEDIES................................................................26

5.1    Events of Default..........................................................................................26
5.2    Remedies ......................................................................................................28

ARTICLE 6        - AGENT...............................................................................................29

6.1    Appointment and Authorization of Agent.....................................................29
6.2    Delegation of Duties.....................................................................................31
6.3    Liability of Agent.........................................................................................31
6.4    Reliance by Agent ........................................................................................31
6.5    Notice of Default..........................................................................................31
6.6    Credit Decision: Disclosure of Information by Agent ...................................32
6.7    Indemnification of Agent..............................................................................33
6.8    Agent in Individual Capacity .......................................................................33
6.9    Successor Agent ...........................................................................................33
6.10    Releases: Acquisition and Transfers of Collateral ........................................34
6.11    Application of Payments ..............................................................................35
6.12    Benefit..........................................................................................................35
6.13    The Co-Arrangers.........................................................................................36
6.14    Assignment and Participations .....................................................................36

ARTICLE 7        - GENERAL TERMS AND CONDITIONS ..............................................36

7.1    Consents .......................................................................................................36
7.2    Borrower's Indemnity ...................................................................................37

-ii-

TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| 7.3 | Miscellaneous | 38 |
| 7.4 | Notices | 38 |
| 7.5 | Payments Set Aside | 39 |
| 7.6 | Successors and Assigns | 39 |
| 7.7 | Confidentiality | 41 |
| 7.8 | No Set-off | 42 |
| 7.9 | Sharing of Payments | 42 |
| 7.10 | Amendments: Survival | 43 |
| 7.11 | Costs and Expenses | 44 |
| 7.12 | Tax Forms | 45 |
| 7.13 | Further Assurances | 46 |
| 7.14 | Inducement to Lenders | 47 |
| 7.15 | [Intentionally Omitted] | 47 |
| 7.16 | Interpretation | 47 |
| 7.17 | No Partnership, etc | 47 |
| 7.18 | Records | 48 |
| 7.19 | CHOICE OF LAW AND VENUE: JURY TRIAL WAIVER | 48 |
| 7.20 | Service of Process | 49 |
| 7.21 | USA Patriot Act Notice | 49 |
| 7.22 | Entire Agreement | 49 |
| 7.23 | [Intentionally Omitted] | 49 |
| 7.24 | [Intentionally Omitted] | 49 |
| 7.25 | Partial Releases | 49 |

H3131.0021 BN 15406037

# TERM LOAN AGREEMENT

**This Term Loan Agreement** ("Agreement") is entered into as of November 29, 2007, by and among, on the one hand, the lenders identified on the signature pages hereof (such lenders, together with their respective successors and permitted assigns, are referred to hereinafter each individually as a "Lender" and collectively as the "Lenders"), HIGHLAND FINANCIAL CORP., as co- lead arranger ("HFC"), INTEGRATED FINANCIAL ASSOCIATES, INC., Nevada corporation, as co-lead arranger ("IFA", and collectively with HFC, the "Co-Arrangers"), and NEXBANK, SSB, as the collateral agent and administrative agent for the Lenders ("Agent"), and, on the other hand, ESSEX REAL ESTATE PARTNERS, LLC, a Nevada limited-liability company ("Borrower"), who agree as follows:

## ARTICLE 1 - THE LOAN

1.1     General Information and Exhibits.  This Agreement includes the Exhibits listed below which are marked by an "X," all of which Exhibits are attached hereto and made a part hereof for all purposes.  Borrower and Lenders agree that if any Exhibit to be attached to this Agreement contains blanks, the same shall be completed correctly and in accordance with this Agreement prior to or at the time of the execution and delivery thereof.

| | | | |
|---|---|---|---|
| X | Exhibit "A" | – | Legal Description of the Land |
| X | Exhibit "B" | – | Definitions |
| X | Exhibit "C" | – | Conditions Precedent to Closing of the Loan |
| N A | Exhibit "D" | – | Survey Requirements |
| X | Exhibit "E" | – | Assignment and Assumption |
| X | Exhibit "F" | – | Form of Deed of Trust Note |
| X | Exhibit "G" | – | Schedule of Lenders |
| X | Exhibit "H" | – | Schedule of Exceptions to Covenants, Representations and Warranties and Closing Conditions |
| X | Exhibit "I" | – | Schedule of Allocated Loan Amounts |
| X | Exhibit "J" | – | Development Agreement |
| X | Exhibit "K" | – | Subordinate Loan Documents |

The Exhibits contain other terms, provisions and conditions applicable to the Loan.  Capitalized terms used in this Agreement shall have the meanings assigned to them in the Definitions set forth in Exhibit "B."  This Agreement, the other Loan Documents and the Environmental Agreement, which must be in form, detail and substance satisfactory to Lenders, evidence the agreements of Borrower and Lenders with respect to the Loan.  Borrower shall comply with all of the Loan Documents and the Environmental Agreement.

1.2     Purpose.  The proceeds of the Loan shall be used by Borrower (a) to finance the cost of the acquisition of the Property and to pay transactional fees, costs and expenses incurred in connection therewith, and (b) for the establishment of an interest reserve with respect to the loan.

1.3    The Loan.  Borrower agrees to borrow from each Lender, and each Lender severally agrees to advance its Pro Rata Share of the Loan proceeds to Borrower in an amount not to exceed such Lender's Pro Rata Share of the Loan.  Interest shall accrue and be payable in arrears only on sums advanced hereunder for the period of time outstanding.  The Loan is not revolving.  Any amount repaid may not be reborrowed.

1.4    Evidence of Debt.  Amounts of the Loan funded by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by Agent in the ordinary course of business.  The account or records maintained by Agent and each Lender shall be conclusive absent manifest error of the amounts of the Loan funded by Lenders to Borrower and the interest and payments thereon.  Any failure to record such amounts, interest or payments or any error in doing so shall not, however, limit or otherwise affect the obligation of Borrower hereunder to pay any amount owing with respect to the Indebtedness.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of Agent in respect of such matters, the accounts and records of Agent shall control in the absence of manifest error.

1.5    Increase in Commitments.

(a)    Subject to the terms and conditions hereof, in connection with any extension of the Maturity Date in accordance with Section 2.8, provided that no Default has occurred and is continuing, the Borrower may request that the Lenders increase the Aggregate Commitments (each such commitment increase, a "Commitment Increase") in up to two (2) separate advances (each individually, an "Additional Draw", and collectively the "Additional Draws") by notifying the Agent and each Lender of the amount of the proposed Commitment Increase. The funds advanced for the benefit of Borrower under the Commitment Increase may be advanced at the time of extension and be used solely to pay the extension fees, arranger and/or commitment fees owing by Borrower in connection with any extension of the Maturity Date of the Loan and to replenish the Interest Reserve for the applicable extension period in connection with any such extension (provided that Borrower shall be credited with any excess funds then maintained in the Interest Reserve that may exist as a result of principal pay downs of the Loan made prior to the time of any Additional Draw).  Notwithstanding anything in this Agreement, no Commitment Increase shall require the approval of any Lender other than any Lender (if any) providing all or part of the Commitment Increase, no Lender shall be required to provide all or part of any Commitment Increase unless it agrees to do so in its sole discretion.

(b)    Any Commitment Increase shall be offered by the Borrower to the Lenders pro rata (except as otherwise approved by Agent in its sole discretion) in accordance with the Pro Rata Shares of the Lenders on the date that the Commitment Increase is requested.  The Lenders shall have 15 Business Days to respond to any request for a Commitment Increase (by notice to the Borrower and the Agent) and may elect to accept all, a portion or none of their respective Pro Rata Shares of the proposed Commitment Increase.  Any Lender which fails to respond to a request for a Commitment Increase by the end of such 15 Business Day period will be deemed to have declined the request for its Pro Rata Share of the requested Commitment Increase.  If any portion of a requested Commitment Increase is not provided by the Lenders, then the Borrower may request that one or more Eligible Assignees provide such Commitment Increase.  In any such case, each Person providing a portion of the requested Commitment

Increase shall execute and deliver to the Agent and the Borrower all such documentation as may be reasonably required by the Agent to evidence such Commitment Increase, including without limitation, a subordination agreement (or reaffirmation) with respect to any lenders holding a subordinate lien on the Property at such time, including without limitation, Seller.

(c)    If any requested Commitment Increase is agreed to in accordance with this Section 1.5, the Agent shall determine the effective date of such Commitment Increase (the "Commitment Increase Effective Date"), which Commitment Increase Effective Date shall coincide with the date of any such Maturity Date extension.  The Agent shall promptly confirm in writing to the Lenders the final allocation of such Commitment Increase and the Commitment Increase Effective Date.  On the Commitment Increase Effective Date: (i) the Pro Rata Shares of the Lenders shall be amended to reflect the reallocated Commitments; (ii) each Person added as a new Lender pursuant to a Commitment Increase (a "New Lender") shall become a Lender hereunder and under the other Loan Documents with a Commitment as set forth on the Assignment and Acceptance executed by such Lender; and (iii) the Commitment of each existing Lender that increases its Commitment pursuant to a Commitment Increase (an "Increasing Lender") shall be increased as reflected on such Assignment and Acceptance.

(d)    As a condition precedent to the effectiveness of any such Commitment Increase, the Borrower shall deliver to the Agent a certificate signed by an authorized officer of Borrower, dated as of the Commitment Increase Effective Date, that as of the Commitment Increase Effective Date no Default has occurred and is continuing.

(e)    In no event shall any Commitment Increase be funded by any Lender unless and until all conditions to extension of the applicable Maturity Date have been satisfied in the sole discretion of Agent on or before any Commitment Increase Effective Date.

## ARTICLE 2 - INTEREST RATES, ADVANCES AND PAYMENTS

2.1    Interest Rate.  The unpaid Principal Debt from day to day outstanding which is not past due shall bear interest at a fixed rate of interest equal to the Base Rate.

2.2    Computations and Determinations.  All interest shall be computed on the basis of a year of 360 days and paid for the actual number of days elapsed (including the first day but excluding the last day).  Agent shall determine the interest rate applicable to the Principal Debt in accordance with this Agreement and its determination thereof shall be conclusive in the absence of manifest error.  The books and records of Agent shall be prima facie evidence of all sums owing to Lenders from time to time under the Loan, but the failure to record any such information shall not limit or affect the obligations of Borrower under the Loan Documents.

2.3    [Intentionally Omitted.]

2.4    Increased Cost and Reduced Return.  If at any time after the date hereof, any Lender (which shall include, for purposes of this Section 2.4, any corporation controlling any Lender) determines that the adoption or modification of any applicable Law regarding taxation, the Lender's required levels of reserves, deposits, insurance or capital (including any allocation of capital requirements or conditions), or similar requirements, or any interpretation or administration thereof by any Tribunal or compliance by the Lender with any of such

H3131.0021 BN 1540603v7                                      3

requirements, has or would have the effect of (a) increasing the Lender's costs relating to the Indebtedness, or (b) reducing the yield or rate of return of the Lender on the Indebtedness, to a level below that which the Lender could have achieved but for the adoption or modification of any such requirements. Borrower shall, within ten (10) days of any request by the Lender, pay to the Lender such additional amounts as (in the Lender's sole judgment, after good faith and reasonable computation) will compensate the Lender for such increase in costs or reduction in yield or rate of return of the Lender. No failure by any Lender to immediately demand payment of any additional amounts payable hereunder shall constitute a waiver of the Lender's right to demand payment of such amounts at any subsequent time. Nothing herein contained shall be construed or shall so operate as to require Borrower to pay any interest, fees, costs or charges greater than is permitted by applicable Law. Notwithstanding anything to the contrary in this Agreement, in no event shall this Section 2.4 apply in the case of a Foreign Lender (as defined below in Section 2.9(a)) to the extent any such increased costs or yield reductions are attributable to the status of a Lender or holder of a participation interest as a Foreign Lender.

     2.5    Past Due Rate. If any amount payable by Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Past Due Rate to the fullest extent permitted by applicable Law. Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable on demand, at a rate per annum (the "Past Due Rate") equal to six percent (6%) over the then per annum rate applicable to the Principal Debt hereunder.

     2.6    Prepayment – Yield Maintenance. In addition to prepayments made in connection with sales of Lots as described in Section 3.15 (which prepayments may be made without payment of the Required Yield Maintenance described in this Section 2.6). Borrower may prepay all or any portion of the principal balance of the Loan at any time and from time to time provided that: (i) Agent shall have actually received from Borrower prior written notice of Borrower's intent to prepay, the amount of principal that will be prepaid (the "Prepaid Principal"), and the date on which the prepayment will be made: (ii) each prepayment shall be in the amount of $1,000 or larger integral multiple of $1,000 (unless the prepayment retires the outstanding balance of the Loan in full): (iii) each prepayment shall be in the amount of 100% of the Prepaid Principal, plus accrued unpaid interest thereon to the date of prepayment, plus any other sums which have become due to Agent and Lenders under the Loan Documents on or before the date of prepayment but which have not been paid: and (iv) Borrower pays to Agent for the benefit of Lenders a fee equal to the Required Yield Maintenance in accordance with this Section 2.6 if such prepayment occurs prior to the Yield Maintenance Cut-Off Date.

     2.7    Late Charges. If Borrower fails to make any installment payment under the terms of this Agreement within fifteen (15) days after the date such payment is due, Borrower shall pay to the applicable Lender or Lenders on demand a late charge equal to ten percent (10%) of the amount of such payment that is delinquent. Such fifteen (15) day period shall not be construed as in any way extending the due date of any payment. The "late charge" is imposed for the purpose of defraying the expenses of a Lender incident to handling such delinquent payment. This charge shall be in addition to, and not in lieu of, any other remedy Lenders may have and is in addition to any fees and charges of any agents or attorneys which Agent or Lenders may employ upon the occurrence of a Default, whether authorized herein or by Law. Borrower will

pay this late charge only once on any late payment. Pursuant to Nevada Revised Statutes Section 99.050, Borrower hereby acknowledges that the enforcement of the Past Due Rate and the late charges described herein shall result in the compounding of interest.

2.8    Payment Schedule and Maturity Date; Extensions of Maturity Date.

(a)    Initial Maturity. The entire principal balance of the Loan (including any Additional Draws made pursuant to Section 1.5) then unpaid and all accrued interest then unpaid shall be due and payable in full on the Maturity Date (as it may be extended pursuant to the terms of this Agreement). Accrued unpaid interest payments in the amount of $742,500 shall be due and payable commencing on January 1, 2008, and on the first (1st) day of each succeeding calendar month thereafter until all principal and accrued interest owing on the Loan shall have been fully paid and satisfied. In addition to the foregoing, accrued unpaid interest payments with respect to any Additional Draws shall be due and payable on the first (1st) day of each calendar month immediately following the Commitment Increase Effective Date thereafter. All principal of, interest on, and other amounts payable in respect of the Additional Draws shall constitute Obligations.

(b)    First Extension. The initial Maturity Date may be extended by an additional six (6) month period to June 1, 2009 (the "First Extended Maturity Date"), provided each of the following conditions are satisfied in the sole discretion of Agent:

(i)    Borrower shall request the extension, if at all, by written notice to Agent not more than sixty (60) days, and not less than thirty (30) days, prior to the initial Maturity Date.

(ii)    At the time of the request, and at the time of the extension, Borrower shall have entered into Sales Agreements with prospective buyers for the sale of Lots aggregating not less than 43 acres of Land, which sales transactions shall have been opened with Approved Escrows, with no less than 7% of the purchase price having gone "hard" or otherwise become nonrefundable to the buyer, and otherwise be on terms and conditions reasonably satisfactory to Agent, including the satisfaction of all closing contingencies other than such subdivision and/or parcel map approvals, design approvals and such related items as Agent may reasonably approve.

(iii)    At the time of the request, and at the time of the extension, there shall not exist any Default or any condition or state of facts which after notice and/or lapse of time would constitute a Default under any Loan Document.

(iv)    There shall not have occurred and be continuing a Material Adverse Effect.

(v)    Construction of the infrastructure Improvements described in the Development Agreement, shall be on schedule in accordance with the Development Agreement in the determination of Agent, and all permits, licenses and approvals from all applicable governmental authorities required in connection with the progress of such construction shall have been obtained.

(vi)    Borrower shall be in full compliance with Section 3.15 of this Agreement, including without limitation the minimum Lot sales required by Section 3.15(d).

(vii)    Agent shall have received an appraisal of the Property, which appraisal shall provide for an appraised value of not less than the amount indicated in the appraisal prepared by Valuation Consultants dated November 2, 2007, and otherwise complies with the terms and conditions of Section 3.7 of this Agreement.

(viii)    Borrower shall be in full compliance with the Loan-to-Value Ratio requirements of Section 3.8 of this Agreement.

(ix)    If required by Agent, Agent shall have been provided with an updated title report and appropriate title insurance endorsements shall have been issued by Title Insurer as required by Agent.

(x)    Borrower shall have paid to Agent for the ratable benefit of Lenders a non-refundable extension fee in an amount equal to two percent (2%) of the outstanding principal balance of the Loan at the time of such extension, which fee shall be deemed fully earned as of the date of the granting of such extension.

(xi)    The Base Rate, during the time of such extension period, shall be increased to a rate of interest equal to fourteen percent (14%) per annum.

(xii)    The Interest Reserve shall have been replenished to an amount sufficient to pay for Borrower's interest expense on the Loan for the six month period during the extension period.

(xiii)    Whether or not the extension becomes effective, Borrower shall pay all out-of-pocket costs and expenses incurred by Agent in connection with the proposed extension (pre- and post-closing), including appraisal fees, environmental audit and legal fees.

(c)    Second Extension. The First Extended Maturity Date may be extended by an additional six (6) month period to December 1, 2009 (the "Second Extended Maturity Date"), provided each of the following conditions are satisfied in the sole discretion of Agent:

(i)    Borrower shall request the extension, if at all, by written notice to Agent not more than sixty (60) days, and not less than thirty (30) days, prior to the First Extended Maturity Date.

(ii)    At the time of the request, and at the time of the extension, there shall not exist any Default or any condition or state of facts which after notice and/or lapse of time would constitute a Default under any Loan Document.

(iii)    There shall not have occurred and be continuing a Material Adverse Effect.

(iv)    Construction of the infrastructure Improvements described in the Development Agreement, shall be on schedule in accordance with the Development Agreement in the determination of Agent, and all permits, licenses and approvals from all applicable governmental authorities required in connection with the progress of such construction shall have been obtained.

(v)    Borrower shall be in full compliance with Section 3.15 of this Agreement, including without limitation the minimum Lot sales required by Section 3.15(d).

(vi)    Agent shall have received an appraisal of the Property, which appraisal shall provide for an appraised value of not less than the amount indicated in the appraisal prepared by Valuation Consultants dated November 2, 2007, and otherwise complies with the terms and conditions of Section 3.7 of this Agreement.

(vii)    Borrower shall be in full compliance with the Loan-to-Value Ratio requirements of Section 3.8 of this Agreement.

(viii)    If required by Agent, Agent shall have been provided with an updated title report and appropriate title insurance endorsements shall have been issued by Title Insurer as required by Agent.

(ix)    Borrower shall have paid to Agent for the ratable benefit of Lenders a non-refundable extension fee in an amount equal to two percent (2%) of the outstanding principal balance of the Loan at the time of such extension, which fee shall be deemed fully earned as of the date of the granting of such extension.

(x)    The Base Rate, during the time of such extension period, shall be increased to a rate of interest equal to fourteen and one-half percent (14.5%) per annum.

(xi)    The Interest Reserve shall have been replenished to an amount sufficient to pay for Borrower's interest expense on the Loan for the six month period during the extension period.

(xii)    The outstanding principal balance of the Loan shall not exceed the sum of: (x) $33,000,0000, *plus* (y) 50% of the aggregate amount of any Additional Draws funded pursuant to any Commitment Increase provided under Section 1.5 of this Agreement.

(xiii)    Whether or not the extension becomes effective, Borrower shall pay all out-of-pocket costs and expenses incurred by Agent in connection with the proposed extension (pre- and post-closing), including appraisal fees, environmental audit and legal fees.

2.9    Taxes.

(a)    Any and all payments by Borrower to or for the account of Agent or any Lender under any Loan Document shall be made free and clear of and without deduction for any

and all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges, and all liabilities with respect thereto, excluding, in the case of Agent and any Lender, taxes imposed on or measured by its net income, and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the Laws of which Agent or such Lender, as the case may be, is organized or maintains a lending office (all such non-excluded taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges and liabilities being included within the definition of "Taxes" herein. If Borrower shall be required by any Laws to deduct any Taxes from or in respect of any sum payable under any Loan Document to Agent or any Lender, (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.9), Agent or such Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) Borrower shall make such deductions, (iii) Borrower shall pay the full amount deducted to the relevant taxation authority or other authority in accordance with applicable Laws, and (iv) within 30 days after the date of such payment, Borrower shall furnish to Agent (who shall forward the same to such Lender) the original or a certified copy of a receipt evidencing payment thereof. Notwithstanding anything to the contrary in this Agreement, in no event shall this Section 2.9(a) apply to Taxes or Other Taxes attributable to the status of a Lender or holder of a participation interest as a Foreign Lender (as defined below). For purposes of this Agreement, a "Foreign Lender" is a Lender or holder of a participation interest that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

(b)    In addition, Borrower agrees to pay any and all present or future stamp, court or documentary taxes and any other excise or property taxes or charges or similar levies which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, any Loan Document (hereinafter referred to as "Other Taxes").

(c)    If Borrower shall be required by the Laws of any jurisdiction outside the United States to deduct any Taxes or Other Taxes from or in respect of any sum payable under any Loan Document to Agent or any Lender, Borrower shall also pay to such Lender or Agent (for the account of such Lender), at the time interest is paid, such additional amount that such Lender specifies is necessary to preserve the after-tax yield (after factoring in United States (federal and state) taxes imposed on or measured by net income) the Lender would have received if such deductions (including deductions applicable to additional sums payable under this Section 2.9) had not been made. Notwithstanding anything to the contrary in this Agreement, in no event shall this Section 2.9(c) apply to Taxes or Other Taxes attributable to the status of a Lender or holder of a participation interest as a Foreign Lender.

(d)    Borrower agrees to indemnify Agent and each Lender for the full amount of Taxes and Other Taxes (including any Taxes or Other Taxes imposed or asserted by any jurisdiction on amounts payable under this Section 2.9) paid by Agent and such Lender and any liability (including penalties, interest and expenses) arising therefrom or with respect thereto, in each case whether or not such Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Tribunal. Payment under this clause (d) shall be made within thirty (30) days after Agent or the Lender makes a demand therefor. Notwithstanding anything to the

contrary in this Agreement, in no event shall this <u>Section 2.9(d)</u> apply to Taxes or Other Taxes attributable to the status of a Lender or holder of a participation interest as a Foreign Lender.

(c)     Without prejudice to the survival of any other agreement of Borrower hereunder, the agreements and obligations of Borrower contained in this <u>Section 2.9</u> shall survive the termination of the Commitments and the payment in full of all the other Indebtedness.

2.10    <u>Payments</u>.

(a)     All payments by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by Borrower hereunder shall be made to Agent not later than 12:00 p.m. (Agent's Time) on the date specified herein. Agent shall distribute to each Lender, such funds as such Lender may be entitled to receive hereunder, (i) on or before 3:00 p.m. (Agent's Time) on the day Agent receives such funds, if Agent has received such funds on or before 12:00 p.m. (Agent's Time), or (ii) on or before 12:00 p.m. (Agent's Time) on the Business Day following the day Agent receives such funds, if Agent receives such funds after 12:00 p.m. (Agent's Time). If Agent fails to timely pay any amount to any Lender in accordance with this clause (b), Agent shall pay to such Lender interest at the Federal Funds Rate on such amount, for each day from the day such amount was to be paid until it is paid to such Lender.

(b)     Except as otherwise expressly provided herein, all payments by Borrower or any Lender shall be made to Agent at Agent's Office not later than the time for such type of payment specified in this Agreement. All payments received after such time shall be deemed received on the next succeeding Business Day. All payments shall be made in immediately available funds in lawful money of the United States of America. Whenever any payment falls due on a day which is not a Business Day, such payment may be made on the next succeeding Business Day.

(c)     Upon satisfaction of any applicable terms and conditions set forth herein, Agent shall promptly make any amounts received in accordance with clause (c) above available in like funds received, if payable to any Lender, by wire transfer to such Lender at the address specified in the Schedule of Lenders.

(d)     Unless Borrower or any Lender has notified Agent, prior to the date any payment is required to be made by it to Agent, that Borrower or such Lender, as the case may be, will not make such payment, Agent may assume that Borrower or such Lender, as the case may be, has timely made such payment and may (but shall not be required to do so) in reliance thereon, make available a corresponding amount to the person or entity entitled thereto. If and to the extent that such payment was not in fact made to Agent in immediately available funds, then:

(i)     if Borrower failed to make such payment, each Lender shall forthwith on demand repay to Agent the portion of such assumed payment that was made available to such Lender in immediately available funds, together with interest thereon in respect of each day from and including the date such amount was made available by

Agent to such Lender to the date such amount is repaid to Agent in immediately available funds at the Federal Funds Rate from time to time in effect; and

(ii)    if any Lender failed to make such payment, such Lender or, if applicable, Electing Lender or Lenders shall forthwith on demand pay to Agent the amount thereof in immediately available funds, together with interest thereon for the period from the date such amount was made available by Agent to Borrower to the date such amount is recovered by Agent (the "Compensation Period") at a rate per annum equal to the interest rate applicable to such amount under the Loan. If such Lender pays such amount to Agent, then such amount shall constitute such Lender's Pro Rata Share, included in the applicable Loan advance. If such Lender does not pay such amount forthwith upon Agent's demand therefor, Agent may make a demand therefor upon Borrower, and Borrower shall pay such amount to Agent, together with interest thereon for the Compensation Period at a rate per annum equal to the rate of interest applicable to such amount under the Loan. Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which Agent or Borrower may have against any Lender as a result of any default by such Lender hereunder.

A notice of Agent to any Lender or Borrower with respect to any amount owing under this clause (d) shall be conclusive, absent any manifest error.

(e)    If any Lender makes available to Agent funds for any Loan advance to be made by such Lender as provided in the foregoing provisions of this Section 2.10, and the funds are not advanced to Borrower or otherwise used to satisfy any Obligations of such Lender hereunder, Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(f)    Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan advance in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan advance in any particular place or manner.

2.11    Agent Advances.

(a)    Agent is authorized, from time to time, in Agent's sole discretion to make, authorize or determine advances of the Loan, or otherwise expend funds, on behalf of Lenders ("Agent Advances"), (i) to pay any costs, fees and expenses as described in Section 7.11 herein, and (ii) when Agent deems necessary or desirable to preserve or protect the Loan collateral or any portion thereof (including those with respect to property taxes, insurance premiums, operation management, maintenance, repair, sale and disposition) (A) subject to Section 6.5, after the occurrence of a Default, and (B) subject to Section 6.10, after acquisition of all or a portion of the Loan collateral by foreclosure or otherwise.

(b)    Agent Advances shall constitute obligatory advances of Lenders under this Agreement, shall be repayable on demand and secured by the Loan collateral, and if unpaid by Lenders as set forth below, shall bear interest at the rate applicable to such amount under the

Loan or if no longer applicable. at the Base Rate. Agent shall notify each Lender in writing of each Agent Advance. Upon receipt of notice from Agent of its making of an Agent Advance. each Lender shall make the amount of such Lender's Pro Rata Share of the outstanding principal amount of the Agent Advance available to Agent. in same day funds, to such account of Agent as Agent may designate. (i) on or before 3:00 p.m. (Agent's Time) on the day Agent provides Lenders with notice of the making of such Agent Advance if Agent provides such notice on or before 12:00 p.m. (Agent's Time), or (ii) on or before 12:00 p.m. (Agent's Time) on the Business Day immediately following the day Agent provides Lenders with notice of the making of such advance if Agent provides notice after 12:00 p.m. (Agent's Time).

2.12    Defaulting Lender.

(a)    Notice and Cure of Lender Default: Election Period: Electing Lenders. Agent shall notify (such notice being referred to as the "Default Notice") Borrower (for Loan advances) and each non-Defaulting Lender if any Lender is a Defaulting Lender. Each non-Defaulting Lender shall have the right. but in no event and under no circumstance the obligation. to fund such Defaulting Lender Amount. provided that within twenty (20) days after the date of the Default Notice (the "Election Period"). the non-Defaulting Lender or Lenders (each such Lender. an "Electing Lender") irrevocably commit(s) by notice in writing (an "Election Notice") to Agent. the other Lenders and Borrower to fund the Defaulting Lender Amount and to assume the Defaulting Lender's obligations with respect to the advancing of the entire undisbursed portion of the Defaulting Lender's principal obligations under this Agreement (such entire undisbursed portion of the Defaulting Lender's principal obligations under this Agreement. including its portion of the Payment Amount that is the subject of the default. is hereinafter referred to as the "Defaulting Lender Obligation"). If Agent receives more than one Election Notice within the Election Period. then the commitment to fund the Defaulting Lender Amount and the Defaulting Lender Obligation shall be apportioned pro rata among the Electing Lenders in the proportion that the amount of each such Electing Lender's Commitment bears to the total Commitments of all Electing Lenders. If the Defaulting Lender fails to pay the Defaulting Lender Payment Amount within the Election Period. the Electing Lender or Lenders. as applicable. shall be automatically obligated to fund the Defaulting Lender Amount and the Defaulting Lender Obligation (and the Defaulting Lender shall no longer be entitled to fund such Defaulting Lender Amount or such Defaulting Lender Obligation) within three (3) Business Days after such notice to Agent for reimbursement to Agent or payment to Borrower as applicable. Notwithstanding anything to the contrary contained herein. if Agent has funded the Defaulting Lender Amount. Agent shall be entitled to reimbursement for its portion of the Defaulting Lender Payment Amount pursuant to Section 6.11.

(b)    Removal of Rights: Indemnity. Agent shall not be obligated to transfer to a Defaulting Lender any payments made by or on behalf of Borrower to Agent for the Defaulting Lender's benefit: nor shall a Defaulting Lender be entitled to the sharing of any payments hereunder or under any Note until all Defaulting Lender Payment Amounts are paid in full. Agent shall hold all such payments received or retained by it for the account of such Defaulting Lender. Amounts payable to a Defaulting Lender shall be paid by Agent to reimburse Agent and any Electing Lender pro rata for all Defaulting Lender Payment Amounts. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents or the Environmental Agreement. a Defaulting Lender shall be deemed not to be a "Lender" and such

Defaulting Lender's Commitment shall be deemed to be zero. A Defaulting Lender shall have no right to participate in any discussions among and or decisions by Lenders hereunder and/or under the other Loan Documents or the Environmental Agreement. Further, any Defaulting Lender shall be bound by any amendment to, or waiver of, any provision of, or any action taken or omitted to be taken by Agent and/or the non-Defaulting Lenders under, any Loan Document or the Environmental Agreement which is made subsequent to the Defaulting Lender's becoming a Defaulting Lender. This Section 2.12 shall remain effective with respect to a Defaulting Lender until such time as the Defaulting Lender shall no longer be in default of any of its obligations under this Agreement by curing such default by payment of all Defaulting Lender Payment Amounts (i) within the Election Period, or (ii) after the Election Period with the consent of the non-Defaulting Lenders. Such Defaulting Lender nonetheless shall be bound by any amendment to or waiver of any provision of, or any action taken or omitted to be taken by Agent and/or the non-Defaulting Lenders under any Loan Document or the Environmental Agreement which is made subsequent to that Lender's becoming a Defaulting Lender and prior to such cure or waiver. The operation of this clause (b) or clause (a) above alone shall not be construed to increase or otherwise affect the Commitment of any non-Defaulting Lender, or relieve or excuse the performance by Borrower of its duties and obligations hereunder or under any of the other Loan Documents or the Environmental Agreement. Furthermore, nothing contained in this Section 2.12 shall release or in any way limit a Defaulting Lender's obligations as a Lender hereunder and/or under any of the other Loan Documents or the Environmental Agreement. Further, a Defaulting Lender shall indemnify and hold harmless Agent and each of the non-Defaulting Lenders from any claim, loss, or costs incurred by Agent and or the non-Defaulting Lenders as a result of a Defaulting Lender's failure to comply with the requirements of this Agreement, including any and all additional losses, damages, costs and expenses (including attorneys' fees) incurred by Agent and any non-Defaulting Lender as a result of and/or in connection with (i) a non-Defaulting Lender's acting as an Electing Lender, (ii) any enforcement action brought by Agent against a Defaulting Lender, and (iii) any action brought against Agent and/or Lenders. The indemnification provided above shall survive any termination of this Agreement.

        (c)    Commitment Adjustments. In connection with the adjustment of the amounts of the Commitments of the Defaulting Lender and Electing Lender(s) upon the expiration of the Election Period as aforesaid, Borrower, Agent and Lenders shall execute such modifications to the Loan Documents and the Environmental Agreement as shall, in the reasonable judgment of Agent, be necessary or desirable in connection with the adjustment of the amounts of Commitments in accordance with the foregoing provisions of this Section 2.12. For the purpose of voting or consenting to matters with respect to the Loan Documents or the Environmental Agreement, such modifications shall also reflect the removal of voting rights of the Defaulting Lender and increase in voting rights of Electing Lenders to the extent an Electing Lender has funded the Defaulting Lender Amount and assumed the Defaulting Lender Obligation. In connection with such adjustments, the Defaulting Lender shall execute and deliver an Assignment and Assumption covering that Lender's Commitment and otherwise comply with Section 7.6. If a Lender refuses to execute and deliver such Assignment and Assumption or otherwise comply with Section 7.6, such Lender hereby appoints Agent to do so on such Lender's behalf. Agent shall distribute an amended Schedule of Lenders, which shall thereafter be incorporated into this Agreement, to reflect such adjustments. However, all such Defaulting Lender Amounts and such Defaulting Lender Obligation funded by Agent or Electing

Lenders shall continue to be Defaulting Lender Amounts of the Defaulting Lender pursuant to its obligations under this Agreement.

(d)    No Election.  In the event that no Lender elects to commit to fund the Defaulting Lender Amount and Defaulting Lender Obligation within the Election Period. Agent shall. upon the expiration of the Election Period, so notify Borrower and each Lender.

2.13    Several Obligations; No Liability; No Release.  Notwithstanding that certain of the Loan Documents and/or the Environmental Agreement now or hereafter may have been or will be executed only by or in favor of Agent in its capacity as such. and not by or in favor of Lenders, any and all obligations on the part of Agent (if any) to make any advances of the Loan or reimbursements for other Payment Amounts shall constitute the several (and not joint) obligations of the respective Lenders on a ratable basis. according to their respective Pro Rata Shares.  Except as may be specifically provided in this Agreement. no Lender shall have any liability for the acts of any other Lender.  No Lender shall be responsible to Borrower or any other person for any failure by any other Lender to fulfill its obligations to make advances of the Loan or reimbursements for other Payment Amounts. or to take any other action on its behalf hereunder or in connection with the financing contemplated herein.  The failure of any Lender to pay to Agent its Pro Rata Share of a Payment Amount shall not relieve any other Lender of any obligation hereunder to pay to Agent its Pro Rata Share of such Payment Amounts as and when required herein. but no Lender shall be responsible for the failure of any other Lender to so fund its Pro Rata Share of the Payment Amount.  In furtherance of the foregoing. Lenders shall comply with their obligation to pay Agent their Pro Rata Shares of such Payment Amounts regardless of (i) the occurrence of any Default hereunder or under any Loan Document or the Environmental Agreement; (ii) any failure of consideration. absence of consideration. misrepresentation. fraud. or any other event. failure. deficiency, breach or irregularity of any nature whatsoever in the Loan Documents or the Environmental Agreement; or (iii) any bankruptcy, insolvency or other like event with regard to Borrower or Guarantor.  The obligation of Lenders to pay such Payment Amounts are in all regards independent of any claims between Agent and any Lender.

2.14    Interest Reserve.

(a)    On the date hereof. Agent shall establish an interest reserve for the benefit of the Lenders (the "Interest Reserve") in the amount of $8.910.000.  The Interest Reserve account shall be maintained at one or more depository institutions in the name of Agent. on behalf of the Lenders. as custodian for the Borrower. Agent may make periodic advances from the Interest Reserve to pay interest as and when it becomes due under the Loan.  Borrower hereby irrevocably authorizes Agent to make any interest payment on Borrower's behalf by debiting the Interest Reserve in the amount of the payment and applying the debited amount to accrued and unpaid interest due under the Loan (it being agreed that interest at a rate equal to the Agent's current money market rate shall accrue for the benefit of Borrower on amounts in the Interest Reserve except to the extent. and until such amounts are distributed from the Interest Reserve).  All interest advances made by Agent from the Interest Reserve shall accrue interest at the same rate of interest as the applicable advance for which such interest advance was made.  Upon the occurrence of a Default. Agent shall have the right. but shall not be obligated. to

continue to disburse interest installments for itself and the Lenders from the Interest Reserve as it may determine in its discretion.

      (b)    If any Additional Draws are funded in connection with any Commitment Increase provided under Section 1.5 of this Agreement, the Interest Reserve shall be replenished with a portion of the proceeds of such Additional Draws in such amounts as may be determined by Agent to account for the interest payable by Borrower during the applicable extension period.

    2.15   Exit Fee.  Borrower shall pay an Exit Fee to Agent for the benefit of Lenders in connection with any payment of principal of the Loan in full, whether made in connection with a repayment of the Loan or a permitted or mandatory prepayment of the Loan in full, following a Default or otherwise. Borrower shall pay such Exit Fee on the earliest of the following: the Maturity Date, the date of the acceleration of the principal amount of the Loan or, if the Loan is prepaid in full, the date of such prepayment of the Loan (the "Required Payment Date"). Notwithstanding the foregoing, Borrower shall not be obligated in connection with a mandatory partial prepayment of principal of the Loan to pay the Exit Fee on the date of such mandatory partial prepayment unless such mandatory prepayment shall result in a prepayment of principal of the Loan in full.

## ARTICLE 3 - ADDITIONAL COVENANTS AND AGREEMENTS

    3.1   Inspection.  Upon two (2) days prior notice to Borrower, Agent and its agents may enter upon the Property to inspect the Property at any reasonable time, unless Agent deems such inspection is of an emergency nature, in which event Borrower shall provide Agent with immediate access to the Property. Borrower will also permit Agent and its agents to photograph the Property during normal business hours and at any other reasonable time. Borrower will furnish to Agent and its agents for inspection and copying, all books and records and other documents and information that Agent may reasonably request from time to time.

    3.2   Notice to Lenders.  Borrower shall, within ten (10) days after Borrower has knowledge of the occurrence of any of the following events that could reasonably be expected to have a Material Adverse Effect, notify each Lender in writing thereof, specifying in each case the action Borrower has taken or will take with respect thereto: (a) any violation of any Law or governmental requirement; (b) any litigation, arbitration or governmental investigation or proceeding instituted or threatened against Borrower or any Guarantor or the Property, and any material development therein; (c) any actual or threatened condemnation of any portion of the Property, any negotiations with respect to any such taking, or any loss of or substantial damage to the Property; (d) any labor controversy pending or threatened against Borrower, and any material development in any labor controversy; and (e) any notice received by Borrower with respect to the cancellation, alteration or non-renewal of any insurance coverage maintained with respect to the Property.

    3.3   Financial Statements, Records and Reports.  Borrower shall provide or cause to be provided to Agent all of the following:

      (a)    If requested by Agent, Financial Statements of Borrower: (i) if other than an individual, for each fiscal year of such Reporting Party, as soon as reasonably practicable and

in any event within one hundred twenty (120) days after the close of each fiscal year, and for each fiscal quarter, as soon as reasonably practicable and in any event within forty-five (45) days after the close of each such reporting period; or (ii) if an individual, annual Financial Statements in each instance within forty-five (45) days after the one-year anniversary of the date of his or her Financial Statements most recently provided to Agent for Lenders.

(b)    If requested by Agent, Financial Statements of each Guarantor: (i) if other than an individual, for each fiscal year of such Guarantor, as soon as reasonably practicable and in any event within thirty (30) days after the close of each fiscal year, and for each fiscal quarter, as soon as reasonably practicable and in any event within thirty (30) days after the close of each such reporting period; or (ii) if an individual, annual Financial Statements in each instance within thirty (30) days after the one-year anniversary of the date of his or her Financial Statements most recently provided to Agent for Lenders.

(c)    Prior to the beginning of each fiscal year of Borrower, (i) a capital and operating budget for the Property; and (ii) for each month (and for the fiscal year through the end of that month) a statement of all income and expenses in connection with the Property. Items provided under this clause (c) shall be in form and detail satisfactory to Agent.

(d)    Copies of filed federal income tax returns of Borrower and each Guarantor for each taxable year (with all K-1s and other forms and supporting schedules attached), within thirty (30) days after filing.

(e)    From time to time promptly after Agent's request, such additional information, reports and statements respecting the Property, or the business operations and financial condition of each Reporting Party, as Agent may reasonably request.

Borrower will keep accurate books and records in accordance with sound accounting principles in which full, true and correct entries shall be promptly made with respect to the Property and the operation thereof. Borrower will make all of its books, records and accounts available to Agent and its representatives at the Property upon request and will permit them to review and copy the same. All Financial Statements shall be in form and detail reasonably satisfactory to Agent and shall contain or be attached to the signed and dated written certification of the Reporting Party in form specified by Agent to certify that the Financial Statements are furnished to Agent in connection with the extension of credit by Agent and constitute in all material respects a true and correct statement of the Reporting Party's financial position. All certifications and signatures on behalf of corporations, partnerships, limited liability companies or other entities shall be by a representative of the Reporting Party satisfactory to Agent. All Financial Statements for a Reporting Party who is an individual shall be on Agent's then-current personal financial statement form or in another form satisfactory to Agent. All fiscal year-end Financial Statements of Borrower shall be reviewed, without any qualification or exception not acceptable to Agent, by independent certified public accountants reasonably acceptable to Agent, and shall contain all reports and disclosures required for a fair presentation. Borrower will provide Agent at Borrower's expense with all evidence that Agent may from time to time reasonably request as to compliance with all provisions of the Loan Documents and the Environmental Agreement. Borrower shall promptly notify Agent of any event or condition that could reasonably be expected to have a Material Adverse Effect in the financial condition of Borrower or Guarantor

(if known by Borrower). Agent shall provide a copy of such Financial Statements to each Lender upon receipt. Notwithstanding any provisions of this Agreement to the contrary, insofar as this Agreement calls for the delivery of Financial Statements of a Guarantor, the parties agree that such Financial Statements may be prepared by the accounting staff of the Guarantor, need not be audited, and may consist exclusively of a balance sheet (and may exclude any other financial statements, such as an income statement, statements of cash flow and amounts, reconciliations of changes in equity, or any other statements reflecting changes in financial position but shall otherwise be in form and content reasonably satisfactory to Agent).

3.4    Other Information.  Borrower shall furnish to Agent from time to time upon Agent's request: (a) copies of any or all contracts, bills of sale, statements, receipts or other documents under which Borrower claims title to any materials, fixtures or articles of personal property subject to the lien of the Deed of Trust; and (b) such other information relating to Borrower, Guarantor, the Property, or any indemnitor or other person or party connected with Borrower, the Loan, or any security for the Loan.

3.5    Reports and Testing.  Borrower shall (a) promptly deliver to Agent copies of all reports, studies, inspections and tests made on the Land, and (b) make such additional tests on the Land as Agent reasonably requires. Borrower shall promptly notify Agent of any report, study, inspection or test that indicates any adverse condition relating to the Land.

3.6    Advertising by Lenders.  At Agent's reasonable request and at Agent and Lender's expense, Borrower shall erect and maintain on the Property one or more advertising signs furnished by Agent indicating that the acquisition financing for the Property has been provided by Lenders.

3.7    Appraisal.  From time to time, Agent may obtain an appraisal of all or any part of the Property prepared in accordance with written instructions from Agent by a third-party appraiser engaged directly by Agent. Each such appraiser and appraisal shall be satisfactory to Agent (including satisfaction of applicable regulatory requirements). The cost of any such appraisal shall be borne by Borrower if such appraisal is the first appraisal in any calendar year and in all events if Agent obtains such appraisal after the occurrence of a Default. Whenever Borrower is obligated to pay the cost of an appraisal hereunder, such cost is due and payable by Borrower on demand and shall be secured by the Loan Documents. Agent shall provide a copy of such appraisal to Borrower and each Lender upon receipt. Notwithstanding the foregoing or any other provisions of this Agreement, Agent shall not request an appraisal more frequently than once every 12 months thereafter provided a Default has not occurred and is continuing.

3.8    Loan-to-Value Ratio.  The Property shall have a "Loan-to-Value Ratio" of not greater than: (i) seventy percent (70%) in the case of an "As-Is Bulk Market" valuation, as described in the Valuation Consultants Appraisal, or (ii) sixty percent (60%) in the case of a Prospective Market Value of Individual Parcel Sales "As Improved" valuation (with half street improvements, utilities, curbs, gutters, landscaping and rough graded pads), as described in the Valuation Consultants Appraisal, which Loan-to-Value Ratio shall be calculated as follows: the outstanding principal balance and accrued but unpaid interest on the Loan as of the date of the determination of the ratio shall be divided by the appraised "As-Is" (or "As Improved" as the case may be) value of the Property. The appraised "As-Is" and "As Improved" value of the

Property on the closing date of the Loan shall be based on the Valuation Consultants Appraisal, or, for appraisals otherwise performed pursuant to the terms hereof from time to time, based upon an appraisal meeting the requirements of Section 3.7 above, as reasonably reviewed, adjusted and approved by each Lender.

3.9    Reporting Compliance.  Borrower agrees to comply with any and all reporting requirements applicable to the Loan which are set forth in any law, statute, ordinance, rule, regulation, order or determination of any governmental authority, including The International Investment Survey Act of 1976. The Agricultural Foreign Investment Disclosure Act of 1978. The Foreign Investment in Real Property Tax Act of 1980 and the Tax Reform Act of 1984 and further agrees upon request of Agent to furnish Agent with evidence of such compliance.

3.10    Payment of Withholding Taxes.  Borrower shall not use, or knowingly permit any contractor or subcontractor to use, any portion of the proceeds of any Loan advance to pay the wages of employees unless a portion of the proceeds or other funds are also used to make timely payment to or deposit with (a) the United States of all amounts of tax required to be deducted and withheld with respect to such wages under the Code, and (b) any state and/or local Tribunal or agency having jurisdiction of all amounts of tax required to be deducted and withheld with respect to such wages under any applicable state and/or local Laws.

3.11    ERISA and Prohibited Transaction Taxes.  As of the date hereof and throughout the term of this Agreement: (a) Borrower is not and will not be (i) an "employee benefit plan," as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (ii) a "plan" within the meaning of Section 4975(e) of the Code; (b) the assets of Borrower do not and will not constitute "plan assets" within the meaning of the United States Department of Labor Regulations set forth in 29 C.F.R. § 2510.3-101; (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA; (d) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of fiduciaries with respect to governmental plans; and (e) Borrower shall not engage in any transaction which would cause any obligation or action taken or to be taken hereunder (or the exercise by Agent of any of Lenders' rights under this Agreement, the Note or the other Loan Documents or the Environmental Agreement) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code.  Borrower further agrees to deliver to Agent such certifications or other evidence of compliance with the provisions of this Section 3.11 as Agent may from time to time reasonably request.

3.12    Single Purpose Entity.  Borrower hereby represents, warrants and covenants to Agent and Lenders as follows:

(a)    Borrower shall engage solely in the following business and shall not conduct its business in any manner inconsistent with the following: owning, holding, selling, leasing, developing, financing, refinancing, transferring, exchanging, operating and managing the Property, borrowing and giving security for the Loan pursuant to the terms of the Loan Documents and performing all acts required or permitted under the Loan, and transacting any and all lawful business for which a limited partnership may be organized under the laws regarding, and engaging in such other lawful activities permitted to, limited liability companies

17

under the laws of the State of Nevada, as are necessary, incidental or appropriate in connection therewith.

(b)     Borrower does not and will not own any asset or property other than (i) the Property and (ii) incidental personal property necessary for owning, holding, selling, leasing, developing, financing, refinancing, transferring, exchanging, operating and managing the Property. Borrower shall not engage in any business other than the ownership, management and operation of the Property, and shall conduct and operate its business as presently conducted and operated.

(c)     Except for transactions permitted under Section 7.25, Borrower shall not enter into any contract, agreement or other transaction with any Affiliate of Borrower or any constituent party of Borrower, other than (i) the Development Agreement, or (ii) any contract, agreement or other document upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's length basis with third parties other than any such party or (iii) any other contract, agreement or document (x) terminable upon thirty days notice, (y) terminable if there is a change in the ownership of the Borrower, or (z) are for an aggregate amount not greater than Two Hundred Fifty Thousand Dollars ($250,000).

(d)     Notwithstanding any other provision of this Agreement and so long as any obligations under the Loan Documents remain outstanding and have not been discharged in full, Borrower shall not do any of the following:

(i)     borrow money or incur indebtedness (other than the Loan and property taxes), secured or unsecured, direct or indirect, absolute or contingent, including guaranteeing any obligation other than unsecured trade and operational indebtedness incurred in the ordinary course of business with trade creditors, not evidenced by a note, and in amounts as are normal and reasonable under the circumstances and all of which indebtedness, does not exceed an aggregate amount of $100,000 at any one time (other than legal fees in connection with the Loan and other closing costs and amounts due hereunder), and, not to exceed the amounts permitted under the Loan Documents, or grant consensual liens on its property, except for encumbrances permitted under the Loan Documents; provided, however, Borrower is authorized to execute, deliver and perform the Loan Documents;

(ii)    to the fullest extent permitted by law, dissolve, wind-up or liquidate;

(iii)   sell or lease, or otherwise dispose of all or substantially all of its assets, or sell or lease or otherwise dispose of, any of its assets outside of the ordinary course of business except as permitted in Section 7.25 hereof; or

(iv)    merge or consolidate or enter into any other business combination in whole or in part with or into any other entity

(e)     Borrower has not made, nor will Borrower make, any loans or advances in the nature of indebtedness to, or will pledge its assets for the benefit of (except with respect to

the granting of the lien pursuant to the Deed of Trust), any third party (including any Affiliate or constituent party of Borrower), and shall not acquire obligations or securities of its Affiliates.

(f)      Borrower is and intends to remain solvent and will pay its debts, obligations and liabilities (including, as applicable, shared personnel and overhead expenses) from its own assets as the same shall become due. Borrower will allocate fairly and reasonably any overhead expenses that are shared with an Affiliate, including paying for office space and services performed by any employee of an Affiliate.

(g)      The Loan will not render Borrower insolvent.

(h)      Borrower has done or caused to be done and will do all things necessary to observe organizational requirements and formalities and preserve its existence, and Borrower will not, nor will Borrower permit any constituent party of Borrower to, amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, certificate of organization, trust or other organizational documents of Borrower or such constituent party of Borrower in any respect material to its separateness without the prior written consent of Agent.

3.13    Operational Matters.  Notwithstanding any other provision of this Agreement and so long as any portion of the Obligations remains outstanding and has not been discharged in full, Borrower shall do all of the following:

(a)      maintain books and records and bank accounts separate from those of any other party;

(b)      maintain its assets in such a manner that it is not costly or difficult to segregate, identify or ascertain such assets and maintain its bank accounts separate from any other party;

(c)      hold regular meetings, as and if, appropriate to conduct its business, and observe all customary organizational and operational formalities;

(d)      hold itself out to creditors and the public as a legal entity separate and distinct from any other party (including any Affiliate of Borrower or any constituent party of Borrower);

(e)      prepare financial statements, and if part of a consolidated group, show itself as a separate member of such group to the extent required by applicable tax law on such consolidated tax returns;

(f)      allocate and charge fairly and reasonably any expenses associated with services provided by common employees, office space expenses, and other overhead expenses shared with Affiliates;

(g)      conduct business in its own name, shall not identify itself or any of its Affiliates as a division or part of any other entity and shall maintain and utilize separate stationery, invoices and checks bearing its own name and otherwise maintain an arm's length

relationship with its Affiliates (provided that the foregoing shall not prohibit transfers pursuant to Section 7.25);

      (h)    not commingle its assets or funds with those of any other party and hold all of its assets in its own name;

      (i)    not assume, guarantee, become obligated for, or pay the debts or obligations of any other party;

      (j)    pay its own liabilities and expenses out of its own funds drawn on its own bank account including the salaries of its own employees;

      (k)    not acquire obligations or securities of its members or partners or its Affiliates;

      (l)    not hold out its credit as available to satisfy the obligations of any other party;

      (m)    not pledge its assets for the benefit of any other party (except that Borrower may pledge its assets to secure the Loan), or make any loans or advances to any person or entity except as permitted in Section 7.25;

      (n)    not buy or hold evidence of indebtedness issued by any other party (other than cash, cash equivalents and investment grade securities);

      (o)    correct any known misunderstanding regarding its separate identity;

      (p)    not identify itself as a division of any other party;

      (q)    attempt to maintain adequate capital in light of its contemplated business operations;

      (r)    maintain all required qualifications to do business in the states in which such qualifications are necessary;

      (s)    not form, hold or acquire any subsidiaries (except those existing on the date hereof); and

      (t)    not guarantee, become obligated for or hold itself or its credit out to be responsible for the debts or obligations of any other party or entity or the decisions or actions respecting the daily business or affairs of any other party.

    3.14    <u>Other Limitations</u>.  Prior to the payment in full of the Obligations, neither Borrower nor any of its Subsidiaries shall without the prior written consent of Agent (which may be furnished or withheld at its sole and absolute discretion), give its consent or approval to any of the following actions or items:

      (a)    create. incur or suffer any liens on the Property (other than liens of the Loan Documents or the Subordinate Loan Documents):

      (b)    create. incur or suffer any liens on, or transfers of. all or any portion of the collateral securing the Loan (other than liens of the Loan Documents. Permitted Encumbrances (as detailed in the Deed of Trust) or other liens or transfers permitted hereunder):

      (c)    any modification. amendment. consolidation, spread. restatement. waiver or termination of any of the Loan Documents:

      (d)    the distribution to the partners. members or shareholders of Borrower of property other than cash:

      (e)    any material change in the method of conduct of the business of Borrower. or any of its Subsidiaries (including the entering into of an operating lease with respect to the Property):

      (f)    the settlement of any claim against Borrower or any of its subsidiaries. other than a fully insured third party claim. in any amount greater than $500,000.00 from funds not permitted to be distributed in the ordinary course to parties holding an equity interest in Borrower: or

      (g)    except as permitted by the Loan Documents. any determination to restore or not to restore the Property after a casualty or condemnation pertaining to any portion of the Property valued at $250.000 or more.

3.15    Sale of Lots.

      (a)    Sales Agreements.  From time to time Borrower intends to sell one or more Lots to prospective buyers. Each Lot shall be sold under a Sales Agreement. Each Sales Agreement shall require full payment in cash to Borrower at closing through an escrow with an escrow agent that acknowledges in writing Agent's security interest in any applicable earnest money deposits (an "Approved Escrow"). No Lot may be leased. sold or conveyed under any lease. conditional sales contract or other arrangement where Borrower retains a deferred portion of the purchase price or any residual or contingent interest in the Lot, including any purchase money security interest. without the prior written consent of Agent in each instance.

      (b)    Lot Sales.  A sale of a Lot is deemed to occur only if (a) a Sales Agreement is fully executed without material deviation. alteration or concessions. and otherwise meets the requirements of this Agreement. (b) the sales price for the Lot is not less than the Release Price for such Lot. or as otherwise approved in writing by Agent in its reasonable discretion. (c) all net proceeds of the sale are delivered to Agent commensurate with the close of the Lot sale. and (d) the Borrower has made a good faith determination that the buyer is financially capable of performing under the Sales Agreement.

      (c)    Delivery of Sales Information and Documents.  Within fifteen (15) days after the end of each month if requested. Borrower shall deliver to Agent a sales report reasonably acceptable to Agent (the "Marketing Sales Report") showing (i) all currently pending

sales (separated into new sales entered into during the month being reported on and previous sales contracted for in preceding months), (ii) all closings which took place during the month being reported on, and (iii) all sales previously reported that for any reason did not, or Borrower reasonably expects will not, close. Borrower shall also promptly deliver to Agent such other sales information, documents and agreements as Agent may from time to time reasonably request, including copies of executed Sales Agreements, escrow closing or settlement statements, earnest money deposits received, information regarding prospective buyers, and notice of or information regarding any claimed breach or disavowal of buyer's or Borrower's obligations under any one or more Sales Agreements.

(d)    Payoff of Loan with Lot Sales Proceeds. Notwithstanding anything to the contrary contained herein, Borrower shall cause the repayment in full of the Loan on or before the consummation of the sales of Lots aggregating at least seventy-seven percent (77%) of the total acreage of the Property.

3.16    Earnest Money Deposits. Borrower hereby grants to Agent for the benefit of Lenders a security interest in all earnest deposits received by Borrower from prospective buyers in connection with Lot sales to secure the Obligations. Such deposits shall be deposited and remain in an Approved Escrow until the sale closes, the deposit is returned to the buyer, or Agent agrees that Borrower may claim the deposit as liquidated damages under its Sale Agreement and agrees to release the deposit from the lien of the Deed of Trust. All proceeds from the earnest money shall be paid to Agent for the benefit of Lenders and applied to the Loan or held in reserve as determined in Agent's sole discretion

3.17    Reserve Account (Additional Deposit). On or before January 25, 2008, Borrower shall have deposited with Agent, which Agent shall maintain in the Reserve Account for the benefit of Lenders, additional cash equity in an amount not less than $1,650,000. The Reserve Account shall be maintained at one or more depository institutions in the name of Agent, on behalf of the Lenders, as custodian for the Borrower. Funds maintained in the Reserve Account shall accrue interest for the benefit of Borrower at a rate equal to the Agent's current money market rate. Borrower may request in writing that Agent release the funds in the Reserve Account to Borrower, and Agent shall disburse such funds to Borrower so long as no Default or Material Adverse Effect has occurred and is continuing at the time of such disbursement, in accordance with the following schedule:

(a)    the sum of $800,000 to Borrower on or after the date Borrower has deposited with Agent the additional $1,650,000 cash equity required by this Section 3.17, and

(b)    commencing on March 1, 2008, an additional $130,000 to Borrower on the first Business Day of each successive calendar month until all such amounts in the Reserve Account have been disbursed in full.

3.18    Exceptions to Covenants, Representations and Warranties. Notwithstanding anything to the contrary contained in this Article 3, all covenants and conditions contained in this Article 3 are subject to the modifications set forth in Exhibit "H".

## ARTICLE 4 - REPRESENTATIONS AND WARRANTIES

To induce Lenders to make the Loan, Borrower hereby represents and warrants to Agent and Lenders that except as otherwise disclosed to Agent in writing or as otherwise provided in Exhibit H:

4.1    Organization.  If Borrower is a corporation, partnership, limited liability company or other legal entity, Borrower is and will continue to be (a) duly organized, validly existing and in good standing under the Laws of the state of its organization, (b) authorized to do business and in good standing in each state in which the Property is located, and (c) possessed of all requisite power and authority to carry on its business, and to own the Property.

4.2    Authorization; No Conflict.  Each Loan Document executed by Borrower has been duly authorized, executed and delivered by Borrower, and the obligations thereunder and the performance thereof by Borrower in accordance with their terms are and will continue to be within Borrower's power and authority without the necessity of joinder or consent of any other person.  No provision of the Loan Documents violates or will violate any applicable Law, any covenants or restrictions affecting the Property, any order of any court or governmental authority or any contract or agreement binding on Borrower or the Property.  The Loan Documents do not and will not result in the creation of any encumbrance against any assets or properties of Borrower or any person liable, directly or indirectly, for any part of the Indebtedness except as expressly provided in such documents.

4.3    Enforceability.  The Loan Documents constitute legal, valid and binding obligations of Borrower enforceable in accordance with their terms, except as the enforceability thereof may be limited by Debtor Relief Laws and except as the availability of certain remedies may be limited by general principles of equity.

4.4    No Violation; No Litigation.  Borrower is not in violation of any Law, regulation or ordinance, or any order of any court or Tribunal, and no provision of the Loan Documents violates any applicable Law, any covenants or restrictions affecting the Property, any order of any court or Tribunal or any contract or agreement binding on Borrower or the Property that could reasonably be expected to have a Material Adverse Effect.  There is no judicial or administrative action, claim, investigation, inquiry, proceeding or demand pending (or to Borrower's knowledge threatened) against Borrower or against any other person liable directly or indirectly for any part of the Indebtedness that could reasonably be expected to have a Material Adverse Effect or the validity, enforceability or priority of any of the Loan Documents.

4.5    Taxes.  To the extent required by applicable Law, Borrower has filed all necessary tax returns and reports and have paid all taxes and governmental charges thereby shown to be owing except where the failure to file or pay would not individually or in the aggregate cause a Material Adverse Effect or where such taxes and governmental charges are being disputed in good faith.

4.6    Requirements; Zoning.  The Land complies in all material respects with all Laws and governmental requirements, including all subdivision and platting requirements, without reliance on any adjoining or neighboring property.  The current and anticipated use of the

Property complies in all material respects with all applicable zoning ordinances, regulations and restrictive covenants affecting the Land without the existence of any variance, non-complying use, nonconforming use or other special exception, all use restrictions of any Tribunal having jurisdiction have been satisfied, and no violation of any Law or regulation exists with respect thereto that could reasonably be expected to have a Material Adverse Effect.

4.7    Separate Tax Lot.    The Land is not part of a larger tract of land owned by Borrower or any of its affiliates or any Guarantor, is not otherwise included under any unity of title or similar covenant with other lands not encumbered by the Deed of Trust, and constitutes a separate tax lot or lots with a separate tax assessment or assessments for the Land, independent of those for any other lands or improvements.

4.8    Limited Assets and Liabilities.    Except for assets and liabilities, not material in the aggregate, that are incidental to its ownership of the Property, the assets of Borrower consist solely of the Property, and the liabilities of Borrower are limited to those created under this Agreement and the other Loan Documents.  Borrower owns the Property, subject to no rights of others other than Permitted Encumbrances (as defined in the Deed of Trust), including rights of first refusal, rights of first offer or other rights to acquire, or liens (other than under the Deed of Trust).

4.9    [Intentionally Omitted].

4.10    Financial Matters.    Borrower is solvent after giving effect to all borrowings contemplated by the Loan Documents and no proceeding under any Debtor Relief Law is pending (or to Borrower's knowledge threatened) by or against Borrower or any affiliate of Borrower as a debtor.  All Financial Statements, financial information, reports, statements, plans, budgets, applications, agreements and other data and information (collectively, "Submissions") heretofore furnished or hereafter to be furnished by or on behalf of Borrower to Agent are and will be true, correct and complete in all material respects as of their respective dates and do not and will not omit to state any fact or circumstance necessary to make the statements contained therein not misleading.  There has been no event or condition that could reasonably be expected to have a Material Adverse Effect on Borrower's or to Borrower's knowledge Guarantor's financial condition from the financial condition of Borrower or to Borrower's knowledge Guarantor (as the case may be) indicated in such Submissions.  To Borrower's knowledge, no material adverse change has occurred since the dates of such Submissions in the financial condition of any tenant under any lease described therein.

4.11    Borrower Not a Foreign Person.    Borrower is not a "foreign person" within the meaning of the Code, Sections 1445 and 7701 (i.e., Borrower is not a non-resident alien, foreign corporation, foreign partnership, foreign trust or foreign estate as those terms are defined therein and in any regulations promulgated thereunder).

4.12    Business Loan.    The Loan is solely for business and or investment purposes, and is not intended for personal, family, household or agricultural purposes.  Borrower warrants that the proceeds of the Loan shall be used for commercial purposes and stipulates that the Loan shall be construed for all purposes as a commercial loan.

4.13    No Work Prior to Recordation.  Prior to recordation of the Deed of Trust, except as disclosed to Agent in writing, no work of any kind (including destruction or removal of any existing improvements, site work, clearing, grading, grubbing, draining or fencing of the Land) has been or will be commenced or performed on the Land, no equipment or material has been or will be delivered to or placed upon the Land for any purpose whatsoever, and no contract (or memorandum or affidavit thereof) for the supplying of labor, materials or services for the design or construction of any improvements, or the surveying of the Land, and no affidavit or notice of commencement of construction of any improvements, has been or will be executed or recorded, which could cause a mechanic's or materialmen's lien or similar lien to achieve priority over the Deed of Trust or the rights of Agent and Lenders thereunder.

4.14    No Sale Encumbrance.

(a)    Borrower agrees that Borrower shall not without the prior written consent of Agent Transfer the Property or any part thereof or permit the Property or the collateral securing the Loan or any part thereof to be Transferred except as permitted by Section 7.25. Agent shall not be required to demonstrate any actual impairment of the Property or the collateral for the Loan or any increased risk of default hereunder or under the Loan in order to declare the Obligations immediately due and payable upon any Transfer of the Property without Agent's consent.  Without the prior written consent of Agent, Borrower shall not Transfer (whether directly or indirectly, whether by operation of law or otherwise) any of its ownership interests in the Property.

(b)    As used in this Section 4.14, "Transfer" shall mean any voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment or transfer of all or any part of the Property or any interest therein including, but not limited to: (i) an installment sales agreement wherein Borrower agrees to sell the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Property for other than actual occupancy by a space tenant thereunder; (iii) a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any leases or any rents other than to Lenders as additional security for the Loan; (iv) if Borrower, Guarantor, or any managing member or general partner of Borrower, or Guarantor is a corporation, any Transfer of such corporation's stock (or the stock of any corporation directly or indirectly controlling such Borrower, Guarantor, managing member or general partner by operation of law or otherwise) or the creation or issuance of new stock in one or a series of transactions by which any stock shall directly or indirectly be vested in or pledged to a party or parties who are not now stockholders; (v) except as permitted by the applicable organization documents of Borrower or any managing member of Borrower, if Borrower, Guarantor, or any managing member of Borrower, or Guarantor is a limited liability company or partnership, the Transfer by which any ownership interest in such limited liability company or partnership interests in such partnership shall directly or indirectly be vested in or pledged to parties not having an ownership interest as of the date of this Agreement unless as a direct result of the death of any partner or member or estate planning by such party; provided that at least one (1) of the current managing members remains as managing member of Borrower or if none of the current managing members remains as managing member, then Borrower shall engage a replacement managing member acceptable to Agent in its sole discretion provided that any Transfer occurring solely as a consequence of death shall not be deemed to violate this provision.

and (vi) if Borrower. any Guarantor or any managing member or general partner of Borrower. or any Guarantor is a partnership. limited liability company or joint venture. the change. removal or resignation of a general partner. managing member or joint venturer or the Transfer directly or indirectly of all or any portion of the partnership or ownership interest of any general partner. managing member or joint venturer.

## ARTICLE 5 - DEFAULT AND REMEDIES

5.1    Events of Default.  The occurrence of any one of the following shall be a default under this Agreement ("Default"):

(a)    Any of the Indebtedness is not paid within five (5) Business Days of when due. whether on the scheduled due date or upon acceleration. maturity or otherwise.

(b)    Any covenant. agreement or condition in this Agreement or in any other Loan Document (other than covenants to pay the Indebtedness and other than Defaults expressly listed in this Section 5.1) is not fully and timely performed. observed or kept. and such failure is not cured within thirty (30) days after written notice from Agent, provided that if the nature of such default is that it reasonably requires more than 30 days to cure in the opinion of Agent. Borrower shall not be in Default so long as Borrower commences such cure within such 30 day period and diligently prosecutes the same to completion.

(c)    Any statement, representation or warranty in any of the Loan Documents. or in any Financial Statement or any other writing heretofore or hereafter delivered to Agent or any Lender in connection with the Indebtedness is false. misleading or erroneous in any material respect on the date hereof or on the date as of which such statement, representation or warranty is made.

(d)    A default occurs under any other Loan Document (taking into account any applicable notice and cure period set forth in such Loan Document).

(e)    A default occurs under the Environmental Agreement (taking into account any applicable notice and cure period set forth in said agreement).

(f)    Any insurance required under the Loan Documents lapses or ceases to be in full force and effect.

(g)    The owner of the Property enters into any lease of part or all of the Property which does not comply with the Loan Documents.

(h)    A lien for the performance of work or the supply of materials which is established against the Property. or any stop notice served on Borrower. Agent or any Lender. remains unsatisfied or unbonded for a period of thirty (30) days after the date of filing or service.

(i)    Borrower. Guarantor, or any person liable. directly or indirectly. for any part of the Indebtedness (or any general partner or joint venturer of any of the foregoing):

(i)    (A) Executes an assignment for the benefit of creditors, or takes any action in furtherance thereof; or (B) admits in writing its inability to pay, or fails to pay, its debts generally as they become due; or (C) as a debtor, files a petition, case, proceeding or other action pursuant to, or voluntarily seeks the benefit or benefits of, any Debtor Relief Law, or takes any action in furtherance thereof; or (D) seeks the appointment of a receiver, trustee, custodian or liquidator of the Property or any part thereof or of any significant portion of its other property; or

(ii)    Suffers the filing of a petition, case, proceeding or other action against it as a debtor under any Debtor Relief Law or seeking appointment of a receiver, trustee, custodian or liquidator of the Property or any part thereof or of any significant portion of its other property, and (A) admits, acquiesces in or fails to contest diligently the material allegations thereof, or (B) fails to have the petition, case, proceeding or other action permanently dismissed or discharged on or before the earlier of trial thereon or the sixtieth (60th) day following the date of its filing; or

(iii)    Conceals, removes, or permits to be concealed or removed, any part of its property, with intent to hinder, delay or defraud its creditors or any of them, or makes or suffers a transfer of any of its property which may be fraudulent under any fraudulent conveyance law or Debtor Relief Law; or makes any transfer of its property to or for the benefit of a creditor at a time when other creditors similarly situated have not been paid; or suffers or permits, while insolvent, any creditor to obtain a lien (other than as described in clause (iv) below) upon any of its property through legal proceedings which are not vacated and such lien is not discharged prior to enforcement thereof or in any event within sixty (60) days from the date thereof; or

(iv)    Fails to have discharged within a period of ten (10) days any attachment, sequestration, or similar writ levied upon any of its property; or

(v)    Fails to promptly pay any final money judgment against it.

(j)    Borrower, Guarantor or any person obligated to pay any part of the Indebtedness is liquidated, terminated, dissolved, or merged or consolidated into another entity, or fails or ceases to be in good standing in the State of Nevada and/or the state of its incorporation or organization, if different except to the extent such failure does not constitute a Material Adverse Effect.

(k)    [Intentionally Omitted].

(l)    Agent determines that an event or condition that could reasonably be expected to have a Material Adverse Effect has occurred in the financial condition of Borrower or any Guarantor or in the condition of the Property, which is not cured within thirty (30) days after written notice from Agent, provided that if the nature of such Material Adverse Effect is that it reasonably requires more than 30 days to cure in the opinion of Agent, Borrower shall not be in Default so long as Borrower commences such cure within such 30 day period and diligently prosecutes the same to completion.

(m)    For any reason, without Agent's specific written consent, any Loan Document or the Environmental Agreement ceases to be in full force and effect, or is declared null and void or unenforceable, in whole or in part, or the validity or enforceability thereof, in whole or in part, is challenged or denied by any party thereto other than Agent; or the liens, mortgages or security interests of Agent for the benefit of Lenders in any of the Property become unenforceable, in whole or in part, or cease to be of the priority herein required, or the validity or enforceability thereof, in whole or in part, is challenged or denied by Borrower, Guarantor or any person obligated to pay any part of the Indebtedness.

(n)    A default occurs under any of the Subordinate Loan Documents (taking into account any applicable notice and cure periods set forth in such Subordinate Loan Document).

(o)    A default or breach occurs under the Purchase Agreement or the Development Agreement (taking into account any applicable notice and cure periods set forth in such agreements) or construction of the infrastructure Improvements described in the Development Agreement is not on schedule in accordance with the Development Agreement in the determination of Agent.

5.2    Remedies.  Upon a Default, Agent may with the consent of, and shall at the direction of, the Required Lenders, without notice, exercise any and all rights and remedies afforded by this Agreement, the other Loan Documents, the Environmental Agreement, Law, equity or otherwise, including (a) declaring any and all Indebtedness immediately due and payable, (b) reducing any claim to judgment, or (c) obtaining appointment of a receiver (to which Borrower hereby consents) and or judicial or nonjudicial foreclosure under the Deed of Trust. Provided, however, upon a Default, Agent at its election may (but shall not be obligated to) without the consent of, and shall at the direction of, the Required Lenders, without notice, do any one or more of the following: (a) terminate Lenders' Commitment to lend; (b) in its own name on behalf of Lenders or in the name of Borrower, enter into possession of the Property; or (c) set-off and apply against any Indebtedness, to the extent thereof and to the maximum extent permitted by Law, any and all deposits, funds, or assets in which Agent has been granted a security interest on behalf of Lenders pursuant to any Loan Document to or for the credit or account of Borrower.

Borrower hereby appoints Agent as Borrower's attorney-in-fact, which power of attorney is irrevocable and coupled with an interest, with full power of substitution if Agent so elects, to do any of the following in Borrower's name upon the occurrence of a Default: (i) endorse the name of Borrower on any checks or drafts representing proceeds of any insurance policies, or other checks or instruments payable to Borrower with respect to the Property; (ii) prosecute or defend any action or proceeding incident to the Property; and (iii) pay, settle, or compromise all bills and claims so as to clear title to the Property. Any amounts expended by Agent on its own behalf or on behalf of Lenders in connection with the exercise of its remedies herein shall be deemed to have been advanced to Borrower hereunder as a demand obligation owing by Borrower to Agent or Lenders as applicable and shall constitute a portion of the Indebtedness, regardless of whether such amounts exceed any limits for Indebtedness otherwise set forth herein. Neither Agent nor any Lender shall have any liability to Borrower for the sufficiency or adequacy of any such actions taken by Agent.

No delay or omission of Agent or Lenders to exercise any right, power or remedy accruing upon the happening of a Default shall impair such right, power or remedy or be construed to be a waiver of such Default or any acquiescence therein. No delay or omission on the part of Agent or Lenders to exercise any option for acceleration of the maturity of the Indebtedness or for foreclosure of the Deed of Trust following any Default as aforesaid, or any other option granted to Agent and Lenders hereunder in any one or more instances, and no acceptance by Agent or Lenders of any partial payment on account of the Indebtedness, shall constitute a waiver of such Default, and each such option shall remain continuously in full force and effect. No remedy herein conferred upon or reserved to Agent and/or Lenders is intended to be exclusive of any other remedies provided for in any Note, any of the other Loan Documents or the Environmental Agreement, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder, or under any Note, any of the other Loan Documents or the Environmental Agreement, or now or hereafter existing at Law or in equity or by statute. Every right, power and remedy given to Agent and Lenders by this Agreement, any Note, any of the other Loan Documents or the Environmental Agreement shall be concurrent, and may be exercised from time to time as often as may be deemed expedient by the Required Lenders. Every right, power and remedy given to Agent and Lenders by this Agreement, any Note or any of the Loan Documents may be pursued separately, successively or together against Borrower, or the Property or any part thereof, or any personal property granted as security under the Loan Documents.

Regardless of how a Lender may treat payments received from the exercise of remedies under the Loan Documents or the Environmental Agreement for the purpose of its own accounting, for the purpose of computing the Indebtedness, payments shall be applied as elected by Lenders. No application of payments will cure any Default or prevent acceleration or continued acceleration of amounts payable under the Loan Documents or the Environmental Agreement or prevent the exercise or continued exercise of rights or remedies of Agent and Lenders hereunder or thereunder or at Law or in equity.

## ARTICLE 6 - AGENT

6.1    Appointment and Authorization of Agent.

(a)    Each Lender hereby irrevocably (subject to Section 6.9) appoints, designates and authorizes Agent to take such action on its behalf under the provisions of this Agreement, each other Loan Document and the Environmental Agreement and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement, any other Loan Document or the Environmental Agreement, together with such powers as are reasonably incidental thereto. Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document or the Environmental Agreement, Agent shall not have any duties or responsibilities except those expressly set forth herein, nor shall Agent have or be deemed to have any fiduciary relationship with any Lender. No implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or the Environmental Agreement or shall otherwise exist against Agent. Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents and the Environmental Agreement with reference to Agent is not intended to connote any fiduciary or other implied (or express) obligations arising

under agency doctrine of any applicable Law. Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)    No individual Lender or group of Lenders shall have any right to amend or waive, or consent to the departure of any party from any provision of any Loan Document or the Environmental Agreement, or secure or enforce the obligations of Borrower or any other party pursuant to the Loan Documents or the Environmental Agreement, or otherwise. All such rights, on behalf of Agent or any Lender or Lenders, shall be held and exercised solely by and at the option of Agent for the pro rata benefit of Lenders. Such rights, however, are subject to the rights of a Lender or Lenders, as expressly set forth in this Agreement, to approve matters or direct Agent to take or refrain from taking action as set forth in this Agreement. Except as expressly otherwise provided in this Agreement, the other Loan Documents or the Environmental Agreement, Agent shall have and may use its sole discretion with respect to exercising or refraining from exercising any discretionary rights or taking or refraining from taking any actions which Agent is expressly entitled to exercise or take under this Agreement, the other Loan Documents and the Environmental Agreement, including (i) the determination if and to what extent matters or items subject to Agent's satisfaction are acceptable or otherwise within its discretion, (ii) the making of Agent Advances, and (iii) the exercise of remedies pursuant to, but subject to, Article 5 or pursuant to any other Loan Document or the Environmental Agreement, and any action so taken or not taken shall be deemed consented to by Lenders.

(c)    In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to Borrower or Guarantor, no individual Lender or group of Lenders shall have the right, and Agent (irrespective of whether the principal of the Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether Agent shall have made any demand on Borrower) shall be exclusively entitled and empowered on behalf of itself and Lenders, by intervention in such proceeding or otherwise:

(i)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loan and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of Lenders and Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of Lenders and Agent and their respective agents and counsel and all other amounts due Lenders and Agent under Section 7.11 allowed in such judicial proceeding; and

(ii)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to Agent and, in the event that Agent shall consent to the making of such payments directly to Lenders, to pay to Agent any amount due for the reasonable compensation, expenses,

disbursements and advances of Agent and its agents and counsel, and any other amounts due Agent under Section 7.11.

Nothing contained herein shall be deemed to authorize Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of Lenders except as approved by the Required Lenders or to authorize Agent to vote in respect of the claims of Lenders except as approved by the Required Lenders in any such proceeding.

6.2    Delegation of Duties.  Agent may execute any of its duties under this Agreement, any other Loan Document or the Environmental Agreement by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultant experts concerning all matters pertaining to such duties.   Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects with reasonable care.

6.3    Liability of Agent.  No Agent-Related Persons shall (a) be liable for any action taken or omitted to be taken by any of them under or in connection with this Agreement, any other Loan Document or the Environmental Agreement or the transactions contemplated hereby (except for its own gross negligence or willful misconduct), or (b) be responsible in any manner to any Lender for any recital, statement, representation or warranty made by Borrower or any subsidiary or Affiliate of Borrower, or any officer thereof, contained herein, or in any other Loan Document or the Environmental Agreement, or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with, this Agreement, any other Loan Document or the Environmental Agreement, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, any other Loan Document or the Environmental Agreement, or for any failure of Borrower or any other party to any Loan Document or the Environmental Agreement to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document or the Environmental Agreement, or to inspect the properties, books or records of Borrower, Guarantor, or any of their Affiliates.

6.4    Reliance by Agent.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon advice and statements of legal counsel (including counsel to any party to the Loan Documents or the Environmental Agreement), independent accountants and other experts selected by Agent.  Agent shall be fully justified in failing or refusing to take any action under this Agreement, any other Loan Document or the Environmental Agreement unless it shall first receive such advice or concurrence of the Required Lenders or all Lenders if required hereunder as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement, any other Loan Document or the Environmental Agreement in accordance with a request or consent of the Required Lenders or such greater number of Lenders as may be expressly required hereby in any instance, and such request and

any action taken or failure to act pursuant thereto shall be binding upon all Lenders. In the absence of written instructions from the Required Lenders or such greater number of Lenders, as expressly required hereunder, Agent may take or not take any action, at its discretion, unless this Agreement specifically requires the consent of the Required Lenders or such greater number of Lenders.

6.5    Notice of Default. Agent shall not be deemed to have knowledge or notice of the occurrence of any Default, unless Agent shall have received written notice from a Lender or Borrower referring to this Agreement, describing such Default that Agent determines will have a Material Adverse Effect. Agent will notify Lenders of its receipt of any such notice. Agent shall take such action with respect to such Default as may be requested by the Required Lenders in accordance with Article 5; provided, however, that unless and until Agent has received any such request, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default as it shall deem advisable or in the best interest of Lenders.

6.6    Credit Decision; Disclosure of Information by Agent.

(a)    Each Lender and each Agent-Related Person acknowledges that none of Agent-Related Persons has made any representation or warranty to it, and that no act by Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of Borrower and/or Guarantor, shall be deemed to constitute any representation or warranty by any Agent-Related Person to Lenders or to any other Agent-Related Person or any of them as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender and each Agent-Related Person represents to Agent and each other that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower and Guarantor, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to Borrower hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents and the Environmental Agreement, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of Borrower and Guarantor.

(b)    Agent upon its receipt shall provide each Lender such notices, reports and other documents expressly required to be furnished to Lenders by Agent herein. To the extent not already available to a Lender, Agent shall also provide the Lender and/or make available for the Lender's inspection during reasonable business hours and at the Lender's expense, upon the Lender's written request therefor: (i) copies of the Loan Documents and the Environmental Agreement; (ii) such information as is then in Agent's possession in respect of the current status of principal and interest payments and accruals in respect of the Loan; (iii) copies of all current financial statements in respect of Borrower, or any Guarantor or other person liable for payment or performance by Borrower of any obligations under the Loan Documents or the Environmental Agreement, then in Agent's possession with respect to the Loan; and (iv) other current factual

information then in Agent's possession with respect to the Loan and bearing on the continuing creditworthiness of Borrower or any Guarantor, or any of their respective Affiliates; provided that nothing contained in this Section 6.6 shall impose any liability upon Agent for its failure to provide a Lender any of such Loan Documents, the Environmental Agreement, information, or financial statements, unless such failure constitutes willful misconduct or gross negligence on Agent's part; and provided, further, that Agent shall not be obligated to provide any Lender with any information in violation of Law or any contractual restrictions on the disclosure thereof (provided such contractual restrictions shall not apply to distributing to a Lender factual and financial information expressly required to be provided herein). Except as set forth above, Agent shall not have any duty or responsibility to provide Lenders or any of them with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of Borrower or Guarantor or any of their respective Affiliates which may come into the possession of any of Agent-Related Persons.

6.7     Indemnification of Agent.  Whether or not the transactions contemplated hereby are consummated, Lenders shall indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of Borrower and without limiting the obligation of Borrower to do so), pro rata, and hold harmless each Agent-Related Person from and against any and all Indemnified Liabilities incurred by it; provided, however, that no Lender shall be liable for the payment to any Agent-Related Person of any portion of such Indemnified Liabilities to the extent determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Agent-Related Person's own gross negligence or willful misconduct; provided, further, that no action taken in accordance with the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 6.7.  Without limitation of the foregoing, to the extent that Agent is not reimbursed by or on behalf of Borrower, each Lender shall reimburse Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by Agent as described in Section 7.11.  The undertaking in this Section 6.7 shall survive the payment of all Indebtedness hereunder and the resignation or replacement of Agent.

6.8     Agent in Individual Capacity.  Agent, in its individual capacity, and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire equity interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with any party to the Loan Documents or the Environmental Agreement and their respective Affiliates as though Agent were not Agent hereunder and without notice to or consent of Lenders.

6.9     Successor Agent.  Agent may, and at the request of the Required Lenders as a result of Agent's gross negligence or willful misconduct in performing its duties under this Agreement shall, resign as Agent upon 30 days' notice to Lenders.  If Agent resigns under this Agreement, the Required Lenders shall appoint from among Lenders a successor Agent for Lenders, which successor Agent shall be consented to by Borrower at all times other than during the existence of a Default (which consent of Borrower shall not be unreasonably withheld or delayed).  If no successor Agent is appointed prior to the effective date of the resignation of Agent, Agent may appoint, after consulting with Lenders and Borrower, a successor Agent from among Lenders.  Upon the acceptance of its appointment as successor Agent hereunder, such successor Agent shall succeed to all the rights, powers and duties of the retiring Agent and the

term "Agent" shall mean such successor Agent, and the retiring Agent's appointment, powers and duties as Agent shall be terminated. After any retiring Agent's resignation hereunder as Agent, the provisions of this Article 6 and other applicable Sections of this Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Agent under this Agreement. If no successor Agent has accepted appointment as Agent by the date which is thirty (30) days following a retiring Agent's notice of resignation, the retiring Agent's resignation shall nevertheless thereupon become effective and Lenders shall perform all of the duties of Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.

    6.10    Releases; Acquisition and Transfers of Collateral.

        (a)    Lenders hereby irrevocably authorize Agent to transfer or release any lien on, or after foreclosure or other acquisition of title by Agent on behalf of the Lenders to transfer or sell, any Loan collateral (i) upon the termination of the Commitments and payment and satisfaction in full of all Indebtedness, (ii) in connection with a release, transfer or sale of a lien or property if Borrower will certify to Agent that the release, transfer or sale is permitted under this Agreement or the other Loan Documents (and Agent may rely conclusively on any such certificate without further inquiry), or (iii) after foreclosure or other acquisition of title (A) for a purchase price of 90% of the value indicated in the most recent appraisal of the collateral obtained by Agent made in accordance with regulations governing Agent, less any reduction indicated in the appraisal estimated by experts in such areas, or (B) if approved by the Required Lenders.

        (b)    If all or any portion of the Loan collateral is acquired by foreclosure or by deed in lieu of foreclosure after the occurrence of a Default hereunder, Agent shall take title to the collateral in its name or by an Affiliate of Agent, but for the benefit of all Lenders in their Pro Rata Shares on the date of the foreclosure sale or recordation of the deed in lieu of foreclosure (the "Acquisition Date"). Agent and all Lenders hereby expressly waive and relinquish any right of partition with respect to any collateral so acquired. After any collateral is acquired, Agent shall appoint and retain one or more persons (individually and collectively, the "Property Manager") experienced in the management, leasing, sale and/or disposition of similar properties. After consulting with the Property Manager, Agent shall prepare a written plan for operation, management, maintenance, repair, sale and disposition of the Loan collateral and a budget for the aforesaid, which may include a reasonable management fee payable to Agent (the "Business Plan"). Agent will deliver the Business Plan not later than the sixtieth (60th) day after the Acquisition Date to each Lender with a written request for approval of the Business Plan. If the Business Plan is approved by the Required Lenders, Agent and the Property Manager shall adhere to the Business Plan until a different Business Plan is approved by the Required Lenders. Agent may propose an amendment to the Business Plan as it deems appropriate, which shall also be subject to Required Lender approval. If the Business Plan (as may be amended) proposed by Agent is not approved by the Required Lenders, or if sixty (60) days have elapsed following the Acquisition Date without a Business Plan being proposed by Agent, any Lender may propose an alternative Business Plan, which Agent shall submit to all Lenders for their approval. If an alternative Business Plan is approved by the Required Lenders, Agent may appoint one of the approving Lenders to implement the alternative Business Plan. Notwithstanding any other provision of this Agreement, unless in violation of an approved Business Plan or otherwise in an

emergency situation, Agent shall, subject to clause (a) of this Section 6.10, have the right but not the obligation to take any action in connection with the Loan collateral (including those with respect to property taxes, insurance premiums, operation, management, maintenance, repair, sale and disposition), or any portion thereof.

(c)     Upon request by Agent or Borrower at any time, Lenders will confirm in writing Agent's authority to sell, transfer or release any such liens of particular types or items of Loan collateral pursuant to this Section 6.10; provided, however, that (i) Agent shall not be required to execute any document necessary to evidence such release, transfer or sale on terms that, in Agent's opinion, would expose Agent to liability or create any obligation or entail any consequence other than the transfer, release or sale without recourse, representation or warranty, and (ii) such transfer, release or sale shall not in any manner discharge, affect or impair the obligations of Borrower other than those expressly being released.

(d)     If only two (2) Lenders exist at the time Agent receives a purchase offer for Loan collateral for which one of the Lenders does not consent within ten (10) Business Days after notification from Agent, the consenting Lender may offer ("Purchase Offer") to purchase all of the non-consenting Lender's right, title and interest in the collateral for a purchase price equal to the non-consenting Lender's Pro Rata Share of the net proceeds anticipated from such sale of such collateral (as reasonably determined by Agent, including the undiscounted face principal amount of any purchase money obligation not payable at closing) ("Net Proceeds"). Within ten (10) Business Days thereafter the non-consenting Lender shall be deemed to have accepted such Purchase Offer unless the non-consenting Lender notifies Agent that it elects to purchase all of the consenting Lender's right, title and interest in the collateral for a purchase price payable by the non-consenting Lender in an amount equal to the consenting Lender's Pro Rata Share of the Net Proceeds. Any amount payable hereunder by a Lender shall be due on the earlier to occur of the closing of the sale of the collateral or ninety (90) days after the Purchase Offer, regardless of whether the collateral has been sold.

6.11    Application of Payments.    Except as otherwise provided below with respect to Defaulting Lenders, aggregate principal and interest payments, payments for Indemnified Liabilities, and/or foreclosure or sale of the collateral, and net operating income from the collateral during any period it is owned by Agent on behalf of Lenders ("Payments") shall be apportioned pro rata among Lenders and payments of any fees (other than fees designated for Agent's separate account) shall, as applicable, be apportioned pro rata among Lenders. Notwithstanding anything to the contrary in this Agreement, all Payments due and payable to Defaulting Lenders shall be due and payable to and be apportioned pro rata among Agent and Electing Lenders.    Such apportionment shall be in the proportion that the Defaulting Lender Payment Amounts paid by them bears to the total Defaulting Lender Payment Amounts of such Defaulting Lender.    Such apportionment shall be made until Agent and Lenders have been paid in full for the Defaulting Lender Payment Amounts.    All pro rata Payments shall be remitted to Agent and all such payments not constituting payment of specific fees, and all proceeds of the Loan collateral received by Agent, shall be applied first, to pay any fees, indemnities, costs, expenses (including those in Section 6.7) and reimbursements then due to Agent from Borrower; second, to pay any fees, costs, expenses and reimbursements then due to Lenders from Borrower; third, to pay pro rata interest and late charges due in respect of the Indebtedness  and Agent Advances; fourth, to pay or prepay pro rata principal of the Indebtedness  and Agent Advances;

and last. to Borrower. if required by Law, or Lenders in Pro Rata Share percentages equal to their percentages at the termination of the Aggregate Commitments.

    6.12   Benefit.  The terms and conditions of this Article 6 are inserted for the sole benefit of Agent and Lenders: the same may be waived in whole or in part, with or without terms or conditions, without prejudicing Agent's or Lenders' rights to later assert them in whole or in part.

    6.13   The Co-Arrangers.  Except as set forth in Section 7.7. the Co-Arrangers, each in their respective capacities as such. shall have no duties or responsibilities. and shall incur no liability. under this Agreement and the other Loan Documents.

    6.14   Assignment and Participations.  Borrower acknowledges that Lenders may on or after the closing date of the Loan sell and assign participation interests in and to the Loan. or pledge. hypothecate or encumber. or sell and assign all or any portion of the Loan. to or with such domestic or foreign banks. insurance companies. pension funds. trusts or other institutional lenders. parties or investors (including. without limitation. grantor trusts. owner trusts. special purpose corporations. REMICs. FASITs. CDOs. CLOs. real estate investment trusts or other similar or comparable investment vehicles) as may be selected by such Lender in its sole and absolute discretion and on terms and conditions satisfactory to such Lender in its sole and absolute discretion. Borrower shall cooperate in all respects with Lenders in connection with the sale of participation interests in. or the pledge. hypothecation or encumbrance or sale of all or any portion of. the Loan. and shall. in connection therewith. execute and deliver such estoppels. certificates. instruments and documents as may be reasonably requested by any Lender. Subject to Section 7.7. Borrower grants to Lenders the right to distribute financial and other information concerning Borrower. the Loan collateral. and all other pertinent information with respect to the Loan to any Person who has purchased a participation interest in the Loan. or who has purchased the Loan, or who has made a loan to such Lender secured by the Loan or who has expressed an interest in purchasing a participation interest in the Loan, or expressed an interest in purchasing the Loan or the making of a loan to Lender secured by the Loan. provided however in no event shall any Lender share Borrower's financial or other information with any competitor of Borrower.  If requested by any Lender. Borrower shall execute and deliver. and shall cause Borrower to execute and deliver. at no cost or expense to Borrower. such documents and instruments as may be necessary to split the Loan into two or more loans evidenced by separate sets of notes and secured by separate sets of other related Loan Documents to the full extent required by any Lender to facilitate the sale of participation interests in the Loan or the sale of the Loan or the making of a loan to any Lender secured by the Loan. it being agreed that (a) any such splitting of the Loan will not adversely affect or diminish the rights of Borrower as presently set forth herein and in the other Loan Documents and will not increase the respective obligations and liabilities of Borrower. (b) the Loan Documents securing the Loan as so split will have such priority of lien as may be specified by such Lender. and (c) the retained interest of such Lender in the Loan as so split shall be allocated to or among one or more of such separate loans in a manner specified by such Lender in its sole and absolute discretion.

## ARTICLE 7 - GENERAL TERMS AND CONDITIONS

7.1    <u>Consents</u>.  Except where otherwise expressly provided in the Loan Documents or the Environmental Agreement, in any instance where the approval or consent of Agent or Lenders or the exercise of judgment by Agent or Lenders is required, the granting or denial of such approval or consent and the exercise of such judgment shall be (a) within the sole discretion of Agent or Lenders, and (b) deemed to have been given only by a specific writing intended for the purpose given and executed by Agent or Lenders.  Notwithstanding any approvals or consents by Agent or Lenders, neither Agent nor any Lender has any obligation or responsibility whatsoever for the adequacy, form or content of any matter incident to the Property.  Any inspection, appraisal or audit of the Property or the books and records of Borrower, or the procuring of documents and financial and other information by or on behalf of Agent, shall be for the protection of Agent and Lenders only, and shall not constitute an assumption of responsibility to Borrower or anyone else with regard to the condition, value, maintenance or operation of the Property, or relieve Borrower of any of Borrower's obligations.  Neither Agent nor any Lender has any duty to supervise or to inspect the Property.

7.2    <u>Borrower's Indemnity</u>.    Neither Agent nor any Lender shall be liable or responsible for, and Borrower shall indemnify each Agent-Related Person and each Lender and their respective Affiliates, directors, officers, agents, attorneys and employees (collectively, the "<u>Indemnitees</u>") from and against: (a) any claim, action, loss or cost (including attorneys' fees and costs) arising from or relating to (i) any defect in the Property, (ii) the performance or default of Borrower, (iii) in connection with the protection and preservation of the Loan collateral (including those with respect to property taxes, insurance premiums, operation, management, maintenance, repair, sale and disposition), or (iv) the performance of any obligation of Borrower whatsoever under the Loan Documents; (b) any and all liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses and disbursements (including attorneys' fees and costs) of any kind or nature whatsoever which may at any time be imposed on, incurred by or asserted against any such Indemnitee in any way relating to or arising out of or in connection with (i) the execution, delivery, enforcement, performance or administration of any Loan Document, the Environmental Agreement or any other agreement, letter or instrument delivered in connection with the transactions contemplated thereby or the consummation of the transactions contemplated thereby, (ii) any Commitment or Loan; or (iii) any actual claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory (including any investigation of, preparation for, or defense of any pending or threatened claim, investigation, litigation or proceeding) and regardless of whether any Indemnitee is a party thereto; and (c) any and all liabilities, losses, costs or expenses (including attorneys' fees and costs) that any Indemnitee suffers or incurs as a result of the assertion of any of the foregoing claims, demands, causes of action or proceedings, or as a result of the preparation of any defense in connection with any of the foregoing claims, demands, actions, causes of action or proceedings, in all cases, whether or not an Indemnitee is a party to such claim, demand, action, cause of action or proceeding and whether it is defeated, successful or withdrawn (all of the foregoing, collectively, the "<u>Indemnified Liabilities</u>"); <u>provided</u> that such indemnity shall not, as to any Indemnitee, be available to the extent that such liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross

negligence or willful misconduct of such Indemnitee. Nothing, including any advance or acceptance of any document or instrument, shall be construed as a representation or warranty, express or implied, to any party by Agent or Lenders. Inspection shall not constitute an acknowledgment or representation by Agent or any Lender that there has been or will be compliance with the Loan Documents, the Environmental Agreement or applicable Laws, governmental requirements or restrictive covenants. Inspection, whether or not followed by notice of Default, shall not constitute a waiver of any Default then existing. Agent's failure to inspect shall not constitute a waiver of any rights of Agent or Lenders under the Loan Documents or the Environmental Agreement or at Law or in equity.

7.3    Miscellaneous. This Agreement may be executed in several counterparts, all of which are identical, and all of which counterparts together shall constitute one and the same instrument. The Loan Documents and the Environmental Agreement are for the sole benefit of Agent, Lenders and Borrower and are not for the benefit of any third party. A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision and a determination that the application of any provision of this Agreement to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons, entities or circumstances. Time shall be of the essence with respect to Borrower's obligations under the Loan Documents and the Environmental Agreement. This Agreement and its validity, enforcement and interpretation shall be governed by Nevada Law (without regard to any conflict of Laws principles) and applicable United States federal Law.

7.4    Notices.

(a)    Modes of Delivery; Changes. Except as otherwise provided herein, all notices and other communications required or which any party desires to give under this Agreement, any other Loan Document or the Environmental Agreement shall be in writing. Unless otherwise specifically provided in such other Loan Document or the Environmental Agreement, all such notices and other communications shall be deemed sufficiently given or furnished if delivered by personal delivery, by courier, by registered or certified United States mail, postage prepaid, or by facsimile (with, subject to clause (b) below, a confirmatory duplicate copy sent by first class United States mail), addressed to the party to whom directed or by electronic mail address to Borrower, at the addresses set forth at the end of this Agreement or to Agent or Lenders at the addresses specified for notices on the Schedule of Lenders (unless changed by similar notice in writing given by the particular party whose address is to be changed). Any such notice or communication shall be deemed to have been given and received either at the time of personal delivery, or in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or in the case of facsimile, upon receipt; provided, however, that service of a notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section 7.4 shall not be construed in any way to affect or impair any waiver of notice or demand provided in any Loan Document or the Environmental Agreement or to require giving of notice or demand to or upon any person in any situation or for any reason.

(b)     Effectiveness of Facsimile Signatures.   The Loan Documents and the Environmental Agreement may be transmitted and/or signed by facsimile. The effectiveness of any such documents and signatures shall, subject to applicable Law, have the same force and effect as manually-signed originals and shall be binding on all parties to the Loan Documents and the Environmental Agreement.   Agent may also require that any such documents and signatures be confirmed by a manually-signed original thereof; provided, however, that the failure to request or deliver the same shall not affect the effectiveness of any facsimile document or signature.

(c)     [Intentionally Omitted].

(d)     Reliance by Agent and Lenders.   Agent and Lenders shall be entitled to rely and act upon any notices (including telephonic Loan advance notices) purportedly given by or on behalf of Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. Borrower shall indemnify each Agent-Related Person and each Lender from all losses, costs, expenses and liabilities resulting from the reasonable reliance by such person on each notice purportedly given by or on behalf of Borrower.    All telephonic notices to and other communications with Agent may be recorded by Agent, and each of the parties hereto hereby consents to such recording.  If a Lender does not notify or inform Agent as to whether or not it consents to, or approves of, or agrees to any matter of any nature whatsoever with respect to which its consent, approval or agreement is required under the express provisions of this Agreement or with respect to which its consent, approval or agreement is otherwise requested by Agent, in connection with the Loan or any matter pertaining to the Loan, within ten (10) Business Days (or such longer period as may be specified by Agent) after such consent, approval or agreement is requested by Agent, Lender shall be deemed to have given its consent, approval or agreement, as the case may be, with respect to the matter in question.

7.5     Payments Set Aside.   To the extent that any payment by or on behalf of Borrower is made to Agent or any Lender, or Agent or any Lender exercises any right of set-off, and such payment or the proceeds of such set-off or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law, to a depository (including Agent, any Lender or its or their Affiliates) for returned items or insufficient collected funds or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force as if such payment had not been made or such set-off had not occurred, and (b) each Lender severally agrees to pay to Agent upon demand its applicable share of any amount so recovered from or repaid by Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.   Notwithstanding the foregoing, no Lender Party (as defined in Section 7.8) may exercise any right of set-off except in accordance with Section 7.8.

7.6     Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of clause (b) below, (ii) by way of participation in accordance with the provisions of clause (d) below, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of clause (f) below (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and Pro Rata Share of the Loan at the time owing to it): provided that:

(i)     except in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and Pro Rata Share of the Loan at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes its Pro Rata Share of the Loan outstanding) subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to Agent, shall not be less than $5,000,000 unless each of Agent and, so long as no Default has occurred and is continuing, Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed);

(ii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to its Pro Rata Share of the Loan and the Commitment assigned; and

(iii)     any assignment of a Commitment must be approved by Agent, unless the person that is the proposed assignee is itself a Lender (whether or not the proposed assignee would otherwise qualify as an Eligible Assignee); and

(iv)     the parties to each assignment shall execute and deliver to Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 plus the cost of any applicable endorsement to the Title Insurance or new Title Insurance.

Subject to acceptance and recording thereof by Agent pursuant to clause (c) of this Section 7.6, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, shall have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and

Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of this Agreement with respect to Borrower's obligations surviving termination of this Agreement). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (d) of this Section 7.6.

(c)    Agent, acting solely for this purpose as an agent of Borrower, shall maintain at Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of Lenders, and the Commitments of, and principal amount of each Lender's Pro Rata Share of the Loan owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and Borrower, Agent and Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)    Any Lender may, without the consent of, but with prior notice to Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or its Pro Rata Share of the Loan owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) Borrower, Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement, and (iv) except to the extent consented to by Agent in its sole discretion with respect to each participation, any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement.

(e)    A Participant shall not be entitled to receive any greater payment under Sections 2.1 through 2.8, inclusive, than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant.

(f)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    If the consent of Borrower to an assignment or to an assignee is required hereunder (including a consent to an assignment which does not meet the minimum assignment threshold specified in clause (i) of the provision to the first sentence of clause (b) above),

Borrower shall be deemed to have given its consent ten Business Days after the date notice thereof has been delivered by the assigning Lender (through Agent) unless such consent is expressly refused by Borrower prior to such tenth Business Day.

7.7    Confidentiality.  The Co-Arrangers, the Agent and each Lender agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree in writing to be bound by this Section 7.7); (b) to the extent requested by any regulatory authority; (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process; (d) to any other party to this Agreement; (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section 7.7, to (i) any assignee of or participant in, any of its rights or obligations under this Agreement, or (ii) any direct or indirect contractual counterparty or prospective counterparty (or such contractual counterparty's or prospective counterparty's professional advisor) to any credit derivative transaction relating to obligations to Borrower or Guarantor; (g) with the consent of Borrower; or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 7.7, or (ii) becomes available to Agent or any Lender on a nonconfidential basis from a source other than Borrower.  For the purposes of this Section 7.7, "Information" means all information received from Borrower or Guarantor relating to Borrower or Guarantor or their business, other than any such information that is available to Agent or any Lender on a nonconfidential basis prior to disclosure by Borrower or Guarantor; provided that, in the case of information received from Borrower or Guarantor after the date hereof, such information is clearly identified in writing at the time of delivery as confidential other than information which is delivered to Agent in accordance with this Agreement which shall at all times be subject to this Section 7.7.  Any person required to maintain the confidentiality of Information as provided in this Section 7.7 shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord to its own confidential information.  Agent and Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry, and service providers to Agent and Lenders in connection with the administration and management of this Agreement, the Loan and the Loan Documents.

7.8    No Set-off.  Neither Agent nor any Lender nor any assignee, Participant or Affiliate thereof (each, a "Lender Party") shall proceed directly, by right of set-off, banker's lien, counterclaim or otherwise, against any assets of Borrower or Guarantor (including any general or special, time or demand, provisional or other deposits or other indebtedness owing by such Lender Party to or for the credit or the account of Borrower or Guarantor) for the purpose of applying such assets against the Indebtedness, without the prior written consent of all Lenders.

7.9    Sharing of Payments.  If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the portions of the Loan advanced by it, any payment (whether voluntary, involuntary, through the exercise of any right of set-off subject to Section 7.8 or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such

Lender shall immediately (a) notify Agent of such fact, and (b) purchase from the other Lenders such participations in the portions of the Loan made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such portions of the Loan or such participations, as the case may be, pro rata with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender, such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required payment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered without further interest thereon. Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by Law, exercise all of its rights of payment (including the right of set-off, but subject to Section 7.8) with respect to such participation as fully as if such Lender were the direct creditor of Borrower in the amount of such participation. Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 7.9 and will in each case notify Lenders following any such purchases or repayments. Each Lender that purchases a participation interest pursuant to this Section 7.9 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.

    7.10    Amendments; Survival.  Agent and Lenders shall be entitled to amend (whether pursuant to a separate intercreditor agreement or otherwise) any of the terms, conditions or agreements set forth in Article 6 or as to any other matter in the Loan Documents or the Environmental Agreement respecting payments among the Agent or Lenders or the required number of Lenders to approve or disapprove any matter or to take or refrain from taking any action, without the consent of Borrower or any other Person or the execution by Borrower or any other Person of any such amendment or intercreditor agreement; provided, however, no amendment shall increase the liability of Borrower hereunder or could reasonably be expected to have a Material Adverse Effect unless such amendment is consented to in writing by Borrower. Subject to the foregoing, Agent may amend or waive any provision of this Agreement, any other Loan Document or the Environmental Agreement, or consent to any departure by any party to the Loan Documents or the Environmental Agreement therefrom which amendment, waiver or consent is intended to be within Agent's discretion or determination, or otherwise in Agent's reasonable determination shall not have a Material Adverse Effect; provided, however, otherwise no such amendment, waiver or consent shall be effective unless in writing, signed by the Required Lenders and Borrower or the applicable party to the Loan Documents or the Environmental Agreement, as the case may be, and acknowledged by Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided further, however, no such amendment, waiver or consent shall:

        (a)    extend or increase the Commitment of any Lender, without the written consent of such Lender;

        (b)    postpone any date fixed by this Agreement, any other Loan Document or the Environmental Agreement for any payment excluding mandatory prepayments of principal,

interest, fees or other amounts due to Lenders (or any of them) hereunder or under any other Loan Document or the Environmental Agreement, without the written consent of each Lender directly affected thereby;

      (c)    reduce the principal of, or the rate of interest specified herein on, any portion of the Loan, or any fees or other amounts payable hereunder or any other Loan Document or the Environmental Agreement, without the written consent of each Lender directly affected thereby; provided, however, that Agent may waive any obligation of Borrower to pay interest at the Past Due Rate and/or late charges for periods of up to thirty (30) days, and only the consent of the Required Lenders shall be necessary to waive any obligation of Borrower to pay interest at the Past Due Rate or late charges thereafter, or to amend the definition of "Past Due Rate" or "late charges":

      (d)    change the percentage of the combined Commitments or of the aggregate unpaid principal amount of the Loan which is required for Lenders or any of them to take any action hereunder, without the written consent of each Lender;

      (e)    change the definition of "Pro Rata Share" or "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

      (f)    amend this Section 7.10 without the written consent of each Lender;

      (g)    release the liability of Borrower or any existing Guarantor, without the written consent of each Lender; or

      (h)    transfer or release any lien on, or after foreclosure or other acquisition of title by Agent on behalf of Lenders transfer or sell, any Loan collateral except as permitted in Section 6.10, without the written consent of each Lender;

and, provided, further, that no amendment, waiver or consent shall, unless in writing and signed by Agent in addition to the Lenders required above, affect the rights or duties of Agent under this Agreement, any other Loan Document or the Environmental Agreement. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased without the consent of such Lender.

This Agreement shall continue in full force and effect until the Indebtedness is paid in full and all of Agent's and Lenders' obligations under this Agreement are terminated; and all representations and warranties and all provisions herein for indemnity of the Indemnitees, Agent and Lenders (and any other provisions herein specified to survive) shall survive payment in full, satisfaction or discharge of the Indebtedness, the resignation or removal of Agent or replacement of any Lender, and any release or termination of this Agreement or of any other Loan Documents.

    7.11    Costs and Expenses. Without limiting any Loan Document or the Environmental Agreement and to the extent not prohibited by applicable Laws, Borrower shall pay when due,

shall reimburse to Agent for the benefit of itself and Lenders on demand and shall indemnify Agent and Lenders from, all out-of-pocket fees, costs and expenses paid or incurred by Agent in connection with the negotiation, preparation and execution of this Agreement, the other Loan Documents and the Environmental Agreement (and any amendments, approvals, consents, waivers and releases requested, required, proposed or done from time to time), or in connection with the disbursement, or collection of the Loan or the enforcement of the obligations of Borrower or the exercise of any right or remedy of Agent, including: (a) all fees and expenses of Agent's counsel (including the reasonable allocated costs of internal legal counsel); (b) appraisal, re-appraisal and survey costs; (c) title insurance charges and premiums; (d) title search or examination costs, including abstracts, abstractors' certificates and Uniform Commercial Code searches; (e) judgment and tax lien searches for Borrower and each Guarantor; (f) escrow fees; (g) fees and costs of environmental investigations, site assessments and remediations; (h) recordation taxes, documentary taxes, transfer taxes and mortgage taxes; (i) filing and recording fees; and (j) loan brokerage fees. Borrower shall pay all costs and expenses incurred by Agent, including attorneys' fees (including the market value of services of in-house counsel), if the obligations or any part thereof are sought to be collected by or through an attorney at law, whether or not involving probate, appellate or administrative proceedings or proceedings under any Debtor Relief Law. Borrower shall pay all costs and expenses of complying with the Loan Documents and the Environmental Agreement, except as otherwise provided in the Loan Documents. Borrower's obligations under this <u>Section 7.11</u> shall survive the delivery of the Loan Documents and the Environmental Agreement, the making of advances, the payment in full of the Indebtedness, the release or reconveyance of any of the Loan Documents, the foreclosure of the Deed of Trust or conveyance in lieu of foreclosure, any proceeding under any Debtor Relief Law, and any other event whatsoever.

    7.12    <u>Tax Forms</u>.

        (a)    (i)    Each Foreign Lender shall deliver to Agent, prior to receipt of any payment subject to withholding (or after accepting an assignment or receiving a participation interest herein), two duly-signed completed copies of either Form W-8BEN or any successor thereto (relating to such Foreign Lender and entitling it to a complete exemption from withholding on all payments to be made to such Foreign Lender by Borrower pursuant to this Agreement) or Form W-8ECI or any successor thereto (relating to all payments to be made to such Foreign Lender by Borrower pursuant to this Agreement) of the United States Internal Revenue Service or such other evidence satisfactory to Borrower and Agent that such Foreign Lender is entitled to an exemption from or reduction of, United States withholding tax, including any exemption pursuant to Section 881(c) of the Code. Thereafter and from time to time, each such Foreign Lender shall (A) promptly submit to Agent such additional duly-completed and signed copies of one of such forms (or such successor forms as shall be adopted from time to time by the relevant United States taxing authorities) as may then be available under then-current United States Laws and regulations to avoid, or such evidence as is satisfactory to Borrower and Agent of any available exemption from or reduction of, United States withholding taxes in respect of all payments to be made to such Foreign Lender by Borrower pursuant to the Loan Documents or the Environmental Agreement, (B) promptly notify Agent of any change in circumstances which would modify or render invalid any claimed exemption or reduction, and (C) take such steps as shall not be materially disadvantageous to it, in the reasonable judgment of such Lenders, and as may be reasonably necessary (including the re-designation of its lending

office, if any) to avoid any requirement of applicable Laws that Borrower make any deduction or withholding for taxes from amounts payable to such Foreign Lender.

(ii)    Each Foreign Lender, to the extent it does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Lender under any of the Loan Documents or the Environmental Agreement (for example, in the case of a typical participation by such Lender), shall deliver to Agent on the date when such Foreign Lender ceases to act for its own account with respect to any portion of any such sums paid or payable, and at such other times as may be necessary in the determination of Agent (in the reasonable exercise of its discretion), (A) two duly signed completed copies of the forms or statements required to be provided by such Lender as set forth above, to establish the portion of any such sums paid or payable with respect to which such Lender acts for its own account that is not subject to U.S. withholding tax, and (B) two duly signed completed copies of United States Internal Revenue Service Form W-8IMY (or any successor thereto), together with any information such Lender chooses to transmit with such form, and any other certificate or statement of exemption required under the Code, to establish that such Lender is not acting for its own account with respect to a portion of any such sums payable to such Lender.

(iii)    Borrower shall not be required to pay any additional amount to any Foreign Lender under Section 2.9(a) with respect to any Taxes required to be deducted or withheld on the basis of the information, certificates or statements of exemption such Lender transmits with a United States Internal Revenue Service Form W-8IMY pursuant to this subsection (a) if such Lender shall have failed to satisfy the foregoing provisions of this subsection (a); provided that if such Lender shall have satisfied the requirements of this subsection (a) on the date such Lender became a Lender or ceased to act for its own account with respect to any payment under any of the Loan Documents or the Environmental Agreement, nothing in this subsection (a) shall relieve Borrower of its obligation to pay any amounts pursuant to Section 2.9 in the event that, as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such Lender is no longer properly entitled to deliver forms, certificates or other evidence at a subsequent date establishing the fact that such Lender or other person for the account of which such Lender receives any sums payable under any of the Loan Documents or the Environmental Agreement is not subject to withholding or is subject to withholding at a reduced rate.

(iv)    Agent may, without reduction, withhold any Taxes required to be deducted and withheld from any payment under any of the Loan Documents or the Environmental Agreement with respect to which Borrower is not required to pay additional amounts under this subsection (a).

(b)    Upon the request of Agent, each Lender that is a "United States person" within the meaning of Section 7701(a)(3) of the Code shall deliver to Agent two duly-signed completed copies of United States Internal Revenue Service Form W-9. If such Lender fails to deliver such forms, then Agent may withhold from any interest payment to such Lender an

amount equivalent to the applicable back-up withholding tax imposed by the Code, without reduction.

(c)    If any Tribunal asserts that Agent did not properly withhold or back-up withhold, as the case may be, any tax or other amount from payments made to or for the account of any Lender, such Lender shall indemnify Agent therefor, including all penalties and interest and costs and expenses (including attorneys' fees) of Agent. The obligation of Lenders under this clause (c) shall survive the removal or replacement of a Lender, the payment of all Indebtedness and the resignation or replacement of Agent.

7.13    Further Assurances. Borrower will, upon Agent's reasonable request (a) promptly correct any defect, error or omission in any Loan Document or the Environmental Agreement, (b) execute, acknowledge, deliver, procure, record or file such further instruments and do such further acts as Agent deems necessary, desirable or proper to carry out the purposes of the Loan Documents and the Environmental Agreement and to identify and subject to the liens and security interest of the Loan Documents any property intended to be covered thereby, including any renewals, additions, substitutions, replacements or appurtenances to the Property, (c) execute, acknowledge, deliver, procure, file or record any document or instrument Agent reasonably deems necessary, desirable or proper to protect the liens or the security interest under the Loan Documents against the rights or interests of third persons, and (d) provide such certificates, documents, reports, information, affidavits and other instruments and do such further acts deemed necessary, desirable or proper by Agent to comply with the requirements of any agency having jurisdiction over Agent. In addition, at any time, and from time to time, upon request by Agent or any Lender, Borrower will, at Borrower's expense, provide any and all further instruments, certificates and other documents as may, in the reasonable opinion of Agent or such Lender, be necessary or desirable in order to verify Borrower's identity and background in a manner reasonably satisfactory to Agent or such Lender.

7.14    Inducement to Lenders.    The representations and warranties contained in this Agreement, the other Loan Documents and the Environmental Agreement (a) are made to induce Lenders to make the Loan and extend any other credit to or for the account of Borrower pursuant hereto, and Agent and Lenders are relying thereon and will continue to rely thereon, and (b) shall survive any foreclosure, any conveyance in lieu of foreclosure, or any proceedings under any Debtor Relief Law involving Borrower, Guarantor or the Property.

7.15    [Intentionally Omitted].

7.16    Interpretation.    References to "Dollars," "$," "money," "payments" or other similar financial or monetary terms are references to lawful money of the United States of America.    References to Articles, Sections and Exhibits are, unless specified otherwise, references to articles, sections and exhibits of this Agreement.    Words of any gender shall include each other gender.    Words in the singular shall include the plural and words in the plural shall include the singular.    References to Borrower or Guarantor shall mean each person comprising the same, jointly and severally.    The words "herein," "hereof," "hereunder" and other similar compounds of the word "here" shall refer to this entire Agreement (including the attached exhibits) and not to any particular Article, Section, paragraph or provision.    The words "include" and "including" shall be interpreted as if followed by the words "without limitation."    Captions

and headings in the Loan Documents are for convenience only and shall not affect the construction of the Loan Documents. The term "person" shall include firms, associations, partnerships (including limited partnerships and limited liability partnerships), joint ventures, trusts, corporations, limited liability companies and other legal entities, including public or governmental bodies, agencies or instrumentalities, as well as natural persons.

7.17    No Partnership, etc.  The relationship between Lenders (including Agent) and Borrower is solely that of lender and borrower. Neither Agent nor any Lender has any fiduciary or other special relationship with or duty to Borrower and none is created by the Loan Documents or the Environmental Agreement. Nothing contained in the Loan Documents, and no action taken or omitted pursuant to the Loan Documents, is intended or shall be construed to create any partnership, joint venture, association or special relationship between Borrower and Agent or any Lender or in any way to make Agent or any Lender a co-principal with Borrower with reference to the Property or otherwise. In no event shall the rights and interests of Agent or Lenders under the Loan Documents or the Environmental Agreement be construed to give Agent or any Lender the right to control, or be deemed to indicate that Agent or any Lender is in control of, the business, properties, management or operations of Borrower.

7.18    Records.  The unpaid amount of the Loan and the amount of any other credit extended by Agent or Lenders to or for the account of Borrower set forth on the books and records of Agent shall be presumptive evidence of the amount thereof owing and unpaid, but failure to record any such amount on Agent's books and records shall not limit or affect the obligations of Borrower under the Loan Documents to make payments on the Loan when due.

7.19    CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

(a)    THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF CLARK, STATE OF NEVADA, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST BORROWER, COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE BORROWER, COLLATERAL OR OTHER PROPERTY MAY BE FOUND. BORROWER AND LENDERS WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE

EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 7.19.

(c)    BORROWER AND LENDERS HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER AND LENDERS REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

7.20    Service of Process.    Borrower hereby irrevocably designates and appoints J. Douglas Driggs, Jr., Santoro, Driggs, Walch, Kearney, Holley & Thompson, 400 S. 4th Street, Suite 300, Las Vegas, Nevada 89101, as Borrower's authorized agent to accept and acknowledge on Borrower's behalf service of any and all process that may be served in any suit, action or proceeding instituted in connection with this Loan in any state or federal court sitting in the State of Nevada. If such agent shall cease so to act, Borrower shall irrevocably designate and appoint without delay another such agent in the State of Nevada satisfactory to Agent and shall promptly deliver to Agent evidence in writing of such agent's acceptance of such appointment and its agreement that such appointment shall be irrevocable. Borrower hereby consents to process being served in any suit, action or proceeding instituted in connection with this Loan by (a) the mailing of a copy thereof by certified mail, postage prepaid, return receipt requested, to Borrower and (b) serving a copy thereof upon J. Douglas Driggs, Jr., Santoro, Driggs, Walch, Kearney, Holley & Thompson, 400 S. 4th Street, Suite 300, Las Vegas, Nevada 89101, the agent, if any, hereby designated and appointed by Borrower as Borrower's agent for service of process. Borrower irrevocably agrees that such service shall be deemed to be service of process upon Borrower in any such suit, action or proceeding.

7.21    USA Patriot Act Notice.    Each Lender and Agent (for itself and not on behalf of any Lender) hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow such Lender or Agent, as applicable, to identify Borrower in accordance with the Act.

7.22    Entire Agreement.    The Loan Documents and the Environmental Agreement constitute the entire understanding and agreement between and among Borrower, Agent and Lenders with respect to the transactions arising in connection with the Loan, and supersede all prior written or oral understandings and agreements between and among Borrower, Agent and Lenders with respect to the matters addressed in the Loan Documents or the Environmental Agreement. In particular, and without limitation, the terms of any commitment letter, letter of intent or quote letter by Agent or any Lender to make the Loan are merged into the Loan Documents and/or the Environmental Agreement, as applicable. Neither Agent nor any Lender has made any commitments to extend the term of the Loan past the stated Maturity Date or to

provide Borrower with financing except as set forth in the Loan Documents.   Except as incorporated in writing into the Loan Documents or the Environmental Agreement, there are not, and were not, and no persons are or were authorized by Agent or any Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Loan Documents or the Environmental Agreement.

7.23    [Intentionally Omitted]

7.24    [Intentionally Omitted]

7.25    Partial Releases.   Notwithstanding anything to the contrary set forth in this Agreement and provided no Default shall have occurred and be continuing, upon the written request of Borrower, at Borrower's expense but for no additional consideration, Agent shall, in connection with the sale of Lots described in Section 3.15 of this Agreement, release or cause its authorized representative (including but not limited to, any title company so authorized by Agent) to release from the lien of the Deed of Trust any portions of the Land specified in the notice from Borrower to be so released (the portion identified in any such notice referred to herein as the "Release Property"), upon the satisfaction of each of the following conditions (as certified by an officer of Borrower):

(a)    both the Release Property and the portion of the Land that will continue to be subject to the lien of the Deed of Trust after giving effect to the proposed release of the Release Property (the "Continuing Encumbered Land") shall constitute property interests which may be transferred without violation of applicable subdivision and land use laws;

(b)    the release of the Release Property will not (x) impair access to the remaining portion of the Continuing Encumbered Land, or (y) otherwise violate the requirements of any document of record covering the Continuing Encumbered Land or any applicable law regarding subdivisions, parcel maps, lots or parcels and/or the sale of real property;

(c)    Agent shall have received a title endorsement or other evidence reasonably satisfactory to Agent that the priority of the liens evidenced by the Deed of Trust with respect to the portion of the Continuing Encumbered Land shall be maintained as of the effectiveness of the proposed release;

(d)    Borrower shall pay all of Agent's reasonable costs and expenses including, without limitation, reasonable attorneys' fees, arising in connection with such release;

(e)    After giving effect to the proposed release, the portion of the Continuing Encumbered Land shall have a Loan-to-Value Ratio of not greater than the ratio required by Section 3.8 of this Agreement; and

(f)    prior to or concurrently with the reconveyance of the Release Property, Agent shall have received a repayment of the Loan in an amount equal to the Release Price for such Release Property, which repayment shall be applied in accordance with the provisions of Section 6.11 of this Agreement.

Upon Borrower's satisfaction of each of the conditions set forth in subsections (a) through (g) above, Agent shall execute, acknowledge, deliver, procure, record or file such further instruments and do such further acts as reasonably necessary to effectuate such release.

Upon Borrower's satisfaction of each of the above conditions, Borrower shall have the right to transfer the Release Property to a third party (including without limitation an Affiliate of Borrower) without payment of any further amounts to Borrower or pre-payment of any further indebtedness under the Loan.

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

**(Signatures appear on the following page)**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

BORROWER:

ESSEX REAL ESTATE PARTNERS, LLC,
a Nevada limited liability company

By:  Las Vegas Development Associates, LLC.
     a Nevada limited liability company
     Its:  Manager

     By:
     Name: George F. Holman
     Its: Managing Member

Borrower's Address for Notices:

Essex Real Estate Partners, LLC
2500 W. Sahara, Suite 202
Las Vegas, Nevada 89102
Attn: George F. Holman
Telephone: 702.365.6661
Telecopier: 702.365.6663
Electronic Mail:  georgeholman@mac.com

The Federal Tax Identification Number
of Borrower: 261349428

S-1
(Term Loan Agreement)

Nexbank, SSB
13455 Noel Road, Suite 2220
Dallas, Texas  75240
Attn:  Jeff Scott
Direct Dial:  (972) 934-4741
Direct Fax:  (972) 934-4790

With copies to:

Buchalter Nemer
1000 Wilshire Boulevard, 15th Floor
Los Angeles, California 90017
Attn.: Joseph Vargas, Esq.
Fax No  (213) 630-5750
Email: jvargas@buchalter.com

NEXBANK, SSB.
as Agent

By: _____
    Name: _____
    Title: _____
                    **Jeff Scott**
                **Vice President**
                NexBank, SSB

S-2
(Term Loan Agreement)

Highland Financial Corp.
13455 Noel Road, Suite 800
Dallas, Texas 75240
Attn: Clifford Stoops
Direct Dial: 972.628.4021
Direct Fax: 972.628.4022

HIGHLAND FINANCIAL CORP.,
as Co-Arranger

By: _____

Name: PETER CHUNG

Title: AUTHORIZED SIGNATORY

S-3
(Term Loan Agreement)

Integrated Financial Associates
7785 W. Sahara Ave.
Suite 100
Las Vegas, Nevada 89117
Attn: Bill Dyer
Direct Dial: (702) 257-0021
Direct Fax: (702) 257-0031

INTEGRATED FINANCIAL
ASSOCIATES, INC.,
as Co-Arranger and a Lender

By: _____
Name: _William Dyer_____
Title: _President_____

The Foothill Group, Inc.
2450 Colorado Avenue
Suite 3000W
Santa Monica, California 90404
Attn:  Mike Bohannon
Direct Dial:  (310) 453-7380
Direct Fax:  (310) 453-7470

THE FOOTHILL GROUP, INC..
as Lender

By: _____

Name: _____

Title: _____

S-5
(Term Loan Agreement)

EXHIBIT "A"

[Legal Description of Land]

Lots One (1). Eight (8). Twenty-one (21). Twenty-two (22) and Twenty-eight (28) of THE AMENDED PARENT FINAL MAP OF SOUTH EDGE, as shown by map thereof on file in Book 137 of Plats. Page 100. in the Office of the County Recorder of Clark County. Nevada.

EXHIBIT "B"

DEFINITIONS

As used in this Agreement and the attached exhibits, the following terms shall have the following meanings:

"Affiliate" means any person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under direct or indirect common control with, another person. A person shall be deemed to be "controlled by" any other person if such other person possesses, directly or indirectly, power (a) to vote 10% or more of the securities (on a fully diluted basis) having ordinary voting power for the election of directors or managing general partners or the equivalent; or (b) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.

"Agent" has the meaning set forth in the introductory paragraph of this Agreement.

"Agent Advances" means advances as set forth in Section 2.11(a) of this Agreement.

"Agent's Fee Letter" means that certain fee letter, dated as of even date herewith, between Borrower and Agent, in form and substance satisfactory to Agent.

"Agent's Office" means Agent's address and, as appropriate, account as set forth on the Schedule of Lenders, or such other address or account as Agent hereafter may designate by written notice to Borrower and Lenders.

"Agent's Time" means the time of day observed in the city where Agent's Office is located.

"Agent-Related Persons" means Agent, together with its Affiliates (including Co-Arrangers), and the officers, directors, employees, agents and attorneys-in-fact of such persons and Affiliates.

"Aggregate Commitments" means the Commitments of all Lenders.

"Agreement" has the meaning set forth in the introductory paragraph of this Agreement, and includes all exhibits attached hereto and referenced in Section 1.1.

"Allocated Loan Amount" means, with respect to a Release Property, the allocated loan amount for such Release Property as set forth on Exhibit "I" hereto.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender, or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arranger's Fee Letter" means that certain fee letter, dated as of even date herewith, between Borrower and Co-Arrangers, in form and substance satisfactory to Co-Arrangers.

B-1

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit "E."

"Assignment of Contracts" means that certain Collateral Assignment of Contracts, Licenses and Permits dated of even date herewith by Borrower in favor of Agent for the benefit of Lenders.

"Base Rate" means Thirteen and one-half percent (13.5%) per annum, as may be adjusted from time to time in accordance with the terms of this Agreement.

"Borrower" has the meaning set forth in the introductory paragraph of this Agreement.

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where Agent's Office is located.

"Co-Arrangers" has the meaning set forth in the introductory paragraph of this Agreement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Commitment" means, as to each Lender, its obligation to advance its Pro Rata Share of the Loan in an aggregate principal amount not exceeding the amount set forth opposite such Lender's name on the Schedule of Lenders at any one time outstanding, as such amount may be adjusted from time to time in accordance with this Agreement.

"Debtor Relief Law" means the Bankruptcy Code of the United States of America, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Deed of Trust" means the Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing dated of even date herewith, from Borrower to Chicago Title Insurance Company, as trustee for the benefit of Agent and Lenders, securing repayment of the Indebtedness and Borrower's performance of its other obligations to Agent and Lenders under the Loan Documents, as amended, modified, supplemented, restated and replaced from time to time.

"Default" has the meaning set forth in Section 5.1 of this Agreement.

"Defaulting Lender" means a Lender that fails to pay its Pro Rata Share of a Payment Amount within five (5) Business Days after notice from Agent, until such Lender cures such failure as permitted in this Agreement.

"Defaulting Lender Amount" means the Defaulting Lender's Pro Rata Share of a Payment Amount.

"Defaulting Lender Payment Amount" means a Defaulting Lender Amount plus interest from the date such Defaulting Lender Amount was funded by Agent and or an Electing Lender, as applicable, to the date such amount is repaid to Agent and/or such Electing Lender, as applicable, at the rate per annum applicable to such Defaulting Lender Amount under the Loan or otherwise at the Base Rate.

"Development Agreement" means the Development Agreement, dated October 19, 2007, between Seller and South Edge, LLC, a Nevada limited liability company, which agreement pertains to the development and construction of certain infrastructure improvements on the Property, and a copy of which is attached hereto as Exhibit "J" hereto.

"Disbursement Letter" means an instructional letter executed and delivered by Borrower to Agent regarding the extensions of credit to be made on the Closing Date, the form and substance of which is satisfactory to Agent.

"Eligible Assignee" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund, and (d) any other person (other than a natural person) approved by Agent and, unless a Default has occurred and is continuing, Borrower (each such approval not to be unreasonably withheld or delayed).

"Environmental Agreement" means the Environmental Indemnity Agreement of even date herewith by and among Borrower, Guarantor and Agent for the benefit of Lenders.

"Environmental Assessment" means a written report (including all drafts thereof) of an environmental assessment of the Property of such scope as may be reasonably requested by Agent, including the taking of soil borings and air and groundwater samples and other above- and below-ground testing, by a consulting firm acceptable to Agent and made in accordance with Agent's established guidelines.

"ERISA" has the meaning set forth in Section 3.11 of this Agreement.

"Exit Fee" shall mean a non-refundable fee to be paid to Agent for the benefit of Lenders in connection with the repayment or prepayment of the Loan in full, which Exit Fee shall be deemed fully earned as of the end of each calendar month during the term of Loan. The Exit Fee shall be calculated as follows: the *product of:* (x) 2.0% *times* the quotient of (i) the number of days elapsed from the closing of the Loan to the Required Payment Date (whether made in connection with a repayment of the Loan or a permitted or mandatory prepayment of the Loan in full, following a Default or otherwise) and (ii) 365, and (y) the principal balance of the Loan on the date of such prepayment.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for that day shall be the rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on the next succeeding Business Day, the Federal Funds Rate for such

day shall be the average rate (rounded upwards to the next higher 1/100 of 1%) charged to Agent on such day on such transactions as determined by Agent.

"Fee Letters" means, collectively, the Agent's Fee Letter and the Arranger's Fee Letter.

"Financial Statements" means (a) for each Reporting Party other than an individual, a balance sheet, income statement, statements of cash flow and amounts, a reconciliation of changes in equity, and unless Agent otherwise consents, consolidated and consolidating statements if the Reporting Party is a holding company or a parent of a subsidiary entity, and (b) for each Reporting Party who is an individual, a balance sheet, statements of amounts, and sources and uses of cash, and unless Agent otherwise consents, Financial Statements for each entity owned or jointly owned by the Reporting Party.

"Fund" means any person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial real estate loans and similar extensions of credit in the ordinary course of its business.

"Guarantor" means George F. Holman, an individual, and Las Vegas Development Associates, LLC, a Nevada limited liability company, whether one or more, and if more than one, each one individually or all collectively.

"Guaranty" means the Guaranty Agreement of even date herewith by Guarantor in favor of Agent for the benefit of Lenders.

"Improvements" means all on site and off site improvements to the Land or to be constructed on the Land, together with all fixtures, tenant improvements and appurtenances now or later to be located on the Land and or in such improvements.

"Indebtedness" means any and all indebtedness to Agent and or Lenders evidenced, governed or secured by, or arising under, any of the Loan Documents, including the Loan.

"Indemnified Liabilities" has the meaning set forth in Section 7.2.

"Intercreditor Agreement" means that certain Intercreditor and Subordination Agreement, dated of even date herewith, between Seller and Agent, as amended, modified, supplemented, restated and replaced from time to time.

"Interest Reserve" has the meaning set forth in Section 2.14.

"Land" means the real property described in Exhibit "A."

"Laws" means all constitutions, treaties, statutes, laws, ordinances, regulations, rules, orders, writs, injunctions, or decrees of the United States of America, any state or commonwealth, any municipality, any foreign country, any territory or possession, or any Tribunal.

"Lender" means each lender from time to time party to this Agreement.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such on the Schedule of Lenders, or such other office or offices as such Lender may from time to time notify Borrower and Agent.

"Loan" means the loan by Lenders to Borrower, in the maximum amount of $66,000,000, as such amount may be increased from time to time in accordance with the terms hereof, including without limitation pursuant to Additional Draws funded pursuant to Section 1.5 of this Agreement.

"Loan Documents" means this Agreement (including all exhibits), the Deed of Trust, the Note, the Disbursement Letter, the Guaranty, the Assignment of Contracts, the Fee Letters, any financing statements, and such other documents evidencing, securing or pertaining to the Loan as shall, from time to time, be executed and/or delivered by Borrower, Guarantor, or any other party to Agent or any Lender pursuant to this Agreement (but not including the Environmental Agreement), as they may be amended, modified, restated, replaced or supplemented from time to time.

"Loan-to-Value Ratio" has the meaning set forth in Section 3.8 of this Agreement.

"Lot" means a legally subdivided parcel, consisting of a portion of the Property.

"Material Adverse Effect" means: (a) a material adverse change in, or a material adverse effect upon, the Property, or the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) or prospects of Borrower or Borrower and its Subsidiaries taken as a whole; (b) a material impairment of the ability of any party to the Loan Documents or the Environmental Agreement to perform its obligations under any such document or agreement to which it is a party; or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any party to the Loan Documents or the Environmental Agreement of any such document or agreement to which it is a party.

"Maturity Date" means the initial maturity date of December 1, 2008, or if extended in accordance with Section 2.8(b) of this Agreement, the First Extended Maturity Date, or, if extended in accordance with Section 2.8(c) of this Agreement, the Second Extended Maturity Date, as it may be earlier terminated in accordance with the terms hereof.

"Note" means collectively each of the Deed of Trust Notes dated of even date herewith executed by Borrower and payable to the order of each Lender in the amount of the Lender's Commitment and collectively in the maximum principal amount of the Loan, substantially in the form of Exhibit "F," as amended, modified, replaced, restated, extended or renewed from time to time.

"Obligations" means all liabilities, obligations, covenants and duties of, any party to a Loan Document arising under or otherwise with respect to any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees(including the fees provided for in the Fee Letters) that accrue after the commencement by or against any party to a Loan Document or any Affiliate thereof of any proceeding under any Debtor Relief Law naming such

person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceedings.

"Past Due Rate" has the meaning set forth in Section 2.5.

"Payment Amount" means an advance of the Loan, an unreimbursed Agent Advance, an unreimbursed Indemnified Liability, or any other amount that a Lender is required to fund under this Agreement.

"Principal Debt" means the aggregate unpaid principal balance of this Loan at the time in question.

"Property" means the Land, the Improvements and all other property constituting the "Property" as described and defined in the Deed of Trust, or subject to a right, lien or security interest to secure the Loan pursuant to any other Loan Document.

"Pro Rata Share" means, with respect to each Lender at any time, a fraction expressed as a percentage, the numerator of which is the amount of the Commitment of such Lender at such time and the denominator of which is the amount of the Aggregate Commitments at such time or, if the Aggregate Commitments have been terminated, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the total outstanding amount of all Indebtedness held by such Lender at such time and the denominator of which is the total outstanding amount of all Indebtedness at such time. The initial Pro Rata Share of each Lender named on the signature pages hereto is set forth opposite the name of that Lender on the Schedule of Lenders.

"Purchase Agreement" means that certain Agreement of Purchase and Sale of Real Property and Escrow Instructions, dated July 17, 2007, between Borrower (as successor by assignment to Las Vegas Development Associates, LLC, a Nevada limited liability company), and Seller, as amended by that certain First Amendment to and Restatement of Agreement of Purchase and Sale of Real Property and Escrow Instructions, dated November 8, 2007.

"Release Price" means, with respect to each Release Property, an amount equal to the greater of: (i) one hundred percent (100%) of the gross sales price of the Release Property minus reasonable and customary closing costs incurred by Borrower in connection with the closing of the sale of the Release Property, and (ii) the Release Price for such Release Property, Lot or portion thereof in accordance with the table set forth on Exhibit "I" hereto. The amounts in the Release Price table set forth on Exhibit "I" are subject to adjustment by Agent as may be required in Agent's reasonable determination to account for Additional Draws provided by one or more Lenders in connection with a Commitment Increase under Section 1.5 of this Agreement.

"Reporting Party" means each party for whom Financial Statements are required to be delivered to Lender

"Reporting Period" means a specified period to which Financial Statements relate.

"Required Lenders" means as of any date of determination one or more Lenders having more than 50% of the Aggregate Commitments or, if the Aggregate Commitments have been terminated, one or more Lenders holding in the aggregate more than 50% of the total outstanding amount of all Indebtedness; provided that the Commitment of, and the portion of the total outstanding amount of all Indebtedness held by, any Defaulting Lender shall be excluded for purposes of making a determination of the Required Lenders.

"Required Payment Date" has the meaning set forth in Section 2.15.

"Required Yield Maintenance" means a fee due upon any prepayment made prior to the Yield Maintenance Cut-Off Date, which shall constitute liquidated damages and not a penalty, equal to the amount of interest which would have accrued on such prepaid amount had such prepaid amount remained outstanding for the term of the Loan ending on the Yield Maintenance Cut-Off Date, less the aggregate amount of all interest previously paid to Lenders by Borrower on account of such prepaid amount.

"Reserve Account" means an account established by Agent on or prior to the date hereof, which account shall be funded by Borrower as in an amount not less than $1,650,000 on or prior to the closing date of the Loan, and in accordance with Section 3.17 of this Agreement. Funds maintained in the Reserve Account shall be released in accordance with Section 3.17 of this Agreement.

"Sales Agreement" means a written sales agreement entered into by Borrower with a prospective buyer for the sale of one or more Lots.

"Schedule of Lenders" means the schedule of Lenders party to this Agreement as set forth on Exhibit "G," as it may be modified from time to time in accordance with this Agreement.

"Seller" means KB Home Nevada, Inc., a Nevada corporation, and its successors and assigns under the Subordinate Loan Documents.

"Subordinate Loan Documents" means the Subordinate Note, the Subordinate Deed of Trust and all other UCC financing statements, instruments, agreements and other documents evidencing or governing the Subordinate Loan Documents or providing for any other right in respect thereof, as amended, restated, supplemented or otherwise modified from time to time. The Subordinate Loan Documents are attached hereto as Exhibit "K".

"Subordinate Note" means that certain Note dated of even date herewith in the aggregate original principal amount of $7,000,000 made by Borrower to the order of Seller, as amended, restated, supplemented or otherwise modified from time to time.

"Subsidiary" means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries.

"Taxes" has the meaning set forth in Section 2.9(a).

"Title Company" means Chicago Title Insurance Company..

"Title Insurance" means the loan policy or policies of title insurance issued to Agent for the benefit of Lenders by Title Company, in an amount equal to the maximum principal amount of the Loan, insuring the validity and priority of the Deed of Trust encumbering the Land for the benefit of Agent and Lenders, as further described in Exhibit "C" hereto.

"Tribunal" means any state, commonwealth, federal, foreign, territorial or other court or governmental department, commission, board, bureau, district, authority, agency, central bank, or instrumentality, or any arbitration authority.

"Valuation Consultant's Appraisal" means that certain Appraisal, dated November 3, 2007, prepared by Valuation Consultants (Keith Harper, MAI) with respect to the Property.

"Yield Maintenance Cut-Off Date" means September 1, 2008.

EXHIBIT "C"

CONDITIONS PRECEDENT TO CLOSING OF THE LOAN

As conditions precedent to the closing of the Loan, if and to the extent required by Agent, Agent shall have received and approved the following:

1.    Fees and Expenses.  Any and all required commitment and other fees (including, without limitation, all fees due and payable at closing in accordance with the Fee Letters) and evidence satisfactory to Agent that Borrower has paid all other fees, costs and expenses (including the fees and costs of Lenders' counsel) then required to be paid pursuant to this Agreement and all other Loan Documents, including all fees, costs and expenses that Borrower is required to pay pursuant to any loan application or commitment.

2.    Financial Statements.  The Financial Statements of Borrower and Guarantor or any other party required by any loan application or commitment or otherwise required by Agent.

3.    Appraisal.  A market value appraisal of the Property made within 180 days prior to the date of this Agreement, which appraises the Property at not less than the appraised value required by Agent and Lenders.  The appraiser, appraisal and appraised value of the Property must be satisfactory to Agent (including satisfaction of applicable regulatory requirements) and the appraiser must be engaged directly by Agent.

4.    Authorization.  Such evidence as Agent may require of the existence, good standing, authority and capacity of Borrower, each Guarantor, and their respective constituent partners, members, managers and owners (however remote) to execute, deliver and perform their respective obligations to Agent and Lenders under the Loan Documents and the Environmental Agreement, including:

(a)    For each partnership (including a joint venture or limited partnership): (i) a true and complete copy of an executed partnership agreement or limited partnership agreement and all amendments thereto; (ii) for each limited partnership, a copy of the certificate of limited partnership and all amendments thereto accompanied by a certificate issued by the appropriate governmental official of the jurisdiction of formation that the copy is true and complete, and such evidence as Agent may require of registration or qualification to do business in the state where Borrower's principal place of business is located and if different, the state in which the Property is located; and (iii) a partnership affidavit certifying who will be authorized to execute or attest any of the Loan Documents and the Environmental Agreement, and a true and complete copy of the partnership resolutions approving the Loan Documents and the Environmental Agreement and authorizing the transactions contemplated in this Agreement, the other Loan Documents and the Environmental Agreement.

(b)    For each corporation: (i) a true and complete copy of its articles of incorporation and by-laws and all amendments thereto, a certificate of incumbency of all of its officers who are authorized to execute or attest to any of the Loan Documents and the Environmental Agreement, and a true and complete copy of resolutions approving the Loan

Documents and the Environmental Agreement and authorizing the transactions contemplated in this Agreement, the other Loan Documents and the Environmental Agreement; and (ii) certificates of existence, good standing and qualification to do business issued by the appropriate governmental officials in the state of its formation and if different, the state in which the Property is located.

   (c) For each limited liability company or limited liability partnership: (i) a true and complete copy of the articles of organization and operating agreement and all amendments thereto, a certificate of incumbency of all of its members who are authorized to execute or attest to any of the Loan Documents and the Environmental Agreement, and a true and complete copy of resolutions approving the Loan Documents and the Environmental Agreement and authorizing the transactions contemplated in this Agreement, the other Loan Documents and the Environmental Agreement; and (ii) certificates of existence, good standing and qualification to do business issued by appropriate governmental officials in the state of its formation and if different, the state in which the Property is located.

   (d) For each entity or organization that is not a corporation, partnership, limited partnership, joint venture, limited liability company or limited liability partnership, a copy of each document creating it or governing the existence, operation, power or authority of it or its representatives.

   (e) All certificates, resolutions and consents required by Agent applicable to the foregoing.

   (f) All due diligence materials deemed necessary by Agent and each Lender with respect to verifying Borrower's identity and background information in a manner satisfactory to Agent and each Lender.

 5. Loan Documents and Environmental Agreement. From Borrower, Guarantor and each other person required by Agent, all Loan Documents then required by Agent and the Environmental Agreement (with a copy for each Lender), each duly executed, acknowledged and or sworn to as required, each dated concurrently herewith and each in form and content satisfactory to Agent, and such evidence as Agent may require that the Deed of Trust has been recorded in the official records of the city or county in which the Property is located and UCC-1 financing statements have been filed in all filing offices that Agent may require.

 6. Opinions. The written opinion of counsel satisfactory to Agent for Borrower, each Guarantor, and any other persons or entities addressed to Agent for the benefit of Lenders, dated the date of this Agreement.

 7. No Special Flood Hazard Area. A flood insurance policy (with a copy for each Lender) in an amount sufficient to meet the requirements of applicable law and the Federal Emergency Management Agency, as such requirements may from time to time be in effect, and otherwise in compliance with the requirements of the Loan Documents, or evidence satisfactory to Agent that no part of the Land is located in a Special Flood Hazard Area (SFHA).

 8. Title Insurance. An ALTA extended coverage lender's title insurance policy, issued by Title Company (which shall be approved by Agent) in the maximum amount of the

Loan plus any other amount secured by the Deed of Trust, on a coinsurance and or reinsurance basis if and as required by Agent; (a) insuring without exclusion or exception for creditors' rights that the Deed of Trust constitutes a valid lien covering the Land, having the priority required by Agent and subject only to those exceptions and encumbrances (regardless of rank or priority) as Agent may approve, in a form acceptable to Agent, and with all "standard" exceptions which can be deleted, including the exception for matters which a current survey would show, deleted to the fullest extent authorized under applicable title insurance rules, and Borrower shall satisfy all requirements therefor; (b) containing no exception for standby fees or real estate taxes or assessments other than those for the year in which the closing occurs to the extent the same are not then due and payable and endorsed "not yet due and payable" and no exception for subsequent assessments for prior years; (c) providing full coverage against mechanic's, materialmen's and other similar liens to the extent authorized under applicable title insurance rules, and Borrower shall satisfy all requirements therefor; (d) insuring that no restrictive covenants shown in the Title Insurance have been violated, and that no violation of the restrictions will result in a reversion or forfeiture of title; (e) insuring all appurtenant easements; insuring that indefeasible or marketable (as coverage is available) fee simple title to the Land is vested in Borrower; (f) containing such affirmative coverage and endorsements as Agent may require and are available under applicable title insurance rules, and Borrower shall satisfy all requirements therefor; (g) insuring any easements, leasehold estates or other matters appurtenant to or benefiting the Land as part of the insured estate; (h) insuring the right of access to the Land to the extent authorized under applicable title insurance rules, and Borrower shall satisfy all requirements therefor; and (i) containing provisions acceptable to Agent regarding advances and/or readvances of Loan funds after closing. Borrower and Borrower's counsel shall not have any interest, direct or indirect, in Title Company (or its agent) or any portion of the premium paid for the Title Insurance.

9.    <u>Insurance Policies</u>. The insurance policies initially required by Agent pursuant to the Loan Documents, together with evidence satisfactory to Agent that all premiums therefor have been paid for a period of not less than one (1) year from the date of this Agreement and that the policies are in full force and effect.

10.    <u>Environmental Compliance Report</u>. Evidence satisfactory to Agent that no portion of the Land is "wetlands" under any applicable Law and that the Land does not contain and is not within or near any area designated as a hazardous waste site by any governmental authority, that neither the Property nor any adjoining property contains or has ever contained any substance classified as hazardous or toxic (or otherwise regulated, such as, without limitation, asbestos, radon and or petroleum products) under any Law or governmental requirement pertaining to health or the environment, and that neither the Property nor any use or activity thereon violates or is or could be subject to any response, remediation, clean-up or other obligation under any Law or governmental requirement pertaining to health or the environment, including an Environmental Assessment of the Property made within twelve (12) months prior to the date of this Agreement by a consulting firm acceptable to Agent, showing that there is no evidence of any such substance which has been generated, treated, stored, released or disposed of in the Property and such additional evidence as may be required by Agent. All reports, drafts of reports and recommendations, whether written or oral, from such consulting firm shall be made available and communicated to Agent.

11.    Soil Reports.  A soil composition and test boring report and a foundation report satisfactory to Agent regarding the Land, made within three (3) years prior to the date of this Agreement by a licensed professional engineer satisfactory to Lenders.

12.    Access, Utilities and Laws.  (a) Evidence satisfactory to Agent that all applicable zoning ordinances, restrictive covenants and governmental requirements affecting the Property permit the use for which the Property is intended and have been or will be complied with without the existence of any variance, non-complying use, nonconforming use or other special exception; and (b) evidence satisfactory to Agent that the Land complies and will comply with all Laws and governmental requirements regarding subdivision and platting and would so comply if the Land and the Improvements thereon were conveyed as a separate parcel.

13.    Priority.  (a) Evidence satisfactory to Agent that prior to and as of the time the Deed of Trust was filed for record (i) no activity or circumstance was visible on or near the Land which would constitute inception of a mechanic's, materialmen's or other similar lien against the Property, and (ii) no mechanic's, materialmen's or other similar lien claim or notice, lis pendens, judgment, or other claim or encumbrance against the Property has been filed for record in the county where the Property is located or in any other public record which by Law provides notice of claims or encumbrances regarding the Property; (b) a certificate or certificates of a reporting service acceptable to Agent, reflecting the results of searches made not earlier than ten (10) days prior to the date of this Agreement, (i) of the central and local Uniform Commercial Code records, showing no filings against any of the collateral for the Loan or against Borrower otherwise except as consented to by Agent, and (ii) if required by Agent, of the appropriate judgment and tax lien records, showing no outstanding judgment or tax lien against Borrower or any Guarantor.

14.    [Intentionally Omitted].

15.    Tax and Standby Fee Certificates.  Evidence satisfactory to Agent (a) of the identity of all taxing authorities and utility districts (or similar authorities) having jurisdiction over the Property or any portion thereof, (b) that all taxes, standby fees and any other similar charges have been paid, including copies of receipts or statements marked "paid" by the appropriate authority, and (c) that the Land is a separate tax lot or lots with separate assessment or assessments of the Land and Improvements independent of any other land or improvements and that the Land is a separate legally subdivided parcel.

16.    Other Documents.  Such other documents and certificates as Agent may reasonably request from Borrower, any Guarantor, and any other person or entity, in form and content satisfactory to Agent.

17.    Purchase Agreement.  Agent shall have received and approved the Purchase Agreement, which Agreement shall provide for a purchase price of $62,000,000, which shall be evidenced by cash payment of $55,000,000 and a deferred payment of $7,000,000 as more particularly described in the Purchase Agreement.

18.    Upfront Equity (Reserve Account).  Evidence satisfactory to Agent that the Borrower has funded $1,6500,000 into the Reserve Account on or before the date hereof.

EXHIBIT "D"

SURVEY REQUIREMENTS

*[Survey not required]*

EXHIBIT "E"

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (this "Assignment") is dated as of the Effective Date set forth below and is entered into by and between _____ ("Assignor") and _____ ("Assignee"). Capitalized terms used but not defined herein shall have the meanings given to them in the Term Loan Agreement identified below (the "Loan Agreement"), receipt of a copy of which is hereby acknowledged by Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, Assignor hereby irrevocably sells and assigns to Assignee, and Assignee hereby irrevocably purchases and assumes from Assignor, subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by Agent as contemplated below, (i) all of Assignor's rights and obligations as a Lender under the Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of Assignor under the respective facilities identified below (including, without limitation Guaranties, and (ii) to the extent permitted to be assigned under applicable Law, all claims, suits, causes of action and any other right of Assignor (in its capacity as a Lender) against any person, whether known or unknown, arising under or in connection with the Loan Agreement, any other documents or instruments delivered pursuant thereto or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at Law or in equity, related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "Assigned Interest"). Such sale and assignment is without recourse to Assignor and, except as expressly provided in this Assignment, without representation or warranty by Assignor.

1.    Assignor:    _____

2.    Assignee:    _____ [is an Affiliate/Approved Fund of _____]

3.    Borrower(s):    _____

4.    Agent:    _____, as the administrative agent under the Loan Agreement

5.    Loan Agreement:    The Term Loan Agreement, dated as of November 29, 2007 among Essex Real Estate Partners, LLC, a Nevada limited liability company, the Lenders parties thereto, and Nexbank SSB, as Agent, and the other agents parties thereto.

E-1

6.    Assigned Interest:

| Aggregate Amount of Commitment/Loans for all Lenders | Amount of Commitment/Loans Assigned | Percentage Assigned of Commitment/Loans |
|---|---|---|
| $_____ | $_____ | _____% |

Effective Date: _____, 20__ [TO BE INSERTED BY ADMINISTRATIVE
AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF
TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR:

_____

By: _____
       Title:


ASSIGNEE:

_____

By: _____
       Title:


[Consented to and] Accepted:

_____

as Agent

By: _____
       Title:

[Consented to:]

By: _____
       Title:

*ANNEX 1 TO ASSIGNMENT AND ASSUMPTION*

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1.    Assignor.  Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Loan Agreement, any other Loan Document or the Environmental Agreement, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents, or any collateral thereunder, or the Environmental Agreement, (iii) the financial condition of Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or the Environmental Agreement, or (iv) the performance or observance by Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document or the Environmental Agreement.

1.2.    Assignee.  Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement, (ii) it meets all requirements of an Eligible Assignee under the Loan Agreement (subject to receipt of such consents as may be required under the Loan Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Loan Agreement, together with copies of the most recent financial statements delivered pursuant to Section ___ thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision independently and without reliance on Agent or any other Lender to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, and (v) if it is a Foreign Lender, attached hereto is any documentation required to be delivered by it pursuant to the terms of the Loan Agreement, duly completed and executed by Assignee; and (b) agrees that (i) it will, independently and without reliance on Agent, Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents and the Environmental Agreement, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents and the Environmental Agreement are required to be performed by it as a Lender.

1.3    Assignee's Address for Notices, etc.  Attached hereto as Schedule 1 is all contact information, address, account and other administrative information relating to Assignee.

2.    Payments.  From and after the Effective Date. Agent shall make all payments in respect of the Assigned Interest (including payments of principal. interest. fees and other amounts) to Assignee whether such amounts have accrued prior to or on or after the Effective Date.  Assignor and Assignee shall make all appropriate adjustments in payments by Agent for periods prior to the Effective Date or with respect to the making of this Assignment directly between themselves.

3.    General Provisions.  This Assignment shall be binding upon. and inure to the benefit of. the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts. which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment.  This Assignment shall be governed by. and construed in accordance with. the Law of the State of Nevada.

*SCHEDULE 1 TO ASSIGNMENT AND ASSUMPTION*

ADMINISTRATIVE DETAILS

(ASSIGNEE TO LIST NAMES OF CREDIT CONTACTS, ADDRESSES, PHONE AND
FACSIMILE NUMBERS, ELECTRONIC MAIL ADDRESSES AND ACCOUNT AND
PAYMENT INFORMATION)

    (a)    *Domestic Lending Office:*

        Assignee Name: _____
        Address: _____
        _____
        Mail Code: _____
        Attn.: _____
        Telephone: _____
        Facsimile: _____
        Electronic Mail: _____

    (b)    *Notices:*

        Assignee Name: _____
        Address: _____
        _____
        Mail Code: _____
        Attn.: _____
        Telephone: _____
        Facsimile: _____
        Electronic Mail: _____

    (c)    *Payment Instructions:*

        Account No.: _____
        Attn.: _____
        Reference: _____

EXHIBIT "F"

DEED OF TRUST NOTE

S_____                                    November 29, 2007

FOR VALUE RECEIVED. ESSEX REAL ESTATE PARTNERS. LLC. a Nevada limited-liability company ("Borrower," whether one or more) hereby promises to pay to the order of _____ ("Lender") under that certain Loan Agreement (defined below) among Borrower. NEXBANK. SSB. as the collateral agent and administrative agent (together with any and all of its successors and assigns. "Agent") as agent for the benefit of the lenders (collectively. "Lenders") from time to time a party to that certain Term Loan Agreement (the "Loan Agreement") dated November 29, 2007. without offset. in immediately available funds in lawful money of the United States of America. at Agent's Office as defined in the Loan Agreement. the principal sum of _____ ____'100 DOLLARS ($_____ ) (or the unpaid balance of all principal advanced against this Note. if that amount is less). together with interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

1.      Note: Interest: Payment Schedule and Maturity Date.  This Note is the Note referred to in the Loan Agreement and is entitled to the benefits thereof and subject to prepayment in whole or in part as provided therein.  The entire principal balance of this Note then unpaid shall be due and payable at the times set forth in the Loan Agreement.  Accrued unpaid interest shall be due and payable at the times and at the interest rate(s) set forth in the Loan Agreement until all principal and accrued interest owing on this Note shall have been fully paid and satisfied.  Any amount not paid when due and payable hereunder shall. to the extent permitted by applicable Law. bear interest and. if applicable. a late charge as set forth in the Loan Agreement.

2.      Security: Loan Documents.  The security for this Note includes a Deed of Trust. Assignment of Rents and Leases. Security Agreement and Fixture Filing (which. as it may have been or may be amended, restated, modified or supplemented from time to time. is herein called the "Deed of Trust") dated November 29, 2007 herewith from Borrower to Chicago Title Company. Trustee. covering certain property in the City of Henderson County of Clark. State of Nevada. described therein (the "Property").  This Note. the Deed of Trust. the Loan Agreement and all other documents now or hereafter securing. guaranteeing or executed in connection with the loan evidenced by this Note (the "Loan"). as the same have been or may be amended. restated. modified or supplemented from time to time. are herein sometimes called individually a "Loan Document" and together the "Loan Documents."  Notwithstanding the foregoing. the Environmental Indemnity Agreement dated November 29, 2007 ("Environmental Indemnity Agreement") is not a Loan Document

3.      Defaults.

(a)      It shall be a default ("Default") under this Note and each of the other Loan Documents if (i) any principal. interest or other amount of money due under this Note is not paid

in full within ten (10) days of the date when due, regardless of how such amount may have become due, (ii) any covenant, agreement, condition, representation or warranty herein or in any other Loan Document is not fully and timely performed, observed or kept, subject to any applicable grace or cure periods, or (iii) there shall occur any default or event of default under the Deed of Trust or any other Loan Document, subject to any applicable grace or cure periods. Upon the occurrence of a Default, Agent on behalf of Lenders shall have the rights to declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts due hereunder and under the other Loan Documents, at once due and payable (and upon such declaration, the same shall be at once due and payable), to foreclose any liens and security interests securing payment hereof and to exercise any of its other rights, powers and remedies under this Note, under any other Loan Document, or at Law or in equity.

(b) All of the rights, remedies, powers and privileges (together, "Rights") of Agent on behalf of Lenders provided for in this Note and in any other Loan Document are cumulative of each other and of any and all other Rights at Law or in equity. The resort to any Right shall not prevent the concurrent or subsequent employment of any other appropriate Right. No single or partial exercise of any Right shall exhaust it or preclude any other or further exercise thereof, and every Right may be exercised at any time and from time to time. No failure by Agent or Lenders to exercise, and no delay in exercising any Right, including the right to accelerate the maturity of this Note, shall be construed as a waiver of any Default or as a waiver of any Right. Without limiting the generality of the foregoing provisions, the acceptance by Lender from time to time of any payment under this Note which is past due or which is less than the payment in full of all amounts due and payable at the time of such payment, shall not (i) constitute a waiver of or impair or extinguish the right of Agent or Lenders to accelerate the maturity of this Note or to exercise any other Right at the time or at any subsequent time, or nullify any prior exercise of any such Right, (ii) constitute a waiver of the requirement of punctual payment and performance or a novation in any respect, or (iii) in any way excuse the existence of a Default.

(c) If there is a prevailing party in any lawsuit, reference or arbitration arising out of or relating to this Note, the Loan Documents or the Loan, such prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in the action, reference or arbitration, including the market value of services of in-house counsel, in addition to costs and expenses otherwise allowed by law. In all other situations, Borrower agrees to pay all costs and expenses of the holder of this Note which may be incurred in enforcing or protecting the rights or interests of such holder, including attorneys' fees and expenses (including the market value of services of in-house counsel), investigation costs and all court costs, whether or not suit is filed hereon, whether before or after the Maturity Date defined in the Loan Agreement, or whether in connection with bankruptcy, insolvency or appeal, or whether collection is made against Borrower or any guarantor or endorser or any other person primarily or secondarily liable hereunder. From the time(s) incurred until paid in full to the holder of this Note, all such sums shall bear interest at the Past Due Rate defined in the Loan Agreement.

4.    Heirs, Successors and Assigns. The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to

assign the Loan except as otherwise permitted under the Loan Documents. As further provided in the Loan Agreement, a Lender may, at any time, sell, transfer, or assign all or a portion of its interest in this Note, the Deed of Trust and the other Loan Documents, as set forth in the Loan Agreement.

5.    General Provisions. Time is of the essence with respect to Borrower's obligations under this Note. If more than one person or entity executes this Note as Borrower, all of said parties shall be jointly and severally liable for payment of the indebtedness evidenced hereby. Borrower and all sureties, endorsers, guarantors and any other party now or hereafter liable for the payment of this Note in whole or in part, hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that neither Agent nor any Lender shall be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non-exclusive personal jurisdiction of any state or federal court sitting in the city and county, and venue in the city or county, in which payment is to be made as specified in Section 1 of this Note, for the enforcement of any and all obligations under this Note and the Loan Documents; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate any and all rights against Borrower and any of the security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Captions and headings in this Note are for convenience only and shall be disregarded in construing it. The words "include" and "including" shall be interpreted as if followed by the words "without limitation." THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY NEVADA LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW.

6.    Notices. Any notice, request, or demand to or upon Borrower or Lender shall be deemed to have been properly given or made when delivered in accordance with the Loan Agreement.

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN AND AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY

EVIDENCE OF PRIOR. CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.  THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.

IN WITNESS WHEREOF. Borrower has duly executed this Note as of the date first above written.

BORROWER:

**ESSEX REAL ESTATE PARTNERS, LLC.**
a Nevada limited liability company

By:  Las Vegas Development Associates. LLC.
     a Nevada limited liability company
     Its:  Manager

     By:  _____
          Name: George F. Holman
          Its: Managing Member

EXHIBIT "G"

SCHEDULE OF LENDERS

| Lender | Commitment |
|---|---|
| Integrated Financial Associates, Inc. | $23,100,000 |
| The Foothill Group, Inc. | $42,900,000 |
| All Lenders | $66,000,000 |

EXHIBIT "H"

SCHEDULE OF EXCEPTIONS TO COVENANTS, REPRESENTATIONS AND
WARRANTIES AND CLOSING CONDITIONS

      Each of the following items shall constitute an exception to the covenants set forth in Article 3 of the Agreement, and the representations and warranties set forth in Article 4 of the Agreement.

[None]

EXHIBIT "I"

ALLOCATED LOAN AMOUNTS

| | | Appraised Values And Release Prices (1st 12 Months of Loan Term) | | | | |
|---|---|---|---|---|---|---|
| | | Appraised Values | | 130% Release Price | | |
| Lot No. | Acres | by Lot | % of Appraised Value | Allocated Loan Amount | Release Price | Release Price Per Acre |
| 1 | 27.45 | 35,870,000 | 30.3% | 20,006,930 | 26,009,009 | 947,505 |
| 8 | 34.46 | 45,030,000 | 38.1% | 25,116,031 | 32,650,841 | 947,500 |
| 21 | 7.39 | 12,650,000 | 10.9% | 7,183,977 | 9,339,170 | 1,263,758 |
| 22 | 8.12 | 14,350,000 | 12.0% | 7,892,335 | 10,260,035 | 1,263,551 |
| 28 | 5.97 | 11,400,000 | 8.8% | 5,800,727 | 7,540,945 | 1,263,140 |
| | 83.39 | 119,330,000 | 100.0% | 66,000,000 | 85,800,000 | 1,028,900 |

# EXHIBIT "J"

## DEVELOPMENT AGREEMENT

[*Attached on the following pages*]

Recording Requested by
and when recorded return to:

KB HOME Nevada Inc.
5655 Badura Ave.
Las Vegas, Nevada 89118
Attention: Ray C. Jones
07010769-FB
APN: 191-15-811-001; 191-15-711-002;
191-23-211-003; 191-23-211-004
191-14-311-002

Receipt/Confirmed Copy

Requestor:
CHICAGO TITLE
12/04/2007 11 07 09    T20070239298
Book/Instr: 20071204-0304952
Agreement            Page Count: 15
Fees: $28.00          N/C Fee: $25.00

Debbie Conway
Clark County Recorder

## DEVELOPMENT AGREEMENT

THIS DEVELOPMENT AGREEMENT (this *"Development Agreement"*) is made as of the 29 day of November, 2007, by and between Essex Real Estate Partners, LLC, a Nevada limited-liability company (*"Buyer"*), and KB HOME Nevada Inc., a Nevada corporation (*"Seller"*), with reference to the following facts:

### R E C I T A L S

A.    Seller owns that certain real property situated in the City of Henderson (*"City"*), County of Clark (the *"County"*), State of Nevada, as described on **Attachment A** (the *"Property"*), which is within the Inspirada Town Center, which is a part of the Inspirada Planned Community (the *"Planned Community"*).

B.    Seller is a member of South Edge, LLC (the *"Consortium"*). The Consortium is comprised of eight (8) members with varying ownership interests in the Consortium. Holdings Manager, LLC is the general manager (the *"General Manager"*) of the Consortium. The General Manager is an affiliate of Focus South Group, LLC which is a member of the Consortium. Landtek, LLC (*"Landtek"*) is managing the engineering, mapping, geotechnical and other land development consultants and contractors in developing the Property and the balance of the Inspirada Town Center and the Planned Community. Landtek is an affiliate of Focus South Group, LLC and the General Manager.

C.    Pursuant to that certain Agreement for the Purchase and Sale of Real Property, dated July 17, 2007, as amended by that certain First Amendment to and Reinstatement of Agreement for the Purchase and Sale of Real Property, dated of even date herewith (collectively, the *"Purchase Agreement"*), by and between Seller and Buyer, Seller intends to sell to Buyer and Buyer intends to purchase from Seller the Property. Section 1.7(b) of the Purchase Agreement provides that Buyer and Seller shall negotiate in good faith a "development agreement" providing for the assurance by Seller of certain infrastructure improvements to the Property after the Close of Escrow.

D.    Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

E.    Pursuant to Section 1.4(b) of the Purchase Agreement, the parties have agreed to holdback a certain portion of the Purchase Price to ensure Seller's performance of providing infrastructure improvements to Buyer, such funds to be released to Seller in accordance with the terms and conditions hereof.

D.    The Property shall be entitled to a maximum of 1,650 of the 5,000 units approved for the Inspirada Town Center as shown on <u>Attachment A</u>.

## A G R E E M E N T

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and conditions set forth herein, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, Seller and Buyer agree as follows:

Article 1.    <u>LOCAL IMPROVEMENT DISTRICT PROVISIONS</u>

1.1    <u>Local Improvement District</u>. Pursuant to the Purchase Agreement, Buyer acknowledges that the Property is or will become subject to a local improvement district ("*LID*") assessment and agrees to be solely responsible for the payment of such assessment. Buyer hereby agrees that the Property shall be subjected to the lien of an LID. With regards to the LID issue, the obligations of Buyer (and its successors and assigns in the land), shall be as follows: Buyer (and its successors and assigns) shall cooperate with Seller and the Consortium to achieve the creation and establishment of the LID, recordation of the LID documents and the perfection of the assessment lien thereof against the Property, which cooperation shall include, without limitation, the execution and delivery (in recordable form where necessary or appropriate) of any and all instruments and documents required to achieve the creation and establishment of the LID and such recordation. Buyer shall also be responsible for timely obtaining any and all necessary consents and documents from Buyer's lenders and/or encumbrancers in order to achieve the recordation of the LID and the assessment lien thereof. Buyer agrees that Buyer's performance of its obligations under this Article 1 shall not be unreasonably withheld, conditioned or delayed. Notwithstanding anything in this Article 1 to the contrary, in the event the lien of the LID exceeds $145,000.00 per acre, Seller shall either pay down the LID such that the LID does not exceed $145,000.00 per acre or pay to Buyer an amount equal to the difference between the aggregate LID principal amount for the entire Property at the actual per acre assessment and the aggregate LID principal amount for the entire Property at $145,000.00 per acre.

Article 2.    <u>OTHER CONSTRUCTION REQUIREMENTS</u>

2.1    <u>Definitions</u>. The terms listed below shall have the following meanings:

2.1.1    "*Buyer's Work of Improvements*" shall mean and refer to those improvements to be constructed by Buyer, on or off the Property, as the case may be, set forth on <u>Attachment B</u> attached hereto.

2

2.1.2     *"Community Improvements"* shall mean and refer to those improvements to be constructed under the direction of the General Manager on or off the Property, as the case may be, set forth on **Attachment C** attached hereto.

2.1.3     *"Holdback Amount"* shall mean and refer to the amount of Seven Million Dollars ($7,000,000.00), as detailed in Section 1.4(b) of the Purchase Agreement.

2.1.4     *"Project"* shall mean and refer to all improvement work undertaken by Buyer on the Property, including Buyer's Work of Improvements and any building construction.

2.2     Buyer's Work of Improvements.     Buyer shall use its reasonable commercial efforts to design, construct and install, at its sole expense, the Buyer's Work of Improvements as detailed on **Attachment B** and to otherwise comply with its obligations set forth in such Attachment. In addition to, and not in limitation of the foregoing, or the provisions of this Development Agreement or the Purchase Agreement or any exhibit thereto, Buyer shall also design, construct and install, at its sole expense, all improvements required for the Property by governmental authorities which are not the Community Improvements or required by the Purchase Agreement to be constructed by Seller or Major Infrastructure (as defined in the Declaration of Development Covenants and Restrictions (Town Center), recorded as Document 20071019, Instrument 0001407 in the office of the Clark County Recorder on October 19, 2007) or except as otherwise provided in the Mass Grading Agreement (Buyer's Mass Grading payment obligations as detailed in the Purchase Agreement excepted) among the members of the Consortium, including, without limitation, all exactions required pursuant to laws or regulations by governmental authorities. All of such improvements shall be subject to all of the provisions of the Development Documents relating to the construction of improvements on the Property.

2.3     Community Improvements.     Seller shall be obligated to coordinate with the General Manager and shall use commercially reasonable efforts to cause the General Manager to design, construct and install the Community Improvements including, but not limited to, the timely exercise of any remedial rights, including, but not limited to, any self-help remedies or rights to complete the Community Improvements. In no event shall Seller be obligated under this Development Agreement to coordinate with the General Manager to cause the General Manager to design, construct or install any improvements other than the Community Improvements.

2.4     Project Approvals — Section 5.4 and 5.5 of the Purchase Agreement address Seller's continued involvement in the entitlement and approval process relating to the Property and a fee for such continued involvement. The obligations of Buyer and Seller are more fully described as follows:

2.4.1     Buyer acknowledges that the Inspirada Town Center Development Agreement, dated June 5, 2007, requires that Supplemental Development Standards for each ITC Planning Area be submitted for City review and approval subject to the requirements of the Inspirada Town Center Development Agreement. Buyer has reviewed the Inspirada Town Center Development Agreement, including attachments, in detail.

3

2.4.2          Section 8.4 of the Inspirada Town Center Development Agreement describes certain obligations of Seller, as noted below (in the following quote, Seller is a member of Developer, and therefore has certain of the obligations of "Developer"):

> It is understood that Developer may transfer all or part of an ITC Planning Area to a member or members of Developer (membership in Developer determined as of the Effective Date) prior to the approval of the Supplemental Development Standards for any such ITC Planning Area. In that event, if a member subsequently transfers all or any part of any ITC Planning Area to any Person who is not a member of Developer (membership in Developer determined as of the Effective Date), Developer acknowledges that the City requires such member's continued involvement in the submission of any Supplemental Development Standards for any ITC Planning Area so transferred. Therefore, Developer agrees that in conjunction with any transfer by such a member to a non-member prior to approval of Supplemental Development Standards as a Minor Modification, such member shall: (a) notify each transferee in writing that approval by City of Supplemental Development Standards for such ITC Planning Area will be required; and (b) Developer and/or member of Developer shall serve as applicant in the submission of proposed Supplemental Development Standards for such ITC Planning Area; and (c) obtain approval from the Design Review Committee of the proposed Supplemental Development Standards prior to submission to City; and (d) notify City in writing of any transfer of an ITC Planning Area for which Supplemental Development Standards have not been approved and identify the transferee.

2.4.3          Pursuant to the requirements of Section 8.4 of the Inspirada Town Center Development Agreement, Seller shall, if requested by Buyer, for a period of eighteen (18) months following close of escrow: (i) serve as applicant in the submission of proposed Supplemental Development Standards for each of Seller's ITC Planning Areas; and (ii) coordinate the submittal and review of the proposed Supplemental Development Standards with the Inspirada Design Review Committee.

2.4.4          In addition, Seller shall, if requested by Buyer, for a period of eighteen (18) months following close of escrow, coordinate and attend meetings related to the Property between the City and Buyer and between the Design Review Committee and Buyer.

2.4.5          Buyer shall, beginning at close of escrow, pay Seller a fee of Twelve Thousand Five Hundred Dollars ($12,500.00) per month for Seller to coordinate the activities under subsections 2.4.3 and 2.4.4 until the earlier of: (a) substantial completion of driveable access and water available for fire protection delivered to a point on the boundary of each of Inspirada Town Center Pods 1, 8, 21, 22, and 28 such that building permits could be

4

obtained for construction on the entire Property; (b) all of the Property has been sold by Buyer to an unaffiliated third party purchaser; or (c) eighteen (18) months from the close of escrow. At such time, Seller's obligation to coordinate the activities under subsections 2.4.3 and 2.4.4 and Buyer's obligation to pay for such coordination of activities under subsections 2.4.3 and 2.4.4 shall terminate.

     2.4.6   Buyer shall coordinate, administer, direct and manage all entitlement and development of the Property, including paying all costs thereof, other than Seller's specific coordination obligations above.

### Article 3.  MISCELLANEOUS DEVELOPMENT ISSUES

    3.1  Merchant Association Fees; Governing Documents. Buyer hereby acknowledges and accepts that the Property is or will become subject to future governing documents related to the Inspirada Town Center and to the Planned Community. Such documents include, but are not limited to:

     3.1.1 Commercial and residential owners' association documents, which may impose obligations on property owners within Inspirada Town Center to pay association fees.

     3.1.2 Declaration of Development Covenants and Restrictions, which may impose restrictions and requirements upon matters including, but not limited to, Preparation and Approval of Project Plans; Obligations with Respect to Construction of Buildings; Park and Public Safety Fees; Marketing and Advertising; Formation of Associations; Construction and Conveyance of Common Facilities; Distribution of Planned Community Notices and Disclosures.

     3.1.3 Constraints Maps.

     3.1.4 Commercial and Residential Sign Guidelines.

The term "*Development Documents*" shall mean and refer to the above documents, together with the Purchase Agreement and the Grant, Bargain and Sale Deed. In accordance with Section 5.9 of the Purchase Agreement, Seller shall cooperate and communicate with and involve Buyer in the negotiation and drafting of any such documents. The creation, adoption and recordation of such documents are subject to the approval of the Consortium. Regardless of the affect of any such documents upon the Property, the adoption of any such documents shall not deemed a breach of the Purchase Agreement or this Development Agreement, nor shall it in any way be deemed a basis for seeking to unwind the transfer of the Property to Buyer or a refund of any deposits or any portion or all of the Purchase Price or Holdback Amount after the Closing under the Purchase Agreement.

5

## Article 4.    HOLDBACK AMOUNT

4.1    Holdback Amount. In accordance with Section 1.4(b) of the Purchase Agreement, the Holdback Amount shall be retained by Buyer's lender until such time as Seller has provided drivable access and water available for fire protection to a point on the boundary of each of Inspirada Town Center Pods 1, 8, 21, 22, and 28 such that building permits could be obtained for construction on the entire Property (the "*Completion Date*"). Within thirty (30) days following the Completion Date, Buyer's lender shall release the Holdback Amount to Seller. Buyer's (and its lender, agents or assigns) performance of its obligations under this Article 4 shall not be unreasonably withheld, conditioned or delayed. Upon payment of the Holdback Amount to Seller, Seller shall cause this Development Agreement and that certain Promissory Note and Deed of Trust, as defined in Section 1.4(b) of the Purchase Agreement, to be removed from title to the Property. Following the release of the Holdback Amount, Seller shall complete any remaining Community Improvements in reasonable due course of business. The obligation to pay to Seller the Holdback Amount shall be a burden on the Property, shall be appurtenant to and for the benefit of Seller and the Property and each part thereof, shall run with the land and be binding on Buyer's successors and assigns.

4.2    Partial Sale. In the event Buyer elects to sell a portion of the Property, not to exceed all but twenty (20) gross acres of the Property, prior to substantial completion of the Community Improvements or the release of the Holdback Amount, Seller agrees to remove this Development Agreement and release the obligations associated with that certain Promissory Note and Deed of Trust, as defined in Section 1.4(b) of the Purchase Agreement, from title to that portion of the Property being conveyed, assuming, following such sale, that the fair market value of the remainder of the Property exceeds the value of Seller's Deed of Trust by a minimum of twenty percent (20%). In the event the fair market value of the remainder of the Property does not exceed the value of Seller's Deed of Trust by a minimum of twenty percent (20%), Buyer shall be obligated to deposit with Escrow Holder an amount equal to any deficiency, to be held for the benefit of Seller until such time as the Community Improvements have been substantially completed and the Holdback Amount is released to Seller.

## Article 5.    GENERAL PROVISIONS

5.1    Captions. The captions used herein are for convenience only and are not a part of this Development Agreement and do not in any way limit or amplify the terms and provisions hereof.

5.2    Time of the Essence; Successors and Assigns. Time is of the essence of each and every provision of this Development Agreement. Each and all of the covenants and conditions of this Development Agreement shall inure to the benefit of and shall be binding upon the successors in interest of Seller and the successors, heirs, representatives and permitted assigns of Buyer. As used in the foregoing, "successors" shall refer both to the parties' respective interests in the Property and to the successors to all or substantially all of their assets and to their successors by merger or consolidation. Nothing contained in this Development Agreement is intended to modify the permission or restrictions contained in the Purchase Agreement or Buyer's ability to assign its interests in the Property.

5.3    Amendments.  This Development Agreement may only be amended by a writing executed by Seller and Buyer.

5.4    Attorney's Fees.  In the event any action shall be instituted between Seller and Buyer in connection with this Development Agreement, the party prevailing in such action shall be entitled to recover from the other party all of its costs and expenses incurred therein, including reasonable attorneys' fees and costs.

5.5    Severability.  In the event that any phrase, clause, sentence, paragraph, section, article or other portion of this Development Agreement shall become illegal, null or void or against public policy, for any reason, or shall be held by any court of competent jurisdiction to be illegal, null or void or against public policy, the remaining portions of this Development Agreement shall not be affected thereby and shall remain in force and effect to the full extent permissible by law.

5.6    Gender and Number.  In this Development Agreement (unless the context requires otherwise), the masculine, feminine and neuter genders and the singular and the plural include one another.

5.7    Entire Agreement.  This Development Agreement, including the Attachments and Schedules attached hereto which are incorporated herein by this reference, constitutes the entire agreement between the parties hereto pertaining to the subject matter hereof and all prior and contemporaneous agreements, representations, negotiations and understandings of the parties hereto, oral or written, are hereby superseded and merged herein.  The foregoing sentence shall in no way affect the validity of this Development Agreement, the Purchase Agreement or any instruments executed in connection with the Purchase Agreement.

5.8    Payments.  Any amounts which are due and owing to Seller or Buyer pursuant to the various terms of the Purchase Agreement, this Development Agreement or any other related agreement shall be paid as specified.  In the event any of these amounts are not paid when due, such amounts shall bear interest as specified in the particular Section requiring such payment or, if not so specified then as specified in the Purchase Agreement.

5.9    Interpretation; Governing Law.  This Development Agreement shall be construed as if prepared by both parties hereto.  Each party acknowledges that it has had full benefit of legal counsel in the preparation and negotiation of this Development Agreement.  This Development Agreement shall be governed by and construed under the laws of the State of Nevada.

5.10    Recordation of Development Agreement.  This Development Agreement shall be recorded against the Property at close of escrow before any mortgages or other encumbrances of Buyer's lenders providing financing for the purchase of the Property have been recorded, to give notice to third parties of the obligations assumed by the parties hereunder.

5.11    Notices.  All notices or other communications between Seller and Buyer required or permitted hereunder shall be in writing and personally delivered (which delivery may be by reputable overnight commercial courier service such as Federal Express), sent by facsimile or sent by certified United States mail, return receipt requested, postage prepaid, to the following address or telephone number (until a notice of change thereof shall have been delivered as provided in this Section 5.11):

| | |
|---|---|
| If to Seller: | KB HOME Nevada Inc.<br>5655 Badura Avenue<br>Las Vegas, Nevada 89178<br>Attn: Don DelGiorno<br>Facsimile: 702-266-8624 |
| Copy to: | KB HOME Nevada Inc.<br>5655 Badura Avenue<br>Las Vegas, Nevada 89178<br>Attn: Ray C. Jones<br>Facsimile: 702-266-8026 |
| If to Buyer: | Essex Real Estate Partners, LLC<br>2500 W. Sahara Avenue, Suite 202<br>Las Vegas, Nevada 89102<br>Attn: George F. Holman<br>Facsimile: 702-365-6663 |
| Copy to: | Santoro, Driggs, Walch, Kearney, Holley & Thompson<br>400 So. 4th Street, 3rd Floor<br>Las Vegas, Nevada 89101<br>Attn: Doug Driggs<br>Facsimile: 702-791-1912 |

A notice shall be effective (i) on the date of personal delivery if personally delivered to the primary notice recipient before 5:00 p.m., otherwise on the day following personal delivery, (ii) when delivered, if sent by facsimile before 5:00 p.m., otherwise on the day following the facsimile transmission or (iii) if mailed as provided above, upon the date of execution of the return receipt or the date upon which the postal authorities first attempt delivery.

5.12    Effect of Development Agreement.   This Development Agreement is made for the purposes set forth in the Recitals to this Development Agreement, and Seller makes no warranties or representations, express or implied, as to the binding effect or enforceability of all or any portion of this Development Agreement or as to the compliance of any of these provisions with public laws, ordinances, and regulations applicable thereto.

5.13    Assignment of Rights and Obligations.  To the extent possible and as governed by the Consortium's governing documents, and without reducing Seller's rights with respect to any other property owned by Seller in the Inspirada Town Center, Seller hereby assigns to Buyer all of Seller's rights and obligations in and to the Property, with the exception

of Seller's ongoing Major Infrastructure payment obligations as detailed in the Declaration of Development Covenants and Restrictions, recorded as Document 20070419, Instrument 0000870 in the office of the Clark County Recorder on April 19, 2007. The parties' intention is to grant Buyer the maximum authority possible with regard to the development of the Property in the Inspirada Town Center, while acknowledging the constraints imposed by the Consortium's governing documents. Seller shall maintain its obligations under Sections 5.4 and 5.5 of the Purchase Agreement to assist Buyer in the entitlement and approval process relating to the Property. Buyer shall assume any and all financial obligations associated with the Property set forth in the various declarations and agreements recorded against the Property, including its pro rata share of any costs in the Inspirada Town Center, including, without limitation, marketing and advertising costs, with the exception of those obligations expressly attributed to Seller as part of the Community Improvements and the payment of any Major Infrastructure costs, as referenced in Section 2.2 herein, if any, or any of the obligations of Seller expressly set forth herein.

5.14 Force Majeure. Neither party shall have any liability to any person for failure to meet any of its obligations under this Agreement, to the extent such failure is the result of any labor dispute, failure of usual sources of supply, war, riot, insurrection, vandalism, commotion, fire, flood, earthquake, accident, storm, loss of the right to use right of ways, act of God or government, or any other cause beyond such party's reasonable control.

5.15 Termination. In addition to any other obligations set forth in Section 4.2 herein, upon substantial completion of the Community Improvements and payment to Seller of the Holdback Amount, this Development Agreement shall no longer be binding upon and run with the Property, and Seller and Buyer, or its assigns, shall cooperate in executing any documents or instruments to such effect. This Development Agreement shall, however, remain in effect thereafter as covenants among the parties until each of their respective obligations hereunder are satisfied.

*[remainder of page left blank intentionally]*

IN WITNESS WHEREOF, the parties hereto have caused this Development Agreement to be executed as of the day and year first written above.

SELLER:

BUYER:

KB HOME Nevada Inc.,
a Nevada corporation

Essex Real Estate Partners, LLC,
a Nevada limited-liability company

By: _____
    Name: Donald J. DelGiorno
    Title:  President

By:  Las Vegas Development Associates, LLC
    a Nevada limited-liability company,
    its Member

    By:_____
       Name: George Holman
       Title:   Manager


STATE OF NEVADA        )
                       )
COUNTY OF CLARK    )

This instrument was acknowledged before me on _____, 20__, by George Holman as Manager of Las Vegas Development Associates, LLC, a Nevada limited-liability company, Member of Essex Real Estate Partners, LLC, a Nevada limited-liability company.


_____
                          Notary Public


STATE OF NEVADA        )
                       )
COUNTY OF CLARK    )

This instrument was acknowledged before me on November 29, 2007, by Donald J. DelGiorno, as President of KB HOME Nevada Inc., a Nevada corporation.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
KATHLEEN SECKINGER
Appt. No. 04-91410-1
My Appt. Expires Sept. 1, 2008

_____
                          Notary Public

10

IN WITNESS WHEREOF, the parties hereto have caused this Development Agreement to be executed as of the day and year first written above.

SELLER:                                          BUYER:

KB HOME Nevada Inc.,                             Essex Real Estate Partners, LLC,
a Nevada corporation                             a Nevada limited-liability company

                                                 By: Las Vegas Development Associates, LLC
                                                     a Nevada limited-liability company,
By_____                   its Member
    Name: Don DelGiorno
    Title:  President                            By:_____
                                                     Name: George Holman
                                                     Title:  Manager


STATE OF NEVADA          )
                         )
COUNTY OF CLARK          )

This instrument was acknowledged before me on November 28, 2007, by George Holman as Manager of Las Vegas Development Associates, LLC, a Nevada limited-liability company, Member of Essex Real Estate Partners, LLC, a Nevada limited-liability company.

                                                 _____
                                                            Notary Public

Notary Public - State of Nevada
County of Clark
JOAN WILEY
My Appointment Expires
February 1, 2009
No. 97-1260


STATE OF NEVADA          )
                         )
COUNTY OF CLARK          )

This instrument was acknowledged before me on _____, 20___, by Don DelGiorno, as President of KB HOME Nevada Inc., a Nevada corporation.


                                                 _____
                                                            Notary Public

10

ATTACHMENT A

TO DEVELOPMENT AGREEMENT

LEGAL DESCRIPTION OF PROPERTY/UNIT ALLOCATION

Lots One (1), Eight (8), Twenty-One (21), Twenty-Two (22) and Twenty Eight (28) of THE AMENDED FINAL PARENT FINAL MAP OF SOUTH EDGE, as shown by map thereof on file in Book 137 of Plats, Page 100, in the Office of the County Recorder of Clark County, Nevada.

A maximum of 1,650 residential units will be permitted in the entire Property. Allocation of such 1,650 residential units to the separate parcels comprising the Property shall be determined by separate agreement.

1

ATTACHMENT B

TO DEVELOPMENT AGREEMENT

BUYER'S WORK OF IMPROVEMENTS

Buyer agrees to use commercially reasonable efforts to construct all of the following improvements ("*Buyer's Work of Improvements*") in conformance with improvement plans approved by the City of Henderson, and in conformance with the approved Supplemental Development Standards and any future Inspirada Town Center and Planned Community governing documents, within the time set forth below:

(i)    All on-site improvements to the Property, and any Planning Areas and Pods comprising the Property, including, without limitation, water, sewer, electric, natural gas, telephone, cable TV, curb, gutter, pavement, street lights, entry landscaping and monumentation, except any improvements which are included in the Community Improvements. Said improvements shall be constructed within the time-frame deemed appropriate by Buyer for the efficient construction and marketing of the residences, commercial or office space on the Property, provided Buyer complies with all Development Documents and any requirements of the City or other government agencies

(ii)    All Project Perimeter Walls and Project entry improvements, including landscaping and monumentation, which are on or adjacent to the Project. The construction thereof shall commence concurrently with the commencement of construction of the first building within the Property and continue without interruption until complete.

1

## ATTACHMENT C

## TO DEVELOPMENT AGREEMENT

### SELLER'S WORK OF IMPROVEMENTS

Note: Unless specifically defined in this Attachment, all capitalized terms used herein shall have the same meaning ascribed them in the Development Agreement.

### OFF-SITE INFRASTRUCTURE
(Utilities and Access up to the Inspirada Town Center Project Perimeter)

1.  WATER

    (a)   2760 Water Zone Improvements – Pump Station and Reservoir
    (b)   2870 Water Zone Improvements – Pump Station and Reservoir

2.  SEWER

    (a)   West Side Sewer

3.  POWER

    (a)   Bicentennial Substation and Feeder to Via Inspirada
    (b)   Future Substation (Democracy)

4.  TELEPHONE / CABLE / GAS

    Timing to be coordinated with Project development plans

5.  STORM DRAINAGE FACILITIES

    (a)   West 4 Channel Construction

6.  STREETS

    (a)   Senate from Via Centre to Via Inspirada
    (b)   Via Inspirada from Executive Airport to Via da Vinci

    Note – Completion Status sufficient to protect Buyer Parcel

### ON-SITE INFRASTRUCTURE
(Utilities Service Mains and Access within Inspirada Town Center
Project Perimeter to Property Perimeter)

1.  SEWER * - Sewer lines have been preliminarily identified.  Actual routing of sewer service mains may change based on City of Henderson requirements

    (a)   Via Centro and Avenida Brancusi from Senate to Via Monet
    (b)   Via Inspirada from Via Bottega to Via da Vinci

       (c)      Via Contessa from Via Venetia to Via da Vinci

2.      WATER * - Waterlines have been preliminarily identified. Actual routing of water service mains may change based on City of Henderson requirements

       (a)      Via Centro from Via Daniella to northern Town Center boundary
       (b)      Via Inspirada from Via Centro to Via Bottega
       (c)      Avenida Brancusi from Via Inspirada to Via Venetia
       (d)      Via Venetia from Avenida Brancusi to Via Contessa
       (e)      Via Contessa from Via Venetia to Bicentennial
       (f)      Bicentennial from Via Inspirada to Via Contessa
       (g)      Via da Vinci from Via Inspirada to Via Contessa

3.      STREETS * - Improvements include pavement, curb & gutter, storm drain, gas and streetlights. Sidewalk will be installed with future landscape improvements and to coordinate with the timing of the onsite building construction. Electric power, telephone and cable utility services to be installed by the respective agencies typically upon completion of the street improvements.

       (a)      Via Centro from Via Daniella to northern Town Center boundary
       (b)      Via Inspirada from Via Centro to Via da Vinci
       (c)      Avenida Brancusi from Via Inspirada to Via Venetia
       (d)      Via Venetia from Avenida Brancusi to Via Contessa
       (e)      Via Contessa from Via Venetia to Bicentennial
       (f)      Bicentennial from Via Inspirada to Via Contessa
       (g)      Via Monet from Via Inspirada to Via Venetia
       (h)      Via Daniella from Avenida Branusci to Via Nuevo
       (i)      Via da Vinci from Via Contessa to Via Inspirada

4.      POWER/TEL/CABLE *

      Timing to be coordinated with Project development plans

5.      PEDESTRIAN REALM AND PARKS - Pedestrian Realm and Park improvements are subject to City of Henderson approval. The final design of pedestrian realms and parks and the location of parks has not been determined. The timing of these improvements is yet to be determined.

      *   Note – Unless Buyer has Tentative Map approval locating utility service connections prior to approval of Sellers improvements plans for on-site infrastructure by the governing agency, Buyer is required to install all service lateral connections, parcel entry improvements and median island openings. Seller will not install final pavement surface until all adjacent properties have completed installation of service laterals and parcel entrances.

2

# EXHIBIT "K"

## SUBORDINATE LOAN DOCUMENTS

[*Attached on the following pages*]

Receipt/Conformed Copy

Requestor:
CHICAGO TITLE
*2/04/2007 11:07:39   7200702098CG
Book/Instr: 20071204-0001854
Trust Deed      Page Count  19
Fees  $32.00    A/C Fee  $25.00

Debbie Conway
Clark County Recorder

Recording Requested by
and when recorded return to:

KB HOME Nevada Inc.
5655 Badura Ave.
Las Vegas, Nevada 89118
Attention: Ray C. Jones
    191-15-812-001;  191-15-711-002
    191-23-211-003;  191-23-211-004
APN: 191-14-311-002
Loan No.:

07010769-FB

This DEED OF TRUST WITH ASSIGNMENT OF RENTS ("*Deed of Trust*") is made this __29__ day of November, 2007, by and between Essex Real Estate Partners, LLC, a Nevada limited-liability company ("*Trustor*"), with an office at 2500 W. Sahara Avenue, Suite 202, Las Vegas, Nevada 89102, to Chicago Title Agency a Nevada corporation ("*Trustee*"), with an office at 9500 Flamingo Rd., Las Vegas, NV 89147, for the benefit of KB HOME Nevada Inc., a Nevada corporation ("*Beneficiary*"), with an office at 5655 Badura Avenue, Las Vegas, Nevada 89118.

WITNESSETH:

That Trustor grants the following described real property, which is situated in the County of Clark, State of Nevada, to Trustee in trust, with power of sale for the benefit of Beneficiary, to have and to hold upon the trusts, covenants and agreements hereinafter set forth:

SEE **EXHIBIT A** ATTACHED HERETO

TOGETHER WITH: (a) All buildings, structures and all other improvements that are, or that may be hereafter, erected or placed thereon or therein, (b) all interests of Trustor in and to all inventory, equipment, fixtures and other goods now or in the future located thereon or therein or otherwise affixed or attached to or installed in said real property, including furniture, furnishings, machinery, appliances, generators, boilers, furnaces, water tanks, heating, ventilating and air conditioning equipment, and building materials and supplies, and all accessories, additions, parts, proceeds, products, repairs, replacements and substitutions of or to any of such property, (c) all water rights and rights to the use of water that are now or that may be hereafter used in connection with the said real property or any part thereof and any improvements or appurtenances thereto, (d) any and all other rights pertaining or appurtenant, including, without limitation, all development rights and mineral rights and easements and right-of-way now owned or hereafter acquired which are used in connection with any portion of the said real property or as a means of ingress to or egress from said real property, and the interests of Trustor herein, and (e) subject to the present assignment of rents which is hereinafter made to Beneficiary: (i) the tenements, hereditaments and appurtenances thereunto belonging or in any way appertaining, and the rents, issues, income revenues, royalties and profits thereof (ii) Trustor's interest as Lessor in and to all leases of said real property, or any part thereof, now existing or hereafter made,

1

including all modifications, extensions and renewals thereof, provided that any purchaser at foreclosure of the real property granted hereunder shall be entitled, at his election, to terminate or enforce any lease of the said real property, or any part thereof, which is hereinafter entered into, modified, extended or renewed, (iii) all the estate, right, title, property, possession, interest or other claim or demand, in law or in equity, which Trustor now has or may hereafter acquire, in or to the said real property, or any part thereof, with appurtenances. (iv) Trustor's interest in and to all contracts, contract rights, accounts, general intangibles, deposit accounts, instruments and documents now or in the future relating to or arising in connection with said real property, including permits, approvals and other government authorizations, plans and specifications, agreements with contractors, subcontractors, suppliers, managers and supervisors, architects and engineers, warranties, indemnities and insurance policies, take-out, refinancing and other loan commitments, claims, awards and settlements relating to or arising from any insurance or loss of, damage to, trespass on, or taking, condemnation or public use of any said real property, license agreements, purchase and sale agreements and options, sale proceeds, escrow proceeds, deposits, rights to payment, trademarks, trade names, goodwill and other types of intangible personal property of any kind or nature, and (v) any and all other rights pertaining to or appertaining to the said real property, and the interests of Trustor therein. The real property together with the rights and interests of Trustor described herein above shall hereinafter collectively be referred to as the "*Property*."

FOR THE PURPOSE OF SECURING:

A.    Payment of the principal sum of Seven Million Dollars ($7,000,000.00), according to the terms of a promissory note, dated November 29, 2007, made by Trustor payable to the order of Beneficiary, according to the tenor and effect of said promissory note and all renewals, extensions, modifications, amendments and substitutions of, or for, said promissory note or notes (hereinafter collectively referred to as the "*Note*").

B.    The expenses and costs incurred or paid by Beneficiary in the preservation and enforcement of the rights and remedies of Beneficiary and the duties and liabilities of Trustor hereunder, including, but not by way of limitation, attorneys' fees, court costs, witness fees, expert witness fees, collection costs, and costs and expenses paid by Beneficiary in performing for Trustor's account any obligation of said Trustor under this instrument or under any obligation secured hereby.

C.    Payment of additional sums and interest thereon which may hereafter be loaned to Trustor when evidenced by a promissory note or notes which recite that the same is secured by this Deed of Trust.

D.    Performance of every obligation, covenant, agreement and warranty of Trustor contained in this Deed of Trust.

E.    Performance of each and every term, provision, covenant and condition contained in any loan agreement, credit agreement, purchase agreement, development agreement or any other document or instrument executed by Trustor in favor of Beneficiary relating to the loan

2

evidenced by the Note hereby secured (the Note together with any such agreement, document or instrument shall hereinafter collectively be referred to as the *"Loan Documents"*).

AND IT IS FURTHER PROVIDED THAT:

1.  *Compliance with Laws.*  Trustor shall not commit, suffer or permit any act to be done, or condition to exist, on the Property which violates or is prohibited by any law, statute, code, act, ordinance, order, judgment, decree, injunction, rule, regulation, permit, license, authorization, direction or requirement of any government or subdivision thereof, whether it be federal, state, county or municipal, which is applicable to the Property, or any part thereof, now or at any time hereafter.  The requirements set forth by this Paragraph 1 are hereinafter collectively referred to as the *"Legal Requirements."*

2.  *Repair and Maintenance.*  Trustor agrees to properly care for and keep the Property in first class condition, order and repair; to care for, protect and repair all buildings and improvements situate thereon; not to remove or demolish any buildings or other improvements situate thereon; not to remove, materially alter or demolish any buildings or improvements damaged or destroyed thereon; to complete in a good workmanlike manner any building or other improvement which may be constructed thereon; and to pay, when due, all claims for labor performed and for materials furnished therefore; and otherwise to protect and preserve the same; to comply with all Legal Requirements having application to any alterations or improvements made thereon; not to commit or permit any waste or deterioration of said buildings and improvements or of said Property, as amended, the Resource Conservation and Recovery Act, as amended, or any other Legal Requirement related to hazardous substances; and to do any other act or acts all in a timely and proper manner, which, from the character or use of the Property may be reasonably necessary to maintain the Property in a first class condition, the specific enumerations herein not excluding the general.

3.  *Environmental Compliance.*

    (a)    As used herein, the term *"Hazardous Substances"* shall mean any or all of the following: (i) any and all hazardous substances, hazardous materials, toxic substances or solid waste as defined in the Clean Air Act, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, the Resource Conservation Act of 1976, as amended, and the Hazardous Materials Transportation Act, as amended, the Resource Conservation and Recovery Act, as amended, or any other Legal Requirement related to hazardous substances and the regulations promulgated thereunder, (ii) any substance or materials listed as hazardous or toxic in the United States Department of Transportation Table, by the Environmental Protection Agency or any successor agency or under any Federal, state or local laws or regulations, (iii) any asbestos, poly-chlorinated biphenyls, urea formaldehyde foam, explosives or radioactive waste, or (iv) any other chemical, material or substance which is not classified as hazardous or toxic but exposure to which is prohibited, limited or regulated by any federal, state, local or other governmental authority having jurisdiction over the Property.

    (b)    Trustor shall comply with any and all Legal Requirements regarding the presence or removal of Hazardous Substances on the Property, shall pay

3

immediately, when due, the costs of removal from the Property of any such Hazardous Substances which are required to be removed pursuant to any Legal Requirement and shall keep the Property free of any lien which may arise pursuant to such Legal Requirement. The Trustor shall not, and shall not permit any person or entity to release, discharge, or dispose of any Hazardous Substances on the Property except in compliance with all Legal Requirements and, if the same shall exist, Trustor shall immediately remove or cause to be removed from the Property such Hazardous Substances to the extent required to be removed pursuant to any Legal Requirement.

    4.    *Taxes.*

    (a)    Trustor agrees to pay, at least thirty (30) days before default and/or delinquency: (i) all taxes and assessments, of any kind or nature, which are assessed against or affect the Property or any part thereof (*"Impositions"*); and (ii) all obligations which are represented, evidenced or secured by liens, encumbrances, charges and/or claims on said Property, or any part thereof, which appear to have priority over the lien of this Deed of Trust (*"Senior Encumbrances"*).

    (b)    In the event that Trustor fails to make any payment required by subparagraph 4(a) above, within the time periods required therein, Beneficiary may pay the same without demand or notice (in which case Beneficiary shall be the sole judge of the legality, validity and/or priority of the obligation so paid and of the amount required to be paid).

    5.    *Insurance.* Trustor agrees to keep all buildings and/or improvements, which are ever located on the Property, insured by policies of insurance providing coverage against loss by fire, earthquake, flood and/or hazard, which policy(ies) shall have extended coverage endorsements and shall be issued by company(ies) authorized to issue such policy(ies) in the State of Nevada. Said insurance shall provide for at least thirty (30) days advance written notice to Beneficiary prior to cancellation and provide coverage in such sum or sums as shall equal the total indebtedness and other obligations secured by this Deed of Trust and all obligations having priority over this Deed of Trust, or the full replacement value of such buildings and/or improvements, whichever is less (such policies shall not contain a co-insurance provision whereby Trustor becomes a co-insurer in the event of loss). Said insurance shall be payable to Beneficiary to the amount of the unsatisfied obligations to Beneficiary hereby secured. The policy or policies of said insurance shall be delivered to Beneficiary, as further security, and in default hereof, Beneficiary may procure such insurance, and expend such sum or sums therefor as Beneficiary shall deem necessary. So long as no Event of Default (as defined in Paragraph 12 below) has occurred and is continuing, Trustor may settle, compromise or adjust any insurance or other claim with the prior written consent of Beneficiary. Upon the occurrence and during the continuance of an Event of Default, Beneficiary shall have the sole right to settle, compromise or adjust any insurance or other claim in such manner as Beneficiary may determine, and for this purpose, Beneficiary may, in its own name or in the name of Trustor, take such action as Beneficiary deems appropriate. Any amount collected by Trustor with respect to an insurance or other claim shall be delivered immediately to Beneficiary. The amount collected by Trustor or Beneficiary under any fire or other insurance policy may be applied by Beneficiary upon the indebtedness secured hereby and in such order as Beneficiary may determine, or at the option of

4

Beneficiary, the entire amount so collected, or any part thereof, may be released to Trustor. Such application or release shall not cure or waive any default or notice of default hereunder or invalidate any act done pursuant to such notice.

6.      *Assignment of Rents and Condemnation Proceeds.*

        (a)      Trustor hereby irrevocably and absolutely assigns and transfers to Beneficiary, all rents, issues, income, revenues, royalties and profits derived from the Property, or any business activity conducted thereon, and each and every part thereof, including all present and future leases and rental agreements, reserving unto Trustor a license to collect such rents, issues, income, revenue, royalties and profits prior to written notice to Trustor of any Event of Default, as defined by Paragraph 12 below. Subsequent to such an Event of Default and written notice to Trustor thereof, any rents, issues, profits and income, including those past due, unpaid or undetermined, shall be collected by Beneficiary or its agent, and shall be applied, less costs and expenses of operation and collection, including reasonable attorneys' fees, to any indebtedness and/or obligation secured hereby, and in such order as Beneficiary shall determine. Rights assigned to Beneficiary under this Paragraph 6 may be enforced by Beneficiary without regard to the adequacy of the security hereof or the solvency of Trustor by any one or more of the following methods: (i) appointment of a receiver, (ii) Beneficiary's taking possession of the Property; (iii) Beneficiary's collecting any monies payable under leases or rental agreements directly form the parties obligated for payment; (iv) injunctions; and (v) any other method permitted by law. The collection of such rents, issues and profits and income, and the application thereof as aforesaid, shall not cure or constitute a waiver of any default or notice of default hereunder or invalidate any act done pursuant to such notice. Trustor and Beneficiary intend that this assignment shall be a present, absolute and unconditional assignment, not an assignment for additional security only, and shall, immediately upon the execution hereof, subject to the license granted above, give Beneficiary, and its agent, the right to collect the rents, issues, profits and income and to apply them as aforesaid. Nothing contained herein, nor any collection of rents, issues, profits and income by Beneficiary, or its agent, or a receiver, shall be construed to make Beneficiary a "*Mortgagee-in-Possession*" of the Property so long as Beneficiary has not itself entered into actual possession of the Property or shall be construed to be an assumption of liability by Beneficiary under, or a subordination of, the lien of this Deed of Trust, to any tenancy, lease or option. Trustee agrees to provide Beneficiary with updated leases within ten (10) days of any request by Beneficiary.

        (b)      Any award of damages in connection with any condemnation for public use of, or injury to the Property, or any part thereof, is hereby assigned and shall be paid to Beneficiary, who may apply or release such moneys received by Beneficiary in the same manner and with the same effect as herein provided for disposition of proceeds of insurance.

7.      *Performance by Trustee or Beneficiary*

        (a)      Should the Trustor fail to make any payment or perform any act which Trustor is obligated to make or perform hereby, then the Trustee, or Beneficiary, at the election of either of them, but without any obligation to do so, without demand or notice to the Trustor, or any successor in interest of the Trustor and without releasing Trustor from any

5

obligation hereunder, may make such payment or perform such act and incur any liability, or expend whatever amounts, in its absolute discretion, it may deem necessary therefor. All sums incurred or expended by the Trustee or Beneficiary, under the terms hereof, shall become immediately due and payable by the Trustor to the Trustee or Beneficiary when so incurred or expended, and shall bear interest until paid at an annual percentage rate equal to the Default Rate which is set forth by Paragraph 12 below. In no event shall payment by Trustee or Beneficiary be construed as a waiver of the default occasioned by Trustor's failure to make such payment or payments.

(b)    If, during the existence of the trust created hereby, there is commenced or pending any suit or action affecting the Property, or any part thereof, or the title thereto, or if any adverse claim for or against the Property, or any part thereof, is made or asserted, the Trustee or Beneficiary may appear or intervene in the suit or action and retain counsel therein and defend same, or otherwise take such action therein as they may be advised, and may settle or compromise same or the adverse claim; and in the behalf and for any of the purposes may pay and expend such sums of money as the Trustee or Beneficiary may deem to be necessary. All such sums incurred or expended by Trustee or Beneficiary under the provisions of this paragraph shall become immediately due and payable by the Trustor to the Trustee or Beneficiary when so incurred or expended and shall bear interest until paid an annual percentage rate equal to the Default Rate which is set forth by Paragraph 12 below.

(c)    Trustor agrees to pay and discharge all costs, fees and expenses of incurred in connection with any default by Trustor or the preservation of the trust created hereby, including without limitation (i) reconveyance and foreclosure fees of Trustee, (ii) costs and expenses of Beneficiary or Trustee or any receiver appointed under this Deed of Trust in connection with the operation, maintenance, management, protection, preservation, collection, sale or other liquidation of the trust created hereby or foreclosure of this Deed of Trust, (iii) advances made by Beneficiary to complete or partially construct all or any part of any construction which may have commenced on the Property or otherwise to protect the security of this Deed of Trust, (iv) costs of evidence of title, and (v) the reasonable fees and disbursements of Trustee's and Beneficiary's legal counsel and other out-of-pocket expenses, together with interest on all such amounts until paid at the Default Rate.

8.    *Modifications*. At any time, and from time to time, without liability therefor and without notice to Trustor, upon written request of Beneficiary and presentation of this Deed of Trust and the Note secured hereby for endorsement, and without affecting the personal liability of any person for payment of the indebtedness secured hereby or the effect of this Deed of Trust upon the remainder of the Property, Trustee may (a) reconvey any part of the Property; (b) consent in writing to the making of any map or plat thereof; (c) join in granting any easement thereon, or (d) join in any extension agreement or subordination agreement in connection herewith. The Beneficiary may without notice to or consent of Trustor extend the time of payment of any indebtedness secured hereby to any successor in interest of the Trustor without discharging the Trustor from liability thereon.

9.    *Reconveyance*. Upon receipt of written request from Beneficiary reciting that all sums secured hereby have been paid and upon surrender of this Deed of Trust and the Note

6

secured hereby to Trustee for cancellation and retention, or such other disposition as Trustee, in its sole discretion, may choose, and upon payment of its fees, the Trustee shall reconvey, without warranty all portions of the Property which are then encumbered hereby. The recitals in such reconveyance of any matters of fact shall be conclusive proof of the truth thereof. The grantee in such reconveyance may be described in general terms as "the person or persons legally entitled thereto."

10.    *Substitution of Trustee.*  The Beneficiary or its assigns may, from time to time, appoint another trustee, or trustees, to execute the trust created by this Deed of Trust or other conveyance in trust.  Upon the recording in the appropriate county of such certified copy or executed and acknowledged instrument, the new trustee or trustees shall be vested with all the title, interest, powers, duties and trusts in the Property which are vested in or conferred upon the original trustee.  If there be more than one trustee, either may act alone and execute the trusts upon the request of the Beneficiary; and all his acts thereunder shall be deemed to be the acts of all trustees, and the recital in any conveyance executed by such sole trustee of such request shall be conclusive evidence thereof, and of the authority of such sole trustee to act in accordance therewith.

11.    *Due on Sale, etc.*

(a)    If a *"Transfer of Interest"* (as defined by subparagraph 11(b) below) shall have occurred with respect to the Property, without the prior written consent of Beneficiary having first been obtained, then, at the option of Beneficiary, any indebtedness or obligation which is secured hereby shall immediately become due and payable, without demand or notice, irrespective of the maturity dates which may be expressed in any Loan Documents evidencing such indebtedness or obligation.

(b)    A *"Transfer of Interest"* shall be deemed to have occurred with respect to the Property:  (i) if Trustor, or any of them shall or shall enter into an agreement to, sell, transfer, convey or in any manner alienate any interest in the Property or shall be divested of title to the Property in any manner or way, whether voluntarily or involuntarily, and/or (ii) if Trustor, or any of them, is other than a natural person, and any beneficial interest in Trustor, or any one of them, is sold, transferred, conveyed, hypothecated or encumbered.  However, the terms of this subparagraph (b) notwithstanding, none of the following shall constitute a *"Transfer of Interest"* under Section 11:  (i) the creation of an encumbrance which has junior priority to the lien of this Deed of Trust, (ii) a transfer by devise, descent or operation of law on the death of a joint tenant, (iii) the granting of a leasehold interest with a term of less than one (1) year (provided that the grantee of such leasehold interest is not also granted an option to purchase all or any portion of the Property), and (iv) the occurrence of a "partial sale" as described in Section 4.2 of that certain Development Agreement by and between Trustor, as Buyer, and Beneficiary, as Seller, dated November 8, 2007.

12.    *Default*

(a)    The occurrence of any of the following shall constitute an *"Event of Default"* hereunder:  (i) failure by Trustor to pay when due any amount which Trustor is

7

required to pay under any Loan Documents secured by this Deed of Trust, (ii) failure by Trustor to satisfy or perform any obligation secured by this Deed of Trust, other than the payment of money, or failure by Trustor to comply with, satisfy or perform any term, provision, covenant or condition, other than the payment of money as contained in the Loan Documents which default continues for a period of more than thirty (30) days after written notice from Beneficiary or such lesser period, if any, as may be provided for in the relevant Loan Document, and/or (iii) the commencement by Trustor of a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to it or its respective debts under the United States Bankruptcy Code or any bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official, for any substantial part of its property or the consent by Trustor to any such relief or to the appointment or taking possession by any such official in any involuntary case or other proceeding commenced against Trustor or the admission by Trustor, in writing, of its inability to pay its debts as they come due, unless dismissed within ninety (90) days.

(b)     Any reference in this Deed of Trust to the "*Default Rate*" shall mean a rate of interest which is equal to Prime plus six percent (6%) per annum or eighteen percent (18%) per annum, whichever is higher.

13.     *Power of Sale*. Upon the occurrence of an Event of Default, as defined by Paragraph 12 above, and recording of the notice of default and election to sell, as required by Chapter 107 of the Nevada Revised Statutes, then the Trustee, its successors or assigns, on demand by Beneficiary shall sell the Property, in whole or in part, in order to accomplish the objectives of these trusts, in the manner following, namely:

(a)     The Trustee shall first give notice of the time and place of such sale, in the manner provided by the laws of the State for the sale of real property under execution, and may from time to time postpone such sale by such advertisement as it may deem reasonable, or without further advertisement, by proclamation made to the persons assembled at the time and place previously appointed and advertised for such sale, and on the day of sale so advertised, or to which such sale may have been postponed, the Trustee may sell the property as so advertised, at public auction, at the time and place specified in the notice, either in the county in which the Property, or any part thereof, to be sold, is situated, or at the principal office of the Trustee, in its discretion, to the highest cash bidder. The beneficiary, obligee, creditor, or the holder or holders of the Loan Documents secured hereby may bid and purchase at such sale. The Beneficiary may, after recording the notice of breach and election, waive or withdraw the same or any proceedings thereunder, and shall thereupon be restored to his former position and have and enjoy the same rights as though such notice had not been recorded.

(b)     The Trustee, upon such sale, shall make (without warranty), execute and, after due payment made, deliver to purchaser or purchasers, his or their heirs or assigns, a deed or deeds of the Property so sold which shall convey to the purchaser all the title of the Trustor in the Property and shall apply the proceeds of the sale thereof in payment, firstly, of the expenses of such sale, together with the reasonable expenses of this trust, including counsel fees, in a reasonable amount, which shall become due upon any default made by Trustor in any of the payments aforesaid; and also such sums, if any, as Trustee of Beneficiary shall have paid, for

8

procuring a search of the title to the Property, of any part thereof, subsequent to the execution of the Deed of Trust; and in payment, secondly, to of the obligations or debts secured hereby, and interest thereon then remaining unpaid, and the amount of all other moneys with interest thereon herein agreed or provided to be paid by Trustor in such order as Beneficiary may elect in its sole discretion; and the balance or surplus of such proceeds of sale it shall pay to Trustor, its successor or assigns.

(c)    In the event of a sale of the Property conveyed or transferred in trust, or any part thereof, and the execution of a deed or deeds therefor under such trust, the recital therein of default, and of recording the notice of breach and election to sell, and of the elapsing of the requisite time period, and of the giving of notice of sale, and of a demand by Beneficiary that such sale should be made, shall be conclusive proof of such default, recording, election, elapsing of time, and of the due giving of such notice, and that the sale was regularly and validly made on due and proper demand by Beneficiary; and any such deed or deeds with such recitals therein shall be effectual and conclusive against Trustor, its successors and assigns, and all other persons; and the receipt for the purchase money recited or contained in any deed executed to the purchaser as aforesaid shall be sufficient discharge to such purchaser from all obligation to see to the proper application of the purchase money, according to the trusts aforesaid. With respect to any of the Property which is personal property, Beneficiary shall have, in the jurisdiction in which enforcement of this Deed of Trust is sought, or in any other applicable jurisdiction, all remedies of a secured party under the Uniform Commercial Code and may require Trustor, on demand, to assemble all such personal property and make the same available to Beneficiary at such places as Beneficiary may select that are reasonably convenient for both parties, whether at the premises of Trustor or elsewhere.

14.    *Deficiency*.  Trustor agrees to pay any deficiency arising from any cause after application of the proceeds of the sale held in accordance with the provisions Paragraph 13 above.

15.    *Remedies Cumulative and Limitation of Waiver*.  The rights and remedies of Beneficiary upon the occurrence of one or more defaults by Trustor (whether such rights and remedies are conferred by statute, by rule of law, by this Deed of Trust, or otherwise) may be exercised by Beneficiary, in the sole discretion of Beneficiary, either alternatively, concurrently, or consecutively in any order. The exercise by Beneficiary, or Trustee at the express direction of Beneficiary, of any one or more of such rights and remedies shall not be construed to be an election of remedies nor a waiver of any other rights and remedies Beneficiary might have unless, and limited to the extent that, Beneficiary shall so elect or so waive by an instrument in writing delivered to Trustee. By accepting payment of any sum secured hereby after its due date, Beneficiary does not waive its right either to require prompt payment, when due, of all other sums so secured or to declare default, as herein provided, for failure to so pay.

16.    *Stamps*.  If at any time the United States of America, any state thereof or any governmental subdivision of such state shall require revenue stamps to be affixed to the Note or any of the other Loan Documents, or the payment of any other tax paid on or in connection therewith, Trustor shall pay the same with any interest or penalties imposed in connection

9

therewith if Trustor is permitted by law to pay such amount and, if not so permitted then the Note shall immediately be due and payable.

17.    *Law.*  Trustor acknowledges and agrees that this Deed of Trust and the other Loan Documents, including provisions with respect to the making of any disbursements, the creation of any monetary obligations and the rights accruing and compensation payable to Beneficiary in connection therewith, shall be governed by and construed in accordance with the laws of the State of Nevada; *provided, however,* in all instances, federal law shall apply to the extent that Beneficiary may have greater rights thereunder.

18.    *Miscellaneous.*

(a)    This Deed of Trust applies to, inures to the benefit of, and binds all parties hereto, their heirs, legatees, devisees, administrators, executors, successors, and assigns. It is expressly agreed that the trust created hereby is irrevocable by Trustor.

(b)    In the event that Trustor consists of more than one person or entity, the obligations of Trustor hereunder shall be joint and several.

(c)    In this Deed of Trust, whenever the context so requires, the masculine gender includes the feminine and/or neuter, and the singular number includes the plural. The term "*Beneficiary*" includes any future holder of the note secured hereby. The term "*Trustor*" includes the term "*Grantor.*"

(d)    Trustor hereby appoints Beneficiary the attorney-in-fact of Trustor to prepare, sign, file and record one or more financing statements; any documents of title or registration, or like papers, and to take any other action deemed necessary, useful or desirable by Beneficiary to perfect and preserve Beneficiary's security interest against the rights or interests of third persons.

(e)    If any provision of this Deed of Trust or its application to any person or circumstances is held invalid, the other provisions hereof or the application of the provision to other persons or circumstances shall not be affected.

(f)    The captions or headings at the beginning of each section hereof are for convenience of the parties and are not a part of this Deed of Trust.

(g)    Time is of the essence of each provision of this Deed of Trust.

19.    *Notice.*  Except as otherwise provided by law, any notice, request, demand, consent, approval or other communication ("*Notice*") provided or permitted under this Deed of Trust, or any other instrument contemplated hereby, shall be in writing, signed by the part giving such Notice and shall be given by personal delivery to the other party or by United States certified or registered mail, postage prepaid, return receipt requested, addressed to the party for whom it is intended at its address as set forth below. Unless otherwise specified, Notice shall be deemed given when received, but if delivery is not accepted, on the earlier of the date delivery is refused or the third day after same is deposited in any official United State Postal Depository.

10

Any party from time to time, by Notice to the other parties given as above set forth, may change its address for purpose of receipt of any such communication.

Beneficiary:    KB HOME Nevada Inc.
5655 Badura Avenue
Las Vegas, Nevada 89118
Attn.: Don DelGiorno, Division President

Trustor:    Essex Real Estate Partners, LLC
2500 W. Sahara Avenue, Suite 202,
Las Vegas, Nevada 89102
Attn.: George Holman, Manager

Trustee:    Chicago Title Agency of Nevada Inc.
9500 Flamingo Road
Las Vegas, NV 89147
Attn: Legal Department

20.    *No Third Party Beneficiaries.* This Deed of Trust is made and entered into for the sole protection and benefit of the parties hereto, and no other person or entity shall be a direct or indirect beneficiary of, or shall have any direct or indirect cause of action or claim in connection with this Deed of Trust or any of the other Loan Documents.

21.    *No Offset.* Under no circumstances shall Trustor fail or delay to perform (or resist the enforcement of) any of its obligations in connection with any of the Loan Documents because of any alleged offsetting claim or cause of action against Beneficiary (or any indebtedness or obligation of Beneficiary) which has not been confirmed in a final judgment of a court of competent jurisdiction (sustained on appeal, if any) against Beneficiary, and Trustor hereby waives any such rights of setoff (or offset) which it might otherwise have with respect to any such claims or causes of action against Beneficiary (or any such obligations or indebtedness of Beneficiary), unless and until such right of setoff is confirmed and liquidated by such a final judgment. Trustor further waives any right that it might otherwise have to require a marshaling of any security of Beneficiary or to direct the order in which Beneficiary pursues its rights or remedies with respect to any of its security.

22.    *Fixture Filing.* This Deed of Trust covers goods which are or are to become fixtures related to the Property, and constitutes a "*Fixture Filing*" with respect thereto, executed by Trustor as "*Debtor*" and Beneficiary as "*Secured Party.*"

23.    *Arbitration.*

(a)    *Binding Arbitration.* Upon the demand of Trustor or Beneficiary (collectively the "*Parties*"), whether made before the institution of any judicial proceeding or not more than thirty (30) days after service of a complaint, third party complaint, cross-claim or counterclaim or any answer thereto or any amendment to any of the above, any Dispute (as defined below) shall be resolved by binding arbitration in accordance with the terms of this

11

arbitration clause. A *"Dispute"* shall include any action, dispute, claim, or controversy of any kind, whether founded in contract, tort, statutory or common law, equity, or otherwise, now existing or hereafter occurring between the parties arising out of, pertaining to or in connection with this Deed of Trust or any related agreements, documents, or instruments (the *"Documents"*). The parties understand that by this agreement they have decided that the Disputes may be submitted to arbitration rather than being decided through litigation in court and that once decided by an arbitrator the claims involved cannot be brought, filed or pursued in court.

(b)     *Governing Rules.*     Arbitrations conducted pursuant to this Agreement, including selection of arbitrators, shall be administered by the American Arbitration Association (*"Administrator"*) pursuant to the Commercial Arbitration rules of the Administrator. Arbitration's conducted pursuant to the terms hereof shall be governed by the provisions of the Federal Arbitration Act (Title 9 of the United States Code), and to the extent the foregoing are inapplicable, unenforceable or invalid, the laws of the State of Nevada. Judgment upon any award rendered hereunder may be entered in any court having jurisdiction; provided, however, that nothing contained herein shall be deemed to be a waiver by any party that is a bank of the protections afforded to it under 12 U.S.C. §91 or similar governing state law. Any party who fails to submit to binding arbitration following a lawful demand by the opposing party shall bear all costs and expenses, including reasonable attorneys' fees, incurred by the opposing party in compelling arbitration of any Dispute.

(c)     *No Waiver, Preservation of Remedies. Multiple Parties.*     No provision of, nor the exercise of any rights under, this arbitration clause shall limit the right of any party to: (i) foreclose against any real or personal property collateral or other security; (ii) exercise self-help remedies (including repossession and setoff rights); or (iii) obtain provisional or ancillary remedies such as injunctive relief, sequestration, attachment, replevin, garnishment, or the appointment of a receiver from a court having jurisdiction. Such rights can be exercised at any time except to the extent such action is contrary to a final award or decision in any arbitration proceeding. The institution and maintenance of an action as described above shall not constitute a waiver of the right of any party, including the plaintiff, to submit the Dispute to arbitration, nor render inapplicable the compulsory arbitration provisions hereof. Any claim or Dispute related to exercise of any self-help, auxiliary or other exercise of rights under this section (c) shall be a Dispute hereunder.

(d)     *Arbitrator Powers and Qualifications; Awards.*     Arbitrators shall resolve all Disputes in accordance with the applicable substantive law. Arbitrators may make an award of attorneys' fees and expenses if permitted by law or the agreement of the parties. All statutes of limitation applicable to any Dispute shall apply to any proceeding in accordance with this arbitration clause. Arbitrator(s) may, in the exercise of their discretion, at the written request of a party in any Dispute: (i) consolidate in a single proceeding any multiple party claims that are substantially identical and all claims arising out of a single loan or series of loans including claims by or against Trustor(s) Guarantors, sureties and or owners of collateral if different from the Trustor; and (ii) administer multiple arbitration claims as class actions in accordance with Rule 23 of the Federal Rules of Civil Procedure. If the Arbitration is conducted pursuant to the terms of an agreement between the Bank and the Trustor related to the indebtedness guaranteed,

12

then the Arbitration Panel shall be the one selected by the Trustor and Bank pursuant to their agreement to decide the Dispute between them. The arbitrator(s) shall be empowered to resolve any dispute regarding the terms of this Agreement or the arbitrability of any Dispute or any claim that all or any part (including this provision) is void or voidable but shall have no power to change or alter the terms of this Agreement. The award of the arbitrator(s) shall be in writing and shall specify the factual and legal basis for the award. Single Arbitrators and Arbitration Panels shall be required to make specific, written findings of fact and conclusions of law.

(e)     *Miscellaneous.*     To the maximum extent practicable, the Administrator, the arbitrator(s) and the parties shall take any action necessary to require that an arbitration proceeding hereunder be concluded within ninety (90) days of the filing of the Dispute with the Administrator. The arbitrator(s) shall be empowered to impose sanctions for any party's failure to proceed within the times established herein. Arbitration proceedings hereunder shall be conducted in Las Vegas, Nevada at a location determined by the Administrator. In any such proceeding a party shall state as a counterclaim any claim which arises out of the transaction or occurrence or is in any way related to the Documents which does not require the presence of a third party which could not be joined as a party in the proceeding. The provisions of this arbitration clause shall survive any termination, amendment, or expiration of the Documents and repayment in full of sums owed to Bank by Trustor unless the parties otherwise expressly agree in writing. Each party agrees to keep all Disputes and arbitration proceedings strictly confidential, except for disclosures of information required in the ordinary course of business of the parties or as required by applicable law or regulation.


*[remainder of page intentionally left blank]*

13

IN WITNESS WHEREOF, Trustor has executed this instrument on the day and year first above written.

TRUSTOR:                                          TRUSTEE:

Essex Real Estate Partners, LLC,                  _____
a Nevada limited-liability company                a _____

By:  Las Vegas Development Associates, LLC
     a Nevada limited-liability company,          By: _____
     its Member                                       Name: _____
                                                      Its: _____
By: _____
    Name:  George Holman
    Title:   Manager


BENEFICIARY:

KB HOME Nevada Inc.,
a Nevada corporation

By: _____
    Name:  Don DelGiorno
    Its.  President


STATE OF NEVADA          )
                         ) ss.
COUNTY OF CLARK          )

        On this 28th day of November, 2007, personally appeared before me a Notary Public,
George Holman, Manager _____, personally known (or proven) to me to be
the person whose name is subscribed to the above instrument who acknowledged that he/she
executed the instrument.

        [notary seal:
        Notary Public - State of Nevada
        County of Clark
        JOAN WILEY
        My Appointment Expires
        February 1, 2009]                    _____
                                             Notary Public

My Commission expires: _2-1-09_

14

IN WITNESS WHEREOF, Trustor has executed this instrument on the day and year first above written.

TRUSTOR:

Essex Real Estate Partners, LLC,
a Nevada limited-liability company

By: Las Vegas Development Associates, LLC
    a Nevada limited-liability company,
    its Member

    By: _____
        Name: George Holman
        Title:  Manager

TRUSTEE:

Chicago Title Agency
a Nevada corporation

By: _____
    Name:  Bob Cannata
    Its: Assistant Vice President

BENEFICIARY:

KB HOME Nevada Inc.,
a Nevada corporation

By: _____
    Name:  Donald J. DelGiorno
    Its:  President


STATE OF NEVADA      )
                     ) ss.
COUNTY OF CLARK      )

On this 29 day of November, 2007, personally appeared before me a Notary Public, Bob Cannata , Asst. V.P. , personally known (or proven) to me to be the person whose name is subscribed to the above instrument who acknowledged that he/she executed the instrument.

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
KARLEEN GARRISON
Appt. No. 97-1556-1
My Appt. Expires Oct 23, 2006

_____
Notary Public

My Commission expires: 10-23-08

14

STATE OF NEVADA        )
                       ) ss.
COUNTY OF CLARK        )

     On this _____ day of November, 2007, personally appeared before me a Notary Public, _____, _____, personally known (or proven) to me to be the person whose name is subscribed to the above instrument who acknowledged that he/she executed the instrument.


_____
Notary Public


My Commission expires: _____.




STATE OF NEVADA        )
                       ) ss.
COUNTY OF CLARK        )

     On this 29ᵗʰ day of November, 2007, personally appeared before me a Notary Public, Donald J. DeIGiorno, President, KB Home Nevada Inc, personally known (or proven) to me to be the person whose name is subscribed to the above instrument who acknowledged that he/she executed the instrument.


_Kathleen Seckinger_
Notary Public

My Commission expires: 9/01/08 .

NOTARY PUBLIC
STATE OF NEVADA
County of Clark
KATHLEEN SECKINGER
Appt. No. 04-91410-1
My Appt. Expires Sept. 1, 2008

15

EXHIBIT "A"
LEGAL DESCRIPTION

Lots One (1), Eight (8), Twenty-one (21), Twenty-two (22) and Twenty-eight (28) of THE
AMENDED PARENT FINAL MAP OF SOUTH EDGE, as shown by map thereof on file in
Book 137 of Plats, Page 100, in the Office of the County Recorder of Clark County, Nevada.

PROMISSORY NOTE
Secured by Deed of Trust
(Non-Recourse)

U.S. $7,000,000.00                                      November _____, 2007

     FOR VALUE RECEIVED, the undersigned ESSEX REAL ESTATE PARTNERS, LLC, a Nevada limited-liability company ("*Borrower*"), whose address is 2500 W. Sahara Avenue, Suite 202, Las Vegas, Nevada 89102, promises to pay KB HOME NEVADA INC., a Nevada corporation ("*Lender*"), whose address is 5655 Badura Avenue, Las Vegas, Nevada 89118, or such other place as Lender may designate in writing, in lawful money of the United States of America, the principal sum of Seven Million and 00/100 Dollars (U.S. $7,000,000.00), together with any other amounts which may become due in accordance with the following provisions of this Promissory Note (the "*Note*"):

    1.    Maturity Date. Unless this Note shall be accelerated under the terms of this Note or the Deed of Trust (as defined below), the principal sum hereof, together with any other amounts which may become due and payable hereunder shall become due and payable without notice or demand on the Maturity Date. As used herein the "*Maturity Date*" shall mean the date of substantial completion of driveable access and water available for fire protection delivered to a point on the boundary of each of Inspirada Town Center Pods 1, 8, 21, 22, and 28 such that building permits could be obtained for construction on the Property, as described in that certain Development Agreement, dated November 8, 2007, by and between Borrower and Lender (the "*Development Agreement*").

    2.    Prepayment. Borrower shall have the right to prepay the indebtedness in full at any time prior to the Maturity Date.

    3.    Default Interest. Upon the occurrence of an Event of Default under this Note (as defined below), the entire unpaid principal balance hereof shall, for all purposes, thereafter earn interest at the rate of six percent (6%) above the then prime interest rate or eighteen percent (18%), whichever is greater (the "*Default Interest*"), from the date of such default until the unpaid principal balance hereof, attorneys fees, all, other costs and amounts payable under this Note shall have been paid in full.

    4    Security. This Note is secured by a Deed of Trust, Assignment of Rents, Security Agreement and Fixture Filing of even date herewith (the "*Deed of Trust*").

    5.    Default. Provided that Lender has performed all of its obligations under the Development Agreement, the occurrence of any one or more of the following events shall constitute an "*Event of Default*" under this Note: (a) Borrower shall fail to pay all amounts due and payable under this Note by the Maturity Date, (b) Borrower shall fail to perform any of the non-monetary terms, covenants, conditions or obligations required to be performed by Borrower under the terms of this Note or the Deed of Trust which is not remedied within the time period specified in this Note or the Deed of Trust relative to such performance, or if no time period is specified for such performance, within thirty (30) days after written notice thereof to Borrower; or (c) there shall occur an "*Event of Default*" under the Deed of Trust.

    6.    Acceleration Upon Default. Upon the occurrence of any Event of Default under this Note or the Deed of Trust, then the entire principal balance plus the Default Interest, irrespective of

the Maturity Date specified herein, shall become immediately due and payable at the option of Lender.

7. <u>Cumulative Remedies</u>. The rights or remedies of the Lender as provided in this Note or the Deed of Trust shall be cumulative and concurrent, and may be pursued singly, successively, or together against Borrower (subject to Section 15 of this Note), the Property (as defined in the Deed of Trust), or otherwise at the sole discretion of the Lender. The failure to exercise any such right or remedy shall in no event be construed as a waiver or release of said rights or remedies or a waiver of the right to exercise them at any later time.

8. <u>Waiver</u>. The Borrower hereby waives diligence, presentment, protest and demand, and also notice of protest, of demand, of nonpayment, of dishonor and of maturity.

9. <u>Payment of Costs and Liability</u>. If Lender incurs any costs or expenses, including attorneys' fees, in connection with the enforcement of this Note or the Deed of Trust, then Borrower agrees to pay the reasonable attorneys fees ("*reasonable*" being the usual hourly billing rates charged by Lender's outside attorneys) and costs thereof, regardless of whether suit or action is commenced or defended. Furthermore, if any lawsuit, arbitration proceeding or other action or effort is commenced to enforce any of the terms of this Note or the Deed of Trust, then the prevailing party will have the right to recover its reasonable attorneys' fees, paralegal fees and costs of suit from the other party.

10. <u>Severability</u>. If any term or condition of this Note shall be held to be invalid or unenforceable, the rest of the Note shall be enforced without the invalid or the unenforceable provision.

11. <u>Notices</u>. Any notice given under this Note, shall be in writing and shall be deemed to have been sufficiently given at the earlier of when personally delivered or at 5:00 P.M. (in the time zone of the addressee of the notice) on the second business day after deposit in the United States certified or registered mail, postage prepaid, or deposit with a nationally recognized overnight delivery service, and addressed to the address of the party to whom such notice is directed as such address is set forth in the first paragraph of this Note, or at such other address as any party may from time to time notify the other by notice in writing as aforesaid. A business day is any day other than a Saturday, Sunday or any day on which federal savings banks in Nevada are authorized or required to be closed.

12. <u>Governing Law</u>. This Note shall be construed according to and governed by the laws of the State of Nevada.

13. <u>Limitations on Sale or Encumbrance</u>. The Deed of Trust includes certain limitations on the right of Borrower to sell, develop, entitle or otherwise improve the Real Property encumbered by the Deed of Trust or to pledge the Real Property as security for other financing. Reference to the Deed of Trust should be made for the text of these provisions, which are incorporated herein by this reference.

14. <u>Non Recourse</u>. Lender agrees that it shall not seek to enforce any monetary judgment with respect to the indebtedness evidenced by this Note against the Borrower except through recourse to the Real Property (as defined in the Deed of Trust), unless the obligation from which the judgment arises is one of the Carveout Obligations, as defined below.

2

15.    Carveout Obligations.  The "*Carveout Obligations*" are (a) the obligation to repay any portion of the indebtedness evidenced by this Note that arises from any of the Carveouts (as defined below), (b) the obligation to repay the entire indebtedness evidenced by this Note, if the Lender's exculpation of the Borrower from personal liability under this Section has become void as set forth below, (c) the obligation to indemnify the Lender in respect of its actual damages suffered in connection with any of the Carveouts, and (d) the obligation to defend and hold the Lender harmless from and against any claims, judgments, causes of action or proceedings arising from any of the Carveouts. The "*Carveouts*" are:

(i)    material written misrepresentation contained in this Note or in the Deed of Trust;

(ii)    waste of the Real Property (which shall include damage, destruction or disrepair of the Real Property caused by a willful act or grossly negligent omission of the Borrower, but shall exclude ordinary wear and tear in the absence of gross negligence);

(iii)    failure to pay property taxes or assessments with respect to the Real Property;

(iv)    failure to pay to the Lender all rents, income and profits, net of reasonable and customary operating expenses, received during any period in which an Event of Default hereunder existed;

(v)    any liability of the Borrower under any environmental indemnity set forth in the Deed of Trust;

(vi)    any violation by the Borrower of the "Development Covenants" (as defined in the Deed of Trust); and

(vii)    failure to keep the Real Property free from any liens which arise as a result of Buyer's development or improvement of the Property.

16.    Assignment.  Except with the advance written consent of the Lender, which consent may be withheld in the Lender's sole and absolute discretion, the Borrower shall not assign or transfer, or attempt to assign or transfer, its obligations hereunder, with the exception of Essex Real Estate Partners, LLC, an affiliated limited liability company majority controlled as to ownership and voting interests by Borrower.

*[remainder of page intentionally left blank]*

3

Dated the date and year first recited above.

> BORROWER:
>
> Essex Real Estate Partners, LLC,
> a Nevada limited-liability company
>
> By:  Las Vegas Development Associates, LLC
>      a Nevada limited-liability company,
>      its Member
>
>      By: _____
>      Name: George Holman
>      Title:  Manager

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT D

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

6

20071204-0001853

191-15-811-001; 191-15-711-002;
191-23-211-003; 191-23-211-004
191-14-311-002

~~RECORDING REQUESTED BY AND~~
WHEN RECORDED MAIL TO:

NEXBANK, SSB
13455 Noel Road, Suite 2220
Dallas, Texas 75240
Attn: Jeff Scott
Vice President Agency Services

07010769-FB

Fee: $56.00
N/C Fee: $25.00

12/04/2007         11·07·09
T20070209908
Requestor:
    CHICAGO TITLE

Debbie Conway            KGP
Clark County Recorder    Pgs: 43

[SPACE ABOVE LINE FOR RECORDER'S USE ONLY]

## DEED OF TRUST,
## ASSIGNMENT OF RENTS AND LEASES,
## SECURITY AGREEMENT AND
## FIXTURE FILING
## (NEVADA)

THIS DOCUMENT SERVES AS A FIXTURE FILING UNDER NRS 104.9502
OF THE NEVADA REVISED STATUTES.

THIS DOCUMENT SECURES "FUTURE ADVANCES" (AS DEFINED IN NRS 106.320).
THE MAXIMUM PRINCIPAL AMOUNT TO BE SECURED HEREBY IS $100,000,000.

Borrower's Organizational Identification Number: 261349428

This Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture
Filing (this "Deed of Trust") is made as of November 29, 2007, by ESSEX REAL ESTATE
PARTNERS, LLC, a Nevada limited liability company ("Borrower"), as trustor, in favor of
CHICAGO TITLE INSURANCE COMPANY, as trustee ("Trustee"), for the benefit of
NEXBANK, SSB, as beneficiary in its capacity as collateral agent and administrative agent
("Agent") for the lenders (each, a "Lender" and collectively, "Lenders") from time to time party
to that certain Term Loan Agreement of even date herewith (the "Loan Agreement") among
Borrower, Lenders, HIGHLAND FINANCIAL CORP., as co-lead arranger, INTEGRATED
FINANCIAL ASSOCIATES, INC., a Nevada corporation, as co-lead arranger, and Agent. The
addresses for Borrower, Agent and Trustee are set forth at the end of this Deed of Trust.

### ARTICLE 1

#### Definitions; Granting Clauses; Secured Indebtedness

Section 1.1    Secured Indebtedness.    This Deed of Trust is made to secure the
obligations of Borrower under the Loan Documents and all other matters and indebtedness
defined below as Secured Indebtedness, which indebtedness includes the Note defined and
described below in the original face principal amount of Sixty-Six Million Dollars
($66,000,000).

BN 1540587v3

Section 1 2    <u>Definitions</u>.

(a)    In addition to other terms defined herein, each of the following terms shall have the meaning assigned to it, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

"<u>Agent</u>": Nexbank, SSB, in its capacity as Agent for the Lenders or any successor Agent.

"<u>Borrower</u>": Unless the context clearly indicates otherwise, the Borrower(s) named in the introductory paragraph hereof, together with all heirs, devisees, representatives, successors

"<u>Collateral</u>": All of the Property constituting personal property or fixtures in which Borrower is granting Agent for the benefit of Lenders a security interest under this Deed of Trust, together with all proceeds and products thereof and all supporting obligations ancillary thereto or arising in any way in connection therewith.

"<u>Debtor Relief Law</u>": Any federal, state or local law, domestic or foreign, as now or hereafter in effect relating to bankruptcy, insolvency, liquidation, receivership, reorganization, arrangement, composition, extension or adjustment of debts, or any similar law affecting the rights of creditors.

"<u>Default</u>": Any of the events described in <u>Section 4.1</u> of this Deed of Trust.

"<u>Dispute</u>": Any controversy, claim or dispute between or among the parties to this Agreement, including any such controversy, claim or dispute arising out of or relating to (i) this Agreement, (ii) any other Loan Document, (iii) any related agreements or instruments, or (iv) the transaction contemplated herein or therein (including any claim based on or arising from an alleged personal injury or business tort).

"<u>Environmental Agreement</u>": The Environmental Indemnity Agreement dated of even date herewith executed by Borrower and Guarantor in favor of Agent, Lenders and certain other parties. The Environmental Agreement is not a Loan Document.

"<u>Guarantor</u>" has the meaning set forth in the Loan Agreement.

"<u>Holder</u>": Agent for the ratable benefit of Lenders or the subsequent holder at the time in question under this Deed of Trust.

"<u>Indemnified Matters</u>": Any and all claims, demands, liabilities (including strict liability), losses, damages (including consequential damages), causes of action, judgments, penalties, fines, costs and expenses (including reasonable fees and expenses of attorneys and other professional consultants and experts, and of the investigation and defense of any claim, whether or not such claim is ultimately defeated, and the settlement of any claim or judgment including all value paid or given in settlement) of every kind, known or unknown, foreseeable or unforeseeable, which may be imposed upon, asserted against or incurred or paid by any Indemnified Party at any time and from time to time, whenever imposed, asserted or incurred, because of, resulting from, in connection with, or arising out of any transaction, act, omission, event or circumstance in any way connected with the Property or with this Deed of Trust or any

other Loan Document, including any bodily injury or death or property damage occurring in or upon or in the vicinity of the Property through any cause whatsoever at any time, any act performed or omitted to be performed hereunder or under any other Loan Document, any breach by Borrower of any representation, warranty, covenant, agreement or condition contained in this Deed of Trust or in any other Loan Document, any Default, or any claim under or with respect to any Lease.

"Indemnified Party": Each of the following persons and entities: (i) Agent, any Lender and any Holder; (ii) Trustee; (iii) any persons or entities owned or controlled by, owning or controlling, or under common control or affiliated with, Agent, any Lender, any Holder and/or Trustee; (iv) any participants and co-lenders in the Loan; (v) the directors, officers, partners, employees, attorneys, agents and representatives of each of the foregoing persons and entities; and (vi) the heirs, personal representatives, successors and assigns of each of the foregoing persons and entities.

"Law": Any federal, state or local law, statute, ordinance, code, rule, regulation, license, permit, authorization, decision, order, injunction or decree, domestic or foreign.

"Lease": Each existing or future lease, sublease (to the extent of Borrower's rights thereunder) or other agreement under the terms of which any person has or acquires any right to occupy or use the Property or any part thereof or interest therein, and each existing or future guaranty of payment or performance thereunder, and any and all existing or future security therefor and letter-of-credit rights with respect thereto, whether or not the letter of credit is evidenced by a writing.

"Legal Requirement": Any law, agreement, covenant, restriction, easement or condition (including, without limitation of the foregoing, any condition or requirement imposed by any insurance or surety company), as any of the same now exists or may be changed or amended or come into effect in the future.

"Lender": Each Lender from time to time party to the Loan Agreement.

"Loan": The Loan evidenced by the Loan Agreement and the Note.

"Loan Agreement": The Term Loan Agreement dated of even date herewith evidencing and governing the Loan, executed by and between Borrower, Agent and Lenders, as it may from time to time be amended, modified, restated, replaced or supplemented.

"Loan Documents": The Notes, this Deed of Trust, and any other document now or hereafter evidencing, governing, securing or otherwise executed in connection with the Loan, including the Loan Agreement and any letter of credit or reimbursement agreement, tri-party financing agreement, guaranty executed by a third party, or other agreement between Borrower and Lender and any other party or parties, pertaining to the repayment or use of the Loan proceeds, as such documents or any of them may have been or may be from time to time renewed, extended, supplemented, increased or modified; provided, however, that the Loan Documents do not include the Environmental Agreement.

"Notes": (i) The Deed of Trust Notes dated of even date herewith, each made by Borrower and payable to the order of each Lender, collectively in the aggregate face principal amount of $66,000,000, bearing interest as provided in the Loan Agreement, and each containing a provision for, among other things, the payment of attorneys' fees, and (ii) all other promissory notes given in substitution thereof or in modification, supplement, increase, renewal or extension thereof, in whole or in part, whether one or more, as any or all of such promissory notes may from time to time be renewed, extended, supplemented, increased or modified.

"Permitted Encumbrances": (i) Any matters set forth in any policy of mortgagee title insurance issued to Agent for the benefit of Lenders identified in the title policy delivered to Agent in connection with, or subsequent to, the closing under the Loan Agreement, (ii) the liens and security interests evidenced by this Deed of Trust, (iii) statutory liens for real estate taxes and assessments on the Property which are not yet delinquent, (iv) other liens and security interests (if any) in favor of Agent for the benefit of Lenders, (v) the rights of tenants in possession as of the date hereof, if any, pursuant to Leases approved by Agent and the rights of future tenants under any Leases made in accordance with the Loan Documents, and the assignment of such Leases pursuant to this Deed of Trust, and (vi) any matters arising after the date hereof which may be acceptable to Agent or any Holder in its sole and absolute discretion, which Permitted Encumbrances in the aggregate do not materially adversely affect the value or use of the Property or Borrower's ability to repay the Secured Indebtedness.

"Rents": All of the rents, revenue, accounts, deposit accounts, payment intangibles, commercial tort claims, income, profits and proceeds derived and to be derived from the Property or arising from the use or enjoyment of any portion thereof or from any Lease, including the proceeds from any negotiated lease termination or buyout of such Lease, liquidated damages following default under any such Lease, all proceeds payable under any policy of insurance covering loss of rents resulting from untenantability caused by damage to any part of the Property, all of Borrower's rights to recover monetary amounts from any tenant in bankruptcy, including rights of recovery for use and occupancy and damage claims arising out of Lease defaults, including rejections, under any applicable Debtor Relief Law, together with any sums of money that may now or at any time hereafter be or become due and payable to Borrower by virtue of any and all royalties, overriding royalties, bonuses, delay rentals and any other amount of any kind or character arising under any and all present and future oil, gas, mineral and mining leases covering the Property or any part thereof, and all proceeds and other amounts paid or owing to Borrower under or pursuant to any and all contracts and bonds relating to the construction or renovation of the Property.

"Secured Indebtedness": The following promissory notes, obligations, indebtedness, duties and liabilities and all renewals, extensions, supplements, increases and modifications thereof and thereto, in whole or in part, from time to time:

(i)      The Notes;

(ii)     All indebtedness, liabilities, duties, covenants, promises and other obligations owed by Borrower to Agent and/or Lenders pursuant to the Loan Documents, expressly excluding, however, the Environmental Agreement (which is not a Loan Document) and also excluding any guaranty executed by a third party, whether now existing or hereafter arising, and

whether joint or several, direct or indirect, primary or secondary, fixed or contingent, liquidated or unliquidated, and the cost of collection of all such amounts;

(iii)    All amounts that Agent, Lenders or any other Holder may from time to time advance pursuant to the terms and conditions of this Deed of Trust with respect to an obligation secured by a lien or encumbrance prior to the lien of this Deed of Trust or for the protection of this Deed of Trust, together with interest thereon; and

(iv)    If and only if evidenced by a writing reciting that it is secured by this Deed of Trust, any other loan, future advance, debt, obligation or liability owed by Borrower of every kind or character, whether now existing or hereafter arising, whether joint or several, direct or indirect, primary or secondary, fixed or contingent, liquidated or unliquidated, and the cost of collection of all such amounts, and whether or not originally payable to Agent, Lenders or any other Holder, it being contemplated that Borrower may hereafter become indebted to Agent, Lenders or another Holder for one or more of such further loans, future advances, debts, obligations and liabilities.

"Transfer":  Any sale, lease, conveyance, assignment, pledge, encumbrance or transfer, whether voluntary, involuntary, by operation of law or otherwise.

"Trustee":  The trustee identified in the introductory paragraph of this Deed of Trust, and any successor or substitute appointed and designated as herein provided, from time to time acting hereunder.

(b)    Any term used or defined in the Nevada Uniform Commercial Code (Chapters 104 and 104A of the Nevada Revised Statutes), as in effect from time to time, which is not defined in this Deed of Trust has the meaning given to that term in the Nevada Uniform Commercial Code, as in effect from time to time, when used in this Deed of Trust.

Section 1.3    Granting Clause.  For good and valuable consideration, the receipt and sufficiency of which are acknowledged by Borrower, to secure the obligations of Borrower under the Loan Documents and all other matters and indebtedness constituting the Secured Indebtedness, Borrower hereby GRANTS, TRANSFERS and ASSIGNS to Trustee, in trust for the benefit of Agent for the ratable benefit of Lenders, with power of sale and right of entry and possession, all estate, right, title and interest which Borrower now has or may hereafter acquire in and to the following Premises, Accessories and other rights, interests and properties, and all rights, estates, powers and privileges appurtenant thereto (collectively, the "Property")·

(a)    The real property described in Exhibit A which is attached hereto and incorporated herein by reference (the "Land"), together with: (i) any and all buildings, structures, improvements, alterations or appurtenances now or hereafter situated or to be situated on the Land (collectively, the "Improvements"); and (ii) all right, title and interest of Borrower, now owned or hereafter acquired, in and to (A) all streets, roads, alleys, easements, rights-of-way, licenses, rights of ingress and egress, vehicle parking rights and public places, existing or proposed, abutting, adjacent, used in connection with or pertaining to the Land or the Improvements; (B) any strips or gores between the Land and abutting or adjacent properties; (C) all options to purchase the Land or the Improvements or any portion thereof or interest

therein, and any greater estate in the Land or the Improvements; (D) all water, water rights (whether riparian, appropriative or otherwise, and whether or not appurtenant) and water stock, timber, crops and mineral interests on or pertaining to the Land; and (E) all development rights and credits and air rights (the Land, Improvements and other rights, titles and interests referred to in this clause (a) being herein sometimes collectively called the "<u>Premises</u>");

(b)      All fixtures, equipment, systems, machinery, furniture, furnishings, appliances, inventory, goods, building and construction materials, supplies, and other articles of personal property, of every kind and character, tangible and intangible (including software embedded therein), now owned or hereafter acquired by Borrower, which are now or hereafter attached to or situated in, on or about the Land or the Improvements, or used in or necessary to the complete and proper planning, development, use, occupancy or operation thereof, or acquired (whether delivered to the Land or stored elsewhere) for use or installation in or on the Land or the Improvements, and all renewals and replacements of, substitutions for and additions to the foregoing (the properties referred to in this clause (b) being herein sometimes collectively called the "<u>Accessories</u>," all of which are hereby declared to be permanent accessions to the Land);

(c)      All (i) plans and specifications for the Improvements, (ii) Borrower's rights, but not liability for any breach by Borrower, under all commitments (including any commitments for financing to pay any of the Secured Indebtedness), insurance policies (or additional or supplemental coverage related thereto, including from an insurance provider meeting the requirements of the Loan Documents or from or through any state or federal government-sponsored program or entity), contracts and agreements for the design, construction, operation or inspection of the Improvements and other contracts and general intangibles (including payment intangibles and any trademarks, trade names, goodwill, software and symbols) related to the Premises or the Accessories or the operation thereof, (iii) any account or deposit account from which Borrower may from time to time authorize Lender or any Holder to debit and/or credit payments due with respect to the Loan, and all accounts, deposit accounts and general intangibles, including payment intangibles, (iv) deposits and deposit accounts arising from or relating to any transactions related to the Premises or the Accessories (including Borrower's rights in tenants' security deposits, deposits with respect to utility services to the Premises, and any deposits, deposit accounts or reserves hereunder or under any other Loan Documents for taxes, insurance or otherwise), (v) rebates or refunds of impact fees or other taxes, assessments or charges, money, accounts (including deposit accounts), instruments, documents, promissory notes and chattel paper (whether tangible or electronic) arising from or by virtue of any transactions related to the Premises or the Accessories, (vi) permits, licenses, franchises, certificates, development rights, commitments and rights for utilities, and other rights and privileges obtained in connection with the Premises or the Accessories, (vii) Leases, Rents and other benefits of the Premises and the Accessories (without derogation of <u>Article 3</u> hereof), (viii) as-extracted collateral produced from or allocated to the Land, including oil, gas and other hydrocarbons and other minerals and all products processed or obtained therefrom and the proceeds thereof, and (ix) engineering, accounting, title, legal, and other technical or business data concerning the Property, including software, which are in the possession of Borrower or in which Borrower can otherwise grant a security interest;

(d)      All (i) accounts and proceeds (whether cash or non-cash and including payment intangibles), of or arising from the properties, rights, titles and interests referred to above in this

Section 1.3, including the proceeds of any sale, lease or other disposition thereof, proceeds of each policy of insurance, present and future (or additional or supplemental coverage related thereto, including from an insurance provider meeting the requirements of the Loan Documents or from or through any state or federal government-sponsored program or entity), payable because of loss sustained to all or part of the Property (including premium refunds), whether or not such insurance policies are required by Agent, proceeds of the taking thereof or of any rights appurtenant thereto, including change of grade of streets, curb cuts or other rights of access, by condemnation, eminent domain or transfer in lieu thereof for public or quasi-public use under any law, proceeds arising out of any damage thereto, including any and all commercial tort claims, (ii) all letter-of-credit rights (whether or not the letter of credit is evidenced by a writing) Borrower now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Section 1.3, (iii) all commercial tort claims Borrower now has or hereafter acquires relating to the properties, rights, titles and interests referred to in this Section 1.3, and (iv) other interests of every kind and character which Borrower now has or hereafter acquires in, to or for the benefit of the properties, rights, titles and interests referred to above in this Section 1.3 and all property used or useful in connection therewith, including rights of ingress and egress and remainders, reversions and reversionary rights or interests;

(e)    If the estate of Borrower in any of the property referred to above in this Section 1.3 is a leasehold estate, this conveyance shall include, and the lien and security interest created hereby shall encumber and extend to, all other or additional title, estates, interests or rights which are now owned or may hereafter be acquired by Borrower in or to the property demised under the lease creating the leasehold estate; and

(f)    All proceeds and products of, additions and accretions to, substitutions and replacements for, and changes in any of the property referred to above in this Section 1.3.

Section 1.4    Security Interest.  To secure the obligations of Borrower under the Loan Documents and all other matters and indebtedness constituting the Secured Indebtedness, Borrower hereby grants to Agent for the ratable benefit of Lenders a security interest in all of the Collateral, including all proceeds and products thereof and all supporting obligations ancillary thereto or arising in any way in connection therewith.  In addition to its rights hereunder or otherwise, Lender and any Holder shall have all of the rights of a secured party under the Nevada Uniform Commercial Code, as in effect from time to time, or under the Uniform Commercial Code in force from time to time in any other state to the extent the same is applicable law.

## ARTICLE 2

### Representations, Warranties and Covenants

Section 2.1    Borrower represents, warrants and covenants as follows:

(a)    Payment and Performance.  Borrower will make due and punctual payment of the Secured Indebtedness.  Borrower will timely and properly perform and comply with all of the covenants, agreements and conditions imposed upon it by this Deed of Trust and the other Loan Documents and will not permit a Default to occur hereunder or thereunder.  Time shall be of the essence in this Deed of Trust.

BN 1540587v3                                    7

(b)  Title and Permitted Encumbrances.  Borrower has in Borrower's own right, and Borrower covenants to maintain, lawful, good and marketable title to the Property, is lawfully seized and possessed of the Property and every part thereof, and has the right to convey the same, free and clear of all liens, charges, claims, security interests, and encumbrances except for the Permitted Encumbrances.  Borrower will warrant generally and forever defend title to the Property, subject as aforesaid to the Permitted Encumbrances, to Trustee and its successors or substitutes and assigns, against the claims and demands of all persons claiming or to claim the same or any part thereof.  Borrower will punctually pay, perform, observe and keep all covenants, obligations and conditions in or pursuant to any Permitted Encumbrance and will not modify or permit modification of any Permitted Encumbrance without the prior written consent of Holder.  Inclusion of any matter as a Permitted Encumbrance does not constitute approval or waiver by Holder of any existing or future violation or other breach thereof by Borrower, the Property or otherwise.  No part of the Property constitutes all or any part of the principal residence of Borrower if Borrower is an individual.  If any right or interest of Holder or any Lender in the Property or any part thereof shall be endangered or questioned or shall be attacked directly or indirectly, Trustee and Holder and Lenders, or either of them (whether or not named as parties to legal proceedings with respect thereto), are hereby authorized and empowered to take such steps as in their discretion may be proper for the defense of any such legal proceedings or the protection of such right or interest of Holder and each Lender, including the employment of independent counsel, the prosecution or defense of litigation, and the compromise or discharge of adverse claims.  All expenditures so made of every kind and character shall be a demand obligation (which obligation Borrower hereby promises to pay) owing by Borrower to Holder or Trustee or to Holder, for its own account or the account of Lenders (as the case may be), and the party (Trustee, Holder or Lenders, as the case may be) making such expenditures shall be subrogated to all rights of the person receiving such payment.

(c)  Taxes and Other Impositions.  Borrower will pay or cause to be paid all taxes, assessments and other charges or levies imposed upon or against or with respect to the Property or the ownership, use, occupancy or enjoyment of any portion thereof, or any utility service thereto, as the same become due and payable, including all real estate taxes assessed against the Property or any part thereof, and shall deliver promptly to Holder such evidence of the payment thereof as Holder may require.

(d)  Insurance Coverage.  Borrower shall obtain and maintain at Borrower's sole expense: (i) property insurance with respect to all insurable Property, against loss or damage by fire, lightning, windstorm, explosion, hail, tornado and such additional hazards as are presently included in Special Form (also known as "all-risk") coverage and against any and all acts of terrorism and such other insurable hazards as Holder may require, in an amount not less than 100% of the full replacement cost, including the cost of debris removal, without deduction for depreciation and sufficient to prevent Borrower, Holder and Lenders from becoming a coinsurer, such insurance to be in "builder's risk" completed value (non-reporting) form during and with respect to any construction on the Premises; (ii) if and to the extent any portion of the Improvements is, under the Flood Disaster Protection Act of 1973 ("FDPA"), as it may be amended from time to time, in a Special Flood Hazard Area, within a Flood Zone designated A or V in a participating community, a flood insurance policy in an amount required by Holder, but in no event less than the amount sufficient to meet the requirements of applicable law and the FDPA, as such requirements may from time to time be in effect; (iii) general liability insurance,

on an "occurrence" basis against claims for "personal injury" liability, including bodily injury, death or property damage liability, for the benefit of Borrower as named insured and Holder as additional insured on behalf of itself and Lenders; (iv) statutory workers' compensation insurance with respect to any work on or about the Premises (including employer's liability insurance, if required by Holder), covering all employees of Borrower and any contractor; (v) if there is a general contractor, commercial general liability insurance, including products and completed operations coverage, and in other respects similar to that described in clause (iii) above, for the benefit of the general contractor as named insured and Borrower and Holder (on behalf of itself and Lenders) as additional insureds, in addition to statutory workers' compensation insurance with respect to any work on or about the Premises (including employer's liability insurance, if required by Holder), covering all employees of the general contractor and any contractor; and (vi) such other insurance on the Property and endorsements as may from time to time be required by Holder (including soft cost coverage, automobile liability insurance, business interruption insurance or delayed rental income insurance, wind insurance, boiler and machinery insurance, earthquake insurance, sinkhole coverage, and/or permit to occupy endorsement) and against other insurable hazards or casualties which at the time are commonly insured against in the case of premises similarly situated, due regard being given to the height, type, construction, location, use and occupancy of buildings and improvements.

(e)     <u>Insurance Policy Requirements</u>.    All insurance policies shall be issued and maintained by insurers, in amounts, with deductibles, limits and retentions and in forms satisfactory to Holder.  All insurance policies shall require at least ten (10) days' prior written notice to Holder of any cancellation for nonpayment of premiums and at least thirty (30) days' prior written notice to Holder of any other cancellation or any change of coverage  All insurance companies must be licensed to do business in the state in which the Property is located and must have A  M. Best Company financial and performance ratings of A-:IX or better.  All insurance policies maintained, or caused to be maintained, by Borrower with respect to the Property, except for general liability insurance, shall provide that each such policy shall be primary without right of contribution from any other insurance that may be carried by Borrower, Holder or any Lender and that all of the provisions thereof, except the limits of liability, shall operate in the same manner as if there were a separate policy covering each insured.  If any insurer which has issued a policy of hazard, liability or other insurance required pursuant to this Deed of Trust or any other Loan Document becomes insolvent or the subject of any petition, case, proceeding or other action pursuant to any Debtor Relief Law or if in Holder's reasonable opinion the financial responsibility of such insurer is or becomes inadequate, Borrower shall, upon its discovery thereof or upon request by Holder therefor, promptly obtain and deliver to Holder, at Borrower's expense in each instance, a like policy (or, if and to the extent permitted by Holder, acceptable evidence of insurance) issued by another insurer, which insurer and policy meet the requirements of this Deed of Trust or such other Loan Document, as the case may be.  Without limiting the discretion of Holder with respect to required endorsements to insurance policies, all such policies for loss of or damage to the Property shall contain a standard mortgagee clause (without contribution) naming Holder as mortgagee for the benefit of itself and Lenders with loss proceeds payable to Holder on behalf of itself and Lenders notwithstanding (i) any act, failure to act or negligence of or violation of any warranty, declaration or condition contained in any such policy by any named or additional insured, (ii) the occupation or use of the Property for purposes more hazardous than permitted by the terms of any such policy, (iii) any foreclosure or other action by Holder or Lenders under the Loan Documents, or (iv) any change in title to or

ownership of the Property or any portion thereof, such proceeds to be held for application as provided in the Loan Documents. The originals of each initial insurance policy (or to the extent permitted by Holder, a copy of the original policy and such evidence of insurance as may be acceptable to Holder) shall be delivered to Holder at the time of execution of this Deed of Trust, with all premiums fully paid current, and each renewal or substitute policy (or evidence of insurance) shall be delivered to Holder, with all premiums fully paid current, at least ten (10) days before the termination of the policy it renews or replaces. Borrower shall pay all premiums on policies required hereunder as they become due and payable and promptly deliver to Holder evidence satisfactory to Holder of the timely payment thereof.

(f)    Insurance Proceeds. If any loss occurs at any time when Borrower has failed to perform Borrower's covenants and agreements with respect to any insurance payable because of loss sustained to any part of the Property, whether or not such insurance is required by Holder, Holder, on behalf of itself and Lenders, shall nevertheless be entitled to the benefit of all insurance covering the loss and held by or for Borrower, to the same extent as if it had been made payable to Holder for the benefit of itself and Lenders. Upon any foreclosure hereof or transfer of title to the Property in extinguishment of the whole or any part of the Secured Indebtedness, all of Borrower's right, title and interest in and to the insurance policies referred to in this clause (f) (including unearned premiums) and all proceeds payable thereunder shall thereupon vest in the purchaser at foreclosure or other such transferee, to the extent permissible under such policies. Holder shall have the right on behalf of Lenders (but not the obligation) to make proof of loss for, settle and adjust any claim under, and receive the proceeds of, all insurance for loss of or damage to the Property, regardless of whether or not such insurance policies are required by Holder, and the expenses incurred by Holder in the adjustment and collection of insurance proceeds shall be a part of the Secured Indebtedness and shall be due and payable to Holder on demand (for its own account or for the account of Lenders, as applicable). Neither Holder nor Lenders shall be, under any circumstances, liable or responsible for failure to collect or exercise diligence in the collection of any of such proceeds or for the obtaining, maintaining or adequacy of any insurance or for failure to see to the proper application of any amount paid over to Borrower. Borrower shall at all times comply with the requirements of the insurance policies required hereunder and of the issuers of such policies and of any board of fire underwriters or similar body as applicable to or affecting the Property.

(g)    Reserve for Insurance, Taxes and Assessments. Upon request of Holder after the occurrence of a Default, to secure the payment and performance of the Secured Indebtedness, but not in lieu of such payment and performance, Borrower will deposit with Holder for the benefit of itself and Lenders a sum equal to real estate taxes, assessments and charges (which charges for the purposes of this clause (g) shall include any recurring charge which could result in a lien against the Property) against the Property for the current year and the premiums for such policies of insurance for the current year, all as estimated by Holder and prorated to the end of the calendar month following the month during which Holder's request is made, and thereafter will deposit with Holder, on each date when an installment of principal and/or interest is due on the Note, sufficient funds (as estimated from time to time by Holder) to permit Holder to pay at least fifteen (15) days prior to the due date thereof, the next maturing real estate taxes, assessments and charges and premiums for such policies of insurance. Holder shall have the right to rely upon tax information furnished by applicable taxing authorities in the payment of such taxes or assessments and shall have no obligation to make any protest of any such taxes or assessments.

Any excess over the amounts required for such purposes shall be held by Holder for future use, applied to any Secured Indebtedness or refunded to Borrower, at Holder's option, and any deficiency in such funds so deposited shall be made up by Borrower upon demand of Holder. All such funds so deposited shall bear no interest, may be commingled with the general funds of Holder and shall be applied by Holder toward the payment of such taxes, assessments, charges and premiums when statements therefor are presented to Holder by Borrower (which statements shall be presented by Borrower to Holder a reasonable time before the applicable amount is due); provided, however, that, if a Default shall have occurred hereunder, such funds may at Holder's option be applied to the payment of the Secured Indebtedness in the order determined by Holder in its sole discretion, and that Holder may (but shall have no obligation) at any time, in its discretion, apply all or any part of such funds toward the payment of any such taxes, assessments, charges or premiums which are past due, together with any penalties or late charges with respect thereto. The conveyance or transfer of Borrower's interest in the Property for any reason (including the foreclosure of a subordinate lien or security interest or a transfer by operation of law) shall constitute an assignment or transfer of Borrower's interest in and rights to such funds held by Holder under this clause (g) but subject to the rights of Holder and Lenders hereunder.

(h)    <u>Condemnation</u>. Borrower shall notify Holder immediately of any threatened or pending proceeding for condemnation affecting the Property or arising out of damage to the Property, and Borrower shall, at Borrower's expense, diligently prosecute any such proceedings. Holder shall have the right (but not the obligation) to participate in any such proceeding and to be represented by counsel of its own choice. Holder shall be entitled to receive, on behalf of itself and Lenders, all sums which may be awarded or become payable to Borrower for the condemnation of the Property, or any part thereof, for public or quasi-public use, or by virtue of private sale in lieu thereof, and any sums which may be awarded or become payable to Borrower for injury or damage to the Property. Borrower shall, promptly upon request of Holder, execute such additional assignments and other documents as may be necessary from time to time to permit such participation and to enable Holder to collect and receipt for any such sums. Neither Holder nor Lenders shall be, under any circumstances, liable or responsible for failure to collect or to exercise diligence in the collection of any such sum or for failure to see to the proper application of any amount paid over to Borrower. Holder is hereby authorized, in its own name on behalf of itself and Lenders or in Borrower's name, to settle or compromise any condemnation claim or cause of action, and to execute and deliver valid acquittances for, and to appeal from, any award, judgment or decree arising from any such claim or cause of action. All costs and expenses (including attorneys' fees) incurred by Holder in connection with any condemnation shall be a demand obligation owing by Borrower (which Borrower hereby promises to pay) to Holder (for its own account or for the account of Lenders, as applicable) pursuant to this Deed of Trust.

(i)    <u>Damages and Insurance and Condemnation Proceeds</u>. Borrower hereby absolutely and irrevocably assigns to Agent for the ratable benefit of itself and Lenders, and authorizes the payor to pay to Agent or any other Holder, the following claims, causes of action, awards, payments and rights to payment (collectively, "<u>Claims</u>"): all awards of damages and all other compensation payable directly or indirectly because of a condemnation, proposed condemnation or taking which affects any part of the Property; all awards and other Claims arising out of any warranty affecting any part of the Property or for damage or injury to any part

of the Property; all proceeds of any insurance policies payable because of loss sustained to any part of the Property, whether or not such insurance policies are required by Holder, and all interest that may accrue on any of the foregoing. All proceeds of Claims described in this clause (i) shall be payable to Holder and shall be applied first to reimburse Holder and Lenders for their costs and expenses of recovering such proceeds, including attorneys' fees. Upon satisfaction of each of the following conditions, provided that no Default exists, Borrower shall be permitted to use the balance of the proceeds ("Net Claims Proceeds") to pay the costs of repairing or reconstructing the Property:

(i)    Holder shall have approved the plans and specifications, construction budget, construction schedule, contractor, architect, engineer and payment and performance bond (if required by Holder);

(ii)    Borrower shall have presented sufficient evidence to Holder that after the repair or reconstruction, the Property will be completely restored to its use, value and condition immediately prior to the occurrence of the damage or condemnation;

(iii)    Holder shall have determined that the Net Claims Proceeds are sufficient to pay the total cost of the repair or reconstruction, including all development costs and interest due on the Secured Indebtedness until the work is complete, or Borrower must provide (or deposit with Holder) its own funds equal to the difference between the Net Claims Proceeds and the total cost of the work, as estimated by Borrower and approved by Holder;

(iv)    Borrower shall have presented sufficient evidence that the Property's operations and income after the repair or reconstruction will be sufficient to pay the operating expenses of the Property and debt service on the Secured Indebtedness with the same coverage ratios considered by Agent and Lenders in underwriting the Loan, including evidence that a sufficient number of existing Leases will continue in full force and effect (subject to rent abatement as may be provided in the Leases) or if any have been terminated, a sufficient number of terminated Leases shall have been replaced with Leases of equal quality in the reasonable judgment of Holder. Any tenant having the right to terminate its Lease due to the damage or condemnation, which has not exercised that right, shall have confirmed in writing to Holder its irrevocable waiver of such termination right;

(v)    All parties having operating, management or franchise interests in and arrangements concerning the Property shall have agreed that they will continue their interests and arrangements for the contract terms then in effect following the repair or reconstruction;

(vi)    All parties having commitments to provide financing with respect to the Property, to purchase Borrower's interest in full or in part in the Property or to purchase the Loan shall have agreed in a manner satisfactory to Holder that their commitments will continue in full force and effect and, if necessary, the expiration of such commitments shall be extended by the time necessary to complete the repair or reconstruction;

(vii)    Borrower shall have presented sufficient evidence to Holder that all necessary governmental approvals and permits can be obtained to allow the rebuilding and reoccupancy of the Property;

BN 1540587v3                                    12

(viii)   Borrower shall have presented sufficient evidence to Holder that the Improvements will take no more than six (6) months to reconstruct and that such reconstruction will be completed prior to the stated maturity of the Note.

If the foregoing conditions are met to Holder's reasonable satisfaction, Holder shall hold the Net Claims Proceeds and any funds that Borrower is required to provide in an interest-bearing account and shall disburse them to Borrower to pay the costs of the work on the terms and subject to the conditions of the provisions of the Loan Agreement governing disbursements. Interest on the funds shall accrue at the rate of interest then being paid by Holder to regular savings account customers and shall be credited to Borrower. Borrower shall provide evidence acceptable to Holder that all work has been completed lien-free, in a workmanlike manner and in accordance with all Legal Requirements. Borrower agrees that the conditions described above are reasonable. If the foregoing conditions are not satisfied, or if a Default occurs after Holder's receipt of the Net Claims Proceeds, Holder may, at Holder's absolute discretion and regardless of whether the security of Holder and Lenders is impaired, apply all or any of the Net Claims Proceeds to pay or prepay, without any Consequential Loss (as defined in the Loan Agreement) the Secured Indebtedness in such order and in such amounts as Holder may elect. Following the application of any Net Claims Proceeds as contemplated by this clause (i), the unpaid portion of the Secured Indebtedness shall remain in full force and effect and the payment thereof shall not be excused. Notwithstanding the foregoing, the rights of Holder and Lenders shall be subject to applicable law governing use of the Net Claims Proceeds, if any.

(j)   <u>Compliance with Legal Requirements</u>.  The Property and the use, operation and maintenance thereof and all activities thereon do and shall at all times comply with all applicable Legal Requirements. The Property is not, and shall not be, dependent on any other property or premises or any interest therein other than the Property to fulfill any requirement of any Legal Requirement. Borrower shall not, by act or omission, permit any building or other improvement not subject to the lien of this Deed of Trust to rely on the Property or any interest therein to fulfill any requirement of any Legal Requirement. No improvement upon or use of any part of the Property constitutes a nonconforming use under any zoning law or similar law or ordinance. Borrower has obtained and shall preserve in force all requisite zoning, utility, building, health, environmental and operating permits from the governmental authorities having jurisdiction over the Property. If Borrower receives a notice or claim from any person that the Property, or any use, activity, operation or maintenance thereof or thereon, is not in compliance with any Legal Requirement, Borrower will promptly furnish a copy of such notice or claim to Holder. Borrower has received no notice and has no knowledge of any such noncompliance

(k)   <u>Maintenance, Repair and Restoration</u>.  Borrower will keep the Property (as applicable) in first class order, repair, operating condition and appearance, causing all necessary repairs, renewals, replacements, additions and improvements to be promptly made, and will not allow any of the Property to be misused, abused or wasted or to deteriorate. Notwithstanding the foregoing, Borrower will not, without the prior written consent of Holder, (i) remove from the Property any fixtures or personal property covered by this Deed of Trust except such as is replaced by Borrower by an article of equal suitability and value, owned by Borrower, free and clear of any lien or security interest (except that created by this Deed of Trust), or (ii) make any structural alteration to the Property or any other alteration thereto which impairs the value thereof. If any act or occurrence of any kind or nature (including any condemnation or any

casualty for which insurance was not obtained or obtainable) shall result in damage to or loss or destruction of the Property, Borrower shall give prompt notice thereof to Holder and Borrower shall promptly, at Borrower's sole cost and expense and regardless of whether insurance or condemnation proceeds (if any) shall be available or sufficient for the purpose, secure the Property as necessary and commence and continue diligently to completion to restore, repair, replace and rebuild the Property as nearly as possible to its value, condition and character immediately prior to the damage, loss or destruction.

(l)    No Other Liens.  Borrower will not, without the prior written consent of Holder, create, place or permit to be created or placed, or through any act or failure to act, acquiesce in the placing of, or allow to remain, any deed of trust, mortgage, voluntary or involuntary lien, whether statutory, constitutional or contractual, security interest, encumbrance or charge, or conditional sale or other title retention document, against or covering the Property, or any part thereof, other than the Permitted Encumbrances, regardless of whether the same are expressly or otherwise subordinate to the lien or security interest created in this Deed of Trust, and should any of the foregoing become attached hereafter in any manner to any part of the Property without the prior written consent of Holder, Borrower will cause the same to be promptly discharged and released.  Borrower will own all parts of the Property and will not acquire any fixtures, equipment or other property (including software embedded therein) forming a part of the Property pursuant to a lease, license, security agreement or similar agreement, whereby any party has or may obtain the right to repossess or remove same, without the prior written consent of Holder.  If Holder consents to the voluntary grant by Borrower of any deed of trust, lien, security interest, or other encumbrance (hereinafter called "Subordinate Lien") covering any of the Property or if the foregoing prohibition is determined by a court of competent jurisdiction to be unenforceable as to a Subordinate Lien, any such Subordinate Lien shall contain express covenants to the effect that: (i) the Subordinate Lien is unconditionally subordinate to this Deed of Trust and all Leases; (ii) if any action (whether judicial or pursuant to a power of sale) shall be instituted to foreclose or otherwise enforce the Subordinate Lien, no tenant of any of the Leases shall be named as a party defendant, and no action shall be taken that would terminate any occupancy or tenancy without the prior written consent of Holder; (iii) Rents, if collected by or for the holder of the Subordinate Lien, shall be applied first to the payment of the Secured Indebtedness then due and expenses incurred in the ownership, operation and maintenance of the Property in such order as Holder may determine, prior to being applied to any indebtedness secured by the Subordinate Lien; (iv) written notice of default under the Subordinate Lien and written notice of the commencement of any action (whether judicial or pursuant to a power of sale) to foreclose or otherwise enforce the Subordinate Lien or to seek the appointment of a receiver for all or any part of the Property shall be given to Holder with or immediately after the occurrence of any such default or commencement; and (v) neither the Holder of the Subordinate Lien, nor any purchaser at foreclosure thereunder, nor anyone claiming by, through or under any of them shall succeed to any of Borrower's rights hereunder without the prior written consent of Holder.

(m)    Operation of Property.  Borrower will operate the Property in a good and workmanlike manner and in accordance with all Legal Requirements and will pay all fees or charges of any kind in connection therewith.  Borrower will not use or occupy or conduct any activity on, or allow the use or occupancy of or the conduct of any activity on, the Property in any manner which violates any Legal Requirement or which constitutes a public or private

nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto. Borrower will not initiate or permit any zoning reclassification of the Property or seek any variance under existing zoning ordinances applicable to the Property or use or permit the use of the Property in such a manner which would result in such use becoming a nonconforming use under applicable zoning ordinances or other Legal Requirement. Except as contemplated by the Loan Agreement in connection with the sale of Lots (as defined in the Loan Agreement), Borrower will not impose any easement, restrictive covenant or encumbrance upon the Property, execute or file any subdivision plat or condominium declaration affecting the Property or consent to the annexation of the Property to any municipality, without the prior written consent of Holder. Borrower will not do or suffer to be done any act whereby the value of any part of the Property may be lessened. Borrower will preserve, protect, renew, extend and retain all material rights and privileges granted for or applicable to the Property. Without the prior written consent of Holder, there shall be no drilling or exploration for or extraction, removal or production of any mineral, hydrocarbon, gas, natural element, compound or substance (including sand and gravel) from the surface or subsurface of the Land regardless of the depth thereof or the method of mining or extraction thereof. Borrower will cause all debts and liabilities of any character (including all debts and liabilities for labor, material and equipment (including software embedded therein) and all debts and charges for utilities servicing the Property) incurred in the construction, maintenance, operation and development of the Property to be promptly paid.

(n)    Further Assurances. Borrower will, promptly on request of Holder, (i) correct any defect, error or omission which may be discovered in the contents, execution or acknowledgment of this Deed of Trust or any other Loan Document; (ii) execute, acknowledge, deliver, procure and record and/or file such further documents (including further deeds of trust, security agreements, and assignments of rents or leases) and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Deed of Trust and the other Loan Documents, to more fully identify and subject to the liens and security interests hereof any property intended to be covered hereby (including specifically, but without limitation, any renewals, additions, substitutions, replacements, or appurtenances to the Property) or as deemed advisable by Holder to protect the lien or the security interest hereunder against the rights or interests of third persons; and (iii) provide such certificates, documents, reports, information, affidavits and other instruments and do such further acts as may be necessary, desirable or proper in the reasonable determination of Holder to enable Holder and Lenders to comply with the requirements or requests of any agency having jurisdiction over Holder or any Lender or any examiners of such agencies with respect to the indebtedness secured hereby, Borrower or the Property. Borrower shall pay all costs connected with any of the foregoing, which shall be a demand obligation owing by Borrower (which Borrower hereby promises to pay) to Holder (for its own account or the account of Lenders, as applicable) pursuant to this Deed of Trust.

(o)    Fees and Expenses. Without limitation of any other provision of this Deed of Trust or of any other Loan Document and to the extent not prohibited by applicable law, Borrower will pay, and will reimburse to Holder (for its own account or the account of Lenders, as applicable) and/or Trustee on demand to the extent paid by Holder, Lenders and/or Trustee: (i) costs of appraisals obtained in connection with the origination of the Loan and after the occurrence of a Default; (ii) all filing, registration and recording fees, recordation, transfer and other taxes, brokerage fees and commissions, abstract fees, title search or examination fees, title

policy and endorsement premiums and fees, Uniform Commercial Code search fees, judgment and tax lien search fees, escrow fees, attorneys' fees, architect's fees, engineering fees, construction consultant fees, environmental inspection fees, survey fees, and all other costs and expenses of every character incurred by Borrower or Holder, Lenders and/or Trustee in connection with the preparation of the Loan Documents, the evaluation, closing and funding of the Loan, and any and all amendments and supplements to this Deed of Trust, the Note or any other Loan Documents or any approval, consent, waiver, release or other matter requested or required hereunder or thereunder, or otherwise attributable or chargeable to Borrower as owner of the Property; and (iii) all costs and expenses, including attorneys' fees and expenses (including the market value of services provided by in-house counsel), incurred or expended in connection with the exercise of any right or remedy, or the defense of any right or remedy or the enforcement of any obligation of Borrower, hereunder or under any other Loan Document.

     (p)   <u>Indemnification</u>.  Borrower will indemnify and hold harmless each and every Indemnified Party from and against, and reimburse them on demand for, any and all Indemnified Matters.  Without limitation, the foregoing indemnity shall apply to each Indemnified Party with respect to matters which in whole or in part are caused by or arise out of the negligence of such (and/or any other) Indemnified Party.  However, such indemnity shall not apply to a particular Indemnified Party to the extent that the subject of the indemnification is caused by or arises out of the gross negligence or willful misconduct of that Indemnified Party.  Any amount to be paid under this clause (p) by Borrower to any Indemnified Party shall be a demand obligation owing by Borrower (which Borrower hereby promises to pay) to such Indemnified Party pursuant to this Deed of Trust.   The indemnity in this clause (p) shall not terminate upon the release, foreclosure or other termination of this Deed of Trust but will survive the enforcement of any remedy provided in any Loan Document, including the foreclosure of this Deed of Trust or conveyance in lieu of foreclosure, the repayment of the Secured Indebtedness, the discharge and release of this Deed of Trust and the other Loan Documents, any bankruptcy or other proceeding under any Debtor Relief Law, and any other event whatsoever.  The rights of Indemnified Parties under this clause (p) shall be in addition to all other rights that Indemnified Parties or any of them may have under this Deed of Trust, any other Loan Document, or the Environmental Agreement.  Nothing in this clause (p) or elsewhere in this Deed of Trust or in the Environmental Agreement shall limit or impair any rights or remedies that any Indemnified Party may have (including any rights of contribution or indemnification) against Borrower or any other person under any other provision of this Deed of Trust, any other Loan Document, any other agreement including the Environmental Agreement, or any applicable Legal Requirement.

     (q)   <u>Taxes on Note or Deed of Trust</u>.  Borrower will promptly pay all income, franchise and other taxes owing by Borrower and any stamp, documentary, recordation and transfer taxes or other taxes (unless such payment by Borrower is prohibited by law) which may be required to be paid with respect to any Note, this Deed of Trust or any other instrument evidencing or securing any of the Secured Indebtedness.  In the event of the enactment after this date of any law of any governmental entity applicable to Holder, any Lender, any Note, the Property or this Deed of Trust deducting from the value of property for the purpose of taxation any lien or security interest thereon, or imposing upon Holder or any Lender the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Borrower, or changing in any way the laws relating to the taxation of deeds of trust or mortgages or security agreements or debts secured by deeds of trust or mortgages or security agreements or

the interest of the mortgagee or secured party in the property covered thereby, or the manner of collection of such taxes, so as to affect this Deed of Trust or the Secured Indebtedness or Holder or any Lender, then, and in any such event, Borrower, upon demand by Holder, shall pay such taxes, assessments, charges or liens, or reimburse Holder therefore (for its own account or the account of the affected Lender(s), as applicable); provided, however, that if in the opinion of counsel for Holder (i) it might be unlawful to require Borrower to make such payment or (ii) the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then and in such event, Holder may elect, by notice in writing given to Borrower, to declare all of the Secured Indebtedness to be and become due and payable sixty (60) days from the giving of such notice.

(r)    <u>Statement Concerning Note or Deed of Trust</u>.  Borrower shall at any time and from time to time furnish within seven (7) days of request by Holder a written statement in such form as may be required by Holder stating that (i) the Notes, this Deed of Trust and the other Loan Documents are valid and binding obligations of Borrower, enforceable against Borrower in accordance with their terms; (ii) the unpaid principal balance of each Note and the aggregate unpaid principal balance of the Loan; (iii) the date to which interest on each Note is paid; (iv) the Notes, this Deed of Trust and the other Loan Documents have not been released, subordinated or modified; and (v) there are no offsets or defenses against the enforcement of the Notes, this Deed of Trust or any other Loan Document.  Alternatively, if any of the foregoing statements in clauses (i), (iv) and (v) are untrue, Borrower shall specify the reasons therefor.

(s)    <u>Letter-of-Credit Rights</u>.  If Borrower is at any time a beneficiary under a letter of credit (whether or not the letter of credit is evidenced by a writing) relating to the properties, rights, titles and interests referred to in <u>Section 1.3</u> of this Deed of Trust now or hereafter issued in favor of Borrower, Borrower shall promptly notify Holder thereof and, at the request and option of Holder, Borrower shall, pursuant to an agreement in form and substance satisfactory to Holder, either (i) arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to Holder of the proceeds of any drawings under the letter of credit, or (ii) arrange for Holder to become the transferee beneficiary of the letter of credit, with Holder agreeing, in each case, that the proceeds of any drawing under the letter of credit are to be applied as provided in <u>Section 5.2</u> of this Deed of Trust.

(t)    <u>Status of Borrower</u>.  If Borrower is a corporation, partnership, limited liability company or other legal entity, Borrower is and will continue to be (i) duly organized, validly existing and in good standing under the laws of its state of organization, (ii) authorized to do business and in good standing in each state in which the Property is located, and (iii) possessed of all requisite power and authority to carry on its business and to own and operate the Property. Borrower's exact legal name is correctly set forth at the end of this Deed of Trust.  If Borrower is not an individual, Borrower is an organization of the type specified in the introductory paragraph of this Deed of Trust.  If Borrower is a registered entity, Borrower is incorporated in or organized under the laws of the state specified in the introductory paragraph of this Deed of Trust.  If Borrower is an unregistered entity (including a general partnership), it is organized under the laws of the state specified in the introductory paragraph of this Deed of Trust. Borrower will not cause or permit any change to be made in its name, identity (including its trade name or names), or corporate or partnership structure unless Borrower shall have notified Holder in writing of such change at least 30 days prior to the effective date of such change, and shall

have first taken all action required by Holder for the purpose of further perfecting or protecting the lien and security interest of Holder in the Property. In addition, Borrower shall not change its corporate or partnership structure without first obtaining the prior written consent of Holder. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics concerning the Property, has been for the preceding four months (or, if less, the entire period of the existence of Borrower) and will continue to be the address of Borrower set forth at the end of this Deed of Trust (unless Borrower notifies Holder of any change in writing at least 30 days prior to the date of such change). If Borrower is an individual, Borrower's principal residence has been for the preceding four months and will continue to be the address of the principal residence of Borrower set forth at the end of this Deed of Trust (unless Borrower notifies Holder of any change in writing at least 30 days prior to the date of such change). Borrower's organizational identification number, if any, assigned by the state of incorporation or organization is correctly set forth on the first page of this Deed of Trust. Borrower shall promptly notify Holder of any change in its organizational identification number. If Borrower does not now have an organizational identification number and later obtains one, Borrower shall promptly notify Holder of such organizational identification number.

Section 2.2    <u>Performance by Holder on Borrower's Behalf</u>.  Borrower agrees that if Borrower fails to perform any act or to take any action which under any Loan Document Borrower is required to perform or take, or to pay any money which under any Loan Document Borrower is required to pay, and whether or not the failure then constitutes a Default, and whether or not there has occurred any Default or the Secured Indebtedness has been accelerated, Holder, in Borrower's name or its own name on behalf of itself and Lenders, may, but shall not be obligated to, perform or cause to be performed such act or take such action or pay such money, and any expenses so incurred by Holder or Lenders and any money so paid by Holder or Lenders shall be a demand obligation owing by Borrower to Holder for its own account or the account of Lenders, as applicable (which obligation Borrower hereby promises to pay), shall be a part of the Secured Indebtedness, and Holder and/or Lenders, upon making such payment, shall be subrogated to all of the rights of the person, entity or body politic receiving such payment. Holder and its designees shall have the right to enter upon the Property at any time and from time to time for any such purposes. No such payment or performance by Holder or Lenders shall waive or cure any Default or waive any right, remedy or recourse of Holder or Lenders. Any such payment may be made by Holder or Lenders in reliance on any statement, invoice or claim without inquiry into the validity or accuracy thereof. Each amount due and owing by Borrower to Holder or Lenders pursuant to this Deed of Trust shall bear interest, from the date such amount becomes due until paid, at the rate per annum provided in the Loan Agreement for interest on past due principal owed on the Loan but never in excess of the maximum nonusurious amount permitted by applicable law, which interest shall be payable to Holder on demand for its own account or the account of Lenders, as applicable; and all such amounts, together with such interest thereon, shall automatically and without notice be a part of the Secured Indebtedness. The amount and nature of any expense by Holder or Lenders hereunder and the time when paid shall be fully established by the certificate of Holder or any of Holder's officers or agents.

Section 2.3    <u>Absence of Obligations of Holder and Lenders with Respect to Property</u>. Notwithstanding anything in this Deed of Trust to the contrary, including the definition of

"Property" and/or the provisions of Article 3 hereof, (i) to the extent permitted by applicable law, the Property is composed of Borrower's rights, title and interests therein but not Borrower's obligations, duties or liabilities pertaining thereto, (ii) Holder and Lenders neither assume nor shall have any obligations, duties or liabilities in connection with any portion of the items described in the definition of "Property" herein, either prior to or after obtaining title to such Property, whether by foreclosure sale, the granting of a deed in lieu of foreclosure or otherwise, and (iii) Holder may, at any time prior to or after the acquisition of title to any portion of the Property as above described, advise any party in writing as to the extent of Holder's and Lenders' interest therein and/or expressly disaffirm in writing any rights, interests, obligations, duties and/or liabilities with respect to such Property or matters related thereto. Without limiting the generality of the foregoing, it is understood and agreed that neither Holder nor Lenders shall have any obligations, duties or liabilities prior to or after acquisition of title to any portion of the Property, as lessee under any lease or purchaser or seller under any contract or option unless Holder elects otherwise by written notification.

Section 2.4    Authorization to File Financing Statements; Power of Attorney.  Borrower hereby authorizes Holder at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements as authorized by applicable law, required by Holder to establish or maintain the validity, perfection and priority of the security interests granted in this Deed of Trust. For purposes of such filings, Borrower agrees to furnish any information requested by Holder promptly upon request by Holder. Borrower also ratifies its authorization for Holder to have filed any like initial financing statements, amendments thereto or continuation statements if filed prior to the date of this Deed of Trust. Borrower hereby irrevocably constitutes and appoints Holder and any officer or agent of Holder, with full power of substitution, as its true and lawful attorneys-in-fact with full irrevocable power and authority in the place and stead of Borrower or in Borrower's own name to execute in Borrower's name any such documents and to otherwise carry out the purposes of this Section 2.4, to the extent that Borrower's authorization above is not sufficient. To the extent permitted by law, Borrower hereby ratifies all acts said attorneys-in-fact have lawfully done in the past or shall lawfully do or cause to be done in the future by virtue hereof. This power of attorney is a power coupled with an interest and shall be irrevocable.

## ARTICLE 3

## Assignment of Rents and Leases

Section 3.1    Assignment.   To secure the obligations of Borrower under the Loan Documents and all matters and indebtedness constituting the Secured Indebtedness, Borrower hereby assigns to Agent for the ratable benefit of itself and Lenders all Rents and all of Borrower's rights in and under all Leases. Upon the occurrence and during the continuation of any Default, Agent and any other Holder shall have the right, power and authority to collect any and all Rents on behalf of itself and Lenders. While any Default is continuing, all Rents shall be paid directly to Holder and not through Borrower, all without the necessity of any further action by Holder, including any action to obtain possession of the Land, Improvements or any other portion of the Property or any action for the appointment of a receiver. Borrower hereby authorizes and directs the tenants under the Leases to pay Rents to Holder upon written demand by Holder, without further consent of Borrower, without any obligation of such tenants to

determine whether a Default has in fact occurred and regardless of whether Holder has taken possession of any portion of the Property, and the tenants may rely upon any written statement delivered by Holder to the tenants   Any such payments to Holder shall constitute payments to Borrower under the Leases, and Borrower hereby irrevocably appoints Holder as its attorney-in-fact, which power of attorney is with full power of substitution and coupled with an interest, to do all things during the continuance of a Default, which Borrower might otherwise do with respect to the Property and the Leases thereon, including: (a) demanding, receiving and enforcing payment of any and all Rents; (b) giving receipts, releases and satisfactions for any and all Rents; (c) suing either in the name of Borrower or in Holder's own name on behalf of itself and Lenders for any and all Rents; (d) applying the net proceeds of any and all Rents collected by Holder, after deducting all expenses of collection, including attorneys' fees and expenses, to the Secured Indebtedness in such order and manner as Holder may elect and/or to the operation and management of the Property, including the payment of management, brokerage and attorneys' fees and expenses (including reasonable reserves for anticipated expenses), or at the option of Holder, holding the same as security for the payment of the Secured Indebtedness; (e) leasing, in the name of Borrower, the whole or any part of the Property which may become vacant; (f) employing agents for such leasing and paying such agents reasonable compensation for their services; and (g) requiring Borrower to deliver to Holder all security deposits and executed originals of all Leases and copies of all records relating thereto.  Holder may take any or all of the foregoing actions with or without taking possession of any portion of the Property or taking any action with respect to such possession.  The assignment contained in this Section 3.1 shall become null and void upon the reconveyance of this Deed of Trust.

Section 3.2    Covenants, Representations and Warranties Concerning Leases and Rents.

Borrower covenants, represents and warrants that:

(a)    Borrower has good title to, and is the owner of the entire landlord's interest in, the Leases and Rents hereby assigned and has authority to assign them;

(b)    All Leases are valid and enforceable, and in full force and effect, and are unmodified except as stated therein;

(c)    Borrower is not in default under its Lease (and no event has occurred which with the passage of time or notice or both would result in a default under its Lease) and is not the subject of any petition, case, proceeding or other action pursuant to any Debtor Relief Law;

(d)    To Borrower's knowledge, no tenant in the Property is in default under its Lease (and no event has occurred which with the passage of time or notice or both would result in a default under its Lease) or is the subject of any petition, case, proceeding or other action pursuant to any Debtor Relief Law;

(e)    Unless otherwise stated in a Permitted Encumbrance, no Rents or Leases have been or will be assigned, mortgaged, pledged or otherwise encumbered and no other person has acquired or will acquire any right, title or interest in such Rents or Leases;

(f)    No Rents have been waived, released, discounted, set off or compromised;

(g)    Except as stated in the Leases, Borrower has not received any funds or deposits from any tenant for which credit has not already been made on account of accrued Rents;

(h)    Borrower shall perform all of its obligations under the Leases and enforce the tenants' obligations under the Leases to the extent enforcement is prudent under the circumstances;

(i)    Borrower will not, without the prior written consent of Holder, waive, release, discount, set off, compromise, reduce or defer any Rent, receive or collect Rents more than one (1) month in advance, grant any rent-free period to any tenant, reduce any Lease term or waive, release or otherwise modify any other material obligation under any Lease, renew or extend any Lease except in accordance with a right of the tenant thereto in such Lease, approve or consent to an assignment of a Lease or a subletting of any part of the premises covered by a Lease, or settle or compromise any claim against a tenant under a Lease in bankruptcy, in any other proceeding pursuant to any Debtor Relief Law or otherwise;

(j)    Borrower will not, without the prior written consent of Holder, terminate or consent to the cancellation or surrender of any Lease having an unexpired term of one (1) year or more;

(k)    Borrower will not execute any Lease except in accordance with the Loan Documents and for actual occupancy by the tenant thereunder;

(l)    Borrower shall give prompt notice to Holder, as soon as Borrower first obtains notice, of any claim, or the commencement of any action, by any tenant or subtenant under or with respect to a Lease regarding any claimed damage, default, diminution of or offset against Rent, cancellation of the Lease, or constructive eviction, excluding, however, notices of default under residential Leases, and Borrower shall defend, at Borrower's expense, any proceeding pertaining to any Lease, including, if Holder so requests, any such proceeding if Holder and/or Lenders are parties thereto;

(m)    Promptly upon request by Holder, Borrower shall deliver to Holder all security deposits and executed originals of all Leases and copies of all records relating thereto;

(n)    There shall be no merger of the leasehold estates created by the Leases, with the fee estate of the Land without the prior written consent of Holder; and

(o)    Holder, on behalf of itself and Lenders, may at any time and from time to time by specific written instrument intended for the purpose, unilaterally subordinate the lien of this Deed of Trust to any Lease, without joinder or consent of or notice to Borrower, any tenant or any other person, and notice is hereby given to each tenant under a Lease of such right to subordinate. No such subordination shall constitute a subordination to any lien or other encumbrance, whenever arising, or improve the right of any junior lienholder, and nothing herein shall be construed as subordinating this Deed of Trust to any Lease.

Section 3.3    No Liability of Lender or Holder or Lenders.  Holder and Lenders neither have nor assume any obligations as lessor or landlord with respect to any Lease. Agent's acceptance of this assignment on behalf of itself and Lenders shall not be deemed to constitute

any Holder or any Lender a "mortgagee in possession," nor shall such acceptance obligate Holder or any Lender to appear in or defend any proceeding relating to any Lease or to the Property, or to take any action hereunder, expend any money, incur any expenses, perform any obligation or liability under any Lease, or assume any obligation for any deposit delivered to Borrower by any tenant and not as such delivered to and accepted by Holder. Neither Holder nor Lenders shall be liable for any injury or damage to person or property in or about the Property, or for Holder's failure to collect or to exercise diligence in collecting Rents, but Holder and Lenders shall be accountable only for Rents that they shall actually receive. Neither the assignment of Leases and Rents, nor enforcement of the rights of Holder and Lenders regarding Leases and Rents (including collection of Rents), nor possession of the Property by Holder or Lenders, nor Holder's consent to or approval of any Lease (nor all of the same), shall render Holder or any Lender liable on any obligation under or with respect to any Lease or constitute affirmation of, or any subordination to, any Lease, occupancy, use or option.

Section 3.4    Rights Cumulative. The powers and rights of Holder and Lenders under this Article 3 shall be cumulative of all other powers and rights of Holder and Lenders under the Loan Documents or otherwise. Such powers and rights granted in this Article 3 shall be in addition to the other remedies provided for in this Deed of Trust upon the occurrence of a Default and may be exercised independently of or concurrently with any of said remedies. If Holder or Lenders seek or obtain any judicial relief regarding Rents or Leases, the same shall in no way prevent the concurrent or subsequent employment of any other appropriate rights or remedies nor shall the same constitute an election of judicial relief for any foreclosure or any other purpose.

<h1 style="text-align:center">ARTICLE 4</h1>

<h2 style="text-align:center">Default</h2>

Section 4.1    Events of Default. The occurrence of any one of the following shall be a default under this Deed of Trust ("Default"):

(a)    Nonperformance of Covenants. Any covenant, agreement or condition of this Deed of Trust (other than covenants otherwise addressed in another clause of this Section 4.1) is not fully and timely performed, observed or kept, and such failure is not cured within the applicable notice and cure period (if any) provided for herein.

(b)    Default under other Loan Documents or Environmental Agreement  A Default occurs under any other Loan Document or the Environmental Agreement.

(c)    Transfer of the Property. Any Transfer occurs with respect to all or any part of the Property or any interest therein, except for: (i) sales or transfers of items of the Accessories which have become obsolete or worn beyond practical use and which have been replaced by adequate substitutes owned by Borrower, having a value equal to or greater than the replaced items when new; (ii) the grant, in the ordinary course of business, of a leasehold interest in a part of the Improvements to a tenant for occupancy, not containing a right or option to purchase and not in contravention of any provision of this Deed of Trust or of any other Loan Document. Holder may, in its sole discretion, waive a Default under this clause (c), but it shall have no

obligation to do so; and (iii) any sale or transfer of certain portions of the Property upon the satisfaction of the conditions set forth in, and upon the terms and conditions set forth in, Section 7.25 of the Loan Agreement. Any waiver will be conditioned upon the grantee's integrity, reputation, character, creditworthiness and management ability being satisfactory to Holder in its sole judgment, and may also be conditioned upon such one or more of the following, if any, that Holder may require: the execution by the grantee of a written assumption agreement prior to such Transfer containing such terms as Holder may require; the receipt by Holder and Lenders of a principal paydown on each Note; the receipt by Holder and Lenders of an assumption fee; the reimbursement of all of the expenses incurred by Holder and Lenders in connection with such Transfer, including attorneys' fees; and any modification of the Loan Documents as Holder may require, including an increase in the rate of interest payable under the Note and/or a modification of the terms of the Loan. NOTICE - THE SECURED INDEBTEDNESS IS SUBJECT TO ACCELERATION IN THE EVENT OF A TRANSFER WHICH IS PROHIBITED UNDER THIS CLAUSE (c).

(d)     Transfer of Interests in Borrower.  (i) If Borrower is a corporation, a Transfer occurs with respect to shares possessing, in the aggregate, more than fifty percent (50%) of the voting power without the prior written consent of Holder; (ii) if Borrower is a partnership or joint venture, a Transfer occurs with respect to more than fifty percent (50%) of the partnership or joint venture interests in the aggregate, or any general partner or joint venturer withdraws or is removed or admitted without the prior written consent of Holder; or (iii) if Borrower is a limited liability company, a Transfer occurs with respect to more than fifty percent (50%) of the voting power or ownership interests, in either case in the aggregate, or any managing member withdraws or is removed or admitted without the prior written consent of Holder. NOTICE - THE SECURED INDEBTEDNESS IS SUBJECT TO ACCELERATION IN THE EVENT OF A TRANSFER WHICH IS PROHIBITED UNDER THIS CLAUSE (d).

(e)     Grant of Easement, Etc.  Except as contemplated by the Loan Agreement in connection with the sale of Lots (as defined in the Loan Agreement), without the prior written consent of Holder, Borrower grants any easement or dedication, or files any plat, condominium declaration or restriction, or otherwise encumbers the Property, or seeks or permits any zoning reclassification or variance, unless such action is expressly permitted by the Loan Documents or does not affect the Property.

(f)     Abandonment.  The owner of the Property abandons any of the Property.

(g)     Default Under Other Lien.  A default or event of default occurs under any lien, security interest or assignment covering the Property or any part thereof (whether or not Holder has consented, and without hereby implying any consent by Holder or Lenders, to any such lien, security interest or assignment not created hereunder), or the holder of any such lien, security interest or assignment declares a default or institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

(h)     Destruction.  The Improvements (if any) are so demolished, destroyed or damaged that in the reasonable opinion of Holder, it cannot be restored or rebuilt with available funds to a profitable condition within a reasonable period of time and in any event prior to the final maturity date of the Note.

(i)    <u>Condemnation</u>. (i) Any governmental authority requires or commences any proceeding for the demolition of any building or structure comprising a part of the Premises, or (ii) there is commenced any proceeding to condemn or otherwise take pursuant to the power of eminent domain, or a contract for sale or a conveyance in lieu of such a taking is executed which provides for the transfer of, a material portion of the Premises, including the taking (or transfer in lieu thereof) of any portion which would result in the blockage or substantial impairment of access or utility service to the Improvements or which would cause the Premises to fail to comply with any Legal Requirement.

Section 4.2    <u>Notice and Cure</u>.  If any provision of this Deed of Trust or any other Loan Document provides for Holder to give to Borrower any notice regarding a default or incipient default, then if Holder shall fail to give such notice to Borrower as provided, the sole and exclusive remedy of Borrower for such failure shall be to seek appropriate equitable relief to enforce the agreement to give such notice and to have any acceleration of the maturity of the Note and the Secured Indebtedness postponed or revoked and foreclosure proceedings in connection therewith delayed or terminated pending or upon the curing of such default in the manner and during the period of time permitted by such agreement, if any, and Borrower shall have no right to damages or any other type of relief not herein specifically set out against Holder, all of which damages or other relief are hereby waived by Borrower.  Nothing herein or in any other Loan Document shall operate or be construed to add on or make cumulative any cure or grace periods specified in any of the Loan Documents.

## ARTICLE 5

### Remedies

Section 5.1    <u>Certain Remedies</u>.  If a Default shall occur, Holder may (but shall have no obligation to) exercise any one or more of the following remedies, without notice (unless notice is required by applicable statute):

(a)    <u>Acceleration; Termination</u>.  Holder may at any time and from time to time declare any or all of the Secured Indebtedness immediately due and payable and such Secured Indebtedness shall thereupon be immediately due and payable, without presentment, demand, protest, notice of protest, notice of acceleration or of intention to accelerate or any other notice or declaration of any kind, all of which are hereby expressly waived by Borrower.

(b)    <u>Enforcement of Assignment of Rents</u>.  Holder may take any of the actions described in <u>Article 3</u> with or without taking possession of any portion of the Property or taking any action with respect to such possession.

(c)    <u>Trustee's Sale</u>.

(i)    Holder may execute and deliver to Trustee written declaration of default and demand for sale and written notice of default and of election to cause all or any part of the Property to be sold, which notice Trustee shall cause to be filed for record; and after the lapse of such time as may then be required by law following the recordation of such notice of default, and notice of sale having been given as then required by law, Trustee, without demand on Borrower,

shall sell such Property at the time and place fixed by Trustee in such notice of sale, either as a whole or in separate parcels and in such order as Holder may direct (Borrower waiving any right to direct the order of sale), at public auction to the highest bidder for cash in lawful money of the United States (or cash equivalents acceptable to Trustee to the extent permitted by applicable law), payable at the time of sale. Trustee may postpone the sale of all or any part of the Property by public announcement at the time fixed by the preceding postponement. Trustee shall deliver to the purchaser at such sale its deed conveying the property so sold, but without any covenant or warranty, express or implied, and the recitals in such deed of any matters or facts shall be conclusive proof of the truthfulness thereof. Any person, including Trustee, Holder or any Lender, may purchase at such sale, and any bid by Holder or any Lender may be, in whole or in part, in the form of cancellation of all or any part of the Secured Indebtedness.

(ii)     The sale by Trustee of less than the whole of the Property shall not exhaust the power of sale herein granted, and Trustee is specifically empowered to make successive sales under such power until the whole of the Property shall be sold. In the event any sale hereunder is not completed or is defective in the opinion of Holder, such sale shall not exhaust the power of sale hereunder and Holder shall have the right to cause a subsequent sale or sales to be made hereunder. If the proceeds of any sale of less than the whole of the Property shall be less than the aggregate of the Secured Indebtedness and the expense of executing this trust as provided herein, this Deed of Trust and the lien hereof shall remain in full force and effect as to the unsold portion of the Property just as though no sale had been made; provided, however, that Borrower shall never have any right to require the sale of less than the whole of the Property but Holder shall have the right, at its sole election, to request Trustee to sell less than the whole of the Property.

(iii)     Trustee may, after any request or direction by Holder, sell not only the real property but also the Collateral and other interests which are a part of the Property, or any part thereof, as a unit and as a part of a single sale, or may sell any part of the Property separately from the remainder of the Property. It shall not be necessary for Trustee to have taken possession of any part of the Property or to have present or to exhibit at any sale any of the Collateral.

(iv)     After each sale, Trustee shall receive the proceeds of said sale and apply the same as herein provided. Payment of the purchase price to Trustee shall satisfy the obligation of purchaser at such sale therefor, and such purchaser shall not be responsible for the application thereof.

(v)     Trustee or its successor or substitute may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Trustee, including the posting of notices and the conduct of sale, but in the name and on behalf of Trustee, its successor or substitute. If Trustee or its successor or substitute shall have given notice of sale hereunder, any successor or substitute Trustee thereafter appointed may complete the sale and the conveyance of the property pursuant thereto as if such notice had been given by the successor or substitute Trustee conducting the sale.

(d)     Uniform Commercial Code. Without limitation of any rights of enforcement of Holder and Lenders with respect to the Collateral or any part thereof in accordance with the

BN 1540587v3                                                            25

procedures for foreclosure of real estate, Holder may exercise its rights of enforcement with respect to the Collateral or any part thereof under the Nevada Uniform Commercial Code, as in effect from time to time (or under the Uniform Commercial Code in force, from time to time, in any other state to the extent the same is applicable law) and in conjunction with, in addition to or in substitution for those rights and remedies: (i) Holder may enter upon Borrower's premises to take possession of, assemble and collect the Collateral or, to the extent and for those items of the Collateral permitted under applicable law, to render it unusable; (ii) Holder may require Borrower to assemble the Collateral and make it available at a place Holder designates which is mutually convenient to allow Holder to take possession or dispose of the Collateral; (iii) written notice mailed to Borrower as provided herein at least five (5) Business Days prior to the date of public sale of the Collateral or prior to the date on which private sale of the Collateral will be made shall constitute reasonable notice; provided that, if Holder fails to comply with this clause (iii) in any respect, the liability of Holder and Lenders for such failure shall be limited to the liability (if any) imposed on them as a matter of law under the Nevada Uniform Commercial Code, as in effect from time to time (or under the Uniform Commercial Code, in force from time to time, in any other state to the extent the same is applicable law); (iv) any sale made pursuant to the provisions of this clause (d) shall be deemed to have been a public sale conducted in a commercially reasonable manner if held contemporaneously with and upon the same notice as required for the sale of the Property under power of sale as provided in clause (c) above in this Section 5.1; (v) in the event of a foreclosure sale, whether made by Trustee under the terms hereof, or under judgment of a court, the Collateral and the other Property may, at the option of Holder, be sold as a whole; (vi) it shall not be necessary for Holder to take possession of the Collateral or any part thereof prior to the time that any sale pursuant to the provisions of this clause (d) is conducted and it shall not be necessary for the Collateral or any part thereof to be present at the location of such sale; (vii) with respect to application of proceeds from disposition of the Collateral under Section 5.2 hereof, the costs and expenses incident to disposition shall include the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Holder and Lenders (including the market value of services provided by in-house counsel); (viii) any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to nonpayment of the Secured Indebtedness or as to the occurrence of any Default, or as to Holder having declared all of such indebtedness to be due and payable, or as to notice of time, place and terms of sale and of the properties to be sold having been duly given, or as to any other act or thing having been duly done by Holder or Lenders, shall be taken as prima facie evidence of the truth of the facts so stated and recited; (ix) Holder may appoint or delegate any one or more persons as agent to perform any act or acts necessary or incident to any sale held by Holder, including the sending of notices and the conduct of the sale, but in the name of Holder on behalf of itself and Lenders; (x) Holder may comply with any applicable state or federal law or regulatory requirements in connection with a disposition of the Collateral, and such compliance will not be considered to affect adversely the commercial reasonableness of any sale of the Collateral; (xi) Holder may sell the Collateral without giving any warranties as to the Collateral, and may specifically disclaim all disposition warranties, including warranties relating to title, possession, quiet enjoyment and the like, and all warranties of quality, merchantability and fitness for a specific purpose, and this procedure will not be considered to affect adversely the commercial reasonableness of any sale of the Collateral; (xii) Borrower acknowledges that a private sale of the Collateral may result in less proceeds than

a public sale; and (xiii) Borrower acknowledges that the Collateral may be sold at a loss to Borrower, and that in such event neither Holder nor Lenders shall have any liability or responsibility to Borrower for such loss.

(e)    <u>Judicial Action</u>.    Subject to any provision of the Loan Agreement regarding reference and arbitration, Holder may bring an action on behalf of itself and Lenders in any court of competent jurisdiction to foreclose this instrument or to obtain specific performance of any of the covenants or agreements of this Deed of Trust.

(f)    <u>Entry on Property</u>.    Holder is authorized on behalf of itself and Lenders, prior or subsequent to the institution of any foreclosure proceedings, to the fullest extent permitted by applicable law, to enter upon the Property or any part thereof, and to take possession of the Property and all books and records, and all recorded data of any kind or nature, regardless of the medium of recording, including all software, writings, plans, specifications and schematics relating thereto, and to exercise without interference from Borrower any and all rights which Borrower has with respect to the management, possession, operation, protection or preservation of the Property. Holder shall not be deemed to have taken possession of the Property or any part thereof except upon the exercise of its right to do so, and then only to the extent evidenced by its demand and overt act specifically for such purpose. All costs, expenses and liabilities of every character incurred by Holder and Lenders in managing, operating, maintaining, protecting or preserving the Property shall constitute a demand obligation of Borrower (which obligation Borrower hereby promises to pay) to Holder (for its own account or the account of Lenders, as applicable) pursuant to this Deed of Trust. If necessary to obtain the possession provided for above, Holder may invoke any and all legal remedies to dispossess Borrower. In connection with any action taken by Holder pursuant to this clause (f), neither Holder nor Lenders shall be liable for any loss sustained by Borrower resulting from any failure to let the Property or any part thereof, or from any act or omission of Holder in managing the Property unless such loss is caused by the willful misconduct and bad faith of Holder, nor shall Holder or Lenders be obligated to perform or discharge any obligation, duty or liability of Borrower arising under any lease or other agreement relating to the Property or arising under any Permitted Encumbrance or otherwise arising. Borrower hereby assents to, ratifies and confirms any and all actions of Holder with respect to the Property taken under this clause (f).

(g)    <u>Receiver</u>.    Holder, on behalf of itself and Lenders, shall as a matter of right be entitled to the appointment of a receiver or receivers for all or any part of the Property, whether such receivership is incident to a proposed sale (or sales) of such property or otherwise, and without regard to the value of the Property or the solvency of any person or persons liable for the payment of the Secured Indebtedness, and Borrower does hereby irrevocably consent to the appointment of such receiver or receivers, waives notice of such appointment, of any request therefor or hearing in connection therewith, and any and all defenses to such appointment, agrees not to oppose any application therefor by Holder, and agrees that such appointment shall in no manner impair, prejudice or otherwise affect the rights of Holder and Lenders to application of Rents as provided in this Deed of Trust. Nothing herein is to be construed to deprive Holder of any other right, remedy or privilege they may have under the law to have a receiver appointed. Any money advanced by Holder or Lenders in connection with any such receivership shall be a demand obligation (which obligation Borrower hereby promises to pay) owing by Borrower to

Holder (for its own account or the account of Lenders, as applicable) pursuant to this Deed of Trust.

(h)    Powers of Holder. Holder may, on behalf of itself and Lenders, either directly or through an agent or court-appointed receiver, and without regard to the adequacy of any security for the Secured Indebtedness:

(i)    enter, take possession of, manage, operate, protect, preserve and maintain, and exercise any other rights of an owner of, the Property, and use any other properties or facilities of Borrower relating to the Property, all without payment of rent or other compensation to Borrower;

(ii)    enter into such contracts and take such other action as Holder deems appropriate to complete all or any part of the Improvements or any other construction on the Land, subject to such modifications and other changes in the Improvements or the plan of development as Holder may deem appropriate;

(iii)    make, cancel, enforce or modify leases, obtain and evict tenants, fix or modify rents and, in its own name or in the name of Borrower, otherwise conduct any business of Borrower in relation to the Property and deal with Borrower's creditors, debtors, tenants, agents and employees and any other persons having any relationship with Borrower in relation to the Property, and amend any contracts between them, in any manner Holder may determine;

(iv)    either with or without taking possession of the Property, notify obligors on any contracts that all payments and other performance are to be made and rendered directly and exclusively to Holder, and in its own name on behalf of itself and Lenders supplement, modify, amend, renew, extend, accelerate, accept partial payments or performance on, make allowances and adjustments and issue credits with respect to, give approvals, waivers and consents under, release, settle, compromise, compound, sue for, collect or otherwise liquidate, enforce or deal with any contracts or other rights, including collection of amounts past due and unpaid (Borrower agreeing not to take any such action after the occurrence of a Default without prior written authorization from Holder);

(v)    endorse, in the name of Borrower, all checks, drafts and other evidences of payment relating to the Property, and receive, open and dispose of all mail addressed to Borrower and notify the postal authorities to change the address for delivery of such mail to such address as Holder may designate; and

(vi)    take such other action as Holder deems appropriate to protect the security of this Deed of Trust.

(i)    Environmental Impairment. In addition to any other rights or remedies Agent may have under this Deed of Trust at law or in equity, upon the occurrence of a Default under this Deed of Trust, Agent may (a) pursue any remedies available to it under NRS 40.507, 40.508 and NRS 40.512, and/or (b) do or cause to be done whatever is necessary to cause the Property to comply with all Environmental Laws, and the cost thereof shall become immediately due and payable upon demand by Agent. Without limiting any other rights or remedies of Agent, Borrower acknowledges and agrees that the provisions of the Environmental Agreement are

"environmental provisions," as that term is defined in NRS 40.502, and that Borrower's failure to comply with the terms of such sections shall be a breach of contract such that Agent and Lenders shall have the remedies provided under NRS 40.508 for the recovery of damages and for the enforcement thereof. Pursuant to C.C.P. § 736, Agent's action for the recovery of damages or enforcement of this Agreement shall not constitute an action within the meaning of NRS 40.430 or constitute a deficiency judgment within the meaning of NRS 40.455. In addition, Borrower acknowledges and agrees that Agent may waive the lien of this Deed of Trust in accordance with the provisions of NRS 40.512.

(j)    Other Rights and Remedies.  Holder and Lenders may exercise any and all other rights and remedies which Holder and Lenders may have under the Loan Documents, or at law or in equity or otherwise.

Section 5.2    Proceeds of Foreclosure.  The proceeds of any sale held by Trustee or Holder or any receiver or public officer in foreclosure of the liens and security interests evidenced hereby shall be applied in accordance with the requirements of applicable laws and to the extent consistent therewith, FIRST, to the payment of all necessary costs and expenses incident to such foreclosure sale, including all attorneys' fees and legal expenses (including the market value of services provided by in-house counsel), advertising costs, auctioneer's fees, costs of title rundowns, lien searches, trustee's sale guaranties, foreclosure sale guaranties, litigation guaranties and/or other title policies and endorsements, inspection fees, appraisal costs, fees for professional services, environmental assessment and remediation fees, all court costs and charges of every character, and the maximum fee legally permitted, or a reasonable fee when the law provides no maximum limit, to Trustee acting under the provisions of clause (c) of Section 5.1 hereof if foreclosed by power of sale as provided in said clause (c), and to the payment of the other Secured Indebtedness, including specifically, without limitation, the principal, accrued interest and attorneys' fees due and unpaid on the Notes and the amounts due and unpaid and owed to Holder and Lenders under this Deed of Trust and the amounts due and unpaid and owing to Lender (or its affiliates), the order and manner of application to the items in this clause FIRST to be in Holder's sole discretion; and SECOND, the remainder, if any, shall be paid to Borrower, or to Borrower's heirs, devisees, representatives, successors or assigns, or such other persons (including the holder or beneficiary of any inferior lien) as may be entitled thereto by law; provided, however, that if Holder is uncertain which person or persons are so entitled, Holder, on behalf of itself and Lenders, may interplead such remainder in any court of competent jurisdiction, and the amount of any attorneys' fees, court costs and expenses incurred in such action shall be a part of the Secured Indebtedness and shall be reimbursable (without limitation) from such remainder.

Section 5.3    Holder as Purchaser.  Holder and any Lender shall have the right to become the purchaser at any sale held by Trustee or its substitute or successor or by any receiver or public officer or at any public sale.  Holder shall have the right to credit upon the amount of Holder's successful bid, to the extent necessary to satisfy such bid, all or any part of the Secured Indebtedness in such manner and order as Holder may elect.  Any Lender shall have the right to credit upon the amount of the Lender's successful bid, all or any part of the Secured Indebtedness evidenced by the Note made payable to the Lender in such manner and order as the Lender may elect.

Section 5.4     Remedies Cumulative.  All rights and remedies provided for herein and in any other Loan Document are cumulative of each other and of any and all other rights and remedies existing at law or in equity, and Trustee, Holder and Lenders shall, in addition to the rights and remedies provided herein or in any other Loan Document, be entitled to avail themselves of all such other rights and remedies as may now or hereafter exist at law or in equity for the collection of the Secured Indebtedness and the enforcement of the covenants herein and the foreclosure of the liens and security interests evidenced hereby, and the resort to any right or remedy provided for hereunder or under any such other Loan Document or provided for by law or in equity shall not prevent the concurrent or subsequent employment of any other appropriate right or rights or remedy or remedies.

Section 5.5     Discretion as to Security.  Holder, on behalf of itself and Lenders, may resort to any security given by this Deed of Trust or to any other security now existing or hereafter given to secure the payment of the Secured Indebtedness, in whole or in part, and in such portions and in such order as may seem best to Holder in its sole and uncontrolled discretion, and any such action shall not in anywise be considered as a waiver of any of the rights, benefits, liens or security interests evidenced by this Deed of Trust.

Section 5.6     Borrower's Waiver of Certain Rights.  To the full extent Borrower may do so, Borrower agrees that Borrower will not at any time insist upon, plead, claim or take the benefit or advantage of any law now or hereafter in force providing for any appraisement, valuation, stay, extension or redemption, homestead, moratorium, reinstatement, marshaling or forbearance, and Borrower, for Borrower, Borrower's heirs, devisees, representatives, successors and assigns, and for any and all persons ever claiming any interest in the Property, to the extent permitted by applicable law, hereby waives and releases all rights of redemption, valuation, appraisement, stay of execution and all rights to a marshaling of assets of Borrower, including the Property, or to a sale in inverse order of alienation in the event of foreclosure of the liens and/or security interests hereby created.  Borrower shall not have or assert any right under any statute or rule of law pertaining to the marshaling of assets, sale in inverse order of alienation, the exemption of homestead, the administration of estates of decedents, or other matters whatsoever to defeat, reduce or affect the right of Holder and Lenders under the terms of this Deed of Trust to a sale of the Property for the collection of the Secured Indebtedness without any prior or different resort for collection, or the right of Holder and Lenders under the terms of this Deed of Trust to the payment of the Secured Indebtedness out of the proceeds of sale of the Property in preference to every other claimant whatsoever.

Section 5.7     Delivery of Possession After Foreclosure.  In the event there is a foreclosure sale hereunder and at the time of such sale, Borrower or Borrower's heirs, devisees, representatives, or successors as owners of the Property are occupying or using the Property, or any part thereof, each and all shall immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day to day, terminable at the will of purchaser, at a reasonable rental per day based upon the value of the property occupied, such rental to be due daily to the purchaser; and to the extent permitted by applicable law, the purchaser at such sale shall, notwithstanding any language herein apparently to the contrary, have the sole option to demand immediate possession following the sale or to permit the occupants to remain as tenants at will.

## ARTICLE 6

### Miscellaneous

Section 6.1    Scope of Deed of Trust. This Deed of Trust is a deed of trust with respect to that portion of the Property which is real property, a security agreement with respect to that portion of the Property which is personal property (it being agreed that, whenever possible, components of the Property shall be deemed to be real property rather than personal property), an assignment of rents and leases, a financing statement and fixture filing and a collateral assignment. In addition to the foregoing, this Deed of Trust covers all proceeds.

Section 6.2    Effective as a Financing Statement and Fixture Filing. This Deed of Trust shall be effective as a financing statement filed as a fixture filing with respect to all fixtures included within the Property and is to be filed for record in the real estate records of each county where any part of the Property (including said fixtures) is situated. This Deed of Trust shall also be effective as a financing statement covering as-extracted collateral (including oil and gas), accounts and general intangibles under the Nevada Uniform Commercial Code, as in effect from time to time, and the Uniform Commercial Code, as in effect from time to time, in any other state where the Property is situated which will be financed at the wellhead or minehead of the wells or mines located on the Property and is to be filed for record in the real estate records of each county where any part of the Property is situated. This Deed of Trust shall also be effective as a financing statement covering any other Property and may be filed in any other appropriate filing or recording office. The respective mailing addresses of Borrower and Agent are set forth at the end of this Deed of Trust. A carbon, photographic or other reproduction of this Deed of Trust or of any financing statement relating to this Deed of Trust shall be sufficient as a financing statement for any of the purposes referred to in this Section 6.2.

Section 6.3    Notice to Account Debtors. In addition to the rights granted elsewhere in this Deed of Trust, Holder may at any time notify the account debtors or obligors of any accounts, chattel paper, general intangibles, negotiable instruments or other evidences of indebtedness included in the Collateral to pay Holder directly.

Section 6.4    Waiver by Holder. Holder may at any time and from time to time by a specific writing intended for the purpose: (a) waive any Default without waiving any other prior or subsequent Default; (b) waive compliance by Borrower with any covenant herein made by Borrower to the extent and in the manner specified in such writing; (c) consent to Borrower's doing any act which hereunder Borrower is prohibited from doing, or to Borrower's failing to do any act which hereunder Borrower is required to do, to the extent and in the manner specified in such writing; (d) release any part of the Property or any interest therein from the lien and security interest of this Deed of Trust, without the joinder of Trustee; or (e) release any party liable, either directly or indirectly, for the Secured Indebtedness or for any covenant herein or in any other Loan Document without impairing or releasing the liability of any other party. In addition to the foregoing, Holder may remedy any Default without waiving the Default remedied. No such act shall in any way affect the rights or powers of Holder, Lenders or Trustee hereunder except to the extent specifically agreed to by Holder in such writing. Neither failure by Holder to exercise, nor delay by Holder or Lenders in exercising, nor discontinuance of the exercise of any right, power or remedy (including the right to accelerate the maturity of the Secured Indebtedness or

any part thereof) upon or after any Default shall be construed as a waiver of such Default or as a waiver of the right to exercise any such right, power or remedy at a later date. No single or partial exercise by Holder or Lenders of any right, power or remedy hereunder shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder may be exercised at any time and from time to time. No waiver of any provision hereof or consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Holder and then such waiver or consent shall be effective only in the specific instance, for the purpose for which given and to the extent therein specified. No notice to or demand on Borrower in any case shall of itself entitle Borrower to any other or further notice or demand in similar or other circumstances.

Section 6.5    No Impairment of Security.  The lien, security interest and other security rights of Holder and Lenders hereunder or under any other Loan Document shall not be impaired by any indulgence, moratorium or release granted by Holder including any renewal, extension or modification which Holder may grant with respect to any Secured Indebtedness, or any surrender, compromise, release, renewal, extension, exchange or substitution which Holder may grant in respect of the Property, or any part thereof or any interest therein, or any release or indulgence granted to any endorser, guarantor or surety of any Secured Indebtedness. The taking of additional security by Holder and Lenders shall not release or impair the lien, security interest or other security rights of Holder and Lenders hereunder or affect the liability of Borrower or of any endorser, guarantor or surety, or improve the right of any junior lienholder in the Property (without implying hereby any consent to any junior lien by Holder or Lenders).

Section 6.6    Borrower's Successors.  If the ownership of the Property or any part thereof becomes vested in a person other than Borrower, Holder may, on behalf of itself and Lenders, without notice to Borrower, deal with such successor or successors in interest with reference to this Deed of Trust and to the Secured Indebtedness in the same manner as with Borrower, without in any way vitiating or discharging Borrower's liability hereunder or its liability for the payment of the Secured Indebtedness or performance of the obligations secured hereby. No transfer of the Property, no forbearance on the part of Holder, and no extension of the time for the payment of the Secured Indebtedness given by Holder shall operate to release, discharge, modify, change or affect, in whole or in part, the liability of Borrower hereunder for the payment of the Secured Indebtedness or performance of the obligations secured hereby or the liability of any other person hereunder for the payment of the Secured Indebtedness. Each Borrower agrees that it shall be bound by any modification of this Deed of Trust or any of the other Loan Documents made by Holder on behalf of itself and Lenders and any subsequent owner of the Property, with or without notice to such Borrower, and no such modifications shall impair the obligations of such Borrower under this Deed of Trust or any other Loan Document. Nothing in this Section or elsewhere in this Deed of Trust shall be construed to imply any consent by Holder or Lenders to any transfer of the Property.

Section 6.7    Place of Payment; Forum.  All Secured Indebtedness which may be owing hereunder at any time by Borrower shall be payable at the place designated in the Notes (or if no such designation is made, at the address of Holder indicated at the end of this Deed of Trust). Borrower hereby irrevocably submits generally and unconditionally for itself and in respect of its property to the non-exclusive jurisdiction of any Nevada state court or any United States federal court sitting in the county in which the Secured Indebtedness is payable, and to the non-exclusive

jurisdiction of any state or United States federal court sitting in the state in which any of the Property is located, over any suit, action or proceeding arising out of or relating to this Deed of Trust or the Secured Indebtedness. Borrower hereby irrevocably waives, to the fullest extent permitted by law, any objection that Borrower may now or hereafter have to the laying of venue in any such court and to any claim that any such court is an inconvenient forum. Borrower hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any Nevada state court or any United States federal court sitting in the state in which the Secured Indebtedness is payable may be made by certified or registered mail, return receipt requested, directed to Borrower at its address stated at the end of this Deed of Trust or at a subsequent address of Borrower of which Holder received actual notice from Borrower in accordance with this Deed of Trust, and service so made shall be complete five (5) days after the same shall have been so mailed. Nothing herein shall affect the right of Holder to serve process in any manner permitted by law or limit the right of Holder to bring proceedings against Borrower in any other court or jurisdiction; provided, however, that in the event of any inconsistency between the terms and conditions of this Section 6.7 and those of any provision in the Loan Agreement regarding reference and arbitration, the terms and conditions of the reference and arbitration provision of the Loan Agreement shall prevail.

Section 6.8    WAIVER OF JURY TRIAL.

(a)    THE VALIDITY OF THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEVADA.

(b)    THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS DEED OF TRUST AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF CLARK, STATE OF NEVADA, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST BORROWER, COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT AGENT'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE AGENT ELECTS TO BRING SUCH ACTION OR WHERE SUCH BORROWER COLLATERAL OR OTHER PROPERTY MAY BE FOUND. BORROWER AND LENDERS WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 6.8.

(c)    BORROWER AND LENDERS HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON

OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS. BORROWER AND LENDERS REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

Section 6.9    Subrogation to Existing Liens; Vendor's Lien. To the extent that proceeds of the Notes are used to pay indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Property, such proceeds have been advanced by Holder and Lenders at Borrower's request, and Holder and Lenders shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, however remote, regardless of whether said liens, security interests, charges or encumbrances are released, and all of the same are recognized as valid and subsisting and are renewed and continued and merged herein to secure the Secured Indebtedness, but the terms and provisions of this Deed of Trust shall govern and control the manner and terms of enforcement of the liens, security interests, charges and encumbrances to which Holder and Lenders are subrogated hereunder.  It is expressly understood that, in consideration of the payment of such indebtedness by Holder and Lenders, Borrower hereby waives and releases all demands and causes of action for offsets and payments in connection with said indebtedness. If all or any portion of the proceeds of the Loan or of any other Secured Indebtedness has been advanced for the purpose of paying the purchase price for all or a part of the Property, no vendor's lien is waived; and Holder shall have, and is hereby granted, for the ratable benefit of itself and Lenders, a vendor's lien on the Property as cumulative additional security for the Secured Indebtedness.  Holder, on behalf of itself and Lenders, may foreclose under this Deed of Trust or under the vendor's lien without waiving the other or may foreclose under both.

Section 6.10    Application of Payments to Certain Indebtedness.  If any part of the Secured Indebtedness cannot be lawfully secured by this Deed of Trust or if any part of the Property cannot be lawfully subject to the lien and security interest hereof to the full extent of such indebtedness, then all payments made shall be applied on said indebtedness first in discharge of that portion thereof which is not secured by this Deed of Trust.

Section 6.11    Nature of Loan; Compliance with Usury Laws. The Loan is being made solely for the purpose of carrying on or acquiring a business or commercial enterprise.  It is the intent of Borrower, Holder and Lenders and all other parties to the Loan Documents to conform to and contract in strict compliance with applicable usury law from time to time in effect.  All agreements among Holder, Lenders and Borrower (or any other party liable with respect to any indebtedness under the Loan Documents) are hereby limited by the provisions of this Section 6.11, which shall override and control all such agreements, whether now existing or hereafter arising.  In no event or contingency (including prepayment, default, demand for payment or acceleration of the maturity of any obligation), shall the interest taken, reserved, contracted for, charged, chargeable or received under this Deed of Trust, the Notes or any other Loan Document or otherwise, exceed the maximum nonusurious amount permitted by applicable

law (the "Maximum Amount"). If from any possible construction of any document, interest would otherwise be payable in excess of the Maximum Amount, any such construction shall be subject to the provisions of this Section 6.11 and such document shall ipso facto be automatically reformed and the interest payable shall be automatically reduced to the Maximum Amount, without the necessity of execution of any amendment or new document. If Holder and Lenders shall ever receive anything of value which is characterized as interest under applicable law and which would apart from this provision be in excess of the Maximum Amount, an amount equal to the amount which would have been excessive interest shall, without penalty, be applied to the reduction of the principal amount owing on the Secured Indebtedness in the inverse order of its maturity and not to the payment of interest, or refunded to Borrower or the other payor thereof if and to the extent such amount which would have been excessive exceeds such unpaid principal. The right to accelerate the maturity of the Notes or any other Secured Indebtedness does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Holder and Lenders do not intend to charge or receive any unearned interest in the event of acceleration. All interest paid or agreed to be paid to Holder and Lenders shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full stated term (including any renewal or extension) of the Secured Indebtedness so that the amount of interest on account of such indebtedness does not exceed the Maximum Amount. As used in this Section, the term "applicable law" shall mean the laws of the State of Nevada or the federal laws of the United States applicable to this transaction, whichever laws allow the greater interest, as such laws now exist or may be changed or amended or come into effect in the future.

Section 6.12    Substitute Trustee.    Trustee may resign by an instrument in writing addressed to Holder or Trustee may be removed at any time with or without cause by an instrument in writing executed by Holder. In case of the resignation, removal or disqualification of Trustee, or if for any reason Holder shall deem it desirable to appoint a substitute or successor trustee to act instead of the herein-named trustee or any substitute or successor trustee, then Holder shall have the right and is hereby authorized and empowered to appoint a successor trustee(s) or a substitute trustee(s) without any formality other than appointment and designation in writing executed by Holder and the authority hereby conferred shall extend to the appointment of other successor and substitute trustees successively until the Secured Indebtedness has been paid in full or until the Property is fully and finally sold hereunder. If Holder is a corporation or association and such appointment is executed on its behalf by an officer of such corporation or association, such appointment shall be conclusively presumed to be executed with authority and shall be valid and sufficient without proof of any action by the board of directors or any superior officer of the corporation or association. Upon the making of any such appointment and designation, all of the estate and title of Trustee in the Property shall vest in the named successor or substitute Trustee(s) and it shall thereupon succeed to, and shall hold, possess and execute, all of the rights, powers, privileges, immunities and duties herein conferred upon Trustee.

Section 6.13    No Liability of Trustee.    Trustee shall not be liable for any error of judgment or act done by Trustee in good faith, or be otherwise responsible or accountable under any circumstances whatsoever (including Trustee's negligence), except for Trustee's gross negligence or willful misconduct. Trustee shall have the right to rely on any instrument, document or signature authorizing or supporting any action taken or proposed to be taken by it hereunder, believed by it in good faith to be genuine. All moneys received by Trustee shall, until used or applied as herein provided, be held in trust for the purposes for which they were

received, but need not be segregated in any manner from any other moneys (except to the extent required by law), and Trustee shall be under no liability for interest on any moneys received by it hereunder. Borrower hereby ratifies and confirms any and all acts which the herein-named Trustee or its successor or successors, substitute or substitutes, in this trust, shall do lawfully by virtue hereof. Borrower will reimburse Trustee for, and save Trustee harmless against, any and all liability and expenses which may be incurred by Trustee in the performance of its duties. The foregoing indemnity shall not terminate upon discharge of the Secured Indebtedness, or foreclosure, release or other termination of this Deed of Trust.

Section 6.14    Reconveyances.

(a)    Reconveyance from Deed of Trust. If all of the Secured Indebtedness shall have been paid in full, and all of the covenants, warranties, undertakings and agreements made in this Deed of Trust shall have been kept and performed, and all obligations, if any, of Holder for further advances shall have been terminated, then, and in that event only, all rights under this Deed of Trust shall terminate (except to the extent expressly provided herein with respect to indemnifications, representations and warranties and other rights which are to continue following the reconveyance hereof) and the Property shall become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, and the Property shall be reconveyed by Holder in due form at Borrower's cost. Without limitation, all provisions herein for indemnity of Holder. Lender and/or Trustee shall survive discharge of the Secured Indebtedness, and any foreclosure, reconveyance or termination of this Deed of Trust.

(b)    Partial Reconveyance; No Reconveyance in Default. Holder may, regardless of consideration, cause the reconveyance of any part of the Property from the lien of this Deed of Trust without in any manner affecting or impairing the lien or priority of this Deed of Trust as to the remainder of the Property. Holder hereby agrees to provide a partial release of this Deed of Trust with respect to any portion of the Property following Borrower's satisfaction of each of the conditions set forth in Section 7.25 of the Loan Agreement. No partial reconveyance shall be sought, requested or required if any Default has occurred which has not been cured.

(c)    Reconveyance Fee. Borrower agrees to pay fees in the maximum amounts legally permitted, or reasonable fees when the law provides no maximum limit, for Trustee's rendering of services in connection with each partial or complete reconveyance of the Property from the lien of this Deed of Trust.

Section 6.15    Notices.    All notices, requests, consents, demands and other communications required or which any party desires to give hereunder or under any other Loan Document shall be in writing and, unless otherwise specifically provided in such other Loan Document, shall be deemed sufficiently given or furnished if delivered by personal delivery, by nationally recognized overnight courier service, or by registered or certified United States mail, postage prepaid, addressed to the party to whom directed at the addresses specified at the end of this Deed of Trust (unless changed by similar notice in writing given by the particular party whose address is to be changed) or by facsimile. Any such notice or communication shall be deemed to have been given either at the time of personal delivery or, in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile. Notwithstanding the foregoing, no notice of change of address shall

be effective except upon receipt. Any Borrower whose address is set forth at the end of this Deed of Trust hereby requests that a copy of notice of default and notice of sale be mailed to it at that address. If any Borrower fails to insert an address, that failure shall constitute a designation of such Borrower's last known address as the address for such notice  This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in any Loan Document or to require giving of notice or demand to or upon any person in any situation or for any reason.

Section 6.16 <u>Invalidity of Certain Provisions</u>. A determination that any provision of this Deed of Trust is unenforceable or invalid shall not affect the enforceability or validity of any other provisions, and the determination that the application of any provision of this Deed of Trust to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances.

Section 6.17 <u>Interpretation</u>. References to Articles, Sections and Exhibit(s) are, unless specified otherwise, references to articles, sections and exhibit(s) of this Deed of Trust. Words of any gender shall include each other gender. Words in the singular shall include the plural and words in the plural shall include the singular. The words "<u>herein</u>," "<u>hereof</u>," "<u>hereunder</u>" and other similar compounds of the word "<u>here</u>" shall refer to this entire Deed of Trust and not to any particular Article, Section, paragraph or provision. The words "<u>include</u>" and "<u>including</u>" shall be interpreted as if followed by the words "<u>without limitation</u>." Captions and headings in this Deed of Trust are for convenience only and shall not affect the construction of this Deed of Trust. The term "<u>person</u>" and words importing persons as used in this Deed of Trust shall include firms, associations, partnerships (including limited partnerships and limited liability partnerships), joint ventures, trusts, corporations, limited liability companies and other legal entities, including public or governmental bodies, agencies or instrumentalities, as well as natural persons.

Section 6.18 <u>Binding Effect; Borrower</u>.  The terms, provisions, covenants and conditions hereof shall be binding upon Borrower and the heirs, devisees, representatives, successors and assigns of Borrower; provided, however, that Borrower may not assign this Deed of Trust, or assign or delegate any of its rights or obligations under this Deed of Trust, without the prior written consent of each Lender in each instance (and any attempted assignment or delegation by Borrower without such consent shall be null and void). The obligations of Borrower hereunder shall be joint and several. If any Borrower or any signatory who signs on behalf of any Borrower is a corporation, partnership or other legal entity, Borrower and any such signatory, and the person or persons signing for it, represent and warrant to Holder and Lenders that this instrument is executed, acknowledged and delivered by Borrower's duly authorized representatives. If Borrower is an individual, no power of attorney granted by Borrower herein shall terminate on Borrower's disability.

Section 6.19 <u>Trustee, Holder and Lender Assigns; Covenants Running with the Land</u>. The terms, provisions, covenants and conditions hereof shall inure to the benefit of Trustee, Holder, any Lender and any of their successors and assigns and shall constitute covenants running with the Land. Holder and any Lender may, from time to time, sell, transfer, or assign all or a portion of its respective interest in the Secured Indebtedness and the Loan Documents, on and subject to the terms and conditions of the Loan Agreement and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass-through certificates or

other securities evidencing a beneficial interest in a rated or unrated public offering or private placement. In the event of any such sale, transfer or assignment of the Secured Indebtedness or any part thereof, the rights and benefits under this Deed of Trust may be transferred with such Secured Indebtedness. Borrower waives notice of any sale, transfer or assignment of the Secured Indebtedness or any part thereof, and agrees that failure by Holder, Lenders or any other party to give notice of any such sale, transfer or assignment will not affect the liability of Borrower hereunder. Holder is hereby authorized to disseminate any information it now has or hereafter obtains pertaining to the Secured Indebtedness or this Deed of Trust, including credit or other information on Borrower, any of its principals, the Property and/or any guarantor or other party liable, directly or indirectly, for any part of the Secured Indebtedness, to any actual or prospective assignee or participant with respect to the Secured Indebtedness, to any of Holder's affiliates, to any regulatory body having jurisdiction over Holder, and to any other parties as necessary or appropriate in Holder's reasonable judgment.

Section 6.20    Execution; Recording.    This Deed of Trust may be executed in several counterparts, all of which counterparts together shall constitute one and the same instrument. The date or dates reflected in the acknowledgments hereto indicate the date or dates of actual execution of this Deed of Trust, but such execution is as of the date shown on the first page hereof, and for purposes of identification and reference the date of this Deed of Trust shall be deemed to be the date reflected on the first page hereof. Borrower will cause this Deed of Trust and all amendments and supplements thereto and substitutions therefor and all financing statements and continuation statements relating thereto to be recorded, filed, re-recorded and refiled in such manner and in such places as Trustee or Holder shall reasonably request and will pay all such recording, filing, re-recording and refiling taxes, fees and other charges.

Section 6.21    Modification or Termination.    The Loan Documents may be modified or terminated only by a written instrument or instruments intended for that purpose and executed by the party against which enforcement of the modification or termination is asserted. Any alleged modification or termination which is not so documented shall not be effective as to any party.

Section 6.22    No Partnership, Etc.    The relationship between Borrower on the one hand and Holder and Lenders on the other is solely that of lender and borrower. Holder and Lenders have no fiduciary or other special relationship with Borrower. Nothing contained in the Loan Documents or the Environmental Agreement is intended to create any partnership, joint venture, association or special relationship between Borrower and Holder and Lenders or in any way to make Holder or any Lender a co-principal with Borrower with reference to the Property. All agreed contractual duties between or among Holder, Lenders, Borrower and Trustee are set forth herein and in the other Loan Documents and in the Environmental Agreement, and any additional implied covenants or duties are hereby disclaimed. Any inferences to the contrary of any of the foregoing are hereby expressly negated.

Section 6.23    Applicable Law.    THIS DEED OF TRUST, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION SHALL BE GOVERNED BY AND CONSTRUED, INTERPRETED AND ENFORCED IN ACCORDANCE WITH AND PURSUANT TO THE LAWS OF THE STATE OF NEVADA (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW, EXCEPT AS OTHERWISE REQUIRED BY MANDATORY PROVISIONS OF LAW

AND EXCEPT TO THE EXTENT THAT REMEDIES PROVIDED BY THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF NEVADA ARE GOVERNED BY THE LAWS OF SUCH OTHER JURISDICTION.

Section 6.24 <u>Entire Agreement</u>.    The Loan Documents and the Environmental Agreement constitute the entire understanding and agreement among Borrower, Holder and Lenders with respect to the transactions arising in connection with the Secured Indebtedness and supersede all prior written or oral understandings and agreements among Borrower, Holder and Lenders with respect to the matters addressed in the Loan Documents and the Environmental Agreement.  Borrower hereby acknowledges that, except as incorporated in writing in the Loan Documents or the Environmental Agreement, there are not and were not, and no persons are or were authorized by Holder or Lenders to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the matters addressed in the Loan Documents and the Environmental Agreement.

[Remainder of page intentionally left blank; signature(s) follow on next page]

IN WITNESS WHEREOF, Borrower has executed this instrument as of the date first written on page 1 hereof.

The address of Borrower is:

2500 W. Sahara, Suite 202
Las Vegas, Nevada 89102

BORROWER:

ESSEX
ESSEX REAL ESTATE PARTNERS, LLC,
a Nevada limited-liability company

By:    Las Vegas Development Associates, LLC,
       a Nevada limited-liability company,
Its:   Manager

By: _____
        George F. Holman, Managing Member

The address of Agent/Holder is:

NEXBANK, SSB
13455 Noel Road, Suite 2220
Dallas, Texas 75240
Attn: Jeff Scott

With a copy to:

HIGHLAND FINANCIAL CORP.
13455 Noel Road, Suite 800
Dallas, Texas 75240
Attn: Keith Beckman

The address of Trustee is:

Chicago Title Company
9500 Flamingo Road, Suite 104
Las Vegas, Nevada 89147

S-1
Deed of Trust (Nevada)

STATE OF NEVADA )
                     ) ss
COUNTY OF CLARK )

This instrument was acknowledged before me on the 28th day of November, 2007, by George F. Holman as the Managing Member of Las Vegas Development Associates, LLC, a Nevada limited liability company, the Manager of Essex Real Estate Partners, LLC, a Nevada limited liability company.

Notary Public — State of Nevada
County of Clark
JOAN WILEY
My Appointment Expires
February 1, 2009
No: 87-1

Notary Public
My Commission Expires

Notarial Acknowledgment
Deed of Trust (Nevada)

## EXHIBIT A

## LAND

All that parcel or parcels of real property located in the City of Henderson, County of Clark, State of Nevada, and more particularly described as follows:

Exhibit A
Deed of Trust (Nevada)

BN 1540587v3

## EXHIBIT "A"
## LEGAL DESCRIPTION

Lots One (1), Eight (8), Twenty-one (21), Twenty-two (22) and Twenty-eight (28) of THE AMENDED PARENT FINAL MAP OF SOUTH EDGE, as shown by map thereof on file in Book 137 of Plats, Page 100, in the Office of the County Recorder of Clark County, Nevada.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT E

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

# JOINT LITIGATION AGREEMENT

## I.    INTRODUCTION

This Joint Litigation Agreement (the "Agreement"), effective as of the last date of signature hereto (the "Effective Date"), concerns the litigation of claims arising out of the lawsuits currently pending in the Eighth Judicial Court, Clark County, Nevada, styled: *Las Vegas Development Associates, LLC, et al. v. KB Home Nevada, Inc.*, Case No. A566442 (the "Essex Litigation") and *Integrated Financial Associates v. KB Home Nevada, Inc.*, formerly Case No. A566442 and now consolidated with the Essex Litigation (the "Lender Litigation") (collectively, the "Litigation").

Integrated Financial Associates, Inc. ("IFA"), by and through the law firm of Marquis & Aurbach ("M&A"), initiated the Lender Litigation against KB Home Nevada, Inc. ("KB"), on or about November 4, 2008.

Las Vegas Development Associates, LLC ("LVDA"), and Essex Real Estate Partners, LLC ("Essex"), by and through the law firm of Santoro, Driggs, Walch, Kearney, Holley & Thompson, initiated the Essex Litigation against KB on or about June 30, 2008.  LVDA and Essex have now retained M&A to continue representing them in the Essex Litigation.

Westchester CLO, Ltd, Gleneagles CLO, Ltd., Stratford CLO, Ltd, Greenbriar CLO, Ltd, Eastland CLO, Ltd, Brentwood CLO, Ltd, Jasper CLO, Ltd, Longhorn Credit Funding LLC, Grayson CLO, Ltd, and Red River CLO, Ltd (collectively, the "Highland Funds"); and, NexBank, SSB ("NexBank"), as collateral agent and administrative agent to the Lenders, seek to initiate additional claims against KB in the Litigation.  The Highland Funds and NexBank have retained the law firm of Lackey Hershman ("LH") for this purpose, and intend to file a motion to intervene in the Litigation.

Collectively, IFA, LVDA, Essex, Highland Funds, and NexBank shall be referred to herein as the Parties.

The Parties, and each of them, have mutually agreed that LH shall represent them, and each of them, as Lead Counsel in the Litigation.  The Parties, and each of them, have further agreed that M&A shall continue to represent the Parties as Local Counsel in the Litigation.

## II.    MUTUALITY OF PURPOSE

The Parties hereby recognize and acknowledge that it is in the best interest of the Parties to share information, resources and efforts in litigating the allegations raised in the Litigation, and to use privileged communications and work product as part of the joint litigation effort to advance a joint undertaking.

This mutuality of interest includes, but is not limited to, providing a coordinated and joint effort in the litigation of the Parties' claims and defense, if any, that may arise in the Litigation for the purpose of furthering an orderly and efficient litigation of the Litigation and minimizing the cost of legal representation, while providing all protections that are afforded by the attorney-client privilege, the work product privilege, and the joint litigation privilege.  Furthermore, the Parties and their undersigned counsel consider that disclosures of matters of common concern in regard to this Agreement are essential to the effective representation of the Parties in these matters of separate but common interest, and for the advancement of the joint undertaking.  The

Parties, therefore, enter into this Agreement, and therefore memorialize and affirm its terms as follows:

1.    The Parties mutually agree to work together and assist each other in litigating the claims involving a common interest brought by and/or against the Parties in the Litigation by way of claim(s), counterclaim(s), and/or third-party claim(s).

2.    The Parties agree that none of the Parties will pursue any claim(s), counterclaim(s), third-party claim(s), defense(s), or claim(s) of any nature or description, that allege fault against any of the other Parties, their agents, or litigation consultants during litigation of the Litigation. Moreover, no additional claim(s), third-party claim(s), counterclaim(s), or claim(s) of any nature or description will be filed or sought by any Party against any other Party prior to the filed disposition of all cases that comprise the Dispute, whether by verdict, settlement, or final appeal.

### III.    JOINT INFORMATION

As this Agreement concerns the disclosure of information between the Parties, the Parties hereby acknowledge and agree to the following:

1.    The Parties acknowledge that they have certain common interests in connection with the Litigation, and that it is in their best interest to exchange:

(a)    Privileged attorney-client communications;

(b)    Privileged attorney work product; and

(c)    A joint and common litigation effort

(collectively, the "Joint Information").

2.    Each Party agrees that all Joint Information exchanged in connection with the joint efforts in the Litigation is communicated in confidence for the common purpose of securing legal advice and representation, and is therefore subject to:

(a)    The terms of this Agreement;

(b)    The attorney work-product and the attorney-client privilege pertaining to the Parties producing the Joint Information; and

(c)    The joint litigation privilege, to the extent recognized under Nevada law,

none of which can be waived by any individual Party without the written consent of all Parties.

3.    Nothing in this section shall constitute a waiver by any Party of any attorney-client, work product, or other applicable privilege regarding information that is not shared among the Parties.

4.    The Parties and the undersigned counsel agree that the privilege that is contained in this Agreement relative to the protection of the Joint Information shall be applicable to the respective employees and agents, including experts and consultants, retained to assist in the Litigation.

5.    Each Party agrees that the communication of Joint Information among the Parties has not been and shall not be deemed a waiver of the joint litigation privilege, the attorney-client privilege, the attorney work-product privilege, or any other applicable privilege, and with the

2

cooperation efforts of the Parties, shall not be deemed a waiver of any claims or defenses against any Party.

6.     Pursuant to this Agreement, a Party can exchange any and all factual information in its possession or which it has knowledge and all opinions of any experts retained by any of the Parties regarding any topic at issue in the Litigation and any matters related to the alleged specific claims and potential defenses thereto, if any.  Such information includes, but is not limited to, documents attained through discovery or otherwise, expert witness opinions, their reports and/or theories, and lay witnesses, and witness statements.

7.     Notwithstanding the foregoing, the Parties agree that there is no obligation for any Party to this Agreement to exchange information with any other Party.  If a Party voluntarily chooses to exchange privileged information in its possession pursuant to procedures set forth in this Agreement, then such information will receive the protection afforded by this Agreement.

## IV.     EXCHANGE OF JOINT INFORMATION

1.     The Parties and their undersigned counsel agree that any documents exchanged between counsel shall, to the extent practical, be clearly marked with the statement: "CONFIDENTIAL: PRIVILEGED DOCUMENT PURSUANT TO JOINT LITIGATION AGREEMENT."  All oral communications between the Parties concerning the Litigation shall be presumed to be made pursuant to this Agreement. The Parties further agree that any memorialization of prior oral communications shall, to the extent possible, include the statement that the communication is being made pursuant to this Agreement. Notwithstanding the above, failure to include such a statement on the material or to make this statement at a meeting shall not constitute a waiver of the privilege as to the document or meeting.

2.     No Party shall disclose the contents of this Agreement or of any Joint Information obtained pursuant to this Agreement without prior written consent of all of the Parties.  Upon receipt by a Party of a subpoena or other document requesting access to, or production of, Joint Information, the recipient Party shall immediately:  (1) notify all other Parties of the request; (2) take all necessary steps to defend against and resist the request; and (3) cooperate with the other Parties in defending against and resisting the request.

## V.     SCOPE OF THE JOINT LITIGATION PRIVILEGE

1.     The Parties and their undersigned counsel agree that the communications among the Parties' counsel, as well as joint interviews of prospective witnesses in connection with the Litigation, are confidential and are protected from disclosure to any third party by the attorney-client privilege and work-product privilege, as well as the joint litigation privilege.  Each Party agrees that these confidential communications among the Parties have not been, and shall not be, deemed a waiver of the joint litigation privilege, the attorney-client privilege, the attorney work-product privilege, and/or any other applicable privilege.

2.     The Parties agree that all client and witness statements, interviews, memoranda of law, memoranda, factual summaries, transcript digest, document, computer databases, or any other such material and information that would otherwise be protected from disclosure to any third party by the Parties' attorney-client privilege or attorney-work product privilege will be similarly protected pursuant to the joint litigation doctrine recognized in such cases as *Collins v. State*, 113 Nev. 1177, 946 P.2d 1055 (1997).

3

3.     Nothing contained in this Agreement shall create an attorney-client relationship between a Party and the attorney for any other Party.   Provided that no attorney-client relationship exists between the Parties pursuant to another agreement, the Parties understand and acknowledge that each of the undersigned counsel has an obligation to zealously represent his or her own client.

## VI.   ACCEPTANCE AND CONSENT

1.     The Parties to this Agreement have read and understand all of the terms and provisions of this Agreement, and each have had a reasonable opportunity to consult with an independent attorney before signing it regarding potential conflicts of interest, and the advantages and disadvantages of joint representation.   It is agreed that in the event this Agreement is terminated by the Parties. LH and M&A may continue to represent IFA, the Highland Funds, and Nexbank in the Litigation; and LVDA and/or Essex may be required to obtain new counsel in the Litigation. The Parties hereby waive any claims of conflict of interest they may have in connection with such representation and agree they waive all rights they may have to disqualify LH and/or M&A from continuing such representation.

2.     The Parties have made such investigation of the facts pertaining to this Agreement, and of all the matters pertaining thereto, as they deem necessary.

3.     The Parties understand and acknowledge that by signing this Agreement they accept and agree to be bound by all of its terms.

4.     This Agreement constitutes the entire agreement between the Parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous oral and written agreements, understandings, and representations, if any. There have been no representations or warranties made by any Party other than the representations and warranties contained herein.

## VII.   TOLLING OF PARTIES' RIGHTS TO PURSUE CLAIMS

In order to preserve the status quo concerning any applicable statute of limitation that may apply to any actual or potential claims between the Parties related to or arising from the subject matter of the Litigation, the Parties agree that any and all statutes of limitation applicable to related claims are hereby tolled as of this date of this Agreement until one (1) year after the final disposition of all of the actions constituting the Litigation.

## VIII.   CONDITIONS UNDER THE AGREEMENT

1.     The Parties acknowledge and agree that no adequate remedies are available for the breach of this Agreement, and that, in the event of a breach or a threatened breach, specific performance of this Agreement may be ordered, a breach hereof shall be enjoined, or both.

2.     Each Party to this Agreement agrees that Joint Information received from the other Parties shall be used only in connection with the Litigation, and shall not be used for any other purpose.

3.     The existence of this Agreement or of joint efforts in the Litigation should not be used offensively or defensively in any subsequent litigation involving any issue relating to or deriving from the Litigation (i.e. indemnity, contribution, or the like), nor will any Party to this

4

Agreement claim that any counsel is disqualified in such subsequent litigation by reason of the joint effort. The Parties agree that neither their joint effort nor this Agreement shall be admissible in any subsequent litigation involving any issue relating to or deriving from the Litigation.

4.    Nothing herein contained is intended to impose an affirmative duty or obligation upon any Party or any Party's counsel to take any action which is not in a Party's best interest or to exchange, share or produce any materials or information otherwise subject to a claim of privilege or work product, or the production of which is subject to any other defense or objections. However, each Party to this Agreement is obligated to share materials and information (including access to expert witnesses whose testimony or opinions relate to issues common to the joint effort) that had been prepared or developed as part of the joint effort.

5.    Each Party agrees to notify every other Party of any settlement proposal, and agrees not to enter into any settlement agreement that withdraws the remaining Parties access to files or experts developed as a part of the joint effort.

6.    It is expressly understood and agreed by the Parties that this Agreement and the joint effort shall not alter, resend, modify or waive any right or obligation of any Party under a prior agreement, and that if there is any conflict between this Agreement and a prior agreement, the prior agreement shall control and the conflicting provision of this Agreement shall be null and void to the extent of said conflict. If any Party believes this Agreement is in conflict with a prior agreement, such Party shall give written notice of the potential conflict to the other Parties immediately upon learning of the potential conflict, which notice shall further describe the conflict as necessary to advise the Parties.

7.    This Agreement shall be interpreted and enforced pursuant to the laws of the State of Nevada. The Parties hereby irrevocably consent to the exclusive jurisdiction and venue of the Courts of the State of Nevada, and any Federal Court located within Nevada, in connection with any action or proceeding arising out of or relating to this Agreement or the joint effort contemplated hereby. The Parties agree that any portion of this Agreement that violates Nevada law shall be stricken from the Agreement, leaving all other portions of the Agreement in full force and effect.

8.    Nothing herein is intended or shall be deemed to be an admission of any liability on the part of any Party to this Agreement or of the existence of facts upon which liability can be based. It is the intent of the Parties that no provision herein shall be construed as an indication of evidence of conspiracy or bad faith or to require a Party to participate in an act of conspiracy or bad faith and that any provision so construed by a Court shall be null and void. The Parties expressly reserve all right, defenses, obligations and claims between them.

9.    This Agreement was drafted by counsel for one of the Parties for convenience, and shall not be construed against the drafting Party in the event of a dispute. The language of this Agreement shall be construed as a whole, according to its fair meaning and intent.

10.    Each person signing this Agreement on behalf of each Party represents and warrants that he or she is authorized to do so on behalf of that Party and that all prerequisite corporate or partnership approvals and actions have been given and/or taken.

11.    This Agreement may be executed in one or more counterparts, each which shall constitute one and the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties. The Parties agree that facsimile signatures

5

will be treated in all manner and respects as a binding and original document, and the signature of any Party shall be considered for these purposes as an original signature.

**IX.   TERMINATION**

The Parties agree that this Agreement may be terminated by giving written notice to counsel for the all other Parties at least ten (10) days in advance of the date in which the Agreement is to be terminated.   In event of termination, the Parties agree that information documents exchanged prior to the termination date shall be entitled to continuing protection under the terms and conditions of this Agreement.

**IN WITNESS WHEREOF,** each of the Parties has executed this Agreement on the date and year written below.

Las Vegas Development Associates, LLC;

By: _____
George F. Holman, Managing Member

Essex Real Estate Partners, LLC:
By: Las Vegas Development Associates, LLC

By: _____
George F. Holman, Managing Member

Integrated Financial Associates:

By: _____
Bill Dyer, President

NexBank SSB:

By: _____

6

will be treated in all manner and respects as a binding and original document, and the signature of any Party shall be considered for these purposes as an original signature.

IX.    TERMINATION

The Parties agree that this Agreement may be terminated by giving written notice to counsel for the all other Parties at least ten (10) days in advance of the date in which the Agreement is to be terminated.   In event of termination, the Parties agree that information documents exchanged prior to the termination date shall be entitled to continuing protection under the terms and conditions of this Agreement.

**IN WITNESS WHEREOF, each of the Parties has executed this Agreement on the date and year written below.**

Las Vegas Development Associates, LLC;


By: _____
    George F. Holman, Managing Member


Essex Real Estate Partners, LLC:
    By: Las Vegas Development Associates, LLC

By: _____
    George F. Holman, Managing Member


Integrated Financial Associates:

By: _____
    Bill Dyer, President


NexBank SSB:



By: _____

6

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Westchester CLO, Ltd.:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Gleneagles CLO, Ltd.:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Stratford CLO, Ltd.:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Greenbriar CLO, Ltd.:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Eastland CLO, Ltd.:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Brentwood CLO, Ltd.:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Jasper CLO, Ltd.:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

7

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Longhorn Credit Funding, LLC:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Grayson CLO, Ltd.:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

James D. Dondero, President
Strand Advisors, Inc., General Partner of
Highland Capital Management, L.P.

Red River CLO, Ltd.:
By:  Highland Capital Management, L.P.
As Collateral Manager
By:  Strand Advisors, Inc., Its General Partner

8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT F

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

## Steve Harris

| | |
|---|---|
| **From:** | Steve Harris |
| **Sent:** | Wednesday, January 22, 2020 8:12 PM |
| **To:** | Candace Carlyon; William Noall |
| **Cc:** | mcl3303@aol.com |
| **Subject:** | Essex Real Estate Partners, LLC Chapter 11 Reorganization Proceeding |
| **Attachments:** | doc05931420200122200640.pdf |

Dear Candace and Bill,

Enclosed please find correspondence for your immediate review.

Thank you,
Steve

**Stephen R. Harris, Esq.**
**Harris Law Practice LLC**
6151 Lakeside Drive, Suite 2100
Reno, Nevada 89511
775-786-7600
steve@harrislawreno.com

# HARRIS LAW PRACTICE LLC
## ATTORNEY AND COUNSELOR AT LAW
### STEPHEN R. HARRIS, ESQ.
6151 LAKESIDE DRIVE, SUITE 2100
RENO, NEVADA 89511
(775) 786-7600
steve@harrislawreno.com

January 22, 2020

*Via Email ccarlyon@carlyoncica.com*
Candace Carlyon, Esq.
Carlyon Cica Chtd.
265 E. Warm Springs Road
Suite 107
Las Vegas, NV 89119

*Via Email wnoall@gtg.legal*
William Noall, Esq.
Garman Turner Gordon LLP
650 White Drive
Suite 100
Las Vegas, NV 89119

Re:   **Essex Real Estate Partners, LLC - Chapter 11 reorganization proceeding**

Dear Candace and Bill:

I represent Essex Real Estate Partners, LLC in its Chapter 11 proceeding currently pending in the United States Bankruptcy Court, Reno, Nevada. In that regard, I note that NexBank, SSB, as collateral agent and administrative agent, filed a secured Proof of Claim (Claim 1) ("POC") in the Debtor's Chapter 11 case on January 6, 2020. The basis for the POC is allegedly certain Trust Deed Notes in the collective principal amount of $66,000,000, and related Term Loan Agreement and Deed of Trust recorded against the Debtor's real property. NexBank asserts in the POC that it is the beneficiary of the Term Loan Agreement and other Loan Documents.

As you know from prior conversations, the Debtor asserts that pursuant to NRS § 106.240 it is conclusively presumed that the debts under the Term Loan Agreement, Trust Deed Notes and Deed of Trust were regularly satisfied and discharged ten (10) years after the Loans became wholly due on December 1, 2008.

Based on the foregoing, NexBank had an obligation under NRS § 107.077 to instruct the trustee under the Deed of Trust to reconvey the Deed of Trust within 21 calendar days from when the debt was "otherwise satisfied or discharged." To date, NexBank has not complied with the requirements of NRS § 107.077. Accordingly, please accept this letter as a formal demand by the Debtor for NexBank to take the necessary steps under NRS § 107.077 to release and reconvey the Deed of Trust currently recorded against the Debtor's real property, as said Deed of Trust is clouding title to the real property.

Thank you. If you have any questions or concerns, please do not hesitate to contact me.

Very truly yours,

STEPHEN R. HARRIS, ESQ.

cc:  Michael Lehners, Esq. (via email)